## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | | |
|---|---|---|
| In re: | ) | Misc. No. 10-06502-JEM |
| | ) | |
| MINOR FAMILY HOTELS, LLC, | ) | Related Chapter 11 Case: |
| | ) | Bankr. W.D. Va. No. 10-62543-WEA |
| Debtor. | ) | |
| | ) | |
| | ) | |
| SPECIALTY FINANCE GROUP LLC, | ) | (Removed from |
| | ) | State Court of Fulton County |
| Plaintiff, | ) | Case No. 2009EV006754F) |
| | ) | |
| v. | ) | |
| | ) | |
| MINOR FAMILY HOTELS, LLC and | ) | |
| HALSEY MINOR, | ) | |
| | ) | |
| Defendants. | ) | |

## SPECIALTY FINANCE GROUP LLC'S EMERGENCY MOTION
## TO REMAND AND INCORPORATED MEMORANDUM OF LAW

Plaintiff Specialty Finance Group LLC ("SFG") hereby files its Emergency Motion to

Remand and Incorporated Memorandum of Law ("Motion"), respectfully showing this Court as

follows.[1]

---

[1] SFG understands that Debtor recently filed a Motion for Inter-District Transfer ("Transfer Motion") on September 4, 2010. [Doc. 2.] SFG's Remand Motion should be decided before Debtor's Transfer Motion, as SFG's Motion poses a threshold jurisdictional issue. See, e.g., Rayonier Wood Prods., LLC v. ScanWare, Inc. (In re ScanWare, Inc.), 411 B.R. 889, 898 (Bankr. S.D. Ga. 2009) (motion to remand should be decided before motion to transfer). If SFG's Remand Motion is granted, Debtor's Transfer Motion will be moot. If SFG's Motion is not granted, SFG anticipates responding to Debtor's Transfer Motion within the timeframe provided under the applicable rules.

## I.  PRELIMINARY STATEMENT

This action should be remanded to the Georgia state court, where it is on the verge of finally being resolved, because the primary relevant factors under 28 U.S.C. § 1452(b) dictate remand, including the following: (1) the extensive proceedings to date in the Georgia state court, (2) the fact that Georgia state law controls the parties' claims, (3) the interests of comity and judicial economy in allowing the Georgia state court to resolve this action, as opposed to having a new court expend judicial resources in connection with getting up to speed in this action, (4) the avoidance of duplicative efforts by the parties, and (5) MFH and Mr. Minor's improper forum shopping.

First, there have been extensive proceedings to date in the Georgia state court.  During the past **year and a half** since this action's inception, the parties have exchanged hundreds of written discovery requests, produced and reviewed hundreds of thousands of documents and taken more than thirty-five (35) depositions.  Fact discovery has been completed and expert discovery is nearing completion.  The parties have filed motions and cross-motions for summary judgment, and the Georgia state court has scheduled oral argument on the pending motions for summary judgment to take place in less than six weeks, on **October 20-21, 2010**.  To the extent this action is not fully resolved at summary judgment, the Georgia state court has specially set this case for a three-week trial beginning in less than two months, on **November 1, 2010**.

Second, state law controls the parties' claims.  This dispute arises from a $23.69 million loan made by SFG to MFH and guaranteed by Mr. Minor.  The loan documents provide that Georgia law governs the claims between the parties, and further provide that MFH and Minor consented to the

jurisdiction of Georgia courts in connection with same.  SFG's claims, as well as MFH and Minor's counterclaims, are all state law claims governed by Georgia law.

Third, the interests of comity and judicial economy likewise dictate that this action should be remanded to the Georgia state court.  The Georgia state court has invested an incredible amount of judicial resources familiarizing itself with the relevant factual and legal issues in connection with managing this action and moving it toward a fair and prompt resolution.  During the past year and a half, the Georgia state court has ruled on approximately ten (10) separate discovery motions, held four (4) separate status conferences/hearings, and entered three (3) detailed case management orders in connection with ensuring the orderly administration and resolution of this action.  Judicial resources should not be unnecessarily expended educating a new court on all of these matters.

Fourth, remanding this case not only will conserve valuable judicial resources, but also will help avoid duplication of effort by the parties.  To date, SFG has spent almost **$3 million** in attorneys' fees and expenses in connection with litigating this action, primarily responding to MFH and Minor's efforts to expand and delay it.  A significant portion of these fees and expenses have been incurred in connection with educating the Georgia state court with regard to the various factual and legal issues relating to this dispute.  SFG should not be forced to duplicate these efforts in connection with bringing a new court up to speed, especially when it is so close to having this matter resolved by the Georgia state court.

Finally, this case should be remanded because it is a clear case of forum shopping by Minor and MFH.  While MFH and Minor have previously attempted to prevent this action from being

litigated in the Georgia state court (through a meritless motion to stay and similarly baseless motion

to dismiss), MFH's most recent tactic -- to declare bankruptcy on the eve of the trial in this action,

improperly remove it to federal court, and then seek to have it transferred to Virginia -- is

particularly egregious.  MFH's eleventh-hour removal is a desperate attempt at forum shopping and

a last-ditch effort to thwart SFG's ongoing attempts to finally conclude this matter.  This is further

confirmed by the timing of MFH's bankruptcy filing, as there has been no recent change in MFH's

financial condition that would warrant a bankruptcy filing at this time.  Accordingly, it should be

rejected.

For all of the above reasons, and as set forth in more detail below, this Court should remand

this case to the Georgia state court.

## II.  FACTUAL BACKGROUND

### A.      MFH Obtains a Loan From SFG and Then Defaults.

More than two and a half years ago, in March of 2008, SFG loaned MFH $23.69 million to

build a hotel.[2]  Contemporaneously therewith, in a separate agreement, Minor guaranteed the loan.

[Doc. 3-5.]  The documents evidencing the loan, as well as the guaranty, provide that Georgia

substantive law governs claims arising from the loan or guaranty.  [Doc. 3-3 (§XI); Doc. 3-4 (§8.18);

Doc. 3-5 (§23).]  The loan documents and guaranty also provide that MFH and Minor consent to the

---

[2] The loan was evidenced by a loan agreement and promissory note, copies of which are attached to
SFG's Complaint in the underlying Georgia lawsuit.  [Doc. 3-4; 3-3.]

jurisdiction of Georgia courts in connection with any such dispute.  [Doc. 3-4 (§8.19); Doc. 3-5 (§24).]

The hotel was to be completed no later than March 7, 2009.  [Doc. 3-4 (§1.05).]  Payments of principal to SFG under the loan were to begin on April 1, 2010.  [Doc. 3-3 (§I.C.); Doc. 3-4 (§3.30)].

Several months after the loan closed, MFH defaulted.  Specifically, MFH had mismanaged the project so poorly that it had become significantly over-budget.  Under the loan documents, an over-budget project constitutes an event of default.  [Doc. 3-4 (§ 3.25).]  Not only did MFH cause the project to become over-budget, MFH actively attempted to conceal this fact from SFG, as confirmed by documentary evidence and witness testimony obtained by SFG through discovery in this matter.

Based on the fact that the project was over-budget, as well as various other defaults, SFG accelerated all amounts due under the loan and guaranty (approximately $10.5 million), and subsequently initiated an action against MFH and Minor in February of 2009 in the State Court of Fulton County, State of Georgia.  [Doc. 3-1.]  This action consists of a claim by SFG against MFH based on MFH's breach of the loan agreement.  Id.  It also includes a separate claim by SFG against Minor under the guaranty.  Id.  Both of SFG's claims are state law claims, as they arise under and are governed by Georgia law.  MFH and Minor subsequently asserted counterclaims against SFG in this action.  [Doc. 3-33.]  While meritless, these claims also are state law claims that are governed by Georgia law.  Id.

**B.      The Georgia State Court and SFG Have Expended a Significant Amount of Time and Resources During the Past Year and a Half Bringing This Action to a Final Resolution.**

During the past year and a half, the parties have litigated their state law claims extensively in this action, and are only weeks away from having their claims resolved either through summary judgment or trial.

Extensive fact discovery has been completed.  During the fact discovery period, the parties exchanged hundreds of interrogatories, requests for admission, and requests for production of documents.  In response to the voluminous requests for production of documents, hundreds of thousands of electronic and paper documents have been produced and reviewed.  The parties also have taken more than thirty-five (35) depositions of party and non-party witnesses around the country.  Expert discovery has commenced and concludes in less than thirty (30) days.[3]

Both sides already have filed motions and cross-motions for summary judgment, which collectively encompass **all** of the parties claims against one another.  Supplemental briefing on these pending summary judgment motions is scheduled to be completed by October 12, 2010.  See Ex. 1 at 71.  Indeed, the Georgia state court has scheduled oral argument on these pending dispositive motions in a little over a month, on **October 20-21, 2010**.  Id. at 72.  The Georgia state court indicated that it would hear any Daubert motions at that time as well. Id. at 71-72.  To the extent this action is not fully resolved at the summary judgment hearing on October 20-21, the Georgia state court also has specially set this case for trial beginning on **November 1, 2010**.  Id. at 72-73.

---

[3] See Transcript of June 8, 2010 Hearing in this case at 71, attached hereto as Exhibit "1."

Moreover, now that fact discovery has concluded and expert discovery is on the verge on concluding, the Georgia state court recently ordered the parties to mediate this case by September 30, 2010. [Doc. 3-36.] Per the Georgia state court's order, the parties have scheduled mediation for September 29-30.

Not only is this litigation in its final stages (indeed, a case cannot be much closer to conclusion), the Georgia state court has invested an incredible amount of judicial resources familiarizing itself with the relevant factual and legal issues in connection with managing this litigation and moving it toward a fair and prompt resolution. In fact, unlike many cases, where a court does not become acquainted with the claims and parties until the dispositive motion stage or trial, the Georgia state court has been involved with this case since its inception. For example, shortly after this case was instituted, MFH and Minor moved to dismiss this action, or, in the alternative, to stay it in favor of the Virginia action they filed against their developer/agent, in which they subsequently added SFG as a party.[4] In connection with denying MFH and Minor's meritless motions to stay and dismiss, the Georgia state court was required to familiarize itself with the factual and legal issues in connection with evaluating the relevant equitable factors to be considered in

---

[4] MFH and Minor give the misimpression in their Notice of Removal [Doc. 1] that the Virginia action they filed against their developer/agent was the "first-filed action" vis-à-vis SFG. However, at the time SFG filed this action against MFH and Minor, MFH and Minor had not filed any claims against SFG in Virginia or elsewhere. Indeed, SFG did not even become a party to the Virginia action until nearly a month after SFG filed this action against MFH and Minor. Accordingly, it is this action, not the Virginia action, that was first-filed between MFH, Minor and SFG.

reaching its determination.  In doing so, the Court held that the various equitable factors favored

resolution of the dispute between MFH, Minor and SFG in Georgia.[5]

Shortly thereafter, in July of 2009, the Georgia state court considered the first of many

discovery related motions, which necessitated a ruling on the overall scope of discovery.  Again, in

connection with resolving numerous discovery disputes throughout the second half of 2009 and the

better part of 2010, the Georgia state court had to gain an understanding of the factual and legal

claims and defenses of the respective parties for purposes of determining whether a particular

category of documents should be produced and/or whether a particular witness should be made

available for deposition.[6]   During the past year and a half, the Georgia state court ruled on

approximately ten (10) separate discovery motions.  Indeed, at the request of the parties, the Georgia

state court ordered the parties' respective 30(b)(6) corporate depositions to be conducted at the

courthouse, in close proximity to the judge's chambers, so that the Georgia state court could be

readily available to address objections on sensitive areas of inquiry, such as those related to the

assertion of the attorney-client privilege.

In addition to addressing the various discovery-related and other motions, the Georgia state

court held numerous status conferences, which involved entering case management orders and

---

[5] See Transcript of April 8, 2009 Hearing in the Georgia Action at 56-57, attached hereto as Exhibit "2."
[6] See Exs. 2 and 3; see also Transcripts of March 19, 2010 and July 29, 2010 Hearings in this action,
attached hereto as Exhibits "3" and "4," respectively.

setting forth various case deadlines to ensure the prompt and orderly administration of this action.[7]

To date, the Georgia state court has entered three separate case management orders in this action.[8]

All of the above efforts of the Georgia state court, as well as by SFG (which has incurred approximately **$3 million** in attorneys' fees in litigating this action), have led the parties to the final stages of the action before the Georgia state court.

## C.    Recognizing That Resolution of This Action Was Imminent, MFH and Minor Engage in an Eleventh-Hour Attempt to Avoid Resolution by the Georgia State Court.

MFH and Minor have been trying to frustrate the Georgia state court's adjudication of this matter since its filing in February 2009.  As noted above, following SFG's initiation of this action, MFH and Minor added SFG to a lawsuit that MFH and Minor filed in Virginia against their developer/agent, Hotel Charlottesville.  Shortly thereafter, MFH and Minor moved to have this action dismissed or stayed based upon their contention that the Virginia action was "first-filed."  The Georgia state court disagreed, finding that this action should proceed in Georgia and further indicating its intent to move forward with adjudication of this action on an "expedited" basis.  See Ex. 3 at 57 (where Georgia state court stated that it "is prepared to handle this matter on an expedited basis").

Despite the Georgia state court's efforts to move this action forward, MFH and Minor repeatedly expanded the scope of this action by conducting sweeping and far-reaching discovery.

---

[7] See Exs. 1, 2, 3 and 4.
[8] See Stipulated Case Management Order, attached hereto as Exhibit "5;" Second Stipulated Case Management Order [Doc. 3-35]; and Ex. 1.

Indeed, Minor's efforts were so overbroad, the Georgia state court ordered MFH and Minor to reimburse SFG for more than $100,000 in costs related to electronic discovery.  See April 20, 2010 Order from Georgia state court, attached hereto as Exhibit "6."

Notwithstanding Minor's initial forum shopping and delay tactics, Minor and MFH understood that SFG ultimately would have its day in court.  Indeed, at the most recent status conference before the Georgia state court, the court indicated that it was not inclined to further delay the summary judgment hearing or trial dates.  Recognizing that judgment day was near, MFH and Minor embarked upon their latest forum shopping and delay strategy -- have MFH file for bankruptcy, remove this action to federal court under the bankruptcy code, and then attempt to have it transferred to federal bankruptcy court in Virginia.  Through this scheme, MFH and Minor are simply trying to avoid the prompt adjudication of this action before the Georgia state court, something they were unsuccessful in doing at the inception of this action.

The timing of MFH's bankruptcy filing confirms the motive behind MFH and Minor's latest forum shopping scheme.  Notably, nothing has changed with respect to MFH's financial condition recently that would cause it to have to seek bankruptcy protection now.  The hotel project has been stagnant for more than eighteen (18) months.  SFG has not sought to foreclose on the property. MFH has no other business purpose other than the development of the hotel, as it is a single-purpose entity, designed solely for this undertaking.  It generates no revenue and has no ongoing business operations.  In fact, the only change to MFH's financial condition has been recently obtaining an

arbitration award against its developer/agent, Hotel Charlottesville.  However, this award would be

an **asset**, rather than a liability, and therefore would weigh against the filing of bankruptcy.

The only relevant new developments relate to the trial dates of the Georgia and Virginia

actions.  The court in the Virginia action recently indicated a few weeks ago for the first time that

the trial of that case would not take place until February of **2012**.  Recently, the Georgia state court

indicated that it would keep the trial date in this action on November 1, 2010.  Desperate to avoid a

prompt resolution of this matter before the Georgia state court, MFH and Minor engaged in the

aforementioned forum shopping scheme.

### III.  ARGUMENT AND CITATION OF AUTHORITY

**A.**     **All** of the Primary Equitable Factors Under Sections 1334 and 1452 Support
         **Abstention and Remand.**

Under Section 1452(b), this Court may remand this case based on "**any** equitable ground" it

deems appropriate.  28 U.S.C. § 1452(b) (emphasis added).[9]  The primary factors courts consider in

connection with determining whether to remand a case are: (1) the extent of proceedings in the

underlying state court action; (2) whether state law controls the parties' claims; (3) the interest of

comity and judicial economy in connection with allowing the state court to resolve the action; (4) the

---

[9] Similarly, under Section 1334(c)(1), this Court may abstain from hearing a matter arising under, arising
in, or related to a bankruptcy case when it is "in the interest of justice, or in the interest of comity with State
courts or respect for State law."  The relevant factors under these two statutes are similar, if not identical.
See, e.g., Rayonier Wood Prods., LLC v. ScanWare, Inc. (In re ScanWare, Inc.), 411 B.R. 889, 897 (Bankr.
S.D. Ga. 2009) ("Discretionary abstention and equitable remand are 'kindred statutes.'  Both favor 'comity
and the resolution of state law questions by state courts.'"); Borne v. New Orleans Health Care, Inc., 116 B.R.
487, 494 (E.D. La 1990) ("[T]he considerations underlying discretionary abstention and remand are the
same").

avoidance of duplicative efforts by the parties; and (5) whether the parties have engaged in forum

shopping.  <u>See. e.g.</u>, <u>Puritan Lace, Co. v. Perfect Home, LLC (In re Perfect Home, LLC)</u>, 231 B.R.

358, 363 (Bankr. N.D. Ala. 1999) (finding that remand was proper based on, *inter alia*, the fact that

"the state court judge is intimately aware of the issues involved in this proceeding and is better

equipped to handle this case with judicial efficiency"); <u>Cook v. Griffin</u>, 102 B.R. 875, 877 (N.D. Ga.

1989) ("where the dispute involves purely state law concerns . . . the court will let the state court

interpret state law"); <u>Rayonier Wood Prods., LLC v. ScanWare, Inc. (In re ScanWare, Inc.)</u>, 411

B.R. 889, 898 (Bankr. S.D. Ga. 2009) ("comity and respect for state jurisdiction are compelling

considerations" in finding that abstention and remand are proper); <u>In re Norrell</u>, 198 B.R. 987, 998

(Bankr. N.D. Ala 1996) ("judicial economy will be served if all issues . . . were tried in the state

court, which is currently in the best posture to provide a prompt resolution of these issues"); <u>Puritan

Lace</u>, 231 B.R. at 362 (exercising discretionary abstention based on, among other considerations,

that the debtor's removal was "clearly a case of forum shopping").  In this case, each and every one

of these factors weighs heavily in favor of remand.

      1.    <u>There Have Been Extensive Proceedings To Date in This Action.</u>

The vast majority of cases considering remand and abstention issues under Sections

1334(c)(1) and 1452(b) have involved cases that were promptly removed before the state court had

devoted substantial efforts on readying the matter for trial.  Where, as here, there has been

substantial investment of time by the state court, the reported decisions uniformly favor abstention

and remand.  <u>See, e.g.</u>, <u>Massey Energy Co. v. West Virginia Consumers for Justice</u>, 351 B.R. 348,

353-54 (E.D. Va. 2006) (ordering permissive abstention and remand in case involving solely state law issues that had been pending in state court for 15 months before removal and which state court had actively managed to get it ready for trial, including ruling on "numerous discovery motions from both parties," and had set a final trial date for which "no further continuances would be granted"); In re Siragusa, 27 F.3d 406, 409 (9th Cir.1994) (affirming permissive abstention in case where belated bankruptcy action represented "an attempt at 'an end run over the state court jurisdiction,' which was tantamount to a finding that the proceeding in bankruptcy court involved forum-shopping"); In re Shop & Go, Inc., 124 B.R. 915, 917-18 (Bankr. M.D. Fla. 1991) (finding permissive abstention and remand appropriate when the "[t]he state court ha[d] made substantial progress in determining the issues involved" and "discovery is largely completed so that the matter can be set for trial promptly in state court"); Puritan Lace, 231 B.R. at 363 (finding that remand was proper based on, among other considerations, the fact that "the state court judge is intimately aware of the issues involved in this proceeding and is better equipped to handle this case with judicial efficiency," and also finding that the debtor's removal of the state court action just months before trial demonstrated an obvious attempt to "delay and miss" its trial date)

In Allen County Bank & Trust Co. v. Valvmatic Intern. Corp., 51 B.R. 578, 582-83 (D. Ind. 1985), the court was faced with a similar eleventh-hour bankruptcy filing and removal of a state law case from state court on the eve of trial. The Allen court determined that "general comity considerations weigh in favor of remand or permissive abstention" and that "[t]here are no reasons evident to this court why this state law action, the resolution of which involves no issues of

bankruptcy law, is not better adjudicated in the more appropriate forum: the state court in which it

was initially filed." Id.  In making its ruling, the Allen court made the following observations:

> The state court in this action can timely adjudicate this action. . . . **The case was ready for trial before a court already familiar with the case and the legal issues presented, legal issues wholly involving state law.** The action, presumably, can be promptly tried upon remand as all the preparation appears done. **To retain this matter would cause duplicative and uneconomical use of scarce judicial resources.** The state court has expertise in the resolution of this type of case, presenting state law questions and is better able to adjudicate this action. . . . . **[D]elay is sure to occur as another court must familiarize itself with the case and find time in its schedule to try the case**. **The bankruptcy estate's administration will be helped by a speedy adjudication in state court. It will not hinder the estate that the action will be decided in state court; what will appear to hinder the administration is further delay or a less than certain reading of the controlling state law.** It appears a more consistent result, resolving state law issues, would obtain in state court where the matter had been for almost two years prior to the filing of the removal petition.

Id. at 582 (emphasis added).

The facts of the instant case are virtually identical to the facts in Allen.  As in Allen, this case

was pending in the trial court for more than a year and a half, with extensive discovery and motion

practice.  As in Allen, the Georgia state court is already familiar with the legal issues presented in

this case.  As in Allen, this action is governed by state law, instead of federal law.  As in Allen,

MFH improperly removed this case only weeks before the scheduled trial date.  Finally, as in Allen,

if not remanded, another court will expend scarce judicial resources and duplicate the Georgia state

court's efforts in getting up to speed, which will inevitably create delay and prejudice SFG.  Thus, as

in Allen, this Court should abstain from exercising jurisdiction and remand this action.

2.      <u>State Law Controls the Parties' Claims.</u>

Courts also routinely remand actions that have been removed to bankruptcy courts where the underlying action involves state law claims.  <u>See, e.g.</u>, <u>Cook</u>, 102 B.R. at 877 ("where the dispute involves purely state law concerns . . . the court will let the state court interpret state law").  Indeed, under similar circumstances, the Bankruptcy Court for the Southern District of Georgia *sua sponte* found that remand was necessary under Section 1334(c)(1) because the underlying complaint merely stated a state law cause of action arising from a default on a promissory note.  <u>See</u> <u>Chapter 11 Bankruptcy Estates of Durango Ga. Paper Co. v. North River, LLC, (Durango Ga. Paper Co.)</u>, 2009 Bankr. LEXIS 4243 (Bankr. S.D. Ga. May 8, 2009).  In so holding, the court reasoned that the "state court system has clear jurisdiction and adjudication in the state court system would bring finality . . . [and] is best suited to adjudicate this matter to a prompt final adjudication."  <u>Id.</u> at *5.

Here, there is no question that state law controls the parties' claims.  This dispute arises from a $23.69 million loan made by SFG to MFH and guaranteed by Mr. Minor.  The loan documents provide that Georgia law governs the claims between the parties.  Indeed, SFG's claims, as well as MFH and Minor's counterclaims currently pending in this action, are state law claims governed by Georgia law.  Given that all of the claims involved in this action are state law claims, and given that MFH and Minor consented to the adjudication of such claims in Georgia, the Georgia state court is the proper forum for adjudication this proceeding and the Georgia state court is best suited to deal with these issues.  <u>Allen</u>, 51 B.R. at 582; <u>Rayonier Wood</u>, 411 B.R. at 898.

15

3.    <u>The Interests of Comity and Judicial Economy Are Best Served By Allowing the
Georgia State Court to Resolve This Action.</u>

Comity and judicial economy interests likewise dictate that this action should be remanded to

the Georgia state court.  <u>See, e.g.</u>, <u>Cook</u>, 102 B.R. at 877 ("Section 1334(c) expresses a strong

congressional desire that in . . . non-core proceedings the federal courts should not rush to usurp the

traditional precincts of the state courts"); <u>Puritan Lace,</u> , 231 B.R. at 363 (finding that remand was

proper based on, among other considerations, the fact that "the state court judge is intimately aware

of the issues involved in this proceeding and is better equipped to handle this case with judicial

efficiency"); <u>Allen,</u> 51 B.R. at 582-83 (remanding case and finding that retaining case would have

caused "duplicative and uneconomical use of scarce judicial resources").

As discussed above, the Georgia state court has invested an incredible amount of judicial

resources familiarizing itself with the relevant factual and legal issues in connection with managing

this action and moving it toward a fair and prompt resolution.  During the past year and a half, the

Georgia state court has ruled on approximately ten (10) separate discovery motions, has held four (4)

separate status conferences/hearings, and has entered three (3) separate case management orders in

connection with ensuring the orderly administration and resolution of this action.  Judicial resources

should not be unnecessarily expended educating a new court on all of these matters.

Remanding this case to the Georgia state court is the most efficient and prompt way to bring

finality to this matter, especially in light of the eminent summary judgment hearing on October 20-

21, 2010 and the trial on November 1, 2010.  Further, by remanding this case back to the Georgia

state court and resolving it in the next two months, MFH would know its respective rights and

16

obligations to SFG, which would not hinder, but actually **help** facilitate the administration of MFH's bankruptcy case.  See In re Norrell, 198 B.R. 987 (Bankr. N.D. Ala. 1996).  In Norrell, the Court determined that remand to state court would benefit the administration of the debtor's bankruptcy estate because:

> the state court should be in a better position to insure the timely adjudication of the case than this Court, which would basically be forced to start trial preparation from scratch.  Trial of the case in state court, as opposed to the bankruptcy court, will not impede the administration of the debtor's bankruptcy case, but instead, will facilitate the administration of the bankruptcy case.

198 B.R. at 996.

Similarly, in this case, the Georgia state court is in a much better position to adjudicate the proceeding in a timely fashion.  If this case were transferred to the Virginia Bankruptcy Court, that court would be forced to start trial preparation from scratch and would negate the extensive time and effort spent by both the Georgia state court and SFG over the past year and a half in connection with moving this matter toward a resolution.  Thus, this factor also weighs in favor of remand.

4.       Remanding This Action Would Avoid Duplication of Efforts By the Parties.

Remanding this case not only will conserve valuable judicial resources, but also will help avoid duplication of effort by the parties, which is another factor favoring remand.  See, e.g., ADT Sec. Servs., Inc. v. Firstline Sec., Inc., 2008 U.S. Dist. LEXIS 95537 at *4 (D. Colo. Nov. 13, 2008) (finding that a remand would "prevent duplication of the judicial process").  To date, SFG has spent almost **$3 million** in attorneys' fees and expenses in connection with litigating this action, primarily responding to MFH and Minor's efforts to expand and delay it.  A significant portion of these fees

and expenses have been incurred in connection with educating the Georgia state court with regard to

the various factual and legal issues relating to this dispute.  SFG should not be forced to duplicate

these efforts in connection with bringing a new court up to speed, especially when it is so close to

having this matter resolved.  See Puritan Lace, 231 B.R. at 361 (holding that debtor's removal of its

state court action just months before trial demonstrated an obvious attempt to "delay and miss" its

trial date).

In addition to the expenses SFG would incur in connection with bringing a new court up to

speed, SFG would also be prejudiced in that it would cause SFG further delay in connection with

recovering the $10.5 million in loan proceeds it has advanced.  This debt has been due and owing

since February of 2009.

Finally, if this case were transferred to the Virginia Bankruptcy Court, SFG would be forced

to incur additional expense litigating this matter in a foreign state, thus negating a valuable pre-

petition bargained-for right in the loan documents and guaranty, whereby that MFH and Minor

consented to the jurisdiction of the Georgia state court in connection with any disputes with SFG.

5.      MFH and Minor Have Engaged in Improper Forum Shopping.

Finally, this case should be remanded because it is a clear case of forum shopping by Minor

and MFH.  See, e.g., Puritan Lace, 231 B.R. at 362 (exercising discretionary abstention based on,

among other considerations, that the debtor's removal was "clearly a case of forum shopping.").

As noted above, MFH and Minor have been trying to frustrate the Georgia state court's

adjudication of this matter since its filing in February 2009.  First, following SFG's initiation of this

18

action, MFH and Minor added SFG to the Virginia lawsuit against their developer/agent, and then moved to have this action dismissed or stayed, based upon their contention that the Virginia action was "first filed."  After the Georgia state court denied MFH and Minor's motion, and indicated to MFH and Minor that it was moving forward with this case on an expedited basis, MFH and Minor next sought to delay and expand this action by conducting sweeping and far-reaching discovery. These efforts ultimately backfired, as the Georgia state court ordered MFH and Minor to reimburse SFG for more than $100,000 in costs related to electronic discovery.

When the Georgia state court recently indicated that it was not inclined to further delay the summary judgment hearing or trial dates, and after the Virginia court indicated several weeks ago for the first time that the Virginia action would not be tried until 2012, MFH filed for bankruptcy, removed this action to federal court under the bankruptcy code and then sought to have it transferred to federal bankruptcy court in Virginia.  As if the aforementioned stall tactics by MFH and Minor were not enough to confirm their transparent forum shopping scheme, the timing of MFH's bankruptcy filing only further confirms it, especially given that nothing has changed with respect to MFH's financial condition recently that would cause it to have to seek bankruptcy protection now.[10]

Based on all of the above considerations, this Court should remand this action to the Georgia state court pursuant to Section 1452(b).

---

[10] As noted above, the only change to MFH's financial condition has been recently obtaining an arbitration award against its developer/agent, Hotel Charlottesville. However, this award, would be an **asset**, rather than a liability, and therefore would weigh against the filing of bankruptcy.

**B.      This Case is a Non-Core Proceeding Involving Exclusively State Law Claims and Counterclaims That All Accrued Long Before MFH's Bankruptcy Filing.**

In addition to the equitable factors supporting remand, another relevant consideration is that this case is a non-core proceeding (contrary to MFH's repeated contentions in its Notice of Removal).  To determine whether a case qualifies as a "core" proceeding, the Eleventh Circuit has adopted the following test:

> If the proceeding involves a right created by the federal bankruptcy law, it is a core proceeding; for example, an action by the trustee to avoid a preference. If the proceeding is one that would arise only in bankruptcy, it is also a core proceeding; for example, the filing of a proof of claim or an objection to the discharge of a particular debt.  If the proceeding does not invoke a substantive right created by the federal bankruptcy law and is one that could exist outside of bankruptcy it is not a core proceeding; it may be related to the bankruptcy because of its potential effect, but under [28 U.S.C] section 157(c)(1) it is an "otherwise related" or non-core proceeding.

Welt v. MJO Holding Corp. (In re Happy Hocker Pawn Shop, Inc.), 212 Fed. Appx. 811, 816 (11th Cir. 2006) (quoting Wood v. Wood, 825 F.2d 90 (5th Cir. 1987)).

First, this case does not involve any rights created by federal bankruptcy law.  All of the claims and counterclaims are state law causes of action arising from a construction loan made by SFG to MFH.  Every single one of these claims and counterclaims accrued long before the filing of MFH's bankruptcy petition.  Second, the case did not arise out of the bankruptcy.  Again, both the initial claims by SFG and the counterclaims by MFH and Minor were asserted pre-petition and do not arise out of the bankruptcy proceeding.  Third, this case does not invoke a substantive right created by the federal bankruptcy law, and as demonstrated by the case's 19-month history, could and obviously did exist outside of bankruptcy court.

20

Thus, this case clearly does not qualify as a "core" proceeding, but instead simply "relates to" a case under title 11.  See Welt, 212 Fed. Appx. 817; see also Ellenberg v. R.J. Griffin & Co. (In re Midland Mech. Contrs.), 196 B.R. 653, 656 (Bankr. N.D. Ga. 1996) ("As a general rule, state law actions for the breach of a pre-petition contract will not give rise to a core proceeding in bankruptcy"); Johnson v. Engel (In re Johnson), 2005 Bankr. LEXIS 2763 (Bankr. N.D. Ga. Dec. 7, 2005) ("As Plaintiff's lawsuit was filed before the bankruptcy petition was filed, it is not a core proceeding.").

Further, as noted above, this action consists purely of state law claims, and only the form of the proceeding is a bankruptcy law proceeding.  Norrell, 198 B.R. 996.  If MFH is found liable to SFG in the State Court Action, the enforcement of that claim will "remain in the hands of the home bankruptcy court, a result which satisfies the only federal interest in this case." Rayonier, 411 B.R. at 898.  Thus, as with the other factors discussed above, the non-core status of the claims and counterclaims, along with the other equitable factors, weighs heavily in favor of remand.

**C.**     **At the Very Minimum, this Court Should Sever the Claims Against Minor, a Non-Debtor, and Remand Them to the Georgia State Court.**

As set forth above, this Court should remand this action to Georgia state court pursuant to Section 1452(b).  However, in the event that this Court declines to remand as to MFH, it should, at the very minimum, sever and remand SFG's claims against Minor, who did not file bankruptcy. From the outset, it appears that MFH had little in the way of valuable assets to satisfy its financial obligations to SFG under the loan, and that SFG would have to focus its collection efforts on Minor in his capacity as guarantor.  There is ample authority supporting this result.  See, e.g., In re Cometk

Electronics, Inc., 23 B.R. 449, 451 (Bankr. S.D.N.Y. 1982) ("If [Plaintiff] aims to satisfy its claim

on the promissory notes by seeking to enforce Miss Weiss' guarantee, this Court will not prevent

such action against Miss Weiss, a non-debtor, and will permit remand of the action to New York

state court"); Schumacher v. White, 429 B.R. 400, 406 (E.D.N.Y. 2010) ("Merely because White

was guaranteeing a separate contract between plaintiff and a corporation that is now in bankruptcy

does not automatically bring this suit within the jurisdiction of the Bankruptcy Court").

## IV.  CONCLUSION

For all of the foregoing reasons, SFG respectfully requests that this Court GRANT its Motion

and remand this case to the Georgia state court.

Respectfully submitted this 8th day of September, 2010.

**MORRIS, MANNING & MARTIN, LLP**

/s/ Lisa Wolgast
Robert P. Alpert
Georgia Bar No. 013635
Jeffrey K. Douglass
Georgia Bar No. 227523
Lisa Wolgast
Georgia Bar No. 773399

*Attorneys for Specialty Finance Group LLC*

1600 Atlanta Financial Center
3343 Peachtree Road, N.E.
Atlanta, Georgia  30326-1044
(404) 233-7000
(404) 365-9532 (fax)

# EXHIBIT "1"

1

2          IN THE STATE COURT OF FULTON COUNTY

3                STATE OF GEORGIA
   SPECIALTY FINANCE GROUP)
4  ,LLC,            )
         PLAINTIFF,   )
5                )
   VS.           )CIVIL ACTION FILE NO. 09EV006754
6                )
   MINOR FAMILY HOTELS,LLC)
7                )
         DEFENDANTS.  )
8  _____ )

9

10

11

12          EXPEDITE MOTION HEARING

13             – – –

14      BEFORE THE HONORABLE SUSAN FORSLING, JUDGE
   FULTON COUNTY JUSTICE CENTER TOWER - COURTROOM 2F
15      FULTON COUNTY STATE COURT, ATLANTA, GEORGIA
            JUNE 8, 2010

16

17

18

19

20  APPEARANCES OF COUNSEL:

21      FOR THE PLAINTIFF:  BOB ALPERT
            ATTORNEY AT LAW
22      FOR THE DEFENDANT:  BETTY SHUMENER
            ATTORNEYS AT LAW
23  _____
            OCTAVIA L. WINFREY
24        CERTIFIED COURT REPORTER
      FULTON COUNTY JUSTICE CENTER TOWER
25        ATLANTA, GEORGIA  30303
            770-873-5548

1        THE COURT:  ALL RIGHT.  HAVING READ ALL OF THESE

2    FASCINATING PAPERS, IT SEEMS TO ME THAT WHAT THIS BOILS

3    DOWN TO TODAY ARE TWO ISSUES.  ISSUES AS IT RELATES TO

4    THE DEPOSITIONS AND THE 12 -- 30(B)6 ISSUES ON THE

5    DEPOSITIONS AND WHETHER FACT DISCOVERY SHOULD BE

6    EXTENDED, POTENTIALLY SOME ISSUES WITH RESPECT TO RULE 26

7    DISCLOSURES.  HAVE I MISSED ANYTHING?

8        MR. DOUGLASS:  I DON'T THINK SO.

9        THE COURT:  THAT'S KIND WHERE YOU ALL ARE?

10        MR. DOUGLASS:  I THINK YOU'RE RIGHT.

11        THE COURT:  ALL RIGHT.  GOOD.  SO I HAVE READ ALL

12    THIS STUFF.  I HAVE STUFF HIGHLIGHTED. ALL RIGHT.  WHO

13    WANTS TO START AND WHICH ISSUE DO YOU WANT TO START?

14        MR. ALPERT:  MY NAME IS BOB ALPERT.  I'M WITH THE

15    LAW FIRM OF MORRIS MANNING AND MARTIN HERE IN ATLANTA.

16    AND OUR FIRM REPRESENTS THE PLAINTIFF IN THIS MATTER,

17    SPECIALTY FINANCE GROUP, LLC.  SEATED DIRECTLY TO MY

18    RIGHT IS JEFF DOUGLASS OF OUR FIRM AND TO JEFF'S RIGHT IS

19    JONATHAN WALDMAN OF OUR FIRM.

20        THE COURT:  DO YOU WANT TO GO AHEAD AN MAKE

21    INTRODUCTIONS HERE?  DOES THAT HELP YOU?  OKAY.

22        MS. SHUMENER:  BETTY SHUMENER FOR THE DEFENSE .

23        THE COURT:  SHE'S FROM CALIFORNIA.

24        MS. SHUMENER:  YEAH.

25        MR. BRANNAN:  ART BRANNAN ALSO FOR THE DEFENDANT,

1       BOTH OF US ARE WITH DLA PIPER,LLP.

2         THE COURT:  ALL RIGHT.  GO AHEAD.

3         MR. ALPERT:  JUDGE FORSLING, WE ASKED FOR A STATUS

4    CONFERENCE WITH THE COURT TO TRY AND SEE IF THE COURT CAN

5    HELP US REACH AN AGREEMENT WITH RESPECT TO THE COMPLETING

6    FACT DISCOVERY AND, FRANKLY, THE REST OF DISCOVERY AND

7    THE REST OF THE DEADLINES IN THE CASE, BUT THEY'RE ALL TO

8    CERTAIN EXTENT TIED TOGETHER.

9         THE COURT:  AND A TRIAL DATE SET, RIGHT?

10        MR. ALPERT:  YOU'RE EXACTLY RIGHT.  YOU'RE EXACTLY

11   RIGHT.  WE HAD DONE A FAIR BIT OF DISCOVERY IN MARCH AND

12   APRIL AND, UNFORTUNATELY, WE WERE UNABLE TO COMPLETE THAT

13   DISCOVERY.  AND WE WERE UNABLE TO COMPLETE THAT

14   DISCOVERY, YOUR HONOR, PRIMARILY BECAUSE DEFENDANTS AND

15   VARIOUS THIRD PARTIES THAT ARE AFFILIATED OR CONTROLLED

16   BY THE DEFENDANTS REFUSE TO PRODUCE CERTAIN DOCUMENTS.

17   AND THEY REFUSE TO PRODUCE A NUMBER OF DOCUMENTS RELATING

18   TO THE DEFENDANT'S FINANCIAL CONDITION.  AS YOU MAY

19   RECALL, THE DEFENDANT'S FINANCIAL CONDITION IS AN ISSUE.

20   ONE OF THE DEFAULTS THAT SFG HAS IDENTIFIED HAS BEEN A

21   SIGNIFICANT CHANGE IN DEFENDANT'S FINANCIAL CONDITION.

22         IN OPPOSITION TO THAT DEFAULT, DEFENDANT SUBMITTED A

23   TWO-PAGE BALANCE SHEET PURPORTING TO REFLECT A NET WORTH

24   OF $211,000,000. UPON RECEIPT OF THAT, WE IMMEDIATELY

25   SENT THAT DISCOVERY TO THE DEFENDANTS AS WELL AS A NUMBER

3

1       OF OTHER PARTIES IN CONNECTION WITH OBTAINING THE

2       INFORMATION.  THE DEFENDANTS PRODUCED SOME INFORMATION,

3       BUT THE VAST MAJORITY OF THE INFORMATION RELATING TO

4       PRIVATE STOCK PURCHASES, THE DEFENDANT DID NOT PRODUCE.

5       HE DID NOT PRODUCE IT, NOTWITHSTANDING THE FACT THAT HE

6       CONTROLS THE INFORMATION AND HAD AN OBLIGATION UNDER

7       9-11-34 TO PRODUCE IT.  ULTIMATELY, WE TOOK THE

8       DEFENDANT'S DEPOSITION AND WE LEARNED AT THE DEPOSITION

9       SOME INTERESTING THINGS, FIRST OF ALL, THAT HE DIDN'T OWN

10      THE STOCK AT ALL, THAT THE STOCK, NOTWITHSTANDING THE

11      FACT THAT HE REPRESENTED THAT ON HIS BALANCE SHEET, IT

12      TURNS OUT THAT HIS COMPANY, A COMPANY THAT HE HAS

13      IDENTIFIED AS MINOR VENTURES THAT HE, ACCORDING TO HIM,

14      FAIRLY, BOLDLY IN HIS DEPOSITION PROCLAIMED "IT IS ME".

15      I OWN IT.  I CONTROL IT.  ANYTHING THAT HAS MY NAME ON IT

16      IS MINE.  THEY ACTUALLY OWN THE STOCK.  WELL, AS YOU

17      MIGHT IMAGINE --

18          THE COURT:  IS THIS AN LLC OR WHAT IS MINOR.

19          MR. ALPERT:  IT'S AN LLC.  AS YOU MIGHT IMAGINE, THE

20      VALUE OF THE STOCK THAT MR. MINOR IS REFLECTING ON THE

21      BALANCE SHEET AS HIS HAS A DIFFERENT VALUE.  IF IT'S

22      OWNED BY A COMPANY, THEN IT'S SUBJECT TO OTHER FINANCIAL

23      AND LEGAL OBLIGATIONS THAT NEED TO BE SATISFIED BEFORE

24      ANY PROFITS OR TRANSFER TO MR. MINOR.

25          HE PRODUCED NONE OF INFORMATION FOR MINOR VENTURES

4

1     THAT WE ASKED FOR.  HE PRODUCED NONE OF THE INFORMATION

2     REGARDING VARIOUS COMPANIES, PRIVATE COMPANIES HE CLAIMS

3     HE OWNED.  SO, WHEN WE COULDN'T GET IT FROM HIM -- AND

4     THIS IS AFTER WE REACHED AN AGREEMENT WITH DEFENDANT'S

5     COUNSEL AND SAID THEY WERE GOING TO PRODUCE AND FULLY

6     RESPOND TO OUR DISCOVERY, PRIOR TO THE HEARING, THE LAST

7     HEARING WE WERE HERE WHERE YOU ISSUED THE ORDER DIRECTING

8     THEM TO PAY THE DISCOVERY COSTS.  WE'RE NOT GETTING IT

9     FROM THEM.  AND SO ANY DISPARATE ATTEMPT, SINCE THEY'RE

10     NOT COMPLYING WITH THEIR DISCOVERY OBLIGATIONS, WE

11     STARTED TO SEND OUT REQUEST DIRECTLY TO THE THIRD,

12     PARTIES GETTING SUBPOENAS ISSUED IN VIRGINIA AND

13     CALIFORNIA.  ALL THOSE COMPANIES MR. MINOR HAS A

14     CONTINUING RELATIONSHIP WITH.  HE OWNS 100 PERCENT OF

15     MINOR VENTURES, LLC.  HE OR A MEMBER OF MINOR VENTURES,

16     LLC IS A CONTROLLING SHAREHOLDER AND/OR ON THE BOARD OF

17     DIRECTORS OF THOSE COMPANIES.  THOSE COMPANIES WON'T

18     PRODUCE THE INFORMATION TO US.  WE HAVE TO GO THROUGH

19     VARIOUS MOTIONS TO COMPEL AND HARANGUING AND HARANGUING.

20     AND NEEDLESS TO SAY, JUDGE, AS YOU MIGHT EXPECT, WE CAN'T

21     GET THE INFORMATION.  WE CAN'T TAKE THEIR DEPOSITIONS.

22     WE CAN'T HAVE OUR FINANCIAL CONSULTANT REVIEW THE

23     INFORMATION, SO WE CAN'T IDENTIFY AN EXPERT SO, IT

24     BASICALLY HAS SET BACK EVERYTHING.

25        THE COURT:  LET ME JUST STOP YOU THERE.  I ALSO

1     RECOLLECT THAT AT ONE POINT THERE WAS AN ISSUE ABOUT THE

2     ACCOUNTANT AND THE ACCOUNTANT PRIVILEGE.  IS THAT ALL

3     ISSUE WHAT HAS SORT OF INITIAL TO THE FINANCIAL?

4          MR. ALPERT:  YES.

5          THE COURT:  BUT I UNDERSTOOD Y'ALL RESOLVED MOST OF

6     THAT.  AM I RIGHT ON THAT?

7          MR. ALPERT:  I THINK THAT WE DID RESOLVE IT.  AND I

8     THAT WE GOT -- EXCUSE ME.  WE RECEIVED A FAIR BIT OF

9     INFORMATION.  I WOULD DEFER TO MR. DOUGLASS.

10         THE COURT:  ALL RIGHT. BUT THAT'S NOT REALLY --

11    WE'RE TALKING ABOUT SOMETHING ALMOST -- NOT WHERE THE

12    ACCOUNTANTS FORM IN TERMS APPEAL STATEMENTS AND AUDITING

13    AND THAT KIND OF STUFF.  WE'RE REALLY TALKING ABOUT MORE

14    YOU'RE SEEKING INFORMATION IN THE CUSTODY, POSSESSION OR

15    CONTROL OF MR. MINOR AS IT RELATES TO ASSETS AND THINGS

16    THAT WOULD BE PART OF HIS FINANCIAL NETWORK, INCLUDING

17    STOCKS AND INCLUDING OWNERSHIP INTEREST AND ASSETS FOR

18    THESE VARIOUS COMPANIES, INCLUDING THE LLC HE MAY OWN.

19         MR. ALPERT:  EXACTLY.

20         THE COURT:  THAT'S WHAT WE'RE TALKING ABOUT RIGHT

21    NOW.

22         MR. ALPERT:  EXACTLY.  EXACTLY.  WE ASKED FOR IT FOR

23    MR. MINOR.  WE ASKED FOR IT DIRECTLY FROM THE COMPANIES.

24    HE HASN'T GIVEN IT TO US.  AND THEN WE WENT TO THE

25    COMPANIES, THEY HAVE OBJECTED, SO WE BASICALLY HAVE BEEN

1      STONEWALLED AND WE HAVE BEEN THWARTED FROM OBTAINING THE

2      DOCUMENTS AND THE INFORMATION WE NEED TO REVIEW THE

3      FINANCIAL CONSULTANT TO THEN GO GET PREPARED FOR IT AND

4      TAKE SOME DEPOSITIONS AND IDENTIFY WHETHER OR NOT WE EVEN

5      NEED TO DISCLOSE AN EXPERT.

6          THE COURT:  ALL RIGHT.  AND I UNDERSTAND THE CASCADE

7      EFFECT FROM THAT.  AND I'M GOING TO HEAR FROM HER WHAT

8      HER SIDE OF THE STORY IS, BUT IN A NUTSHELL WHAT HAS BEEN

9      THE ARTICULATED REASON FOR NOT PROVIDING THIS

10     INFORMATION?

11         MR. ALPERT:  WELL, THAT'S AN EXCELLENT QUESTION,

12     YOUR HONOR.  I DON'T KNOW WHAT MR. MINOR'S REASON FOR NOT

13     PROVIDING THE INFORMATION IS.  I GUESS MR. MINOR COULD

14     TAKE THE POSITION THAT CERTAIN OF THIS INFORMATION IS NOT

15     WITHIN HIS POSSESSION, CUSTODY OR CONTROL, THAT THE

16     INFORMATION, CERTAINLY IF IT ISN'T IN THE CUSTODY AND

17     CONTROL OF HIS LLC.  HOWEVER, THAT IS A DISTINCTION

18     WITHOUT A DIFFERENCE.  AND THE CASE LAW AND THE STATUTE

19     CLEARLY STATE THAT A FORMAL CORPORATE DISTINCTION SUCH AS

20     THAT WILL NOT TAKE THE DISCOVERY OUTSIDE YOUR CONTROL.

21     HE OWNS 100 PERCENT OF MINOR VENTURES, LLC.  HE'S

22     ENTITLED TO ALL THOSE PROFITS.  HE CONTROLS IT.  HE

23     CONTROLS THE DOCUMENT.

24         THE COURT:  AND DID SFG LOOK AT THIS LLC AND ALL

25     THESE OTHER COMPANIES WHEN THEY DETERMINING WHETHER OR

1        NOT TO LOAN HIM THIS MONEY?

2          MR. ALPERT:  WELL, GOOD QUESTION, YOUR HONOR.

3          THE COURT:  I THINK MAYBE THE QUESTION IS

4     NECESSARILY GOOD TO ANSWER.

5          MR. ALPERT:  YEAH, I MEAN EXCELLENT POINT.  IT'S A

6     COMPANY THAT WAS IDENTIFIED IN BALANCE SHEETS BY

7     MR. MINOR AND IT WAS SPECIFICALLY IDENTIFIED IN THE

8     BALANCE SHEET THAT DEFENDANTS SUBMITTED IN SUPPORT OF

9     THEIR MOTION FOR CROSS SUMMARY JUDGMENT AND IN OPPOSITION

10     TO OUR MOTION FOR SUMMARY JUDGMENT.  SO IT IS RELEVANCE.

11     THERE'S NO QUESTION AS TO THE RELEVANCE.

12          AND I DON'T WANT YOU TO MISS THIS POINT.  IT'S VERY

13     IMPORTANT.  WHEN HE LISTED ON THE BALANCE SHEET, IT SAYS

14     THIS IS MY BALANCE SHEET, MR. MINOR.  WE SIT DOWN AT HIS

15     DEPOSITION AND ONE OF THE FEW QUESTIONS HE DID ANSWER

16     DIRECTLY WAS, ACTUALLY, I DON'T OWN THAT.  THAT IS OWN BY

17     MINOR VENTURES.  SO, ONCE THAT COMES INTO PLAY, THEN THE

18     INFORMATION BECOMES EVEN MORE IMPORTANT TO UNDERSTAND

19     WHAT'S HAPPENING WITH MINOR VENTURES.

20          NOW WE HAVE BEEN ABLE TO GET CERTAIN PIECES OF

21     INFORMATION FROM SOME OF THE COMPANIES.  THERE ARE THREE

22     NAMED COMPANIES THAT PRIVATE STOCK HAS OWNED. THERE'S PAX

23     FIRE (PHONETIC).  THERE'S OPEN D&S.  THERE'S SCOTT LABS.

24     WE HAVE BEEN NEGOTIATING AND GOING BACK AND FORTH WITH

25     THEM.  WE HAVE BEEN ABLE TO GET CERTAIN INFORMATION FROM

8

1    THEM RECENTLY, BUT THE POINT IS WE STILL WEREN'T ABLE TO

2    GET THE INFORMATION IN A TIMELY FASHION.  SO THAT'S ONE

3    BIG CHUNK OF WHAT HAS BEEN GOING ON.

4        AND I WANT YOU TO UNDERSTAND, JUDGE, WHEN WE HAD

5    THESE ISSUES, WE SAT DOWN -- I SHOULD SAY WE WERE ON THE

6    TELEPHONE.  I WAS TRAVELING IN NEW YORK AND JEFF WAS IN

7    ATLANTA AND BETTY -- MS. SHUMENER AND MR. O WERE IN

8    CALIFORNIA.  AND WE HAD A CONFERENCE CALL TO TALK ABOUT

9    ALL THIS.  AND WE SAID, HEY, LISTEN.  WE HAVEN'T GOTTEN

10    THE INFORMATION.  WE'VE GOT -- OBVIOUSLY, WHEN WE DIDN'T

11    GET IT, WE POSTPONED ALL OF THOSE DEPOSITIONS.

12    THE COURT:  RIGHT.

13    MR. ALPERT:  OKAY.  AND WE ALSO POSTPONED THE

14    DEPOSITION OF MINOR'S LAWYER, GARY SHEPHERD -- NOT

15    BECAUSE HE WAS NECESSARILY RELATED TO THE FINANCIAL

16    INFORMATION, BUT WE WERE GOING TO GO OUT TO SAN FRANCISCO

17    TO DO ALL THESE DEPOSITIONS. WE WERE GOING TO TRY AND

18    CONSERVE COSTS.  WHAT WE WANT TO DO IS DO THEM ALL AT THE

19    SAME TIME, SO WE PUT THAT ONE OFF AS WELL.  WE SAT DOWN

20    AND TALKED AMONGST OURSELVES AND WE DISCUSSED IN BROAD

21    BRUSH STROKES GENERALLY AN AGREEMENT SAYING, HEY, WE

22    PROBABLY NEED TO EXTEND FACT DISCOVERY TO GET SOME OF

23    THIS STUFF DONE.  HERE IS WHAT WE NEED TO DO.  AND

24    GENERALLY SPEAKING, WE NEVER REACHED AN AGREEMENT, BUT

25    GENERALLY SPEAKING, COUNSEL FOR DEFENDANTS WAS IN FAVOR

9

1    OF IT.  THEY WERE LIKE, YOU KNOW, WE GOT SOME FACT

2    DISCOVERY WE NEED TO DO AS WELL.  WE WANT TO DO THE

3    PARTICIPATING BANKS.  WE WANT TO FINISH MR. SHEATH.  WE

4    WANT TO GIVE A 30(B)6.  WE WANT TO DO THAT.  AND WE SAID,

5    WELL, LET'S SEE IF WE CAN'T WORK SOMETHING OUT.  AT THE

6    END OF THAT CONVERSATION, COUNSEL FOR DEFENDANT SAID,

7    WELL, UNLESS YOU AGREE TO GIVE US A 30(B)6 DEPOSITION OF

8    SFG ON ALL OF THE ISSUES THAT WE ASKED FOR, WE'RE NOT

9    GOING TO AGREE WITH YOU ON ANYTHING.  SO, THAT'S WHEN IT

10    BECAME APPARENT WE WEREN'T GOING TO BE ABLE TO AGREE AND

11    THAT'S WHEN WE NOTED.  WE SENT IN THE NOTICE TO THE COURT

12    SAYING, HEY, WE THINK WE NEED SOME HELP.

13    THE COURT:  OKAY.

14    MR. ALPERT:  WHAT I FOUND A LITTLE DISINGENUOUS IS

15    FOR COUNSEL FOR DEFENDANTS TO COME UP WITH E-MAILS TO MS.

16    WILLINGHAM SAYING, WHAT ARE YOU TALKING ABOUT FACT

17    DISCOVERY?  FACT DISCOVERY IS CLOSED.  YOU HAVE TO COMPLY

18    WITH THE COURT'S ORDER.  AND I FOUND THAT A LITTLE BIT

19    DISINGENUOUS GIVEN THE CONVERSATIONS THAT WERE GOING ON

20    AND GIVEN THE FACT THAT IT'S CLEAR WE DID EVERYTHING WE

21    COULD.  WHEN WE SAT HERE BEFORE YOUR HONOR, I THINK IT

22    WAS TWO MONTHS AGO -- BUT I THINK WHAT YOUR HONOR SAID AT

23    THAT TIME WAS YOU KNOW WHAT, GUYS, I KNOW YOU GUYS WANT

24    TO MOVE THIS THING ALONG PRETTY FAST. THIS IS A TIGHT

25    SCHEDULE, OKAY.

1        THE COURT:  YEAH, I THOUGHT IT WAS FAIRLY

2    AGGRESSIVE.

3        MR. ALPERT:  IT WAS VERY AGGRESSIVE AND YOU SAID IF

4    YOU NEED TO COME AND YOU NEED SOME MORE TIME, SEE IF YOU

5    CAN WORK IT OUT AMONGST YOURSELVES; IF NOT, COME BACK

6    HERE AND WE'LL FIGURE IT OUT.  WE'RE THE PLAINTIFF AND

7    YOU KNOW --

8        THE COURT:  YOU WANT YOUR TRIAL DATE. I UNDERSTAND.

9        MR. ALPERT:  WE WANT TO GET FORWARD, YOUR HONOR, NO

10    BUT WE CAN'T DO IT WITHOUT THE INFORMATION AND WE REALLY

11    FEEL LIKE -- YOU KNOW, WE REALLY FEEL LIKE WE HAVE BEEN

12    THWARTED HERE.  AND IT'S VERY FRUSTRATING FOR US.  THERE

13    WERE ANOTHER NUMBER OF DISCOVERY ISSUES HERE THAT -- IN

14    CONNECTION WITH COMPLETING DISCOVERY DEPOSITIONS THAT WE

15    WEREN'T ABLE TO COMPLETE.  AND THAT I THINK NEED TO BE

16    ADDRESSED AS WELL, BUT WITH RESPECT TO NOT GETTING THE

17    INFORMATION THAT WE ASKED FOR, I MEAN THAT'S THE RUB OF

18    KIND OF WHAT'S GOING ON.

19        THE COURT:  AND AS A RESULT OF -- THE SCENARIO YOU

20    JUST DESCRIBED, LET ME JUST BE AS NEUTRAL BECAUSE I

21    HAVEN'T HEARD FROM YOU YET.  THE PROBLEM IS ONE, YOU

22    DON'T HAVE YOUR FACT DISCOVERY.  AND AS TRIAL LAWYERS WE

23    ALL KNOW THAT WITHOUT FACT DISCOVERY, EXPERT WITNESS

24    DESIGNATIONS CAN'T HAPPEN AND -- I MEAN, IT CAN --

25    REALLY, EVERYTHING CAN KIND OF COME TO A GRINDING HALT.

11

1    ALL RIGHT.  AND SO, THAT'S WHERE WE'RE.  ALL RIGHT.

2     LET ME ASK YOU ONE OTHER QUESTION BEFORE I TALK TO

3    MS. SHUMENER.  THIS IS ON THE 30(B)6 ISSUE.  I UNDERSTAND

4    WHY IT IS THAT YOU DON'T WANT A WHOLE NEW ROUND.  AND I

5    UNDERSTAND THAT YOU PUT YOUR PEOPLE UP.  BUT ON THE OTHER

6    HAND, THEIR POSITION -- THEY HAVEN'T REALLY SET IT THIS

7    WAY, BUT THEY DON'T WANT TO BE AT TRIAL AND ALL OF A

8    SUDDEN MR. WITNESS SAYS, WELL, YEAH, I'M AN INDIVIDUAL

9    HERE AND I CAN'T FIND A COMPANY.  AND THEY ARGUE TO THE

10    JURY, WELL, THESE ARE GREAT, BUT THESE ARE JUST THEIR OWN

11    FOLKS.  THEY'RE NOT BINDING COMPANY.  IS THERE ANY REASON

12    WHY THERE CAN'T BE A STIPULATION THAT THESE FOLKS SPEAK

13    FOR THE COMPANY AND, THEREFORE, AVOID POTENTIALLY -- AND

14    I WILL HEAR FROM THEM, SOME THIRD ADDITIONAL 30(B)N6.

15    MR. ALPERT:  AGREE.

16    THE COURT:  YOU'RE NOT TRYING TO GO WIGGLE OUT FROM

17    THAT.

18    MR. ALPERT:  NO.

19    THE COURT:  AND THAT'S THE ONLY QUESTION, I HAVE.

20    MR. ALPERT:  NO, NOT AT ALL, YOUR HONOR.

21    THE COURT:  AND AS LONG AS YOU'RE NOT TRYING WIGGLE

22    OUT, WE CAN PROBABLY WORK THROUGH THAT WITHOUT HAVING TO

23    DUPLICATE.  AND I DO UNDERSTAND THAT THERE ARE CERTAIN

24    THAT YOU ARE WILLING TO DESIGNATE BECAUSE THEY HAVEN'T

25    SPOKEN.  BUT, YOU KNOW, THAT'S ALWAYS THE ISSUE.  YOU

1    KNOW THAT.

2       MR. ALPERT:  NO QUESTION, JUDGE.  I AGREE 100

3    PERCENT AND I FEEL CONFIDENT WE CAN WORK THROUGH IT.  MY

4    ONLY -- I THINK WE WOULD NEED TO KIND OF WALK THROUGH IT.

5    AND WE'RE HAPPY TO DO IT BECAUSE WHAT YOU HAVE IS

6    SOMETIMES, YOU HAVE PEOPLE THAT ARE IN THE COMPANY.  THEY

7    GET ASKED A QUESTION AND IT'S OBVIOUSLY A VERY NERVE

8    RACKING EXPERIENCE FOR THEM.  UNDER ROADS, LAWYERS ASKING

9    THEM QUESTIONS.  THEY'RE NERVOUS.  AND THEY ANSWER A

10    QUESTION THAT THEY KNOW NOTHING ABOUT, THAT'S COMPLETELY

11    OUTSIDE THE SCOPE OF WHAT THEY KNOW. BUT IF WE WILL GO

12    THROUGH THIS AND I'M HAPPY TO SIT DOWN AND KIND OF WALK

13    THROUGH IT AND DO IT EXACTLY THE WAY THIS COURT SUGGESTS.

14    I AGREE.

15       THE COURT:  I JUST WANT TO MAKE SURE. A FAIR READ OF

16    THAT WAS, OH, GOSH, THEY'RE TRYING WIGGLE HERE.

17       MR. ALPERT:  YEAH.

18       THE COURT:  SO THEY CAN'T HAVE IT BOTH WAYS.  ALL

19    RIGHT.  I'M COMFORTABLE WITH THAT RESPONSE.  THAT WAS ONE

20    OF MY STICKIES TO MYSELF SAID TO ME.  ALL RIGHT.  NOW LET

21    ME HEAR FROM YOU, MS. SHUMENER. YOU CAME ALL THE WAY FROM

22    CALIFORNIA.

23       MS. SHUMENER:  FIRST, I GUESS I WOULD LIKE TO START

24    OFF WITH I'M NOT AWARE OF ANY DOCUMENTS THAT ARE IN

25    MR. MINOR'S POSSESSION, CUSTODY OR CONTROL THAT WE HAVE

13

1    NOT PRODUCED, OTHER THAN THE ONES THAT ARE PRIVELEDGED.

2    I WILL HAVE TO GO BACK AND CHECK IF THERE ARE ANY SUCH

3    THINGS, BUT IT HAS BEEN MY UNDERSTANDING WE HAVE PRODUCED

4    WELL OVER 20,000 DOCUMENTS, 20,000 PAGES OF DOCUMENTS AND

5    PROBABLY QUIET A BIT MORE THAN THAT REGARDING HIS

6    FINANCIAL CONDITION, OKAY.

7        SO I'M AT A LITTLE BIT OF A LOSS AS TO WHAT THEY'RE

8    TALKING ABOUT TO BE HONEST WITH YOU.

9        THE COURT:  LET ME STOP YOU THERE.  HAVE YOU-ALL

10   TAKEN A POSITION THAT IF IT'S IN THE LLC OR ONE OF THESE

11   THREE COMPANIES THAT IT'S NOT IN HIS POSSESSION, CUSTODY

12   OR CONTROL?  HAVE YOU ALL TAKEN THAT POSITION?

13       MS. SHUMENER:  NOT YET.

14       THE COURT:  YET.  WELL, BEFORE WE GET TO THAT -- NOT

15   YET, BUT HAVE YOU PRODUCED DOCUMENTS OF THOSE COMPANIES

16   YET?

17       MS. SHUMENER:  MY UNDERSTANDING IS -- AND I'M NOT

18   DODGING THIS QUESTION.  MY UNDERSTANDING IS FIRST THAT

19   THE REALM OF DOCUMENTS THAT WE PRODUCED IN THE FINANCIAL

20   RECORDS IT DID HAVE INFORMATION REGARDING THOSE

21   PARTICULAR COMPANIES.  IT WASN'T -- I DON'T KNOW WHAT HIS

22   WEALTH IS OTHER THAN HIS INTEREST IN THOSE COMPANIES.

23   AND WE PRODUCED DOCUMENTS REGARDING EXPENSES OF THE

24   COMPANY, THE INCOMES OF THE COMPANY, THE ASSETS OF THE

25   COMPANY, SO I'M NOT SURE WHAT THEY'RE REFERRING TO, ONE.

14

1        THE COURT:  OKAY.

2        MS. SHUMENER:  NUMBER TWO, THEY HAVE SERVED A

3    SEPARATE SUBPOENA ON MINOR VENTURES.  THEY SERVED THAT

4    SUBPOENA ON APRIL 1.  NOW THEY'RE TRYING TO SET -- AND

5    AGAIN, I'M -- I DON'T KNOW IF MINOR VENTURES HAS

6    DOCUMENTS OVER AND ABOVE WHAT MR. MINOR HAS EVEN PRODUCED

7    ALREADY.

8        THE COURT:  OKAY.  NOW LET ME ASK YOU THIS, SO IF

9    THERE'S A SUBPOENA OUT THERE APRIL 1, HOW COME WE DON'T

10    KNOW ABOUT THOSE DOCUMENTS AND IT'S JUNE 8TH?  I MEAN, IT

11    WOULD HAVE BEEN ANSWERED AND WE WOULD HAVE SAID WE DON'T

12    HAVE DOCUMENTS OR WOULD HAVE ANSWERED SAYING WE DO AND

13    THEY'RE PRIVELEDGED OR IN THE ANSWER SAY, WE GOT SOME

14    THAT ARE PRIVILEGE AND THERE ARE SOME NOT. HOW COME WE

15    DON'T KNOW?

16        MS. SHUMENER:  THERE WAS -- I JUST RECENTLY SAW IT,

17    AS WELL AS MY ASSOCIATES.  I DON'T KNOW THE INTRICACIES

18    OF THAT.  I WOULD HAVE TO COME BACK TO THE COURT ON THAT

19    PARTICULAR ONE.  MY UNDERSTANDING IS THAT WE WERE MEETING

20    AND CONFERRING ON THAT SUBPOENA.  I BELIEVE THAT THE

21    LATEST REALM WAS WE WOULD PRODUCE THINGS SHOWING

22    EVALUATIONS.  WE WENT OUT AND FOUND OUT MINOR VENTURES

23    DIDN'T HAVE DOCUMENTS SHOWING EVALUATIONS OF THE

24    COMPANIES IN WHICH IT HELD STOCK.  AND SO, THAT WAS MY

25    UNDERSTANDING OF WHERE THIS ENDED UP.  THEY HAVE

15

1     SUBPOENAED LINDA ROSSMAN.  WE PRODUCED ALL OF HER

2     DOCUMENTS THAT WE HAD RECEIVED AND THERE WERE THOUSANDS

3     OF THEM.

4        THEY HAVE SUBPOENAED RAY THORNSON AND WE DON'T

5     CONTROL HIM.  THEY GOT THE DOCUMENTS FROM HIM AND WGAS.

6     THEY'RE CLAIMING THEY HAVEN'T GOT ALL OF THE DOCUMENTS,

7     BUT HE WAS ANOTHER PERSON WHO HELPED IN THE PREPARATION

8     OF THE BALANCE SHEET AND KNOWS THE EVALUATION OF THE

9     COMPANIES.  I AM NOT AWARE, FRANKLY, OF DOCUMENTS THAT

10    WE'RE WITHHOLDING SAYING, NO, YOU CAN'T HAVE THESE.

11    OKAY.  THAT'S MY -- I'M REPRESENTING THAT TO THE COURT.

12    I'M NOT PLAYING WORD GAMES.  I'M TELLING YOU FROM WHAT I

13    KNOW -- AND I THOUGHT I DID A PRETTY GOOD JOB OF TALKING

14    TO FOLKS AND ASKING, DID WE PRODUCE THIS?  DID WE PRODUCE

15    THIS?  DID WE PRODUCE THIS?

16       I WILL SAY THAT IN OUR TELEPHONE CONVERSATION --

17    FIRST OF ALL, THEY HAD ASKED TO HAVE A CONVERSATION TO

18    EXTEND THE FACT DISCOVERY CUT OFF DATE THE WEEK OF MAY

19    10TH.  I SAID, SO YOU GOT DEPOSITIONS SCHEDULED EVERY

20    SINGLE DAY.  WHEN ARE WE SUPPOSED TO DO IT?  THEY

21    FINALLY, AFTER CANCELING EACH ONE, DAY AFTER DAY, OKAY,

22    ON THE LAST DEPOSITION, THEY SAID ON THURSDAY, WELL,

23    SINCE WE'RE CANCELING GARY SHEPHERD'S DEPOSITION FRIDAY,

24    WHY DON'T WE TALK ON FRIDAY.  WHAT TIME DO YOU HAVE

25    AVAILABLE?  I SHOT BACK AN E-MAIL IMMEDIATELY SAYING I'M

16

1        AVAILABLE AT 1:00.  LET'S DO IT AT 1:00 OR 1:30,

2        SOMETHING AROUND THAT TIME.  OH, SUDDENLY THEY COULDN'T

3        DO IT.  THEY NEXT DAY I GET A MESSAGE ON FRIDAY, CAN WE

4        DO IT EARLIER?  OKAY.  WELL AT THIS POINT IN TIME I'VE

5        ALREADY GOT CONFERENCE CALLS SCHEDULED.  THEN WE WERE

6        SUPPOSED TO DO IT MONDAY.  WE MADE OURSELVES AVAILABLE

7        MONDAY.  THEY COULDN'T DO IT MONDAY.  SO THEN WE DID THE

8        CALL ON TUESDAY.  WHEN WE DID THE CALL ON TUESDAY, IT WAS

9        MR. ALPERT WHO SAID, WE WOULD LIKE TO EXTEND THE

10        DISCOVERY CUT OFF DATE, BUT WE WOULD LIKE TO KEEP THE

11        EXPERT WITNESSES CHANGED THE SAME DAY AND WE WOULD LIKE

12        TO KEEP THE MOTION FOR SUMMARY JUDGMENT AND THE TRIAL

13        DATE THE SAME DAY.  I SAID, I'M WITH YOU 100 PERCENT ON

14        THE MOTION FOR SUMMARY JUDGMENT AND THE TRIAL DATE.

15        HOWEVER, I SAID IF WE'RE GOING TO CONTINUE WITH FACT

16        DISCOVERY, WHICH COULD IMPACT THE OPINIONS OF THE

17        EXPERTS, WE NEED TO EXTEND THAT CUT OFF DATE AS WELL.

18        AND AFTER FACT DISCOVERY CUT OFF, WE CAN TRUNCATE THE

19        TIME WITHIN WHICH WE TAKE THE EXPERTS' DEPOSITIONS SO

20        THAT WE DON'T HAVE TO MOVE THE DATES ON SUMMARY JUDGMENT

21        AND TRIAL.

22            THE COURT:  BUT HADN'T YOU ALREADY DESIGNATED A

23        COUPLE AT THAT POINT?

24            MS. SHUMENER:  NO.

25            THE COURT:  OKAY.

17

1          MS. SHUMENER:  NO, IT HAD NOT BEEN DESIGNATED. THIS

2      IS MAY 17TH AND THE EXPERT DESIGNATIONS WERE DUE I THINK

3      MAY 24TH.

4          THE COURT:  YOU'RE RIGHT.  OKAY.

5          MS. SHUMENER:  OKAY.  SO THEY SAID, FINE.  YOU KNOW

6      WHAT, WE WILL PRESENT YOU WITH A PROPOSED CASE MANAGEMENT

7      ORDER, A NEW SCHEDULING ORDER.  WE'LL GET THAT TO YOU.

8      THEY DIDN'T SAY EXACTLY WHEN, BUT WE'LL GET THAT TO YOU.

9          WE THEN SEND THEM AN E-MAIL SAYING, YOU KNOW,

10      BECAUSE IT'S BULKY.  YOU'VE GOT THESE BIG EXPERT REPORTS

11      WITH ALL OF THEIR EXHIBITS THAT ARE BEING PREPARED AND

12      THEY'RE HUSTLING OUR EXPERTS SAYING, UNTIL WE'VE GOT

13      SOMETHING, YOU GOT TO BE READY.  WE GOT A COURT ORDER IN

14      PLACE.  WE CANNOT DESIGNATE. WE CANNOT PRODUCE THE

15      REPORT.  WE SEND THEM A MESSAGE SAYING WE WOULD LIKE TO

16      DO THE EXCHANGE BY FEDERAL EXPRESS.  I THINK IT WAS A

17      MONDAY -- AND WE'RE SENDING THIS TO THEM, I THINK, ON

18      FRIDAY.  I'M NOT SURE.  THEY SEND BACK, WELL, OKAY.  FED

19      EX IS JUST PEACHY.  FED EX IS FINE.  WE DON'T WANT TO --

20      WE'RE GOING TO RESERVE OUR RIGHTS.  WE'RE NOT GOING TO

21      DESIGNATE ALL OF OUR EXPERTS RIGHT NOW.  WE'RE RESERVING

22      OUR RIGHT TO DESIGNATE SOME OF THEM LATER ON.  OKAY.

23          WE GIVE THEM, PER THE COURT ORDER, WE GOT NO

24      PROPOSED SCHEDULING ORDER FROM THEM.  WE GOT NO

25      EXPLANATION AS TO WHY WE HAVEN'T GOTTEN A PROPOSED

18

1       SCHEDULING ORDER.  WE ARE BOUND BY THE CURRENT ORDER TO

2       EXCHANGE EXPERT WITNESSES.  THEY ENLISTED OURS AND THEN

3       THEY GO AND SAY OH, GEE, WE NOW WANT TO GO SEEK AN

4       EXTENSION OF THE DISCOVERY CUT OFF DATE.  AND THEN THEY

5       SAY, WELL, YOU MISREAD MY "ALL" STATEMENT.  WHEN I SAID

6       THAT WE WEREN'T GOING TO DESIGNATE ALL, I MEANT THAT WE

7       WEREN'T GOING TO DESIGNATE ANY.  WE WERE JUST GOING TO

8       GET YOURS.  AND I THINK -- I HONESTLY BELIEVE THAT WE

9       HAVE BEEN PREJUDICED BY THIS TACTIC.  AND I WILL NOTE

10      WITH RESPECT TO THE DISCOVERY CUT OFF THAT THEY HAVE NOT

11      FILED ONE MOTION TO COMPEL ANY THIRD PARTY TO PRODUCE

12      DOCUMENTS.  THEY HAVE NOT FILED ONE MOTION TO COMPEL.

13      THE MOTIONS THAT THEY FILED EONS AGO ABOUT THE FINANCIAL

14      RECORDS, WE PRODUCED THOSE AND WE RESOLVED THOSE ISSUES.

15      AND I DON'T KNOW IF THEY USE THE MAGIC WORDS THAT WE'RE

16      TAKING THE MOTION OFF THE CALENDAR, BUT THOSE DOCUMENTS

17      HAVE BEEN EXCHANGED.  OKAY.  I DID NOT -- WE MADE OUR

18      WITNESSES AVAILABLE WHENEVER THEY ASKED FOR THEM.  I

19      TRIED TO TURN AROUND PROMPTLY AND MAKE THOSE WITNESSES

20      AVAILABLE.  THERE HAS BEEN -- AND I MAY SAY NOBODY IS

21      SITTING IN A PERFECT POSITION WITH DISCOVERY.  WE HAVE

22      NOT GOTTEN --

23          THE COURT:  I NEVER FOUND A CASE WHERE EVERYBODY

24      HAS.

25          MS. SHUMENER:  THAT'S THE POINT.  AND WE CAN GO ON

19

1     LIKE THIS.

2         THE COURT:  AND THAT'S WHY I'M HERE TO FIGURE OUT

3     HOW DO WE GET OFF THE DIME AND NOT POINT FINGERS AT

4     FOLKS.

5         MS. SHUMENER:  WELL, I'M HAVING A HARD TIME BECAUSE

6     WE'VE BEEN PREJUDICED NOW.

7         THE COURT:  WELL THAT I'M NOT ON LETTER.  WE'LL GET

8     TO THAT POINT -- BUT I MEAN AT THIS POINT, I THINK IT'S

9     TO A CREDIT THAT NOBODY FILED A MOTION TO COMPEL.  I

10     MEAN, THIS BASICALLY IS A MOTION TO COMPEL.  IF YOU

11     REALLY READ THE PAPERS.  THERE'S A LOT OF A ACRIMONY

12     BETWEEN BOTH PARTIES.  AND THE BOTTOM LINE IS HOW DO WE

13     GET OFF THE DIME AND GET PASSED THE ACRIMONY AND HOLD

14     FAST TO OUR TRIAL DATE AND OUR MOTION DATE.  I'M HERE TO

15     TELL YOU GUYS, IF WE DON'T -- I HAVE GIVEN YOU ALL THREE

16     WEEKS.  I'VE NOW SHAVED YOU BY ONE DAY, BUT I HAVE GIVEN

17     YOU ALL ALMOST THREE WEEKS.  I DON'T HAVE ANOTHER THREE

18     WEEKS UNTIL THE BEGINNING OF THE YEAR, SO WE NEED TO PULL

19     TIGHT.  SO MY WHOLE POINT IS THERE'S ENOUGH

20     QUOTE-ON-QUOTE BLAME, MISUNDERSTANDING, LACK OF

21     COMMUNICATION, BAD FAITH ALLEGATIONS ON BOTH SIDES.  I

22     WANT TO MOVE OFF THE DIME.

23         MS. SHUMENER:  CAN I JUST ADDRESS THE 30(B)6

24     DEPOSITIONS AS WELL, PLEASE, IF YOU DON'T MIND?

25         THE COURT:  SURE. NO, I DON'T MIND.

20

1        MS. SHUMENER:  IT IS NOT ADEQUATE TO FOUR OR FIVE

2    INDIVIDUALS --

3        THE REPORTER :  I'M SORRY.  I DIDN'T HEAR YOU.

4        MS. SHUMENER:  FOR THE FIVE INDIVIDUALS THAT WERE

5    DEPOSED.  THIS IS A BANK, BY THE WAY, THAT MADE 1.5

6    BILLION DOLLARS ALONE BEFORE OUR LOAN WAS EVEN MADE.  AND

7    THIS IS NOT WHAT I WOULD CONSIDER A SMALL LITTLE COMPANY,

8    BUT EVEN IT IF IT WERE, THEY WOULD HAVE TO SHOW THAT

9    THERE'S A HUGE PRESUMPTION HERE AND THERE HAS BEEN NO

10    SHOWING ME BY SFG ABOUT IT, THAT THE QUESTIONS I INTEND

11    TO ASK THE 30(B)6 WITNESSES ARE IDENTICAL TO THE

12    QUESTIONS I'VE ASKED.

13        THE COURT:  IT IS OR IS NOT.

14        MS. SHUMENER:  IT IS NOT.

15        THE COURT:  WELL, I HAVEN'T SEEN A SHOWING A BODY OF

16    RESPECT OF ANY DIFFERENCE OF WHAT YOU WANTED.  I HAVEN'T

17    SEEN IT.

18        MS. SHUMENER:  WELL, I DID NOT ASK THEM ANY

19    QUESTIONS THAT I CAN RECALL ABOUT COMPLIANCE WITH THE

20    DEFAULTS ALLEGED IN THE COMPLAINT.  EVERY -- THE LOAN

21    AGREEMENT THAT THEY'RE RELYING ON HAS CERTAIN CONDITIONS

22    PROCEEDING TO THEIR DEFENDING DEFAULT.  I HAVE NOT GONE

23    THROUGH AND ASKED THEM WITH RESPECT TO THE FIVE

24    RECIDIVITY DEFAULTS THAT THEY HAVE ALLEGED IN THE

25    COMPLAINT, WHICH BY THE WAY ARE NOT OVERLY BROAD TOPICS.

21

1      IT'S BUDGET OVERRUNS, THE COMPLETION DATE OF THE PROJECT.

2      THESE ARE WHETHER MR. MINOR GAVE THEM HIS FINANCIAL

3      STATEMENTS IN THE CLAIM, WHETHER HIS FINANCIAL CONDITION

4      DETERIORATED AS OF THE TIME THAT HE DECLARED THE DEFAULT

5      AND THERE'S ONE OTHER -- OH, AND WHETHER WE HAD A RIGHT

6      TO TERMINATE THE DEVELOPER. THESE ARE THE FIVE DEFAULTS.

7        THE COURT:  WELL, RESPECTFULLY, THE 30(B)6 NOTICE

8      THAT I SAW WASN'T SO TAILORED.  IF I SAW A 30(B)6 NOTICE

9      THAT SAYS PUT UP ONE PERSON THAT WILL ADDRESS THE

10     ARTICULATED REASONS FOR DEFAULT BY SFG, I WOULD LOOK AT

11     IT DIFFERENTLY.  WHAT I SAW WAS FIVE OR SIX VERY BROAD

12     TOPICS THAT HAVE BEEN TOUCHED UPON, AS I UNDERSTAND IT,

13     BY THE REPS, BUT IT'S A WHOLE DIFFERENT MATTER, I WOULD

14     THINK YOU WOULD AGREE, MR. ALPERT, TO PUT ONE PERSON UP

15     WHO SAYS HERE ARE OUR FIVE COMPANY REASONS FOR THE

16     DEFAULT.  AND HERE -- HERE'S THE DOCUMENTS AND HERE'S

17     WHAT BACKED IT UP.  HAS ANYBODY TESTIFIED TO THAT YET?

18       MR. ALPERT:  YES AND NO, YOUR HONOR.  LET ME EXPLAIN

19     WHAT I MEAN.  AND I WILL ANSWER YOUR SUGGESTION, YOUR

20     HONOR, BECAUSE I THINK IT MIGHT BE OKAY.  IN CONNECTION

21     WITH DISCOVERY, THEY'RE NOT ONLY DEPOSITIONS, BUT AS YOU

22     KNOW INTERROGATORIES.  AND DEFENDANT SERVED COMPREHENSIVE

23     INTERROGATORIES ON OUR CLIENT.  IN CONNECTION WITH THOSE

24     INTERROGATORIES, THEY ASKED A NUMBER OF INTERROGATORIES

25     ABOUT THE FACTS THAT SUPPORT YOUR DEFAULT, THE FACT THAT

1    SUPPORT THIS CLAIM.  WE ANSWERED THOSE QUESTION UNDER

2    OATH.

3        THE COURT:  OKAY. ONE VERIFICATION?

4        MR. ALPERT:  ONE VERIFICATION BY DILLON PETIGARA

5    (PHONETIC).  THEY HAD IT ALL MONTHS BEFORE THEY TOOK

6    MR. PETIGARA'S DEPOSITION AND THEY MADE THE DECISION NOT

7    TO PUT IT IN FRONT OF HIM AND NOT TO ASK HIM QUESTIONS

8    ABOUT IT.  I MEAN, THIS IS THE CLASSIC SECOND BITE AT THE

9    APPLE.

10       THE COURT:  WELL, I DO THINK THOUGH -- AND THE

11    REASON THAT MAY BE THERE IS AN ISSUE IS THAT I THINK

12    THERE WAS SOME DISCUSSION ABOUT, HEY, LET'S GET THESE

13    DEPOSITIONS AND THEN WE'LL TALK ABOUT 30(B)6 LATER.  THAT

14    COULD BE ONE REASON, RIGHT?

15       MR. ALPERT:  YES.

16       THE COURT:  AND YOU AND I, ALL OF US HAVE TRIED

17    COMPLICATED CASES BEFORE.  AND WE ALL KNOW THAT IT'S

18    REALLY DIFFICULT TO TAKE A STACK OF INTERROGATORIES AND

19    SHOW THEM TO A WITNESS AND HAVE ANY MEANINGFUL

20    PRESENTATION TO A JURY.  AND SO, THE BETTER WAY TO DO

21    IT -- AND, YES, MAYBE I SHOULD FUSS AT YOU AND YOU

22    PERHAPS SHOULD HAVE DONE IT AT THE TIME IT WENT AROUND,

23    BUT IT'S WITHOUT A 30(B)6 DESIGNATION.  AND I CAN

24    UNDERSTAND POTENTIALLY WHY YOU DIDN'T.  I DO THINK IT

25    MIGHT BE REASONABLE IN ORDER TO HAVE AN EFFECTIVE

23

1    PRESENTATION TO THE JURY TO HAVE ONE PERSON DESIGNATED AS

2    THE PERSON IN CHARGE OF ARTICULATING FOR THE COMPANY THE

3    REASONS FOR THE DEFAULT.

4        MR. ALPERT:  AND, JUDGE, IN THE SPIRIT OF COMPROMISE

5    AND WANTING TO, IF I MAY BORROW THE PHRASE, GET OFF THE

6    DIME, I'M HAPPY TO DO IT.

7        THE COURT:  IT'S PROBABLY A NICKEL HERE AT THIS

8    POINT.

9        MS. SHUMENER:  UNTIL LATER IT'S A QUARTER.

10       MR. ALPERT:  I'M HAPPY TO DO IT, BUT THE ONLY THING

11    THAT I WOULD ASK IS THAT WE BE GIVEN THE SAME

12    OPPORTUNITY.

13       THE COURT:  IN WHAT REGARD?

14       MR. ALPERT:  WE WANT TO ASK THE 30(B)6

15    REPRESENTATIVE OF MINOR FAMILY HOTELS THE SAME THING,

16    JUST WALK THROUGH AND ASK THESE S AND NOT GET A RESPONSE

17    OF I'M NOT A LAWYER.  I DON'T KNOW.

18       MS. SHUMENER:  EXCUSE ME, YOUR HONOR.  THEY HAVE

19    NEVER SERVED A 30(B)6 DEPOSITION NOTICE.  NOW WE'RE NOT

20    EXTENDING DISCOVERY.

21       MR. ALPERT:  YES, WE HAVE.

22       MR. DOUGLASS:  WE HAVE.

23       MS. SHUMENER:  WHEN DID YOU SERVE A 30(B)6.

24       MR. ALPERT:  PRIOR TO COMING OUT TO SAN FRANCISCO

25    FOR THE DEPOSITION OF MR. MINOR.

1     MS. SHUMENER:  AND WE REFUSED TO DESIGNATE A

2    WITNESS?

3     MR. ALPERT:  WE NEVER GOT TO IT.

4     THE COURT:  IT ALL JUST PROBABLY GOT CAUGHT UP IN

5    THE SAME 30(B)6 WORLD?

6     MR. ALPERT:  WELL, WHAT HAPPENED IS WE COULDN'T EVEN

7    GET TO IT BEFORE THEY STOPPED THE DEPOSITION.

8     MS. SHUMENER:  WHAT ARE YOU TALKING ABOUT?  YOU

9    DEPOSED MR. MINOR FOR TWO SOLID DAYS.  YOU NEVER

10    MENTIONED ANYTHING ABOUT A 30(B)6.

11     THE COURT:  HE WASN'T DESIGNATED.

12     MR. ALPERT:  HE WASN'T DESIGNATED AND WE NEVER GOT

13    THERE.

14     MS. SHUMENER:  WELL, WE NEVER EVEN DISCUSSED THE

15    30(B)6 DEPOSITION.

16     MR. ALPERT:  WE SENT YOU THE NOTICE.

17     THE COURT:  THAT'S THE POINT.  THAT'S THE POINT.  WE

18    HAVEN'T DISCUSSED IT.  YOU ALL HAVEN'T DISCUSSED IT AND

19    IT NEEDS TO BE DISCUSSED.  CAN YOU -- ANY CHANCE YOU CAN

20    CALL UP WHEN IT WAS, APPROXIMATELY, THAT WAS FILED, THE

21    30(B)6, JUST TO SETTLE THIS ISSUE.

22     MR. ALPERT:  JONATHAN, CAN YOU GO OUTSIDE THE

23    COURTROOM PLEASE AND JUST GIVE A CALL AND TRACK THAT DOWN

24    WITH THERESA?

25     THE COURT:  THE 30(B)6 THAT WOULD HAVE PRIOR TO THE

1    END OF FACT DISCOVERY FOR THE MINOR FAMILY HOTELS

2    30(B)6 -- OR CAROL MAY HAVE IT ON THE DOCKET.  WAS IT

3    FILED WITH US.

4      MR. DOUGLASS:  I'M SURE IT WAS NOT.

5      THE COURT:  IT WAS NOT.  ALL RIGHT.  WELL WITHOUT

6    FINGER POINTING, NAME CALLING, IT SEEMS TO ME THE BEST

7    WAY TO MOVE OFF THE NICKEL, DIME, PENNY, THE MARK AND

8    MOVE THE 30(B)6'S, IF YOU HAVE ALREADY SERVED ONE IS A

9    GOOSE-GANDER RULE, ONE EACH.  WE CAN LIMIT IT BY TIME.

10    WE CAN UNDERSTAND THAT WE ARE NOT GOING TO SPEND EIGHT,

11    TEN HOURS AGAIN.  WE'RE NOT GOING PLOW OVER OLD GROUND.

12    WE ALL HAVE EACH SIDE TRADE TOPICS.  YOURS WILL BE

13    WHATEVER, YOU KNOW, I WANT TO KNOW THE SIX REASONS FOR

14    DEFAULT AND WHATEVER THEY ARE.

15      MS. SHUMENER:  I ALSO WANT THE DOCUMENT RETENTION.

16      THE COURT:  WHATEVER.  THEY NEVER FOUGHT OVER THAT.

17    AND THAT WOULD NOT BE A SLICE AT THIS.  THEY AGREED TO

18    THAT.  AS I UNDERSTAND YOUR PAPERS, YOU HAVE ALWAYS

19    AGREED TO THAT.

20      MR. ALPERT:  YES, YOUR HONOR.

21      THE COURT:  SO THAT'S A GIVEN.  AND THEN THE MOVE,

22    THE 30(B)6 WOULD BE EACH OF YOU HAVE ONE.  YOU IDENTIFY

23    YOUR TOPICS.  IF YOU FUSS OVER YOUR TOPICS AND YOU CAN'T

24    AGREE ON YOUR TOPICS, YOU LET ME KNOW AND I EITHER

25    APPROVE OR DISAPPROVE YOUR TOPICS.  THOSE NEED TO HAPPEN.

1    THEY NEED TO HAPPEN IN MY JUDGMENT TO EFFECT ORDERLY

2    PRESENTATION OF EVIDENCE TO A JURY.

3      MS. SHUMENER:  CAN I ASK YOU YOUR HONOR A QUESTION,

4    A FAVOR?

5      THE COURT:  SURE.  FAVOR.  SURE.

6      MS. SHUMENER:  COULD YOU PLEASE DESIGNATE THE TIME?

7      THE COURT:  WHAT DO YOU THINK IS REASONABLE?

8      MS. SHUMENER:  I WOULD HAVE SAID, IF YOU ASKED ME,

9    FOR EACH SIDE TO HAVE SEVEN HOURS, BUT IF THEY THINK THAT

10    THAT'S TOO MUCH, I'M WILLING TO HAVE EACH SIDE GO FOUR

11    HOURS.

12      THE COURT:  I WOULD THINK AFTER EVERYTHING, FOUR

13    OUGHT TO DO IT.

14      MS. SHUMENER:  OKAY. BUT I WOULD LIKE FOUR REAL

15    HOURS, NOT FOUR HOURS -- NO, I'M SERIOUS.  I MEAN, THEY

16    SAY WE HAVE 40 HOURS OF DEPOSITION.  THEY HAD AS MUCH

17    TIME OF LIVE DEPOSITION TESTIMONY AS WE HAVE WITH TWO

18    WITNESSES THAT WE HAVE WITH FIVE.

19      THE COURT:  HOW DO YOU DEFINE A REAL HOUR?

20      MS. SHUMENER:  I DEFINE IT AS TESTIMONY TIME.  IT'S

21    ON THE RECORD AS THE TIME YOU TAKE FOR BREAKS, THE TIME

22    YOU TAKE FOR LUNCH AND --

23      THE COURT:  AND ARGUING.

24      MS. SHUMENER:  AND, FRANKLY, I WOULD LIKE THE TIME

25    FOR ARGUING THE OBJECTIONS TO EXCLUDED BECAUSE --

27

1      THE COURT:  ALL RIGHT.  FOUR HOURS OF TESTIMONY

2    TIME.

3      MS. SHUMENER:  FOUR HOURS OF TESTIMONY TIME.

4      THE COURT:  OKAY.  AND I THINK THAT'S FAIR TO BOTH

5    SIDES BUT, AGAIN, NAIL THESE TOPICS DOWN IN ADVANCE,

6    EXCHANGE THEM.  AND IF THERE'S AN ARGUMENT ABOUT A TOPIC,

7    LET ME KNOW.

8      MS. SHUMENER:  AND CAN WE HAVE IT UNDERSTOOD BECAUSE

9    I FIND THESE DEPOSITIONS TO BE VERY DISRUPTIVE.  CAN WE

10    HAVE IT UNDERSTOOD WITH THE 30(B)6 DEPOSITIONS, WE CAN

11    HAVE THE STANDING OBJECTION AS TO FORM SO THAT EACH

12    QUESTION IS NOT DISRUPTED WITH A LONG MONOLOGUE.

13      THE COURT:  DO YOU HAVE ANY PROBLEM WITH THAT?

14      MR. ALPERT:  I DON'T THINK I GENERALLY HAVE A

15    PROBLEM, JUDGE, AS LONG AS WE UNDERSTAND WHAT THE FORM OF

16    OBJECTION IS.

17      THE COURT:  CORRECT.

18      MR. ALPERT:  SO I'M SURE WE CAN FIGURE THAT OUT.

19      THE COURT:  WE'LL WORK THAT OUT.  ALL RIGHT.  THAT I

20    THINK WILL HELP EVERYBODY.

21      MS. SHUMENER:  SO WE DON'T HAVE TO STATE THE

22    OBJECTIONS DURING THE DEPOSITION, WE CAN GO THROUGH?

23      THE COURT:  WELL, FORM, THE LAWYERS HUMBLY,

24    RESPECTFULLY USE FORM AS AN UMBRELLA FOR OBJECTIONS THAT

25    REALLY OUGHT TO BE ARTICULATED LIKE PRIVILEGE -- LIKE I

28

1      DON'T KNOW, WHAT ELSE, LEADING.

2        MR. ALPERT:  WELL, LEADING IS A FORM, FORM,

3      FOUNDATION.

4        THE COURT:  SOMETHING THAT CAN BE CURED, I WANT IT

5      CURED.

6        MS. SHUMENER:  WELL, I SEE WHAT YOU'RE SAYING.

7        THE COURT:  BECAUSE OTHERWISE YOU GOT FULL TYPES

8      THAT ARE UNUSABLE.  I TEACH ON DEPOSITIONS.  AND YOU KNOW

9      WHAT HAPPENS?  LAWYERS TAKE WHAT THEY THINK ARE TWO DAYS

10      WORTH OF GREAT DEPOSITIONS.  THEY GET TO TRIAL AND THEY

11      CANNOT USE THEM BECAUSE --

12        MS. SHUMENER:  IF SAID -- BUT WHEN I SAID OBJECTION,

13      VAGUE OR OBJECTION, CALLS FOR SPECULATION OR OBJECTION,

14      OVER BROAD, I GET THIS YOU'RE COACHING THE WITNESS NUMBER

15      ONE BUT, YET, THEY MAKE THE EXACT SAME OBJECTIONS.

16        THE COURT:  YOU WANT ME TO SIT IN ON THESE?

17        MS. SHUMENER:  I WOULD.  I WOULD LOVE IT IF YOU SAT

18      IN ON THESE, YOUR HONOR, OR A PRIVATE REFEREE.  I WOULD

19      LOVE IT.

20        MR. ALPERT:  JUDGE, I WILL TELL YOU WHAT WE WOULD

21      REALLY LIKE -- AND WE ARE GOING TO HAVE TO TOUCH ON THIS

22      TOPIC.  WE TALKED ABOUT MAKING MR. MINOR AVAILABLE FOR

23      TWO DAYS.  IT WAS AN ABSOLUTE CIRCUS.  IT WAS A CIRCUS.

24      WE COULD NOT GET A STRAIGHT ANSWER FROM MR. MINOR.  HE

25      CURSED REPEATEDLY, BOTH HE AND HIS COUNSEL WERE -- AND

1     YOU CAN HEAR IT ON THE TAPE.  THEY ARE LAUGHING AT THE

2     QUESTIONS.  IT TOOK US TWO FULL DAYS TO GET A COUPLE OF

3     HOURS OF TESTIMONY.  IT WAS UNLIKE ANYTHING I'VE EVER

4     SEEN IN MY LIFE.

5        THE COURT:  ALL RIGHT.  LET'S HAVE THEM HERE.  LET'S

6     DO THE DEPOSITIONS HERE. DO BOTH OF THEM HERE AND I WILL

7     GIVE YOU A WHOLE DAY.

8        MS. SHUMENER:  WHEN WE WERE LAUGHING?  I REALLY,

9     SINCERELY RECENT. WHEN WE LAUGHING, MR. ALPERT WAS

10     LAUGHING.  AND WE WERE LAUGHING AT THE DOCUMENTS BECAUSE

11     SOME OF THINGS SAID IN THEM.  MR. MINOR TESTIFIED AT

12     LENGTH AND EXTENSIVELY.  IF YOU TAKE A LOOK AT HOW MANY

13     HOURS HE ANSWERED QUESTIONS, I WELCOME THE DEPOSITION.

14        THE COURT:  WOULD YOU GO GET MY CALENDAR, PLEASE?

15     THIS IS FAIR TO BOTH SIDES.  ALL RIGHT.  WE'LL TAKE THEM

16     HERE.  WE'LL TAKE THEM BOTH HERE.  CAN MR. MINOR BE HERE

17     AND MISTER WHO EVER HE IS BE HERE?

18        MR. ALPERT:  WE WILL MAKE SURE WE HAVE SOMEONE HERE.

19        THE COURT:  UNLESS YOU WANT TO GO SOMEWHERE ELSE?

20        MS. SHUMENER:  NO, NO.

21        THE COURT:  HERE IS FOR EVERYBODY?

22        MS. SHUMENER:   I THINK IT'S MUCH BETTER.

23        THE COURT:  ALL RIGHT. WE'LL DO THAT.

24        MR. ALPERT:  JUDGE, WHEN YOU SAY HERE, YOU MEAN

25     RIGHT HERE?

1        THE COURT:  YES.  I HAVE DONE IT BACK IN THE JURY

2    ROOM.  I HAVE DONE IT IN HERE.  I HAVE DONE IT -- AND I

3    MAY END UP DOING IT THIS WAY BECAUSE I DON'T NECESSARILY

4    NEED TO SIT THERE DURING WHOLE THING.  I HAVE DONE IT.

5    WHEN YOU DO IT HERE AND WHEN THINGS, PEOPLE IDENTIFY

6    EXPERTS, THEY JUST BRING ME OUT AND TELL ME WHAT'S GOING

7    ON AND I MAKE A DECISION RIGHT THERE.  AND SO, INSTEAD OF

8    SITTING THERE LOOKING OVER ANYBODY'S SHOULDER, I'M JUST

9    RIGHT IN THE BACK.  AND I'VE DONE THAT TWO, THREE, FOUR

10    TIMES.  AND IT TENDS TO WORK FOR BOTH SIDES.

11        MR. ALPERT:  I THINK IT'S A GREAT IDEA, JUDGE.

12        THE COURT:  ALL RIGHT. WE'LL DO IT HERE.

13        MR. ALPERT:  SIT IN FOR A WHILE, IF YOU COULD.

14        THE COURT:  I WILL ON EACH SIDE.  ALL RIGHT.  NOW IF

15    I START ASKING QUESTIONS AT THE DEPOSITION, SHUT ME UP.

16    IF I GET BACK INTO TRIAL LAWYER MODE, NO TRIAL LAWYER

17    MODE.  I DON'T WANT TO GO BACK.

18        MS. SHUMENER:  YOU CAN ASK ANYTHING YOU LIKE, YOUR

19    HONOR.

20        THE COURT:  I DON'T WANT TO DO THAT.  OKAY.  SO I

21    THINK THAT'S A FAIR RESOLUTION OF 30(B)6, BUT THAT AGAIN

22    DOES NOT PRE-EMPTS YOU FROM TAKING HER DOCUMENT RETENTION

23    30(B)6 DEPO. I'M NOT TRYING TO CRAMP YOU THAT.

24        NOW LET'S TALK ABOUT TIMING.  HOW FAST CAN WE GET

25    ALL OF THIS DONE?  DO YOU ALL HAVE YOUR PDA AND YOUR

31

1       SCHEDULES HERE.

2         MR. ALPERT:  WE DO.

3         THE COURT:  OKAY.  WE HAVE THE DATE -- I HAVE YOU

4    FOR PRETRIAL ON THE 24TH SEPTEMBER.  IS IT Y'ALL DAUBERT

5    MOTION ON THE 2ND? IS THAT Y'ALL'S, SEPTEMBER 2ND?

6         MR. ALPERT:  MOTION FOR SUMMARY ON THE 2ND.

7         THE COURT:  AND DAUBERT ON THE 2ND, IF THERE ARE

8    ANY.  OKAY.  ALL RIGHT.  I'M MAKING SURE I'M GOING BACK

9    THERE FOR THESE.  SO, DO WE HAVE ANY DEADLINES FOR THE --

10    DO WE HAVE ANYTHING -- A DEADLINE FOR THE COURT PRIOR TO

11    THAT?  I DON'T HAVE ANYTHING ON MY CALENDAR, BUT THAT

12    MEANS Y'ALL HAVE YOUR INTERNAL DEADLINE.

13        MR. ALPERT:  RIGHT.

14        THE COURT:  ALL RIGHT.  SO LET'S START FIRST WHEN DO

15    YOU ALL THINK IT WOULD BE A REASONABLE DATE TO SET THESE

16    MOTIONS DOWN?

17        MR. ALPERT:  YOU'RE TALKING ABOUT --

18        THE COURT:  NOT THE MOTIONS, THESE DEPOSITIONS, I

19    BEG YOUR PARDON.

20        MR. ALPERT:  YOU'RE TALKING ABOUT THE 30(B)6

21    DEPOSITIONS WE JUST DISCUSSED?

22        THE COURT:  YES, SIR.  YES, SIR, MR. ALPERT.

23        MR. ALPERT:  I DON'T THINK THAT THERE'S -- WE CAN

24    CALL OUR CLIENT, JUDGE.  I DON'T SEE ANY REASON WHY WE

25    COULD NOT GET IT DONE IN THE NEXT COUPLE OR THREE WEEKS.

32

1        THE COURT:  OKAY. I HAVE -- MR. SCHAFER, CORRECT ME

2    I'M WRONG, BUT DO I NO HAVE THE ENTIRE DAY OF JULY 9TH,

3    FRIDAY AVAILABLE?

4        THE CLERK:  RIGHT.

5        MS. SHUMENER:  OH, BOY.

6        THE COURT:  IS THAT NOT A GOOD DAY FOR YOU?

7        MS. SHUMENER:  I JUST TOLD COUNSEL I'M ACTUALLY

8    BEING DEPOSE.  AND I WAS JUST TOLD COUNSEL THAT I WAS

9    AVAILABLE ON JULY 9TH, BUT I CAN SEE IF I CAN MOVE IT.

10        THE COURT:  I'M TRYING TO THINK.  YOU KNOW, IT'S DAY

11    WHEN MY COURTROOM IS AVAILABLE.  THESE FRIDAYS ARE GOOD,

12    BUT THAT SEEMS TO BE THE ONLY FRIDAY I HAVE.

13        MS. SHUMENER:  LET ME JUST SEN AN E-MAIL.

14        THE COURT:  YES, MA'AM.

15        MS. SHUMENER:  AND SEE IF I CAN CLEAR OFF THE 9TH. I

16    DON'T KNOW IF MR. MINOR IS AVAILABLE ON THE 9TH.

17        THE COURT:  ALL RIGHT.  Y'ALL TAKE A MINUTE.  LET

18    THEM KNOW, TOO.  I DON'T KNOW WHAT Y'ALL'S SCHEDULE IS,

19    BUT I'M HAPPY TO PRE-EMPT MY CIVIL JURIES FROM THE 26,

20    27, 28TH AND 29TH OF JULY TO HELP YOU ALL GET THROUGH

21    THIS.  I DO HAVE TO CALL ANYBODY IN.   THE 26, 27, 28 AND

22    29TH OF JULY.  I HAVE CIVIL JURIES THAT WEEK, BUT

23    MR. SCHAFER DON'T HAVE ANYBODY SPECIAL SET.  ARE YOU ON

24    VACATION THAT WEEK, MR. ALPERT?

25        MR. ALPERT:  I'M NEVER GOING TO LIVE THAT DOWN.

1    I'VE GOT SOME EXPERT DEPOSITIONS IN NEW YORK ON THE 26TH

2    AND 27TH.  HOW ABOUT THE 29TH AND 30TH?

3       THE COURT:  NOT THE 30TH.  I CAN'T GIVE YOU THE

4    30TH.

5       MR. ALPERT:  HOW ABOUT THE 29TH.

6       THE COURT:  I CAN GIVE YOU THE 29TH AS AN

7    ALTERNATIVE DATE AS WELL, SO EITHER ONE.

8       MS. SHUMENER:  SO THE 29TH FOR WHAT?

9       THE COURT:  THESE DEPOSITIONS.

10      MS. SHUMENER:  OH, FOR BOTH OF THEM IN ONE DAY.

11      THE COURT:  YES, MA'AM.  AND THEN YOU DON'T HAVE TO

12   JEOPARDIZE YOUR 9TH.  YOU BETTER SEE IF MR. MINOR IS

13   AVAILABLE ON THE 29TH.  WOULD YOU CHECK WITH YOUR

14   GENTLEMAN, PLEASE, SIR.

15      MR. DOUGLASS:  ABSOLUTELY.  HE'S IS AVAILABLE.

16   (WHEREUPON, OFF-THE-RECORD DISCUSSIONS OCCURRED.)

17      THE COURT:  LET'S PROTECT THAT DATE FOR NOW.  I CAN

18   ENTER AN ORDER.  SO I THINK WE HAVE KIND OF TAKEN CARE OF

19   THAT ISSUE IT SEEMS TO ME.  AND, REMEMBER, I DO WANT YOU

20   IN THE MEANTIME TO BEGIN THOSE TOPICS AND EXCHANGE THOSE

21   AND NARROW THAT ISSUE FOR THE DAY.

22      ALL RIGHT.  NOW, THE NEXT ISSUE SEEMS TO BE ALL OF

23   THESE DOCUMENTS THAT YOU CLAIM YOU DIDN'T KNOW THEY NEED

24   AND YOU SAY CLEARLY THAT YOU NEED.  IS THERE A PLACE

25   WHERE THERE IS AN OUTSTANDING LIST OF WHAT YOU ARE

1    REQUESTING?

2    MR. ALPERT:  YES, I THINK TO THE EXTENT THAT IT'S IN

3    A NUMBER OF DIFFERENT DOCUMENTS, YOUR HONOR, WE CAN GO

4    SYNTHESIZE THAT AND PUT IT IN ONE PLACE.

5    THE COURT:  THAT'S WHAT I WOULD LIKE.

6    MR. ALPERT:  I CAN TELL YOU THIS -- AND I DON'T HAVE

7    ANY REASON TO BELIEVE THAT COUNSEL FOR DEFENDANT IS NOT

8    BEING FORTHCOMING WITH RESPECT TO WHAT SHE KNOWS.  IT'S

9    MY UNDERSTANDING WE HAVE NOT RECEIVED A SINGLE DOCUMENT

10    REGARDING MINOR VENTURES, LLC.  AND WHAT'S IMPORTANT TO

11    UNDERSTAND -- AND I THINK I TOUCHED ON IT CONCEPTUALLY,

12    BUT I WANT TO ARTICULATE SOME SPECIFICS.  MINOR VENTURES

13    OWNS THE STOCK.  MR. MINOR HAS IDENTIFIED IT AS HIS AND

14    GIVEN HIMSELF FULL VALUE FOR IT.  MINOR VENTURES, LET'S

15    SAY OWNS A DOLLAR WORTH OF STOCK, OKAY.  MINOR VENTURES

16    GOT A LEASE.  ITS GOT A PAYROLL.  ITS GOT INSURANCE.

17    IT'S GOT ALL THOSE.  SO, AT THE END OF DAY WE DON'T KNOW

18    ANYTHING ABOUT THE FINANCIAL OBLIGATIONS, THE TAX

19    STRUCTURE, THE OWNERSHIP STRUCTURE.

20    THE COURT:  THE LIABILITY --

21    MR. ALPERT:  YEAH, TO FIGURE OUT --

22    THE COURT:  -- AGAINST THE ASSETS.  I UNDERSTAND.

23    MR. ALPERT:  AND THAT'S WHAT YOU NEED TO UNDERSTAND.

24    AND ALL THOSE DOCUMENTS GO TO CALCULATING THE VALUE OF

25    THAT STOCK TO MR. MINOR.  WE DON'T HAVE ANY OF THOSE

1      DOCUMENTS.  AND I WILL TELL YOU WHY IT'S IMPORTANT.  ONE

2      OF THE REASONS IT'S IMPORTANT IS, YOU KNOW, WE RECENTLY

3      LEARNED THAT MINOR VENTURES IS NOW SHUTTERING ITS

4      OPERATIONS.  IT HAS VANISHED FROM ITS SPACE, LEAVING ALL

5      KINDS OF COMPUTER AND ART WORK AND STUFF.  THE LANDLORD

6      IS HUNTING THEM DOWN FOR UNPAID RENT.  SO, I MEAN, WHAT

7      ARE MINOR VENTURES, LLC. OBLIGATIONS?

8         MS. SHUMENER:  WHERE DID YOU GET THIS INFORMATION?

9         MR. ALPERT:  I THINK WE GOT FROM --

10        MS. SHUMENER:  BECAUSE I DON'T HAVE THIS

11      INFORMATION.

12        MR. ALPERT:  WELL, YOU MAY WANT IT SINCE YOUR

13      CLIENT'S FAMILY OS YOU ALL THREE MILLION DOLLARS, BETTY.

14      YOU MAY WANT TO FIGURE IT OUT.

15        MS. SHUMENER:  NOT QUITE CLOSE.

16        MR. ALPERT:  DOES THAT DEPEND ON WHETHER OR NOT THE

17      FRAUDULENT TRANSFER CHARGES STICK?

18        MS. SHUMENER:  SHAME ON YOU, MR. ALPERT.

19        THE COURT:  I'M NOT LISTENING TO ALL OF THIS.  YOU

20      DON'T HAVE TO WORRY ABOUT ALL THIS. I'M LISTENING.

21         NOW LET ME MAKE SURE I'M CLEAR, THOUGH.  WHEN

22      MR. MINOR APPLIED FOR THIS LOAN, AM I TO UNDERSTAND THAT

23      PART OF THE ASSETS THAT WERE CONSIDERED BY SFG IN

24      DECIDING WHETHER TO LEND THIS MONEY WERE ASSETS

25      ATTRIBUTABLE TO HIS LLC?  AM I RIGHT ON THAT?

36

1        MR. ALPERT:  I THINK YOU ARE.  WE'LL DOUBLECHECK.

2        THE COURT:  DOUBLE CHECK.  BECAUSE OTHERWISE IT

3    MIGHT GO TO A CHANGE OF CIRCUMSTANCE THAT WOULD EFFECT

4    HIM.  AND I'M NOT SUGGESTING IT'S NOT RELEVANT, BUT IT

5    WOULD BE CLEARLY RELEVANT -- AND I GOT TO BELIEVE IF HE

6    APPLIED FOR A LOAN, HE WOULD HAVE ASSETS.

7        MR. ALPERT:  THERE MAY BE MORE THAN ONE BALANCE

8    SHEET, BUT YOU GOT TO REMEMBER IT CLEARLY WAS IDENTIFIED

9    IN THE BALANCE SHEET THAT WAS SUBMITTED BY DEFENDANTS IN

10    RESPONSE TO THE MOTION FOR SUMMARY JUDGMENT.  HOW DO WE

11    NOT GET TO DISCOVER THAT INFORMATION?

12        THE COURT:  THAT'S RIGHT.  WELL, PLUS I THINK SINCE

13    YOU HAVE -- AS I UNDERSTAND ONE OF YOUR ALLEGATIONS FOR

14    DEFAULT IS THAT THERE WAS A CHANGE IN FINANCIAL

15    CIRCUMSTANCES.

16        MR. ALPERT:  IT IS ONE OF A NUMBER OF THEM.

17        THE COURT:  AND SO, IF SOMETHING HAD TO DO WITH THE

18    LLC THAT CHANGED, EVEN IF IT WASN'T IDENTIFIED AS SORT OF

19    FIRST RUN ASSET IN THE TERMS THAT HE APPLIED, IT STILL

20    COULD EFFECT HIS FINANCIAL STATUS AND YOU'RE ENTITLED TO

21    THAT DISCOVERY.  AND I DON'T THINK THAT'S REALLY -- I

22    THINK IT'S PRETTY MUCH IN THE GAME.  I JUST WANTED TO

23    MAKE SURE.  OKAY.

24        SO HERE'S WHAT WE GOT TO DO -- AND THIS IS WHY

25    COMING INTO COURT IS REALLY A GOOD THING AND YOU ALL

37

1       VERY, VERY NICE TO DO THIS.  I THINK WE NEED TO HAVE TO

2       SYNTHESIZE, TO USE YOUR WORD, WHAT IT IS THAT YOU CLAIM

3       THAT YOU DON'T HAVE THAT YOU HAVE ASKED FOR.  AND LET

4       THEM KNOW THAT BECAUSE -- AND IT MAY BE BECAUSE THEY ARE

5       A BIG FIRM AND THEY TRAVEL.  I THINK MR. O HAS SOME

6       INFORMATION THAT YOU DON'T HAVE.  AND I KNOW YOU'RE IN

7       GOOD FAITH.  I'M NOT SUGGESTING THAT.  AND SO, WE WOULD

8       DO THAT FIRST.

9          MR. ALPERT:  AGREED.

10         THE COURT:  THEN WE WOULD HAVE A RULE SIX TYPE

11      CONVERSATION TO SAY WE WILL DO THIS.  WE WON'T GIVE YOU

12      THIS.  WE WON'T GIVE IT TO YOU BECAUSE OF THIS OR WE

13      THINK THIS IS PRIVILEGED AND HERE IS A OUR PRIVILEGED

14      LOG.  AND AT THAT POINT -- FROM THAT SYNTHESIS OR

15      SYNTHESIZE A DISPUTED DOCUMENT LIST.  AND IF YOU GUYS

16      CAN'T AGREE ON THAT, THEN YOURS TRULY WILL AGREE ON THAT.

17      AND IT SEEMS TO ME THAT WE NEED TO DO THAT SOONER VERSUS

18      LATER.  SO TO YOUR POINT, MS. SHUMENER, ALL OF THESE

19      EXPERTS CAN BE DESIGNATED.

20         NOW -- OKAY.  SO LET'S TALK ABOUT IT AND THEN I WANT

21      TO TALK ABOUT EXPERTS AND MAKE SURE THAT YOU'RE SATISFIED

22      THAT YOU CANNOT WORK THROUGH THAT.  REASONABLY HOW FAST

23      CAN YOU GET THE SYNTHESIS LIST?

24         MR. ALPERT:  WE CAN GET THE SYNTHESIS LIST THIS

25      WEEK, YOUR HONOR.

1        THE COURT:  ALL RIGHT.  THAT WILL BE THEN OH, GOSH,

2    BY EVEN FRIDAY, WOULD YOU SAY?

3        MR. ALPERT:  YES.

4        THE COURT:  OKAY. SO YOU WILL GET THE SYNTHESIS LIST

5    BY FRIDAY.  MS. SHUMENER, REASONABLY WHEN CAN YOU LET

6    THEM -- AND YOU SAY A, WE PRODUCED THIS.  B, WE HAVE NOT

7    BUT WILL PRODUCE THIS.  AND THEN C, WE HAVE THESE BUT WE

8    WILL NOT PRODUCE THESE FOR THE FOLLOWING REASONS?  HOW

9    LONG WOULD IT TAKE YOU TO GET THAT SORT OF RESPONSE BACK

10    TO THE PLAINTIFF?

11        MS. SHUMENER:  THEY'RE GOING TO GET ME THEIR

12    RESPONSE BY THE 11TH?

13        THE COURT:  THEY WILL GET YOU THE LIST BY THE 11TH,

14    YES, MA'AM.

15        MS. SHUMENER:  HOW ABOUT THE 18TH?

16        THE COURT:  THAT WILL GIVE YOU A WEEK.  THAT'S VERY

17    FAIR.  AND THEN HOW ABOUT BY THE 25TH, YOU ALL LET ME

18    KNOW IF THERE ARE -- AFTER A CONVERSATION DURING THAT

19    WEEK OR TWO OR THREE OR E-MAILS, BY THE 25TH, YOU LET ME

20    KNOW IF THERE'S AREAS OF DISPUTE.

21        MR. ALPERT:  I'M HAPPY TO DO THAT, YOUR HONOR.  IS

22    THERE A WAY WE CAN -- AND I THINK THAT TIMEFRAME MAKES A

23    LOT OF SENSE.  TO THE EXTENT WE AGREE ON DOCUMENT

24    CATEGORIES, CAN WE GET THAT ROLLING?

25        THE COURT:  SURE.  THAT MEANS TO ROLL

1      SIMULTANEOUSLY.

2         MR. ALPERT:  AS SOON AS WE AGREE TO IT, IT GETS

3      SENT. IT'S NOT BEING HELD UP AS PART OF A CONTINUING

4      MOTION

5         THE COURT:  ABSOLUTELY. NO.  ANYTHING THAT'S AGREED

6      TO IS SENT.  IN OTHER WORDS --

7         MS. SHUMENER:  OH, NO, WE'LL BE GATHERING THE

8      DOCUMENTS.  I DON'T KNOW.  I JUST HAVE TO SAY MR. MINOR

9      LIVES IN SAN FRANCISCO, MAYBE.  AND I DON'T KNOW WHERE

10     THE DOCUMENTS ARE THAT THEY'RE ASKING FOR BUT, OBVIOUSLY,

11     IF WE'RE SAYING WE'RE GOING TO PRODUCE, WE'LL GO GET

12     THEM.  I MEAN, I JUST DON'T KNOW IF I HAVE THEM IN MY

13     POSSESSION TO TURN THEM OVER.

14        MR. ALPERT:  I'M NOT TALKING ABOUT FROM LOGISTICAL

15     ISSUES.  ALL I'M SAYING IS, SOMETIMES IF YOU GOT EIGHT

16     POINTS TO NEGOTIATE ON THE TABLE, NOBODY IS GOING TO

17     COMMIT TO ANYTHING UNTIL THEY'RE ALL RESOLVED.

18        MS. SHUMENER:  NO, NO, NO.

19        MR. ALPERT:  MY POINT IS IF YOU ARE GOING TO AGREE,

20     IT'S GOING TO --

21        THE COURT:  WHATEVER YOU AGREE TO GETS PRODUCED.

22     AND IT'S LIKE ROLLING ADMISSIONS, IT'S A ROLLING

23     PRODUCTION.  THE ONLY THING THAT GETS HELD OUT IS

24     ANYTHING THAT'S CLAIMED TO BE PRIVELEDGED AND YOU'RE

25     FUSSING OVER.  AND THEN I WILL KNOW BY JUNE 25TH WHAT

40

1      THAT SUBSET OF THE SYNTHESIS IS.  OKAY.  AND THEN I WILL

2      MAKE -- AND THEN ONCE I SEE IT, I WILL PROBABLY WANT SOME

3      KIND OF SUBMISSIONS FROM YOU BOTH.  AND MAYBE ON THE

4      25TH, YOU ALL CAN SEND ME A SUBMISSION.  IT DOESN'T HAVE

5      TO BE PRETTY LONG BRIEFS.  IT CAN JUST BE A LETTER.  I'M

6      HOPEFUL THERE'S NONE, BUT -- I HOPE THERE IS NONE, BUT IF

7      THERE IS, I WANT YOU TO JUST WRITE A LETTER.  YOU DON'T

8      HAVE TO WRITE LONG BRIEFS OR ANYTHING.  AND JUST GIVE ME

9      THE FACTS, MA'AM.  DON'T BE FINGER POINTING.  OKAY.

10      MR. ALPERT:  I UNDERSTAND.

11      THE COURT:  OKAY. ALL RIGHT.  AND THAT IS PRETTY

12      MUCH A FULL MONTH.  ALL RIGHT.  HAVING SAID THAT, LET US

13      TECHNICALLY EXTEND BACK DISCOVERY TO THE 25TH.  DO YOU

14      NEED THAT?

15      MR. ALPERT:  I THINK WHAT WE'RE GOING TO NEED,

16      JUDGE, IS TO THE END OF JULY.

17      THE COURT:  BECAUSE YOU'RE GOING TO WANT DEPOSITIONS

18      ON WHATEVER YOU GET.

19      MR. ALPERT:  ONCE WE GET THE DOCUMENTS, I DON'T KNOW

20      HOW MUCH THERE'S GOING TO BE.  LOAD THEM UP INTO

21      SUMMATION.  LET US REVIEW THEM.  LET A CONSULTANT REVIEW

22      THEM.  WE'RE TALKING ABOUT POSSIBLY, POSSIBLY SOME

23      TECHNICAL FINANCIAL ISSUES.  I HAVEN'T SEEN THE

24      DOCUMENTS.  AND THEN THAT S US A WEEK OR TWO TO REVIEW

25      THEM.  AND WE CAN TAKE -- WE MAY NOT NEED TO TAKE ANY.

41

1    WE MAY NEED TO TAKE UP TO SIX, BUT THAT GIVES US JULY TO

2    TAKE THOSE DEPOSITIONS.

3        THE COURT:  ALL RIGHT.

4        MR. ALPERT:  I MEAN, I REALLY THINK, JUDGE -- GO

5    AHEAD.

6        MS. SHUMENER:  WE HAVE NOT RECEIVED -- WE HAVE NOT

7    RECEIVED, EXCEPT FOR A STACK LIKE THIS FROM TWO OF THE

8    BANK PARTICIPANTS.  I THINK THERE ARE EIGHT OF THEM.  TWO

9    OR THREE OF THEM THEY HAVE PRODUCED DOCUMENTS.  THE REST

10    WE'RE STILL WAITING ON.  THEY'RE SUPPOSED TO GO THROUGH

11    THEM AND THEY SAY THAT WE CONTROL ALL THESE ENTITIES.

12        THE COURT:  LET ME STOP YOU.  I DON'T WANT TO GO TO

13    FINGER POINTING AGAIN.

14        MS. SHUMENER:  I WOULD LIKE TO GET THE PARTICIPANTS'

15    DOCUMENTS.  AND IF THEY ARE GOING TO BE TAKING FACT

16    DISCOVERY UNTIL THE END OF JULY, I WOULD LIKE TO COMPLETE

17    MY DISCOVERY, TOO.

18        THE COURT:  YOU WILL, BUT REFRESH ME.  WERE THOSE

19    THIRD PARTY REQUESTS OR WERE THOSE DIRECT REQUESTS?  I

20    THOUGHT THEY WERE THIRD PARTY REQUESTS.

21        MS. SHUMENER:  THEY WERE THIRD PARTY REQUESTS.  THE

22    WAY WE AGREED -- JUST TO FILL YOU IN. THERE ARE PIECES

23    GOING ON IN DIFFERENT ACTIONS.  SOME OF THESE THIRD

24    PARTIES ARE IN VIRGINIA, SO RATHER THAN GOING THROUGH

25    THIS COURT TO GET A SUBPOENA, WE WENT, AS THEY HAVE DONE,

1      THROUGH VIRGINIA TO GET THE SUBPOENA.

2        THE COURT:  OKAY.

3        MS. SHUMENER:  WHEN WE WERE ON THE PHONE WITH JUDGE

4      HOMSHINER (PHONETIC) IN THE VIRGINIA ACTION, WE HAD

5      AGREED THAT WITH MS. ROSSMAN'S DOCUMENTS, FOR EXAMPLE,

6      BECAUSE THEY WERE MR. MINOR'S PERSONAL FINANCIAL

7      DOCUMENTS, THEY WOULD COME TO US.  WE WOULD REVIEW THEM

8      AND PRODUCE THEM.  WE DID THAT.

9        WE ALSO AGREED THAT WITH THE PARTICIPANT DOCUMENTS

10      THEY WOULD GO TO SFG'S COUNSEL.  SFG'S COUNSEL WOULD

11      REVIEW THEM AND TURN THEM OVER.  TO DATE, WE HAVE ONLY

12      GOTTEN SOMETHING LIKE TWO OR THREE OUT OF THE EIGHT, I

13      THINK.  WE HAVE NOT SEEN A WORD OF ANY DOCUMENTS AS TO

14      THE REST OF THEM.  AND --

15        THE COURT:  DO YOU HAVE ANY THAT YOU HAVE NOT

16      PRODUCED BACK TO THEM?

17        MR. ALPERT:  NONE OF THOSE, JUDGE.  WE'RE HAPPY TO

18      GO AHEAD AND FILE, JUDGE, BUT YOU'RE TALKING ABOUT

19      COMPARING APPLES AND ORANGES.  WHILE MR. MINOR CLEARLY

20      CONTROLS HIS ACCOUNTANT.  WE HAVE NO CONTROL OVER THE

21      PARTICIPATING BANKS.

22        THE COURT:  I DON'T WANT FINGER POINTING.  I WANT

23      THE INFORMATION, BUT IT SEEMS TO ME, MS. SHUMENER, YOUR

24      REMEDY IS TO PUT THE HEAT ON THE THIRD PARTY REQUEST.

25      AND IF YOU NEED AN ORDERED FROM THIS COURT, YOU PREPARE

43

1   IT THAT SAYS WITHIN TEN DAYS THEY SHOULD PRODUCE OR

2   WHATEVER YOU WANT DONE, I WILL BE HAPPY ENTER A ORDER ON

3   THE THIRD PARTY REQUEST.  I KNOW IT GOES THROUGH THEM,

4   BUT THEY GOT TO KICK THE BALL TO THE 50 SO THEY CAN

5   RECEIVE IT.

6     MS. SHUMENER:  I HAVE TO UNDERSTAND SOMETHING. THEY

7   DON'T CONTROL THEM AND YET EVERY COMMUNICATION THAT WE

8   HAVE BEEN SEEKING FROM THEM OR THE VAST MAJORITY OF THEM

9   ARE BASIC LOAN DOCUMENTS THEY CLAIM ARE PRIVILEGE OR

10    ATTORNEY WORK PRODUCT BECAUSE THEY HAVE BEEN

11    COMMUNICATING WITH DIFFERENT DEFENSE.

12     MR. ALPERT:  IT'S A JOINT DEFENSE PRIVILEGE.

13     THE COURT:  I UNDERSTAND.  HANG ON EVERYBODY. AS I

14   UNDERSTAND, THOUGH, THE WAY THE SCHEME IS SET UP, IT'S A

15   THIRD PARTY REQUEST WITH THE LOOK, SEE FOR PRIVILEGE THAT

16   YOUR PRIVILEGE ISN'T COMPROMISED BECAUSE ONCE IT'S OUT OF

17   THE BAG, YOU CAN'T -- BUT AT THE GET-GO TO GET THE

18   DOCUMENTS OFF THE DIME FROM THE THIRD PARTY RECIPIENT IS

19   ON THEM AND THEN IT COMES TO YOU.  YOU'RE NOT HOLDING ANY

20   FROM THEM?

21     MR. ALPERT:  CORRECT.

22     THE COURT:  OKAY.  SO YOUR REMEDY RIGHT NOW IS TO

23   GET THESE FOLKS A KICK IN THE BUTT.  AND I'M WILLING --

24   AND THAT'S SORT OF LIKE GETTING OFF THE DIME ONLY IT'S A

25   LITTLE MORE -- IT GOT A LITTLE MOR UMPH TO IT.  YOU -- IF

44

1      YOU NEED AN ORDER FROM ME ORDERING THEM WITHIN A TIME

2      PERIOD TO DO THAT, I'M HAPPY TO GIVE THAT TO YOU.  OKAY.

3         THEN YOU GUYS CONTINUE -- PLAINTIFF, CONTINUE YOUR

4      FAST TURN AROUND ON THAT BECAUSE YOU KNOW WHAT YOU'RE

5      LOOKING FOR AT THIS POINT.  YOU KNOW WHAT'S PRIVILEGE.

6      YOU KNOW WHAT'S NOT.  IT'S NOT GOING TO TAKE YOU THAT

7      LONG.

8         MR. ALPERT:  AGREED, JUDGE.

9         THE COURT:  YOU WILL HAVE THAT SAME PERIOD TO GET

10     THIS DONE.  OKAY.  ALL RIGHT.

11        MR. ALPERT:  IF I MIGHT PASS ON ONE PIECE OF

12     INFORMATION.  I UNDERSTAND THAT THERE ARE TWO

13     PARTICIPATING BANKS THAT ARE STANDING READY, WILLING AND

14     ABLE TO PRODUCE THEIR DOCUMENTS.  THEY HAVE ASKED THE

15     DEFENDANT TO PAY FOR THE COPYING COST PRIOR TO RELEASING

16     THEM AND THE DEFENDANT SAID WE'RE NOT PAYING FOR IT.

17        MS. SHUMENER:  IF THEY'RE ASKING FOR AN INORDINATE

18     COST, WE WILL NOT DO IT.

19        THE COURT:  ALL RIGHT. WELL YOU ALL WORK ON THAT

20     ISSUE, BUT I THINK THAT'S THE PROCESS.  THE PROCESS IS TO

21     GET THEM TO GET OFF THE DIME.  OKAY. BUT YOU GET THAT

22     FIXED.  IT'S GOOSE-GANDER.  I'M NOT GOING TO GIVE THEM AN

23     EXTENSION AND NOT YOU. THAT'S NOT FAIR.

24        MS. SHUMENER:  OKAY.

25        THE COURT:  ALL RIGHT.  BUT YOU GOT TO GET ALL OF

45

1      THIS DONE IN JULY IT HAS GOT TO HAPPEN.

2         NOW HAVING SAID THAT, HOW ARE WE GOING TO PROCEED

3      WITH THESE EXPERTS BECAUSE AS I UNDERSTAND IT BY

4      SEPTEMBER 2ND, WE GOT MOTIONS FOR SUMMARY JUDGMENT AND

5      DAUBERT, WHICH ALL ARE GOING IMPLICATE THE EXPERTS.  CAN

6      WE DO EXPERTS IN THIS TIMEFRAME?  IT'S GOT TO BE DONE.

7      AND IF NOT, WE CAN MOVE THAT, BUT NOT VERY FAR BECAUSE I

8      GOT YOU-ALL STARTING A TRIAL ON THE 18TH OF OCTOBER.

9         MR. ALPERT:  MY HEART IS STARTING TO RACE, YOUR

10     HONOR.  CAN I GO OUTSIDE FOR A SECOND?

11         THE COURT:  ARE YOU OKAY.

12         MR. ALPERT:  I'M TEASING, BUT THE ANXIETY LEVEL OF

13     ALL THIS REALLY --

14         THE COURT:  I KNOW. DO YOU NEED A BREAK?

15         MR. ALPERT:  NO.

16         MS. SHUMENER:  MY PROBLEM IS I DON'T HAVE A CLUE WHO

17     THEIR EXPERTS ARE.  I DON'T HAVE A CLUE WHAT THEIR

18     EXPERTS ARE GOING TO SAY.

19         THE COURT:  I KNOW.

20         MS. SHUMENER:  AND THEY ARE SITTING NOW WITH OUR

21     DOCUMENTS AND OUR EXPERT DESIGNATIONS FOR WHATEVER THE

22     DATE WAS MAY 24TH OR MAY 26TH OR WHATEVER IT IS.  AND I

23     DON'T KNOW HOW WE FIX THAT.

24         THE COURT:  WELL, THE ONLY WAY -- AN EASY WAY IS TO

25     MOVE THE TRIAL DATE.  AND IT ALL DEPENDS ON HOW OPPOSED

1     EVERYBODY IS TO THAT.

2      MR. ALPERT:  I THINK THAT WE WOULD PROBABLY WANT TO

3     TALK TO OUR CLIENT ABOUT IT, JUDGE, BUT I DON'T KNOW THAT

4     I SEE -- I THINK WE JUST NEED TO LOOK AT THESE DATES

5     BECAUSE I THINK WE'RE GOING TO -- I DO THINK IT'S GOING

6     TO TAKE US TO THE END OF JULY TO FINISH THE DEPOSITIONS

7     AND THE DISCOVERY.  EVEN IF HAVE YOU TURN AROUNDS ON

8     EXPERTS THE FIRST WEEK OF AUGUST, YOU ARE STILL GOING TO

9     NEED AUGUST TO DO THE EXPERTS.

10     THE COURT:  THAT'S RIGHT.  AND THAT'S AGGRESSIVE.

11     MR. ALPERT:  AND THAT'S AGGRESSIVE.  AND THAT MEANS

12     BRIEFING IN SEPTEMBER.

13     THE COURT:  THAT'S WHAT I'M THINKING.

14     MR. ALPERT:  I THINK THAT WE MAY NEED TO JUST LOOK

15     AT THAT.  I GUESS MY OWN -- THE THOUGHT IS YOU'VE CARVED

16     OUT THREE WEEKS FOR A TRIAL.  I REALLY DON'T THINK YOU

17     NEED THREE WEEKS FOR A TRIAL.

18     THE COURT:  WHAT DO YOU THINK THAT I NEED?

19     MR. ALPERT:  I DON'T KNOW.  THERE ARE -- NO JURY HAS

20     BEEN REQUESTED.  AND THE JURY HAS BEEN WAIVED IN THE

21     DOCUMENTS, SO THERE IS NO JURY.

22     MS. SHUMENER:  WELL, THAT'S NOT TRUE.  WE'VE

23     REQUESTED A JURY.

24     THE COURT:  THIS IS A BENCH TRIAL?

25     MS. SHUMENER:  WE'VE REQUESTED A JURY AND WE'LL

1      BRIEF THAT ISSUE.

2        MR. ALPERT:  EXCUSE ME.  WE DIDN'T REQUEST A JURY.

3      AND THERE'S A JURY WAIVER PROVISION IN THE LOAN

4      DOCUMENTS.

5        MS. SHUMENER:  AND WE'LL DEAL WITH THAT, YOUR HONOR.

6        THE COURT:  BUT YOU WANT A JURY?

7        MS. SHUMENER:  WE WANT A JURY.

8        MR. BRANNAN:  YES, YOUR HONOR.

9        THE COURT:  DID YOU ASK FOR 12 OR SIX?

10       MR. BRANNAN:  I REALLY DON'T RECALL.

11        THE COURT:  YOU GOT TO DO WHAT YOU KNOW BEFORE THE

12     END OF TERM.  YOU GUYS HAVE PLENTY OF TIME TO DO IT.

13     SOMETIMES YOU DO IT IN THE ANSWER, SIR.

14       MR. BRANNAN:  YEAH, I JUST DON'T RECALL.

15        THE COURT:  OKAY.  WELL, HAVING SAID THAT THEN, I

16     CAN GIVE YOU -- SO WHEN YOU SAY THREE, ARE YOU TALKING

17     ABOUT JUST STARTING ON 25TH OF OCTOBER?

18       MR. ALPERT:  I WAS TALKING ABOUT GOING TO THE BACK.

19        THE COURT:  WHAT DO YOU MEAN?

20       MR. ALPERT:  I'M TAKING THE LAST WEEK IN NOVEMBER.

21     WE HAVE GOT THE LAST TWO WEEKS OF OCTOBER.

22       MS. SHUMENER:  AND THE FIRST WEEK IN NOVEMBER.

23       MR. ALPERT:  AND THE FIRST WEEK IN NOVEMBER.

24        THE COURT:  AND WHAT WERE YOU TALKING ABOUT DOING

25     THEN?

48

1          MR. ALPERT:  I MEAN, I GUESS OUR POSITION IS -- AND,

2      AGAIN, I UNDERSTAND THERE'S A DISPUTE ON THIS.  OUR

3      POSITION IS WE DIDN'T ASK FOR A JURY.  THERE'S A JURY

4      WAIVER PROVISION IN THE DOCUMENTS THAT'S CLEAR AND THAT'S

5      ENFORCEABLE UNDER GEORGIA LAW AND THAT IF IT'S A BENCH

6      TRIAL, THAT THIS SHOULDN'T TAKE BUT A WEEK.

7          MS. SHUMENER:  MR. MINOR'S GUARANTOR IS NOT WAIVED.

8          THE COURT:  OKAY. SO, ANYWAY, LET'S SAY IT'S TWO

9      WEEKS.  WHAT IF I GAVE YOU -- THE OTHER THING I CAN DO, I

10      CAN GIVE YOU A NOVEMBER TIME BECAUSE I WILL JUST MOVE --

11      IF WE DON'T HAVE YOUR CASE, I WILL MOVE MY CRIMINAL INTO

12      WHAT WAS CIVIL AND I WILL GIVE YOU GUYS -- I WILL GIVE

13      YOU THOSE.

14          MS. SHUMENER:  YOU MEAN THE FIRST TWO WEEKS OF

15      NOVEMBER?

16          THE COURT:  IT SOUNDS LIKE IT WOULD BE TWO MAYBE

17      THREE.  NOW I DON'T HAVE EVERY DAY.  FOR EXAMPLE, I DON'T

18      HAVE THE 5TH.  I DON'T HAVE THE 11TH. I HAVE A SHORT DAY

19      15TH.  OTHER THAN THAT, I HAVE THE FIRST THREE WEEKS OF

20      NOVEMBER.

21          MS. SHUMENER:  WELL THEN LET'S DO THAT.  IT'S GOING

22      BE DARK ON THE 5TH, YOUR HONOR -- THE 11TH.

23          THE COURT:  I'M DARK ON THE 5TH.  THE COURTHOUSE IS

24      DARK ON THE 11TH.  OKAY.  AND I CAN CHANGE THE 15TH.  THE

25      15TH I CAN CHANGE.  THAT'S A DOCTOR'S APPOINTMENT FOR MY

49

1      MOTHER.

2        MS. SHUMENER:  NO.

3        THE COURT:  NO, NO, NO.  THAT'S NOVEMBER FOR CRYING

4    OUT LOUD.  I CAN CHANGE THAT.  THAT'S ONE OF THOSE WHEN

5    YOU CHECK OUT, GIVE ME A DATE.  IT'S FLEXIBLE.

6        MR. ALPERT:  MY SENSE OF IT IS, JUDGE, THAT IF YOU

7    GOT A COMPLETE LOOK AT SOME OF THE THINGS YOU'VE SAID

8    TODAY.  COMPLETING THE FACTS AND GETTING THE DOCUMENTS

9    DONE IN JUNE, GETTING THE REMAINING THE FACT WITNESS

10    DEPOSITIONS DONE IN JULY, EXPERTS IN AUGUST, BRIEFING IN

11    SEPTEMBER AND THEN THE MOTION FOR SUMMARY JUDGMENT THE

12    BEGINNING OF OCTOBER?

13        THE COURT:  THE MIDDLE -- I'M GOING ON A MISSION TO

14    AFRICA.  I'M SO EXCITED. IT'S GOOD WORK FOR THE LORD, BUT

15    -- SO AFTER I GET BACK FROM THERE, WE WOULD HAVE PLENTY

16    OF TIME.

17        MR. DOUGLASS:  WHAT LOOKS GOOD TO YOU?

18        THE COURT:  THE WEEK WE ARE GOING TO START THE

19    TRIAL, THE 18TH.

20        MS. SHUMENER:  OH, THAT'S WONDERFUL.

21        THE COURT:  THE WEEK OF THE 18TH.

22        MR. ALPERT:  OH, THE WEEK WE WERE GOING TO.

23        THE COURT:  YES, SIR.  I HAVE NEVER DONE THIS

24    BEFORE, BUT I AM TOLD THAT I AM NOT GOING TO BE WORTH A

25    WHOLE LOT THAT WEEK WHEN I GET BACK, THAT I AM GOING TO

50

1    HAVE MALARIA, MY HUSBAND DOES STILL LOVE ME OR B, I'M

2    JUST GOING TO HAVE SOME GERM THING OR BE REALLY, REALLY

3    TIRED.  I'VE BEEN TOLD THAT THE WEEK YOU GET BACK YOU'RE

4    JUST NOT -- THE FLIGHTS ARE 19, 20 HOURS.  I GET BACK THE

5    8TH.

6       MR. ALPERT:  SO THE WEEK OF THE 18TH --

7       THE COURT:  SO THE 11TH I CAN KIND OF CATCH UP AND

8    BE WAY READY TO GO ON THE 18TH.  DOES THAT WORK OR

9    EVERYBODY?

10       MR. ALPERT:  GREAT.  IS THERE A DAY THAT WEEK THAT

11    WORKS BEST FOR YOU?

12       THE COURT:  YOU TELL ME.

13       MR. ALPERT:  BETTY, DO YOU WANT TO TRAVEL ON THE

14    WEEKEND OR DO WANT TO DO IT ON A TUESDAY OR WEDNESDAY?

15       THE COURT:  NO, DON'T TRAVEL ON THE WEEKEND.ENJOY

16    YOUR FAMILY.

17       MS. SHUMENER:  LET'S TUESDAY OR WEDNESDAY.

18       THE COURT:  LET'S DO WEDNESDAY.  I WILL JUST CHANGE

19    ALL MY CRIMINAL STUFF AROUND.  ALL RIGHT.  SFG AND WE'LL

20    START AT 9:00 WEDNESDAY.

21       MR. ALPERT:  AND I THINK WHAT WE CAN PROBABLY DO,

22    JUDGE, IS BASED ON THE FRAMEWORK YOU'VE GIVEN US, I THINK

23    WE CAN TAKE THE AMENDED CASE MANAGEMENT OVER.  WE'RE

24    HAPPY TO TAKE THE LEAD ON THIS AND GO GET SOMETHING SENT

25    OVER.  WE'LL TRY TO GET YOU SOMETHING THIS FRIDAY, ALONG

51

1          WITH OUR SYNTHESIS.

2             MS. SHUMENER:  I STILL HAVE TO FIGURE OUT WHAT WE'RE

3          GOING TO DO WITH THE EXPERTS.

4             THE COURT:  YEAH.  WE NEED TO WORK.  WELL, WE GOT

5          THE TIME FRAME NOW, SO WE'LL WORK THROUGH THAT, YES,

6          MA'AM .

7             SO WHAT YOU ALL ARE TALKING ABOUT DOING IS HAVING

8          THE 1ST, THE 8TH AND THE WEEK OF THE 15TH, IF YOU NEED

9          IT, WITH THE UNDERSTANDING WE HAVE A FOUR-DAY WEEK.  WE

10          START ON THE 1ST.

11             MR. ALPERT:  RIGHT, FOUR DAYS ON THE 8TH AND FOUR

12          DAYS --

13             THE COURT:  YES, THAT'S CORRECT.  AND THEN WHOLE

14          WEEK OF -- WELL, YOU CAN HAVE A LONG WEEKEND.  WE MAY

15          JUST WANT TO HAVE THAT MONDAY OFF ANYWAY SO YOU CAN GO

16          HOME.

17             MR. ALPERT:  RIGHT.

18             MS. SHUMENER:  THEN ARE WE GOING TO DO THE 12TH OFF

19          OR KEEP THE 12TH.  DO YOU SEE WHAT I'M SAYING?  IT WOULD

20          ALMOST BE BETTER TO KEEP THE 12TH OFF.

21             THE COURT:  I DON'T CARE.  THE DOCTOR'S APPOINTMENT

22          WE'LL MOVE.  I'M NOT WORRIED ABOUT THAT.  YOU TELL ME.

23          WHAT I'M GOING TO DO IS GET THOSE THREE WEEKS.  I WILL

24          JUST GET THOSE THREE WEEKS AND WHATEVER WORKS WITHIN

25          THOSE THREE WEEKS.  YES, MA'AM.  IT WOULD BE NICE IF

52

1       YOU'RE GOING TO FLY TO CALIFORNIA AND HAVE THOSE FOUR

2       DAYS AND I WILL MOVE THAT APPOINTMENT.  I WILL MOVE IT TO

3       THAT FRIDAY THE 12TH.

4          MS. SHUMENER:  THAT WILL BE WONDERFUL.

5          MR. ALPERT:  WE'RE GOING TO BE DARK ON THE 12TH AND

6       DARK ON THE 11TH. ARE WE GOING TO BE DARK ON THE 15TH?

7          THE COURT:  NO, SIR.  YOU DON'T HAVE TO RECORD THIS.

8       (WHEREUPON, AN OFF-THE-RECORD DISCUSSION OCCURRED.)

9          THE COURT:  WE NEED TO HAVE A DISCUSSION ABOUT THIS

10       EXPERT DESIGNATION DEPO SHOULD GO IN LIGHT OF THE NEW

11       TIME FRAME.  DO YOU THINK THAT'S APPROPRIATE.

12          MR. ALPERT:  NO.  I THINK WE PROBABLY DO, YOUR

13       HONOR.

14          THE COURT:  DOES ANYBODY NEED A BREAK?

15          MR. ALPERT:  I'M FINE.

16          THE COURT:  YOUR ANXIETY LEVEL IS BACK DOWN SINCE WE

17       PUT TRIAL ONLY OFF BY A COUPLE OF WEEKS?

18          MR. ALPERT:  LISTEN, WITH JEFF AND JONATHAN CAME

19       BACK IN THE ROOM I IMMEDIATELY FELT BETTER.

20          THE COURT:  ALL RIGHT.  SO LET'S LOOK AT THIS.  NOW

21       CORRECT ME IF I'M WRONG, IT HAS BEEN 13 YEARS SINCE I'VE

22       TRIED A CASE, AT LEAST AS A LAWYER.  IT'S BEEN AN

23       AFTERNOON SINCE I TRIED ONE THIS MORNING.

24          (WHEREUPON, AN OFF THE RECORD DISCUSSION OCCURRED.)

25          THE COURT:  LET'S GO BACK ON THE RECORD.  WHAT WE

1    HAVE SO FAR AGREED NOW WITH RESPECT TO TAKING OF THE

2    EXPERT -- WELL, WITH RESPECT TO EXPERT DESIGNATION, WE

3    HAVE AGREED THAT ON JULY 29TH THERE WILL BE 30(B)6

4    DEPOSITIONS TAKEN, ONE FOR SFG AND ONE FOR THE MINOR

5    FAMILY HOTELS. WE HAVE AGREED THAT WILL TAKE PLACE IN

6    THIS COURTROOM, THAT I WILL BE HERE FOR PART OF THEM, BUT

7    I WILL BE AT LEAST AVAILABLE FOR ALL OF THEM TO RESOLVE

8    ANY OBJECTIONS OR ANY PROBLEMS.

9      WE ARE NOW LOOKING AT THE POTENTIAL SCHEDULE FOR THE

10    RESPECTIVE DESIGNATION OF EXPERTS AND THE DESIGNATION OF

11    EXPERTS.  MS. SHUMENER HAS MADE A REQUEST THAT HER PRIOR

12    SUBMISSIONS TO SFG WITH RESPECT -- I THINK IT'S TWO

13    EXPERTS, AM I RIGHT?

14      MS. SHUMENER:  TWO EXPERTS.

15      THE COURT:  WITH TWO REPORTS BEING SENT BACK AND

16    MR. ALPERT HAVE NO PROBLEM.

17      MR. ALPERT:  NO, PROBLEM, JUDGE. WE'LL SEND THEM

18    BACK.

19      THE COURT:  THAT WILL HAPPEN.  OKAY.  NOW HAVING

20    SAID THAT -- WHATEVER TIME YOU-ALL WANT.

21      MR. ALPERT:  WE'RE DOING BOTH.  IT WILL PROBABLY BE

22    ALL DAY.  WE CAN START AT 9:30.

23      THE COURT:  9:30 IS FINE.

24      MR. ALPERT:  SO WE CAN AVOID THE TRAFFIC A LITTLE

25    BIT AND THEN GO TO 1:30, HALF HOUR, HOUR BREAK FOR LUNCH

1      AND START THE SECOND ONE IN THE AFTERNOON.

2      THE COURT:  FINE.  ABSOLUTELY FINE.  ALL RIGHT.  NOW,

3      WE HAVE NOW, AS FAR AS I CAN TELL, THE ENTIRE MONTH OF

4      AUGUST AND THE ENTIRE MONTH OF SEPTEMBER TO EFFECTUATE

5      THE DEPOSITIONS.  AND, ACTUALLY, WE HAVE UP UNTIL OCTOBER

6      20TH, WHICH IS THE DATE OF THE HEARING TO EFFECTUATE

7      DESIGNATIONS, DEPOSITIONS AND BRIEFING, CORRECT?

8      MR. ALPERT:  CORRECT.

9      THE COURT:  SO, TELL ME THE FIRST -- TELL ME WHAT

10      YOU ALL WANT TO DO WITH RESPECT TO DESIGNATION?  YOU'RE

11      GOING TO NEED A LITTLE TIME, I WOULD THINK, AFTER THE

12      29TH TO SYNTHESIZE.  SO WHAT DO YOU-ALL PROPOSE?

13      MR. ALPERT:  I THINK THAT DESIGNATIONS, YOUR HONOR,

14      BY THE 10TH.

15      THE COURT:  TUESDAY THE 10TH OF AUGUST?

16      MR. ALPERT:  YES.

17      THE COURT:  THAT'S ABOUT TWO WEEKS, A LITTLE OVER.

18      IS THAT AGREEABLE?

19      MS. SHUMENER:  SURE.  THAT'S FINE.

20      THE COURT:  COB, CLOSE OF BUSINESS ON THE 10TH.

21      SOMEBODY IS WRITING ALL THIS DOWN AND WE'LL PUT THIS IN A

22      SCHEDULING ORDER.  ALL RIGHT.

23      MS. SHUMENER:  AND WE CAN SEND THEM OUT BY FEDERAL

24      EXPRESS THAT DAY.

25      THE COURT:  THAT DAY BY FED EX.

1        MR. ALPERT:  THAT'S FINE.

2        THE COURT:  AND THEY'RE GOING FOLLOW RULE 26.  OKAY.

3    WE'RE ALL AGREED ON THAT.  FEDERAL RULE 26.

4        MR. ALPERT:  DO YOU WANT TO DO -- HOW ABOUT THE

5    27TH?  THAT WILL GIVE US 17 DAYS TO DEPOSE THE EXPERTS.

6        MS. SHUMENER:  THAT'S NOT ENOUGH.

7        THE COURT:  YOU THINK THAT IS ENOUGH?

8        MR. ALPERT:  WELL, I'M STARTING TO THINK ABOUT THE

9    BRIEFING ON THE BACK END AND KEEPING THE OCTOBER 18TH

10    DAY.

11        THE COURT:  I KNOW, BUT I THINK YOU NEED 30 DAYS OF

12    DEPOSITIONS FOR EXPERTS GIVEN THE FACT THAT YOU LIVE

13    DIFFERENT COASTS.

14        MR. ALPERT:  I'M SORRY, JUDGE.  I WAS GOING TO

15    TRANCHE IT WITH EXPERTS, REBUTTAL.

16        THE COURT:  OKAY. SO YOU'RE TALKING -- WHAT ARE YOU

17    TALKING ABOUT?

18        MR. ALPERT:  INITIAL EXPERTS DISCLOSED ON THE 10TH.

19    LET'S SAY UNTIL THE 31ST.  DEPOSE THEM BY THE 31ST AND

20    THEN NAME REBUTTAL EXPERTS BY THE 13TH.

21        THE COURT:  LET ME ASK YOU FIRST.  HOW MANY EXPERTS

22    POTENTIALLY ARE WE LOOKING AT -- TO TAKE FROM THE 10TH TO

23    THE 31ST?  THAT'S THREE WEEKS.  HOW MANY ARE WE LOOKING

24    AT?  POTENTIALLY?

25        MR. ALPERT:  BETTY, Y'ALL HAVE TWO?

56

1          MS. SHUMENER:  PROBABLY SO FAR.

2          THE COURT:  MAYBE THREE?  MAYBE THREE?

3          MR. ALPERT:  SO MAYBE MORE.

4          THE COURT:  MAYBE THREE.

5          MR. ALPERT:  I THINK WE'RE IN THE SAME BOAT.

6          THE COURT:  SIX.  SO CAN YOU-ALL DO SIX EXPERT

7     DEPOSITIONS IN THREE WEEKS?

8          MS. SHUMENER:  YES.

9          THE COURT:  OKAY. IMPRESSIVE.

10          MS. SHUMENER:  UNTIL THE 31ST.  WE'RE GOING TO THE

11     31ST IS WHAT YOU'RE SAYING?

12          THE COURT:  YES.

13          MS. SHUMENER:  AND I THINK ONE OF MY EXPERTS, BUT I

14     DON'T KNOW -- ASSUMING I DON'T CHANGE MY MIND ABOUT HIM,

15     IS HERE IN ATLANTA, BUT ONE OF THEM IS IN LOS ANGELES, SO

16     I DON'T KNOW WHERE YOURS ARE.

17          MR. ALPERT:  I DON'T THINK IT'S GOING TO BE

18     DIFFICULT TO DO, JUDGE.

19          THE COURT:  OKAY.  FAIR ENOUGH.  YOU ALL KNOW BETTER

20     THAN I.  ALL RIGHT.  SO THEN HERE WE ARE.  WE GOT

21     EVERYBODY IN THE FIRST ROUND DEPOSED.  NOW WE WANT TO

22     TALK ABOUT A POTENTIAL FOR REBUTTAL EXPERTS.

23          MR. ALPERT:  SO IF YOU DEPOSE THEM BY THE 31ST, WHAT

24     ABOUT REBUTTAL, IDENTIFYING REBUTTAL EXPERTS BY THE 10TH?

25     I MEAN, IT SHOULD BE ABLE TO -- I MEAN, AT LEAST WITH

57

1      RESPECT TO WHAT WE DO --

2        THE COURT:  TEN DAYS EASILY.

3        MR. ALPERT:  I MEAN, YOU'RE STARTING THAT PROCESS

4      LONG BEFORE YOU TAKE THE DEPOSITION.  YOU'RE STARTING

5      THAT ONCE YOU GET --

6        MS. SHUMENER:  THAT'S FINE.

7        MR. ALPERT:  SO BY THE 10TH.  AND THEN REBUTTAL, IF

8      YOU WANT TO DEPOSE REBUTTAL EXPERTS BY THE 24TH?

9        THE COURT:  YEAH, BECAUSE AT MOST YOU MAY HAVE ONE I

10      WOULD THINK.

11        MR. ALPERT:  I AGREE.

12        MS. SHUMENER:  WE AGREE.

13        THE COURT:  AND THEN YOUR BRIEFING SCHEDULE STARTS

14      ON THE 24TH AND YOU HAVE ALL THE WAY THROUGH THE 20TH TO

15      DO YOUR BRIEFING.

16        MR. ALPERT:  RIGHT NOW WE HAVE INITIAL MOTIONS BY

17      BOTH PARTIES, RIGHT?

18        MR. DOUGLASS:  WE'RE ALREADY ON THE RECORD.  WE GOT

19      RESPONSE BRIEFS AND REPLIES RAW SURPRISE.

20        THE COURT:  AND DAUBERT POTENTIALLY.

21        MR. ALPERT:  YEAH, AND DAUBERT.

22        MS. SHUMENER:  I THINK WE HAVE TO MOVE THE REST,

23      YOUR HONOR, BECAUSE WHEN DO WE FILE THE OPPOSITIONS AND

24      REPLIES TO THE SUMMARY JUDGMENT MOTIONS?

25        THE COURT:  THAT'S WHAT WE'RE TALKING ABOUT RIGHT

1    NOW.

2        MS. SHUMENER:  IT DOESN'T LOOK POSSIBLE IF WE'RE

3    DOING DEPOSITIONS AND REBUTTAL EXPERTS UP UNTIL THE 24TH.

4        THE COURT:  RIGHT.  BUT WE HAVE MOVED UNTIL OCTOBER

5    20TH.  YOU HAVE ALMOST A MONTH TO ARGUE THIS.

6        MR. ALPERT:  I MIGHT CAN SAVE --

7        MS. SHUMENER:  THE QUESTION IS:  WHEN DO WE DO THE

8    OPPOSITIONS?

9        THE COURT:  RIGHT.  YOU HAVE THREE WEEKS IN THERE.

10       MR. ALPERT:  I THINK IT'S DOABLE.  I MEAN, I GUESS

11   THE OTHER THOUGHT, JUDGE, IS YOU KNOW GEORGIA PROCEDURE

12   DOES NOT PROVIDE FOR A REPLY BRIEF AND I KNOW THAT

13   OFTENTIMES WE DO IT.

14       THE COURT:  AND SUR-REPLIES IN Y'ALL'S CASE.

15       MS. SHUMENER:  AND, SUR, SUR, SUR.

16       MR. ALPERT:  AND THE ISSUES ARE FAIRLY IDENTICAL IN

17   THE MOTIONS, BUT THE OTHER THING IS WE'RE GETTING A FULL

18   DAY FOR A MOTION FOR SUMMARY JUDGMENT HEARING.  I, MEAN

19   OFTENTIMES, WE'LL FILE A REPLY.  WE DON'T KNOW WHETHER

20   WE'RE GOING TO GET ORAL ARGUMENT.

21       THE COURT:  YOU CAN GET IT. I AGREE WITH THAT.

22   THERE IS REALLY UNNECESSARY REPLIES.  THE ONLY THING YOU

23   GOT TO DO IS IF YOU GOT AN AFFIDAVIT.  THAT'S GOT TO

24   FOLLOW THAT RULE.

25       MS. SHUMENER:  I DON'T HAVE A PROBLEM WITH THAT.

59

1      THE COURT:  YEAH.  I SAY WE NOT HAVE A LOT OF THAT

2    BECAUSE I WILL GIVE YOU THE WHOLE DAY.  IF WE HAVE TO GO

3    INTO THE NEXT DAY, I WILL GIVE YOU THE NEXT DAY, WHATEVER

4    IT TAKES TO GET THIS DONE, WE'LL DO IT.

5      MR. ALPERT:  WHAT DID WE JUST AGREE TO ON THE

6    REBUTTAL EXPERT DEPOSITIONS, BY WHEN?

7      MS. SHUMENER:  THE 24TH.

8      MR. ALPERT:  WHAT DO YOU-ALL THINK ABOUT BRIEFS,

9    BETTY?

10      MS. SHUMENER:  I LOVE HAVING THE WEEKENDS.  CAN WE

11    DO THE 11TH.  WOULD THAT UPSET YOU, YOUR HONOR?  IS THAT

12    ENOUGH TIME FOR YOU?  BECAUSE THAT'S YOUR FIRST DAY BACK.

13      THE COURT:  I WON'T BE READING ANYTHING PROBABLY

14    UNTIL -- THAT WILL BE FINE WITH ME.

15      MR. ALPERT:  WHEN WILL YOU BE BACK?

16      THE COURT:  I'LL BACK THE 8TH, BUT TO ME IT WILL BE

17    9TH IN MY BRAIN.

18      MR. ALPERT:  RIGHT.  YOU ARE NOT GOING TO BE REALLY

19    LOOKING AT ANYTHING PROBABLY UNTIL THE 12TH.

20      THE COURT:  I'M HOPING BY THE 12TH. I MEAN I WILL

21    START ON THE 11TH, BUT IT WOULD HAVE TO BE REDONE BY THE

22    12TH.  AND I HAVE A NONJURY WEEK THERE SO THAT'S FINE.

23      MR. ALPERT:  WHY DON'T WE SAY -- IF IT'S OKAY WITH

24    YOU, BETTY, THE 12TH.

25      MS. SHUMENER:  THAT'S FINE WITH ME.

60

1       THE COURT:  THAT WILL GIVE YOU THAT EXTRA DAY.  I

2   WILL PROBABLY HAVE A STACK OF MAIL AND STUFF TO GO

3   THROUGH HERE.  I WILL HAVE PLENTY TO DO HERE THAT DAY.

4       MR. ALPERT:  AND DO WANT TO DO -- THOSE ARE THE

5   RESPONSES.  NOW I GUESS THE OTHER THOUGHT IS TO THE

6   EXTENT THERE ARE DAUBERT MOTIONS THAT HAVE NOT BEEN

7   BRIEFED, SO YOU WANT A DAUBERT -- WHAT ABOUT DAUBERT

8   BRIEFS ON THE 8TH AND RESPONSES ON THE 15TH?

9       MS. SHUMENER:  WHY DON'T WE DO THE DAUBERT ON THE

10  15TH AND THE RESPONSES ON THE 19TH?  I MEAN, IS THAT

11  CRAZY TO LEAVE THEM FOR THE TAIL?

12      THE COURT:  IT'S FINE WITH ME.

13      MS. SHUMENER:  I DON'T -- TO ME, THOSE ARE STRAIGHT

14  FORWARD EVIDENTIARY ISSUES.

15      THE COURT:  I DON'T NEED A LOT OF BRIEFING ON THE

16  DAUBERT.  I DO A LOT OF DAUBERT.  I TEACH ON DAUBERT

17  THROUGHOUT THE COUNTRY.  IT DOESN'T MEAN I GET IT RIGHT,

18  BUT I DON'T NEED A LOT OF BRIEFING.  BUT WHAT I DO -- YOU

19  CAN DO A DOWN AND DIRTY DAUBERT.  THIS IS WHAT YOU DO.

20  YOU TELL ME HERE'S THE EXPERT.  THE CHALLENGE IS BASED ON

21  WHICH PART OF THE STATUTE -- BECAUSE GEORGIA HAS A

22  STATUTE AS YOU ALL KNOW.  OF COURSE, WE DO FOLLOW THE

23  CASE AUTHORITY.  AND THEN YOU TELL ME WHETHER IT'S A

24  QUALIFICATIONS ISSUE OR WHETHER IT'S RELIABILITY OR THAT

25  BEING RELIABLY APPLIED, WHATEVER IT IS.  AND THEN YOU

1    TELL ME WHY AND YOU TELL ME WHAT'S IN THE DEPOSITION THAT

2    CAUSES YOU TO BRING IT.  OKAY.  AND THEN, YOU LET ME KNOW

3    WHETHER YOU ARE GOING TO BRING THIS PERSON LIVE.  AND I

4    SUGGEST TO YOU IF IT'S A REAL SERIOUS DAUBERT MOTION, YOU

5    BRING YOUR PERSON LIVE BECAUSE I LIKE TO TALK TO THEM AND

6    ASK THE QUESTIONS BECAUSE SOMETIMES I CAN'T TELL WHETHER

7    THE PERSON IS CREDIBLE UNLESS I HAVE YOU-ALL EXAMINE HIM

8    AND THEN I CAN ASK HIM OR HER QUESTIONS.  BUT I'M SAYING

9    YOUR BOILER PLATE DAUBERT NEED NOT BE LONG.  I DON'T NEED

10    A HISTORY OF DAUBERT.  I GOT ALL THAT.  I HAVE MOST OF

11    THE CASES BACK THERE ON MY DESK ON DAUBERT.  IT WILL SAVE

12    YOU A LOT OF WRITING.

13       MS. SHUMENER:  THEN WHY DON'T WE -- THEN MY

14    RECOMMENDATION WOULD BE TO DO THE DAUBERT MOTIONS BY THE

15    15TH AFTER THE SUMMARY JUDGMENT MOTIONS ARE DONE, THE

16    OPPOSITIONS.

17       MR. ALPERT:  THAT'S FINE.

18       MS. SHUMENER:  AND THEN WE DO THE OPPOSITIONS SAY BY

19    THE 19TH.  AND THEN WE HAVE THEM HEARD AND HAVE OUR

20    DAUBERT WITNESSES HERE MAYBE ON THE 21ST?  IS THE COURT

21    AVAILABLE?

22       THE COURT:  I THINK WE OUGHT TO SCHEDULE BOTH THESE

23    DAYS JUST IN CASE.

24       MR. ALPERT:  THE 20TH AND 21ST.

25       THE COURT:  HERE'S THE DEAL.  WELL, WE HAVE TO DO

1      THE DAUBERT I THINK BEFORE THE SUMMARY JUDGMENT BECAUSE

2      IF YOU DON'T KNOW WHAT YOUR EXPERTS ARE IN HERE ABOUT --

3        MR. ALPERT:  YEAH.  AGREED.  GOOD POINT.

4        THE COURT:  SO YOU HAVE TO DO IT THAT WAY.  SO IF

5      THERE IS -- LET'S RESERVE THE 20TH AND THE 21ST, IF BY

6      THE GRACE OF GOD THERE ARE NO DAUBERIES, WE'LL JUST DO

7      SUMMARY JUDGMENT ON THE 20TH.  IF THERE ARE DAUBERTS,

8      WE'LL DO DAUBERTS ON THE 20THH AND SUMMARY JUDGMENT ON

9      THE 21ST.  FAIR ENOUGH. I WILL GIVE YOU TWO DAYS.

10       MR. ALPERT:  THE REPLY -- SO WE'RE GOING TO DO

11      REPLIES ON THE 19TH?  CAN WE ASK AS COURTESY TO HAVE THE

12      RESPONSE BRIEFS ON DAUBERIES BY THE CLOSE OF BUSINESS,

13      EASTERN ON THE 19TH?

14       THE COURT:  YEAH, BECAUSE I WON'T READ THEM AFTER

15      THAT, TO BE HONEST WITH YOU.  I DON'T PULL LEXIS-NEXIS

16      AND E-FILE AT HOME.  I JUST DON'T.  I HAVE A BOUNDARY.

17      MY HUSBAND IS LAWYER.  WE HAVE HAD TO SET SOME BOUNDARIES

18      AND THAT'S A BOUNDARY.

19       MS. SHUMENER:  SO 5:00 EASTERN.

20       THE COURT:  THE EARLIER THE BETTER IF YOU WANT ME TO

21      READ IT. I'M JUST BEING HONEST.  IF I HAVE IT BY 3:00 MY

22      TIME, IT WILL GET READ.  I LIKE TO READ.

23       MS. SHUMENER:  3:00 IS WONDERFUL.

24       MR. ALPERT:  THAT'S FINE.  3:00 ON THE 19TH.  3:00

25      EASTERN.  SAME -- CAN WE DO THE SAME THING ON THE 15TH?

1        THE COURT:  WHATEVER YOU WANT TO DO ON THAT?

2        MS. SHUMENER:  THAT'S TOO HARD FOR ME. WE'LL BE DOING

3    SUMMARY JUDGMENTS.

4        MR. ALPERT:  WE WANT TO BE FAIR.

5        THE COURT:  I WILL READ THEM ALL TOGETHER.  IT

6    DOESN'T MATTER TO ME. IN OTHER WORDS, I WON'T READ THE

7    ONES WITHOUT A REPLY.  I WAIT UNTIL I GET THEM ALL

8    TOGETHER.  IT'S MORE BALANCED THAT WAY.  WHATEVER YOU

9    DECIDE IS FINE.

10        MS. SHUMENER:  HOW ABOUT 3:00 P.M. YOUR TIME

11        MR. ALPERT:  THAT'S FINE.

12        MS. SHUMENER:  AND SO WE'RE ASSUMING THAT IF THERE

13    ARE DAUBERTS, THEY ARE GOING TO BE HEARD ON THE 20TH

14    INITIALLY.  AND THEN IF THEY ARE, ARE WE FLOWING FROM

15    THAT RIGHT INTO THE SUMMARY JUDGMENT?

16        THE COURT:  YES.

17        MS. SHUMENER:  OKAY. SO EITHER WAY THAT'S GOING TO

18    TAKE, WHAT, 15 MINUTES TO DECIDE?

19        THE COURT:  CORRECT. WELL, MY PLAN WOULD BE, YOU

20    KNOW, TO DAUBERT -- AND I'M HOPEFUL THAT I WILL BE ABLE

21    TO RESOLVE IT.  USUALLY I RULE FROM THE BENCH.  THAT'S MY

22    PRACTICE.  IT MIGHT NOT BE A PRETTY RULE, BUT I WILL

23    RULE.  AND THEN WE GO RIGHT INTO SUMMARY JUDGMENT.  IF

24    YOU NEED A BREAK TO KIND OF REGROUP, BECAUSE DEPENDING

25    WHAT HAPPENS ON DAUBERT, THERE MIGHT NEED TO BE A REGROUP

1     TIME, WE CAN DO THAT.  BUT JUST TO PROTECT OURSELVES,

2     LET'S HAVE THE 20TH AND 21ST IN THIS CASE WE NEED IT.

3       MR. ALPERT:  AGREED.

4       MS. SHUMENER:  AND THE WITNESSES NEED TO BE HERE ON

5     THE 2OTH?

6       THE COURT:  WELL, IT SEEMS TO ME, I LIKE IT.  YOU'RE

7     NOT REQUIRED BY STATUTE TO BRING THEM.  BUT IF YOU HAVE A

8     DAUBERT CHALLENGE AND, PARTICULARLY, IF IT'S YOUR PERSON

9     THAT'S BEING CHALLENGE AND YOU WANT TO CONVINCE ME THAT

10     THEY NEED DAUBERT.  IT REALLY HELPS FOR ME TO EYEBALL

11     THEM AND TALK WITH THEM.  I LET YOU-ALL QUESTION THEM AND

12     THEN I JUMP IN IF I DON'T UNDERSTAND.  THIS IS HIGH

13     FINANCING AND I HAVE SOME QUESTIONS.  IT'S BEEN A LONG

14     TIME SINCE I TOOK THIS STUFF.

15       OKAY. AND THEN THAT -- SAY, HOPEFULLY, I WILL BE

16     ABLE TO GIVE YOU A RULING WITHIN REALLY A SHORT TIME AND

17     THAT GIVES US AN ENTIRE WEEK AFTER ALL THE MOTIONS,

18     ASSUMING THAT NO SUMMARY JUDGMENT IS GRANTED OR EVEN IF

19     SOME ARE AND SOME AREN'T AND WE GO TO TRIAL AND PICK OUR

20     JURY ON MONDAY, THE 1ST; IS THAT RIGHT?

21       MR. ALPERT:  I'M SURE THERE'S GOING TO BE SOME

22     BRIEFING ON WHETHER OR NOT THERE'S GOING TO BE A JURY,

23     BUT, YES.

24       THE COURT:  RIGHT.  ASSUMING THERE'S A JURY.

25     MR. BRANNAN IS QUITE SURE.

1      MR. BRANNAN:  YES.

2      THE COURT:  YOU KNOW WHAT I WOULD LOVE TO DO. WHILE

3   I GOT YOU HERE FOR TWO DAYS, LET'S JUST NAIL THAT.

4   MOTIONS IN LIMINE AT THE SAME TIME.  THIS IS HOW I DO

5   MOTIONS IN LIMINE.  I HAVE TOLD YOU THIS. I DON'T LIKE A

6   WHOLE LOT OF PAPER.  NOW THERE MAY BE SOME THAT YOU CAN'T

7   ANTICIPATE AT THIS TIME BECAUSE YOU HAVEN'T HAD TIME TO

8   SYNTHESIZE EVERYTHING THAT HAPPENED IN THESE TWO DAYS.

9   BOILER PLATE STUFF I WANT YOU ALL TO AGREE ON.  DON'T

10   FILE A WHOLE LOT OF PAPER.  JUST BRING TO ME ANY MOTIONS

11   IN LIMINE THAT YOU ALL DON'T AGREE ON.  IN OTHER WORDS,

12   EVERYBODY KNOWS GENERALLY LIKE TORT INSURANCE, COLLATERAL

13   SOURCE, I DON'T NEED A MOTION IN LIMINE ON THAT.  YOU ALL

14   KNOW.  ALL THE STUFF THAT YOU ALL KNOW IS GRANTED, IT

15   DOESN'T COME IN.  I DON'T NEED THAT.  YOU ALL JUST AGREE

16   ON THAT AND PUT IN A STIPULATION.  AND THEN WHATEVER

17   YOU-ALL ARE FUSSING OVER IN TERMS OF EVIDENCE -- AND I

18   NEED TO GET -- IF YOU WANT ME TO TAKE THOSE UP ON THE

19   21ST, AGAIN, I WOULD LIKE TO HAVE THOSE BY THE 19TH AS

20   WELL.  YOU SEEM LIKE YOU'RE HAVING ANOTHER ANXIETY ATTACK

21   OVER THERE, MR. ALPERT.

22      MR. ALPERT:  WELL, I GUESS MY QUESTION, JUDGE, IS

23   DEPENDING UPON WHAT HAPPENS, DEPENDING UPON WHAT HAPPENS

24   AT THE DAUBERT HEARING AND WHAT HAPPENS AT THE MOTION FOR

25   SUMMARY JUDGMENT HEARING, THAT MAY SIGNIFICANTLY PARE

66

1       DOWN POTENTIAL MOTIONS IN LIMINE.  AND WE'RE GOING TO BE

2       WORKING SO HARD PREPARING FOR THAT HEARING --

3          THE COURT:  WHEN DO YOU WANT TO DO THE MOTIONS.

4          MR. ALPERT:  I WAS THINKING ABOUT GIVING US A CHANCE

5       TO REGROUP AT THE END OF THAT WEEK AND THEN MAYBE THE

6       FOLLOWING WEEK.

7          THE COURT:  OKAY.

8          MS. SHUMENER:  THE FOLLOWING WEEK, MEANING 25TH?

9       BUT YOU GOT YOUR CRIMINAL CALENDAR.

10         THE COURT:  OH, I DON'T CARE ABOUT THAT. WHAT I

11      PROBABLY AM NOT GOING TO DO THEN IS HAVE A WHOLE LOT OF

12      ORIGINAL ARGUMENT.  I DON'T MEAN TO DRAG YOU ALL BACK

13      DOWN HERE FOR ORAL ARGUMENT.

14         MR. ALPERT:  CAN WE JUST TAKE IT UP ON THE 1ST? TO

15      THE EXTENT IF THERE'S ANYTHING YOU WANT TO HEAR MORE

16      ABOUT.

17         THE COURT:  IF THERE'S ANYTHING I WANT TO HEAR MORE

18      ABOUT, WE'LL TAKE IT UP ON THE 1ST.

19         MS. SHUMENER:  OKAY. SO THAT I UNDERSTAND.  SO WHEN

20      ARE WE FILING MOTIONS IN LIMINE BY?

21         THE COURT:  NOT UNTIL THE 25TH.

22         MS. SHUMENER:  OKAY.

23         MR. ALPERT:  THE 25TH.

24         THE COURT:  AND AFTER EVERYTHING HAS BEEN

25      SYNTHESIZED.

67

1        MR. ALPERT:  AND RESPONSE BY THE 29TH.

2        THE COURT:  WELL, THE 28TH.  THAT S ME THE 29TH TO

3    GET YOU ALL READY AND GEARED UP.  WE CAN'T USUALLY GET

4    OUR JURORS DOWN HERE -- OUR JURIES DO NOT USUALLY ARRIVE

5    UNTIL ABOUT 10:30, SO WE HAVE THAT MONDAY MORNING TIME TO

6    GO OVER ANY OF THIS STUFF.  BUT, OTHERWISE, WHAT I WOULD

7    LIKE TO DO, IF IT'S NOT TOO MUCH TO ASK IS GO AHEAD AND

8    NAIL DOWN THE PROPOSED PRETRIAL ORDER BY THE TIME YOU ALL

9    LEAVE HERE ON THE 21ST.

10        MR. ALPERT:  OKAY. WE'LL BE PREPARED TO TALK ABOUT

11    THAT AS WELL.

12        THE COURT:  THAT CAN BE HUGE ON THE MORNING OF TRIAL

13    IF THAT HADN'T BEEN NAILED DOWN.  OKAY.  AND I GUESS

14    WORSE CASE SCENARIO, WE CAN PICK A JURY ON ELECTION DAY,

15    TUESDAY. IT'S ALWAYS A PROBLEM HAVING A JURY ON ELECTION

16    DAY, PARTICULARLY -- BUT IF I DO, I USUALLY JUST DON'T

17    START UNTIL 10:30.  I SAY IF YOU ARE GOING TO VOTE, GO

18    VOTE IN THE MORNING SO WE DON'T HAVE TO GIVE EVERYBODY A

19    LUNCHTIME VOTE AND A NIGHTTIME VOTE AND WE HAVE EVERYBODY

20    KIND OF GOING AT ONE TIME.  OFF THE RECORD.

21        (WHEREUPON, AN OFF-THE-RECORD DISCUSSION OCCURRED.)

22        THE COURT:  OKAY.

23        MS. SHUMENER:  SO JUST TO RECAP THE MOTIONS ON

24    SUMMARY JUDGMENT OPPOSITIONS.  SO IN JUNE WE ARE GOING TO

25    SFG'S DOCUMENT LIST TELLING US WHAT DOCUMENTS THERE ARE

68

1     MISSING, ET. CETERA.  JUNE 18TH, WE RESPOND, MINOR

2     RESPONDS, RIGHT?

3       THE COURT:  ASK THEM.

4       MS. SHUMENER:  JUNE 25TH WE WRITE LETTERS TO THE

5     COURT IF WE CAN'T AGREE, RIGHT?

6       MR. DOUGLASS:  THAT'S RIGHT.

7       MS. SHUMENER:  THEN I'VE GOT THAT WE ARE GOING TO BE

8     HERE IN COURT TAKING 30(B)6 DEPOSITIONS IN JULY ON THE

9     29TH.  AND MY ONLY QUESTION IS:  DO WE HAVE ANYTHING SET

10    WITH RESPECT TO THAT AS TO TOPICS, IN OTHER WORDS,

11    DEADLINES WHERE WE AGREE WHAT THE TOPICS WILL BE?

12      THE COURT:  YOU NEED TO DO THAT.  YOU NEED A

13    DEADLINE FOR THAT.

14      MR. DOUGLASS:  WHY DON'T WE EXCHANGE TOPIC LISTS AT

15    THE SAME TIME WE EXCHANGE THE DOCUMENT LIST AND THAT WAY

16    WE CAN SUBMIT ANYTHING DISPUTED TO THE COURT AT THE SAME

17    TIME.

18      MR. ALPERT:  I FEEL LIKE THE TOPIC LIST WE HAVE KIND

19    OF TALKED ABOUT, BUT TO THE EXTENT WE HAVE TO PUT IT IN

20    WRITE, WE WILL.

21      THE COURT:  I WANT IT IN WRITING FOR BOTH SIDES.

22    THE DEVIL IS IN THE DETAILS.

23      MS. SHUMENER:  I AGREE. SO THE TOPICS LIST -- TOPICS

24    AND THE OPPOSITIONS REGARDING THE TOPICS AND THE LETTERS

25    TO THE COURT WILL ALL BE AGAIN THE 11TH, 18TH AND 25.

1     OKAY.  AND THEN ALL I HAVE FOR JULY THEN IS THE 30(B)6

2     MOTIONS.

3       THE COURT:  AND DOCUMENT PRODUCTION AND FACT

4     DISCOVERY.

5       MS. SHUMENER:  WHEN IS THE FACT DISCOVERY CUT OFF

6     DATE BECAUSE I DON'T HAVE THAT?

7       MR. ALPERT:  I THINK WHAT WE TALKED ABOUT IS THE END

8     OF JULY, JULY 30TH.  SO IF YOU GOT FACT DISCOVERY, I MEAN

9     OBVIOUSLY WE NEED TO GET THE DOCUMENTS AND THEN WE GOT A

10    NUMBER OF PEOPLE WHO WE HAVE IDENTIFIED WE WANT TO

11    DEPOSE.  AND SO, WE'LL HAVE THROUGH JULY 30TH TO FINISH

12    THOSE.

13      THE COURT:  CORRECT.

14      MS. SHUMENER:  SO DOCUMENTS AND DEPOS AND EVERYTHING

15    ELSE, WE'RE GOING TO BE FINE DOING ALL OF THAT UNTIL THE

16    END OF JULY?

17      THE COURT:  YES, MA'AM.

18      MS. SHUMENER:  WE ARE GOING TO DESIGNATE EXPERTS ON

19    AUGUST 10TH?  THAT'S ALL I HAVE FOR JULY, BY THE WAY; IS

20    THAT CORRECT?

21      MR. ALPERT:  I THINK SO.

22      THE COURT:  THAT'S RIGHT.

23      MS. SHUMENER:  SO AUGUST 10 IS EXPERT WITNESS

24    DESIGNATION.

25      MR. ALPERT:  CORRECT.

1       MS. SHUMENER:  AUGUST 31ST IS THE DEADLINE BY WHICH

2    TO COMPLETE EXPERT DEPOS.

3       MR. DOUGLASS:  THAT'S RIGHT.

4       MS. SHUMENER:  SEPTEMBER 10TH.  AND THAT'S ALL I

5    HAVE BY THE WAY FOR AUGUST.  SO IF THERE'S SOMETHING ELSE

6    THAT I'M MISSING.

7       MR. DOUGLASS:  I DON'T THINK SO.

8       MS. SHUMENER:  OKAY. SEPTEMBER 10TH, I HAVE REBUTTAL

9    WITNESSES DESIGNATIONS, ALL OF THESE ARE MUTUAL.

10      MR. DOUGLASS:  RIGHT.

11      MS. SHUMENER:  AND SEPTEMBER 24TH IS THE DEADLINE BY

12     WHICH TO DEPOSE REBUTTAL EXPERTS.

13      MR. DOUGLASS:  RIGHT.

14      MS. SHUMENER:  AND NOW MY CALENDAR IS LITTLE LESS

15     MESSY.  BUT NOW WE'RE IN OCTOBER.  AND OCTOBER 12TH IS

16     THE DEADLINE FOR THOSE SUMMARY JUDGMENT OPPOSITIONS.

17      THE COURT:  TO BE FILED WITH ME.

18      MS. SHUMENER:  YES.  CORRECT.  AND THE DEADLINE BY

19     WHICH TO FILE THE DAUBERT MOTIONS IS THE 15TH OF OCTOBER.

20      THE COURT:  CORRECT.

21      MS. SHUMENER:  AND THEN WE HAVE UNTIL THE 19TH, BY

22     THE CLOSE OF BUSINESS.

23      THE COURT:  3:00.

24      MS. SHUMENER:  3:00 P.M. EASTERN ON THE 19TH TO FILE

25     THE OPPOSITIONS TO THE DAUBERT MOTIONS.  AND THEN ON THE

1    20TH WE HAVE THE DAUBERT -- THE HEARINGS FOR THE DAUBERT

2    MOTIONS, FOLLOWED BY THE HEARINGS OF THE SUMMARY JUDGMENT

3    MOTION.

4        THE COURT:  YES, MA'AM.  THE 20TH AND 21ST.

5        MS. SHUMENER:  AND THE 21ST FOR MORE SUMMARY

6    JUDGMENT ISSUES.

7        THE COURT:  AND MOTIONS IN LIMINE.

8        MR. BRANNAN:  AND THE PROPOSED PRETRIAL.

9        THE COURT:  AND THE PROPOSED PRETRIAL ORDER, YES,

10   SIR, PROPOSED, CONSOLIDATED PRETRIAL ORDER WILL BE TAKEN

11   UP ON THE 21ST AS WELL, OKAY.

12       MS. SHUMENER:  AND THEN ON THE 25TH WE'RE DOING

13   MOTIONS IN LIMINE.

14       THE COURT:  YES, MA'AM.  AND, REMEMBER, SYNTHESIZED.

15   IN OTHER WORDS, JUST THINGS THAT I.

16       MS. SHUMENER:  JUST DISPUTES.

17       THE COURT:  DISPUTED MOTIONS IN LIMINE.  AND YOU

18   CONFER IN GOOD FAITH BEFORE YOU FILE THEM.  I REQUIRE

19   THAT -- TO TRY TO MAKE THEM NOT DISPUTED.

20       MS. SHUMENER:  AND THEN THE 28TH WE'RE GOING TO BE

21   FILING OPPOSITIONS TO THE MOTIONS IN LIMINE.

22       THE COURT:  ALL RIGHT.  AND THEN WE HAVE MOTIONS

23   LIMINE DECIDED ON THE MORNING OF THE 1ST.

24       MS. SHUMENER:  IS THERE ARGUMENT?

25       THE COURT:  IF I NEED IT.

72

1       MS. SHUMENER:  OKAY.

2       THE COURT:  IT'S PARTLY MORE LIKE A CONVERSATION AS

3    OPPOSED TO AN ARGUMENT.  GENERALLY I AM ABLE TO RESOLVE

4    THESE VERY QUICKLY.

5       MS. SHUMENER:  OKAY.  PICKING A JURY AND THEN WE

6    START.

7       THE COURT:  AND WE HAVE RESERVED POTENTIALLY THREE

8    WEEKS WITH THE UNDERSTANDING WE'RE LIKELY ONLY GOING TO

9    NEED TWO.  FOR WHAT I KNOW IN THIS CASE, I WOULDN'T THINK

10    IT WOULD TAKE MORE THAN TWO, BUT WE HAVE 11TH AND 12TH

11    DARK AND THE 5TH.

12       MR. ALPERT:  THE 5TH, THE 11TH AND 12TH ARE DARK .

13       THE COURT:  ALL RIGHT. THAT WAY THE JURY WILL KNOW

14    THAT IN ADVANCE.  AND WHEN YOU HAVE A JURY OVER TWO

15    WEEKS, THEY LIKE TO HAVE SOME TIME TO BE WITH FAMILY AND

16    ALSO TO KNOW THEY HAVE LONG WEEKENDS TO GO BACK TO THEIR

17    OFFICE AND THAT KIND OF THING.

18       MS. SHUMENER:  AND WE CAN ALL COLLAPSE ON THE WEEK

19    OF THANKSGIVING?

20       THE COURT:  OKAY.  ALL RIGHT.  WHO IS OUR SCRIBNER?

21    ALL RIGHT?

22       MR. DOUGLASS:  I THINK WE WERE GOING TO TAKE A CRACK

23    AT SUBMITTING AN AMENDED CASE MANAGEMENT ORDER.

24       THE COURT:  ABSOLUTELY.

25       MS. SHUMENER:  BY WHEN WILL I GET THE -- AND BY THE

73

1    WAY WE EVEN RESPONDED TO A LETTER RECENTLY SENT TO US

2    ABOUT INFORMATION AND DOCUMENTS REGARDING OUR EXPERTS AND

3    I WOULD LIKE EVERYTHING BACK REGARDING THAT.  WHAT WE

4    PAID THE EXPERTS, EVERYTHING. EVERY SHRED OF PAPER.

5        THE COURT:  SEND IT BACK.

6        MR. ALPERT:  AND WE ULTIMATELY GOT THAT STUFF

7    AFTERWARDS.

8        THE COURT:  WHEN YOU GOING TO GIVE IT BACK?  I DON'T

9    NEED A BUNCH OF FINGER POINTING.  COME ON. SEND IT BACK.

10       MR. ALPERT:  YEAH. WE'RE GOING TO GET IT, BUT

11    OBVIOUSLY WE'RE GOING TO GET IT BACK RIGHT WHEN YOU MAKE

12    YOUR DISCLOSURE.

13       MS. SHUMENER:  MAYBE.

14       THE COURT:  YEAH. SEND IT BACK. SEND IT BACK AS IF

15    IT NEVER WAS SENT. WITHIN A WEEK.  WITHIN A WEEK.

16       MR. ALPERT:  WHAT? TO SEND IT BACK?

17       MR. DOUGLASS:  WE'LL SEND IT BACK BY THE END OF THIS

18    WEEK.

19       THE COURT:  THE END OF THIS WEEK.  THANK YOU.  ALL

20    RIGHT.  FAIR ENOUGH.  GREAT JOB EVERYBODY.  I HAVE BEEN

21    VERY IMPRESSED HOW WE CAN SIT DOWN AND WORK THROUGH

22    PROBLEMS.  THE NEXT TIME THERE'S A PROBLEM, BEFORE WE

23    HAVE THIS AMOUNT OF PAPER AND THIS AMOUNT OF FINGER

24    POINTING, MAKE THIS THE LAST RESORT.  MAKE THE FIRST TO

25    JUDGE SCHAFER AND HE'LL MAKE SURE THAT JUDGE FORSLING HAS

1    A TELEPHONE CONVERSATION WITH YOU-ALL OR I MAY BE A BRIEF

2    WITH YOU-ALL SO WE CAN MOVE THIS FASTER.  I DON'T WANT TO

3    MOVE THE TRIAL DATE AGAIN, BUT I UNDERSTAND THE NEED

4    SOMETIMES TO DO ALL THIS PAPER AND I UNDERSTAND THAT

5    YOU-ALL FELT YOU HAD RESPECTIVE POSITIONS THAT NEED TO BE

6    ARTICULATED AND PROTECTED, BUT I'M ABOUT GETTING THIS

7    DONE.  SO NEXT TIME, JUST CALL AND WE'LL DO THIS FIRST

8    INSTEAD OF THIS.  FAIR ENOUGH TO EVERYBODY?  I WILL MAKE

9    MYSELF AVAILABLE TO YOU.  THANK YOU VERY MUCH. ALL RIGHT.

10      (WHEREUPON, THE HEARING CONCLUDED.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2           C E R T I F I C A T E

3  STATE OF GEORGIA:

4  FULTON COUNTY:

5

6        I HEREBY CERTIFY THAT THE FOREGOING TRANSCRIPT WAS

7  TAKEN DOWN, AS STATED IN THE CAPTION, AND THE QUESTIONS AND

8  THERETO WERE REDUCED TO TYPEWRITING UNDER MY DIRECTION; THAT

9  THE FOREGOING PAGE 1 THROUGH 76 COMPLETES AND REPRESENTS A

10  TRUE AND CORRECT TRANSCRIPT OF THE EVIDENCE GIVEN UPON SAID

11  HEARING, AND I FURTHER CERTIFY THAT I AM NOT OF KIN OR COUNSEL

12  TO THE PARTIES IN THE CASE; AM NOT IN THE REGULAR EMPLOY OF

13  COUNSEL FOR ANY OF SAID PARTIES NOR AM I IN ANYWISE INTERESTED

14  IN THE RESULT OF SAID CASE.

15  THIS 16TH OF JUNE, 2010.

16

17      _____

18        OCTAVIA L. WINFREY, CSR B-2422

19         MY COMMISSION EXPIRES THE

20          31ST DAY OF MARCH 2011

21

22

23

24

25

76

# EXHIBIT "2"

1              IN THE STATE COURT OF FULTON COUNTY

2                       STATE OF GEORGIA

3

4    SPECIALTY FINANCE GROUP, LLC,          CIVIL ACTION FILE

5                   Plaintiff,              NO. 09-EV-006754

6            vs
                                            Motion to Dismiss
7    MINOR FAMILY HOTELS, LLC,

8                   Defendant.              COPY

9

10                         - - -

11        Transcript of proceedings before the HONORABLE

12           SUSAN B. FORSLING on April 8, 2009,

13             Atlanta, Fulton County, Georgia.

14                         - - -

15

16   APPEARANCES OF COUNSEL:

17   For the Plaintiff:            ROBERT P. ALPERT, Esq.

18                                 ELIZABETH BALLARD, Esq.

19   For the Defendant:            ARTHUR D. BRANNAN, Esq.

20

21

22

23   CAROL JOHNSON, CCR, RPR

24   Official Court Reporter

25   State Court of Fulton County

1        TRANSCRIPT OF PROCEEDINGS

2        THE COURT:  All right.  We have a Motion to Dismiss,

3    right?  Motion to Stay, or in the alternative Motion to

4    Dismiss, that's the bottom line?

5        MR. ALPERT:  Yes.

6        MR. BRANNAN:  Yes, Your Honor.

7        THE COURT:  Being there is a case in Virginia.  Some

8    of y'all think it should go to Virginia, some of y'all

9    think this is a straightforward, garden variety, quote,

10   suit on a note, and we are going to decide which it is

11   today.  Okay.

12       Both sides ready to proceed?  All right.  Any

13   preliminary matters?

14       MR. BRANNAN:  No, Your Honor.

15       THE COURT:  All right.  You're the movant.  You may

16   proceed.

17       MR. BRANNAN:  Thank you, Your Honor.

18       Your Honor, my name is Art Brannan, with the DLA

19   Piper firm.

20       THE COURT:  Yes, sir.

21       MR. BRANNAN:  And we represent the defendants in

22   this particular proceeding.  They are Minor Family Hotels

23   and Halsey Minor, who is an individual, who guaranteed

24   the loan in this particular case.

25       And just by way of very brief factual introduction,

1    I'm sure you've received the papers.

2        THE COURT:  I have read everything, but please feel

3    free to give me your full argument, sir.

4        MR. BRANNAN:  Okay.  As you know there are two

5    lawsuits here, and they stem out of a construction

6    project for a small, upscale hotel in Charlottesville,

7    Virginia.  And in particular the matters that are before

8    this Court relate, currently relate to a March 2008

9    construction loan agreement which was for $23,690,000, of

10   which a little bit over $10 million has been funded so

11   far.

12       Again, that loan was to finance the development of

13   the hotel in Charlottesville.  It was an upscale boutique

14   hotel, consisted of 101 rooms.  It was a ten story, high

15   end hotel, as I mentioned, restaurant, private dining

16   club, lobby bar, meeting space, outdoor pool, exercise

17   room.  It's quite a project.

18       Our clients, the defendants in this case, have

19   entered into a development agreement with Hotel

20   Charlottesville, LLC, and its principal is Lee Danielson,

21   and they're defined in the papers and representatives as

22   the agent of Minor Family Hotels.

23       The developer here, he had close ties to the lender,

24   and had been working with the lender with respect to

25   identifying -- or on this particular project, before our

1    clients became involved in the project.  As a result

2    there had been work that had been done with respect to

3    the development and the preparation of budgets for this

4    project before our client became involved.

5          The defendants here relied on the representations of

6    the lender and the developer with respect to the

7    viability of the construction budgets that had been

8    performed, and those construction budgets were provided

9    to the defendants by the lender.  In reliance, certainly

10   in part on those budgets, our clients entered into the

11   loan agreement and the guaranty.

12         The budget proved to be inadequate and unrealistic,

13   failed to include key project components, perhaps most

14   notably the restaurant.  There were other issues that

15   were not in the budget that needed to be.  There were, or

16   alleged to be efforts on the part of the lender working

17   together with the developer to conceal the budget issues

18   from the defendants.  These started to come to light.

19         Minor Family Hotels terminated its contract with the

20   developer.  Hired its own consultants to then, to get to

21   the bottom of things.

22         Then in February of this year, February 11, 2009,

23   the suit in Virginia was filed.

24         THE COURT:  Isn't that a City Court that I see?

25         MR. BRANNAN:  It's the Circuit Court for the city of

4

1    Charlottesville.

2        THE COURT:  Is it similar to general jurisdiction

3    trial court such as this one?

4        MR. BRANNAN:  That's my understanding, but that's

5    based on some old information.  My recollection of having

6    handled another case in Virginia about eight years ago.

7        THE COURT:  Okay.

8        MR. BRANNAN:  Okay?  But that's my understanding.

9        THE COURT:  All right.

10        MR. BRANNAN:  I mean, that case was filed against

11    Lee Danielson and Hotel Charlottesville, LLC.  That

12    original filing did not include a claim against the

13    lender, Specialty Finance Group.

14        At that time the defendants were still talking with

15    SFG, Speciality Finance Group, and eventually they had

16    this telephone conference which you no doubt read about

17    in the opposing party's papers on February 19, 2009.

18    While we would dispute their characterization of

19    everything that took place in that call, and I'm not sure

20    we are here to get to the bottom of who said what to who

21    when, but suffice it to say the call did not go well.

22        Specialty Finance Group essentially blamed our

23    client for problems with the budget that it had provided

24    to our clients, and for the problems with respect to

25    management of the project that arose from the inadequacy

1    of the budgets.

2        The call deteriorated, nothing was resolved.  It was

3    at that point that the defendants here determined that

4    they weren't going to be able to work anything out or

5    continue this project with the lender.  And it was at

6    that point they began and subsequently filed the next

7    day, or began to prepare and subsequently filed the next

8    day the Motion for Leave to amend the complaint in

9    Virginia, and that was filed on February 20th, 2009.

10        There was a hearing that was conducted on March 12,

11    2009, and the Court granted the motion, and the order,

12    which is dated March 23, 2009, reflects that ruling.

13        On a parallel track, flowing from that February 19,

14    telephone conference, SFG sent a notice of default to the

15    defendants alleging various defaults, and those are

16    outlined in Exhibit E to their complaint.

17        THE COURT:  Was that the first letter of default, or

18    wasn't there one in December that I recollect?

19        MR. BRANNAN:  There was a --

20        THE COURT:  Was it November?

21        MR. ALPERT:  I think it was November.

22        THE COURT:  I knew there was one before the end of

23    the year.

24        MR. ALPERT:  You're exactly right.  I think it was

25    November 13th, Your Honor.

1            THE COURT:  Thank you.  I thought so.

2            MR. BRANNAN:  There was a prior notice of default.

3        In fact, I believe that notice of default is referenced

4        in the February 23.  It is.  Okay.

5            THE COURT:  Right.

6            MR. BRANNAN:  So there was a subsequent notice of

7        default, on February 23 -- I'm sorry, on February 19.

8            THE COURT:  Right.

9            MR. BRANNAN:  On February 23, four days later, after

10        learning that a Motion to Accelerate -- or, I'm sorry,

11        that the Motion for Leave to Amend had been filed in

12        Virginia, the lender then sends a notice to the

13        defendants accelerating the maturity date of the loan and

14        demanding payment of the approximately $10.5 million.

15            THE COURT:  Right.

16            MR. BRANNAN:  The next day, February 24, 2009, the

17        lender files the suit here on the note and guaranty.

18            So we have two lawsuits, one in Virginia and one

19        here.  We have not obviously filed an answer or

20        counterclaims here.  It's my understanding that the

21        current status in Virginia is that the, that SFG has not

22        yet been required to file an answer there.

23            THE COURT:  Okay.

24            MR. BRANNAN:  I think that is due in about a week,

25        is that right, a week, ten days?

1    MR. ALPERT:  A responsive pleading is due in about

2    a week to ten days, Your Honor.

3    MR. BRANNAN:  Fair enough.  I have not been

4    practicing in Georgia long enough, I was thinking in

5    terms of an answer.

6    THE COURT:  Well, I understand, and I know there was

7    some concern by the attorneys for SFG, that this Court

8    sort of adopted the federal practice in this, but given

9    the fact that there was this other lawsuit, I felt it

10    appropriate to go ahead and hear this Motion to Dismiss

11    before I required the answer.  So I kind of go back and

12    forth, too, having the history of practicing before

13    coming on the bench.  So sometimes it's hard to keep it

14    straight.

15    But at any rate, they have yet to respond in

16    Virginia.  I have delayed your client's response to this

17    matter in terms of an answer until some point after I

18    rule on this motion.

19    MR. BRANNAN:  Yes.

20    THE COURT:  Fair enough.  That's where we are.

21    MR. BRANNAN:  That's where things stand.  It would

22    be, certainly be our intention in the event that this

23    motion is denied, and we are required to respond, that we

24    would be asserting counterclaims that essentially would

25    mirror the claims that are filed against Lee Danielson

1    and his LLC, as well as against the lenders in this case.

2    All right. We don't know whether the lender will

3    file a counterclaim in Virginia on the note and guaranty.

4    I suspect that they would, but we don't know. That will

5    have to wait and see whether the issues all truly line up

6    right on down the line, or whether they only line up 80

7    percent of the way, or 90 percent of the way.

8    THE COURT: Right.

9    MR. BRANNAN: One issue that we'll talk about a

10    little bit more in a minute is that there is a concern, a

11    big concern on our part whether Lee Danielson and the

12    Hotel Charlottesville, LLC, would be subject to this

13    court's jurisdiction because of a lack of contacts with

14    the state of Georgia. And so if we were to proceed in

15    Georgia, we do not believe that we would have all the

16    parties necessary to truly and finally conclude this

17    case. It would necessitate two cases to go forward with

18    largely overlapping issues, witnesses, claims, et cetera.

19    So we have two lawsuits. Essentially we have the

20    same claims. We are going to have the same witnesses in

21    these cases, with respect to the various issues and what

22    happened, what occurred. It involved the same project.

23    It involved the same land which, by the way, secures the

24    loan and is located in Virginia. The same loan documents

25    are going to be at issue in both actions. The same

1        factual and legal issues are going to be involved.

2              They may or may not have the same parties, depending

3        on whether or not this Court has jurisdiction, but we

4        would contend that the Virginia action, which is already

5        pending, is all the parties already involved in that

6        case.  And the court has jurisdiction over everyone

7        there, and the case is proceeding, discovery is

8        proceeding in that case.  That that case is the better

9        forum for these disputes to be resolved.

10             THE COURT:  They would, though, based on the terms

11       of the note in one agreement, would require the Virginia

12       Court to apply Georgia law in construing the note; am I

13       correct?

14             MR. BRANNAN:  Yes.

15             THE COURT:  Okay.

16             MR. BRANNAN:  Yes.

17             THE COURT:  Whereas if it stayed here, we would have

18       a Georgia judge, presumably with some knowledge of

19       Georgia law, applying Georgia law on the note.  So that

20       would be one fundamental difference.  I hear everything

21       you say about the parties and where the land is, but that

22       would be --

23             MR. BRANNAN:  That certainly is a, that certainly is

24       a fundamental difference.  I cannot sit here and tell you

25       what the significant differences are with respect to

1    Virginia law and Georgia law --

2         THE COURT:  I wouldn't expect you to.

3         MR. BRANNAN:  -- in interpreting a note.

4         THE COURT:  I wouldn't expect you to.

5         MR. BRANNAN:  And I'm not sure they would be that

6    different, but we don't know.

7         THE COURT:  I don't know.  But it would, excuse me,

8    that's okay.  That's the reason I asked about this kind

9    of court because you want to think about the City Court

10   of Atlanta.  If it's the same kind of court, it's not,

11   generally doesn't deal with these kinds of things, and

12   then when you try to impose a further, I won't say

13   burden, but obligation or responsibility on them to apply

14   another state's law that may not be, I don't know, that's

15   why I'm asking something.

16        But let's just leave it on the table, but that is

17   one factor to consider in all of this, and I apologize

18   for interrupting you.  I really do.

19        MR. BRANNAN:  No, no, please.  But by the same token

20   the law, and I've not done a choice of law analysis on

21   this, but I suspect that the law that would be applied to

22   various of the tort-based claims that are being asserted

23   in the Virginia action now against the lender may not be

24   governed by Georgia law.  And if those claims then are

25   asserted here, this Court will be construing another

11

1     state's law with respect to perhaps a fraud claim, breach

2     of fiduciary duty, other, if you will, tort-based claims.

3          THE COURT:  I don't know, though, the fraud is a

4     defense to the note, my guess is, and the venue is here,

5     and everybody agrees to choice of law here, we would

6     apply Georgia common law and or statutory law fraud to

7     that note.  I don't know.  To the extent it's a defense

8     to the note, my guess is Georgia law would encompass all

9     of that.

10         To the extent to your other point, that there may be

11    other tort actions that are outside the context of the

12    strict defense to the note with these other parties, you

13    may well be right, which would mean if that happened, if

14    I had jurisdiction, if there were a counterclaim bringing

15    this in, I may have to apply Virginia law.

16         MR. BRANNAN:  As I said, I've not done the analysis.

17         THE COURT:  Yeah.  It's been a long time since we

18    have done that.  I don't know about you, but since I took

19    conflict of the law.  Okay.

20         MR. BRANNAN:  Which brings us to the motion.

21         THE COURT:  All right.

22         MR. BRANNAN:  All right?

23         THE COURT:  Sure.

24         MR. BRANNAN:  And let's start with the Motion to

25    Stay, all right?  The Motion to Stay, I think one thing

1    the parties agree on is that this Court has the

2    discretion to stay this proceeding.

3        THE COURT:  Sure.  Right.

4        MR. BRANNAN:  It's within the Court's discretion.

5        THE COURT:  It's not unlimited or unfettered.  We

6    all agree on that, too.

7        MR. BRANNAN:  I would agree to that.  And I think

8    that the briefing, of course, focused on two points,

9    which the first is which -- whether the Virginia case or

10   the Georgia case was the first filed case.  And secondly,

11   whether the equitable considerations weigh in favor of a

12   stay or not.

13       THE COURT:  And to me the latter are more important

14   than the former.

15       MR. BRANNAN:  I agree.  I think that either the, you

16   could almost reverse them and say that the -- we looked

17   to the equitable considerations, and if it's a tie we go

18   to first filed.

19       We believe that our case in Virginia should be

20   treated as a first filed case and, you know, and

21   certainly, you know, we can walk through the case law and

22   I'll explain to you why.  I am more than happy, though,

23   to talk straight forward about the equitable

24   considerations.

25       THE COURT:  That would be fine.

1          MR. BRANNAN: That would be fine?

2          THE COURT: Yes, sir. I'm pretty clear about the

3      chronology of the filings and --

4          MR. BRANNAN: Because, I mean, under -- if it

5      matters, under the first filed, the relation, but there

6      is, you know, there is some confusion and some citations

7      that are not necessarily on point with respect to the

8      first filed rule. And if that matters, I would want to

9      explain that, but if it's not going to matter, I'm not

10     going to waste your time.

11         THE COURT: It really doesn't matter to me. I'm

12     just exercising my discretion. Thank you.

13         MR. BRANNAN: Fair enough.

14         THE COURT: We are communicating well. Thank you.

15         MR. BRANNAN: All right. I don't want to waste the

16     next 15 minutes of this Court's time talking about

17     something that doesn't really matter to the Court.

18         THE COURT: Yeah. Good idea. Would you pass that

19     along to some of your colleagues? All right.

20         MR. BRANNAN: I will turn the page.

21         THE COURT: All right. Let's turn to some equities.

22         MR. BRANNAN: The equitable considerations here, and

23     again, you know, there is a, as I said, we, the parties

24     agree and basically, you know, the first filed rule

25     governs only, you know, in the absence of a

1      countervailing equitable considerations.  So that's why I
2      characterized it a minute ago really as a tie breaker.
3          The equitable considerations really fall into these
4      three groups of the convenience of the parties and the
5      witnesses; the interest of the courts in providing
6      efficient administration of justice; and potential
7      prejudice to the respective parties.
8          With respect to the convenience of the parties and
9      the witnesses the, you know, in a nutshell, I mean, we've
10     got two lawsuits here.  And the two lawsuits, if they
11     proceed on parallel tracks, that Virginia case is going
12     forward.  The court has said that it wants it, wants it
13     to move forward expeditiously.  Discovery has been
14     served, you know, it's going forward.
15         Now, maybe, maybe the plaintiffs here will be moving
16     for a stay when they file their responsive papers up
17     there.  I don't know.  I don't know how well received
18     that will be by the court.  I just don't know.
19         THE COURT:  I think they are going to be moving for
20     forum non conveniens, to transfer under the papers.  I
21     don't know, but you may be making this same argument up
22     there.  I just want you to know.
23         MR. BRANNAN:  If the stay is granted here, and they
24     do there, and it comes back here, the stay can be lifted.
25         THE COURT:  That's true.  And let's just be real

1        clear on the context, you are making a forum non

2        conveniens argument; are you not?

3              MR. BRANNAN:  No.

4              THE COURT:  No?  You are not?

5              MR. BRANNAN:  No.

6              THE COURT:  Okay.  You're making a stay under

7        general equitable principles in the three categories.

8              MR. BRANNAN:  Yes.

9              THE COURT:  All right.  Let me just make sure I'm

10       hearing you.

11             MR. BRANNAN:  We did not move to dismiss for forum

12       non conveniens.

13             THE COURT:  Okay.

14             MR. BRANNAN:  We are not making that argument.

15             THE COURT:  All right.  Okay.  Good.

16             MR. BRANNAN:  I mean, there are some overlapping,

17       you know, there is some overlapping issues certainly

18       but --

19             THE COURT:  Excuse me, you did have the alternate,

20       you know, Motion to Dismiss which is what made me think

21       you were doing both.  But really what you're looking at

22       is a stay on these equitable grounds.

23             MR. BRANNAN:  Yeah.  The Motion to Dismiss is based

24       on their failure to allow us the cure period before

25       filing suit.  It is not a forum non conveniens --

1      THE COURT:  All right.  I read that.

2      MR. BRANNAN:  -- based dismissal.  All right.

3      THE COURT:  All right.

4      MR. BRANNAN:  But what we are focusing on is, I

5   mean, we are talking about convenience of the parties and

6   the witnesses, but not in a forum non conveniens standard

7   but from the standpoint of the parties should not have to

8   appear in two lawsuits.  Should not have to litigate two

9   lawsuits.  And in particular, witnesses should not have

10  to be deposed twice in two separate lawsuits, appear in

11  two different courtrooms, two, you know, before what will

12  likely will be two juries, and tie up resources and what

13  have you.

14      Now that's in a nutshell, when we talk about the

15  convenience of the parties and the convenience of the

16  witnesses, that's what we, you know, the gist of that

17  prong of our argument.

18      THE COURT:  All right.  Okay.  I don't mean to

19  belabor, this is why I was a little confused.  At page

20  11, in the footnote on your brief, it says, you cite our

21  forum non conveniens statute, and that's what threw me

22  off.  So I appreciate that clarification because it's

23  where it says Virginia is the Proper Forum, and then it

24  says O.C.G.A.  I know you said you'd only seek to stay,

25  yada tada.

1          But it implies that you were relying on those

2     factors, and so I really, really appreciate that

3     clarification.  It's important in terms of, for the

4     exercise in discretion or whether I'm doing the

5     analytical, the analysis that I'm suppose to do, yeah.

6     Okay.

7          MR. BRANNAN:  And that was raised simply for

8     reference by analogy.

9          THE COURT:  Context, too.  I understand.  Okay.

10    Good.

11          MR. BRANNAN:  Okay.

12          THE COURT:  So duplicity in terms of --

13          MR. BRANNAN:  Yes.  And how that, how that

14    duplicity, which will fall under the efficient

15    administration of justice, so these arguments are a bit

16    redundant.  But it's how that then filters down to the

17    parties and to the witnesses.

18          If we've got to produce documents twice, answer

19    interrogatories twice, depose witnesses twice, witnesses

20    have to appear for deposition twice, you know, we just go

21    on and on.  To the extent they are experts, experts are

22    going to have to -- expert witnesses are going to have to

23    appear twice.  You are going to have increased cost for

24    the parties, you know, both with attorneys and with

25    expert consultants.  You just, I think I've probably

1       covered the issue.

2               THE COURT:  No, I understand your point.

3               MR. BRANNAN:  As far as the efficient administration

4       of justice, you've got two lawsuits that in all

5       likelihood are going to cover the same issues.  The two

6       reasons why you may not are, one, this Court may not have

7       jurisdiction over Danielson and Hotel Charlottesville.

8       Two, in the Virginia case the two might not overlap to

9       the extent that the lender, SFG, elects not to file a

10      counterclaim on the note and guaranty, for some reason.

11              THE COURT:  And I assume you have jurisdiction over

12      Specialty Finance Group in Virginia?

13              MR. BRANNAN:  We believe that we do.

14              THE COURT:  Based on contact, maybe, but not

15      necessarily based on the terms of the agreement.

16              MR. BRANNAN:  Correct.

17              THE COURT:  Okay.  I just want to make sure because

18      there is, again we are still in this "what if" because of

19      the posture, but there is still a possibility that you

20      may not have SFG squarely in that lawsuit in Virginia.

21              MR. BRANNAN:  And they haven't responded and they

22      may be filing a Motion to Dismiss for lack of

23      jurisdiction.  I'm not sure how.  I'm sure if they are

24      they may stand up and explain it.

25              THE COURT:  I'm sure they will if you are right.

1     MR. BRANNAN:  So, again, for clarification, I don't

2  want to characterize these lawsuits necessarily as being

3  truly identical.

4     THE COURT:  You're being very fair.

5     MR. BRANNAN:  They very well could be, though, if

6  the counterclaims are filed and jurisdiction exists in

7  both courts over all of the defendants.

8     What we do know, though, as of right now, as we sit

9  here today all of the parties are -- or all of the

10  possible parties here are in the Virginia lawsuit today.

11  They may get out at some point, whether it's for lack of

12  jurisdiction or some other reason, and we know as we sit

13  here today that that case is proceeding, it has not been

14  stayed.  It may subsequently be stayed, we don't know, we

15  haven't seen, again, their responsive papers.

16     So what you have, though, is you have two lawsuits.

17  One in Virginia is proceeding.  It makes -- it simply

18  makes no sense from the standpoint of an efficient

19  administration of justice to have two lawsuits involving

20  the same issues proceeding in two different states.

21     Again, everything has to be done twice.  There is a

22  risk of inconsistent rulings.  We essentially put

23  ourselves in a position where two courts at the, you

24  know, depending how the parties feel about the courts are

25  going to be pushing one court as opposed to the other to

1   make key rulings, and then the arguing, and again, I

2   haven't done the analysis, but we are going to have issue

3   preclusion.  We are going to have res judicata, what we

4   are going to have.  And that really is not conducive to

5   the efficient administration of justice.

6       Further, if there is no jurisdiction over Mr.

7   Danielson and Hotel Charlottesville, this action cannot

8   resolve all the issues that are involved in this case.

9   Whereas the Virginia case, which does have -- and there

10  is jurisdiction over both Mr. Danielson and Hotel

11  Charlottesville, we will be able to resolve all the

12  issues with respect to all of the parties who presently

13  are in that case and the case is proceeding.

14      THE COURT:  All right.

15      MR. BRANNAN:  The last issue with respect to the

16  efficient administration of justice prong goes to the

17  issue that the property is located in Virginia.  This

18  loan secures property in Virginia.  That property is in

19  Charlottesville.  The courts there have a greater

20  interest in that property, I would argue, than do the

21  courts in Georgia, and the ultimate disposition of that

22  property, should there ultimately be, you know, further

23  proceedings with respect to that property.  And that the

24  court there is in the better position to resolve the

25  issues, and ultimately to deal with any disposition of

1    the property, through foreclosure or otherwise, should

2    that occur, than a court here rendering a decision that

3    then fosters additional litigation in Virginia, should

4    the case go there.

5         THE COURT:  But they are not seeking closure.

6         MR. BRANNAN:  Well, they can't, they can't.

7         THE COURT:  I mean, they are seeking payment of a

8    debt against the guarantor as well as the obligor; am I

9    right, here?  I'm not looking at anything where they are

10   requiring me to do something in Virginia.

11        MR. BRANNAN:  No, absolutely not.

12        THE COURT:  But what you're saying is their interest

13   is the interest in the property, the end run interest is

14   clearly waived in Virginia.

15        MR. BRANNAN:  And this could lead there.

16        THE COURT:  Could, yeah.

17        MR. BRANNAN:  And in the event it does, it's yet

18   another proceeding.

19        THE COURT:  Yeah.  It would require a domestication

20   of that judgment in Virginia, I assume, or something, I

21   don't know, but you're saying it might require another

22   proceeding to go against the property if they decide to

23   do it.  I'm not sure if that's right, because I haven't

24   read every word of the deed to secure debt, I have to be

25   honest with you.  But I hear what you're saying.  But we

1    don't have an issue of whether they mean view the

2    property, jurors would need to view the property, we

3    don't have anything like that.  I mean, that's not an

4    issue, right?  I mean, we are not looking at --

5         MR. BRANNAN:  I don't think so.

6         THE COURT:  Okay.  Good.  It's not like that.

7         MR. BRANNAN:  You do have witnesses there.  There

8    are witnesses here.  So, I mean, there is a lot of coin

9    toss issues.

10        THE COURT:  There is some in California, right?

11        MR. BRANNAN:  There are some in California, though

12   we'll take issue, or maybe I would even concede it's

13   easier to get there from Atlanta.

14        THE COURT:  Some days.

15        MR. BRANNAN:  It depends.

16        THE COURT:  One never knows.  Yeah, Charlottesville

17   can be real difficult to get to.

18        MR. BRANNAN:  The third prong, which is the

19   potential prejudice to the parties, simply put, it's best

20   to have all parties in the same lawsuit and get this

21   resolved once and again, you know, and avoid the risk of

22   inconsistent rulings.  The risk of inconsistent rulings

23   here is the single, in our view, is the single greatest

24   potential prejudice to the parties.

25        THE COURT:  I knew that's probably right.

23

1          MR. BRANNAN:  And we obviously don't know which

2     party it poses the greatest prejudice yet, but that's --

3          THE COURT:  Maybe an issue by issue determination.

4          THE COURT:  So unbalanced we strongly believe that

5     the equities favor a stay here, and under all three of

6     those prongs that in determining how this Court should

7     exercise its discretion, that it comes down in favor of a

8     stay.

9          With respect to the Motion to Dismiss, which we

10    argue in the alternative, I'll keep that very short.

11    It's our position, it's laid out in our motion and

12    supporting memorandum, that there is an opportunity to

13    cure after the default.  Notice is furnished to us and if

14    we, in filing the lawsuit the next day is premature, did

15    not afford our contractural right to attempt to cure, and

16    therefore the case should be dismissed as premature.

17         THE COURT:  How do you respond to the notion that

18    there was a prior notice of default, that's why I brought

19    that up earlier, and then once the second notice came in,

20    there was an acceleration.  So then therefore it became a

21    payment default, as soon as the accelerated payment

22    wasn't paid, so you don't get the cure period.  How do

23    you respond to that?

24         MR. BRANNAN:  Well, with respect to the

25    acceleration, which is really what this is all about.

24

1      THE COURT:  Yeah.  I mean, (a), does that not now

2    convert it into a payment issue?  And if so, (b) are you

3    then therefore not entitled to a cure period?  Or is

4    there at least some issue that needs to be litigated on

5    that so a Motion to Dismiss isn't appropriate?  And I

6    apologize for throwing three questions out there, but

7    you're following me.

8      MR. BRANNAN:  But I will say this, in looking at

9    this issue, all the way around, even if we are entitled

10   to dismiss, we would be entitled to dismiss solely

11   without prejudice.  All right?  Which ultimately, if this

12   Court is proceeding on the Motion to Stay, based on

13   equitable considerations, a dismissal without prejudice

14   only becomes important if it reestablishes a first filed

15   date.  Okay?  This is going to be litigated.

16      THE COURT:  Right.

17      MR. BRANNAN:  We are not arguing that the failure,

18   or that the failure to allow the cure period to run is a

19   dispositive issue and would warrant dismissal with

20   prejudice.

21      THE COURT:  Okay.

22      MR. BRANNAN:  Okay?  So with that said, I'm not sure

23   it matters, and I'm not saying we are not right because

24   we believe we are, but I'm not sure it matters how that

25   issue is resolved.

25

1          THE COURT:  All right.  I understand that.

2          MR. BRANNAN:  Is that fair?

3          THE COURT:  Yeah, that's very fair.  You've been

4    very fair and very well organized and very responsive,

5    and I appreciate that.

6          MR. BRANNAN:  Do you have any questions at this

7    time?

8          THE COURT:  No, you've answered them all.  Thank you

9    very much.

10         MR. BRANNAN:  Then I'll sit down for now.

11         THE COURT:  I appreciate it.  Thank you very, very

12   much.

13         All right.  Who's going to argue on behalf of SFG?

14         MR. ALPERT:  Your Honor, good morning, Bob Alpert.

15         THE COURT:  Your turn, Mr. Alpert.

16         MR. ALPERT:  How are you this morning?

17         THE COURT:  Fine.  Good to see you.

18         MR. ALPERT:  Good to see you as well.  I ran into

19   John Ridley on the elevator up.  He asked me to say

20   hello.

21         THE COURT:  Okay.  How's he doing?

22         MR. ALPERT:  He's doing well.  He's doing very well.

23         THE COURT:  He keeps going.  He's a blast from the

24   past, the 80s.

25         MR. ALPERT:  I think you're exactly right.  I

1     remember him from the summer associate program about 14

2     years ago.

3           THE COURT:  Oh, gracious sakes.

4           MR. ALPERT:  But, Your Honor, I plan to argue the

5     Motion to Dismiss -- the Motion to Stay, and then at the

6     end if you have some questions on the Motion to Dismiss,

7     Elizabeth Ballard from our firm is going to handle those.

8           THE COURT:  How are you?  Okay.  Thank you.

9           MR. ALPERT:  Your Honor, I'm going to start --

10          THE COURT:  Are you going to let Ms. Ballard sit up

11    here at the big table with the big boys?

12          MR. ALPERT:  We finally got a chair.

13          THE COURT:  Ms. Ballard, come on up.

14          MR. ALPERT:  Come on up, Ms. Ballard.

15          THE COURT:  It's been a long time.  As far as I know

16    women are allowed to come to the bar and sit.  You want

17    to be up here with the big boys.  All right.

18          MS. BALLARD:  Thank you.

19          THE COURT:  You're welcome, Ms. Ballard, because I

20    know your name is on the complaint as well.

21          MR. ALPERT:  Your Honor, I would like to start with

22    some of the equitable factors that he talked about and

23    make sure we address those first.  And then Mr. Brannan

24    covered a lot of ground, and I want to make sure I hit

25    all the points that he's made, and I want to make sure I

1       answer all your questions.

2           THE COURT:  I appreciate that.  So have your

3       argument, take as much time as you need.

4           MR. ALPERT:  Your Honor, I think you made a very

5       good point earlier when you asked Mr. Brannan about the

6       choice of law, and how Georgia law is going to apply to

7       this dispute.  You're exactly right.  Georgia law is

8       going to apply to this dispute for a number of different

9       reasons.  And, in this particular case, Judge Forsling,

10      there is a significant difference between Georgia law and

11      other state's law that is important, and I want to take a

12      moment to talk about both of those things.

13          As you aptly stated earlier, the documents

14      themselves call for Georgia law to apply.  Georgia courts

15      routinely enforce those provisions.

16          THE COURT:  We do.

17          MR. ALPERT:  And so Georgia substantive law will

18      apply.

19          Now, in this dispute, in this dispute we have a

20      breach of contract claim, or a straightforward suit on a

21      note and guaranty.  If you look at the defenses that the

22      defendants have raised as claims in Virginia, a lot of

23      them are fraud based.  In fact, the main one is

24      fraudulent inducement.  It says you duped me into signing

25      this document, and therefore I should be relieved of my

1    obligations.

2        Well, Georgia is a little bit different from most

3    states on that law, and Georgia law is very specific.  It

4    says in connection with the contract you have either got

5    to (a) rescind the contract and sue for fraud; or (b),

6    affirm the contract and sue for breach of contract and

7    seek damages thereunder.

8        THE COURT:  You have to elect.

9        MR. ALPERT:  You have to elect, different from a lot

10    of states, and in this instance the defendants have not

11    done that.  They have not elected to rescind.  In fact,

12    they have gone the exact other way, and they have

13    affirmed the contract by suing on it.  So they have no

14    fraud claims.

15        And what's more important, Your Honor, and one of

16    the reasons why we think this matter will be handled

17    expeditiously in Georgia is that we will move for

18    judgment on the pleadings or summary judgment very soon.

19    As soon as their responsive pleading is filed -- excuse

20    me, as soon as their answer -- I get confused with the

21    state and federal as well.

22        THE COURT:  That's all right.  You know, over

23    y'all's objection I did kind of adopt a federal

24    procedure.  At times I think it works, it's easy to flip

25    back and forth.  I do that, and I adopt the Rule 26.  I

1        do both of those for experts.  Those two things I do in

2        my court.

3            MR. ALPERT:  I get those confused.  You know when I

4        get confused is the declaration's affidavit.  The

5        affidavit in state court declarations that are called.

6        Not a problem.

7            The important thing is at some point an answer will

8        be filed, hopefully.  We will move for judgment on the

9        pleadings or for summary judgment, and we will say there

10       is a contract, you breached it, and we are entitled to

11       damages.

12           What we anticipate their defense being, and you can

13       see in the amended complaint that's attached to Ms.

14       Shumener's affidavit, you can see they're setting up a

15       defense for you tricked me into signing these documents,

16       by putting aside whether or not that's possible.  That

17       defense is gone.  It is gone.  They don't have it, based

18       on clear Georgia law about what you need to do in

19       connection with fraudulent inducement.

20           So I think the point about Georgia law applying is

21       very important.  I think the other thing that is

22       important to understand, Judge, and you know you talked a

23       little bit about conflict of laws and we all know that

24       that is a tricky area.  But we've been doing a little bit

25       of research in that regard, and what's interesting is

30

1     this, even assuming the Georgia choice of law provision

2     didn't apply, or assuming that somehow these extra

3     contractural provisions were not entitled to applying

4     Georgia substantive law, there is one law that's

5     definitely not going to apply and that's Virginia.

6     Virginia is not going to apply to this dispute.

7          The only question is whether or not Georgia law or

8     possibly California law might apply, and that's because

9     all the documents in this case were negotiated between

10    Georgia and California.  The alleged injuries in

11    connection with misrepresentations, what happened in

12    Georgia or California.  So you had injuries in California

13    or Georgia.  You had representations in California or

14    Georgia.  You had documents signed in California or

15    Georgia.  None of this happened in Virginia and --

16         THE COURT:  I don't mean to jump ahead, but that

17    also calls into question whether your client would be

18    subject to jurisdiction in Virginia, which goes to this

19    overall issue are we going to have two parallel lawsuits

20    going?

21         MR. ALPERT:  Well, you're exactly right.

22         THE COURT:  I'm jumping ahead but it's the same

23    point as Georgia -- to your point, is Georgia and

24    California the two states?

25         MR. ALPERT:  I agree.  I agree with you 100 percent.

1        And I think the one thing that we will agree with, with

2        respect to what Mr. Brannan said is when our responsive

3        pleading is due in a week or so in Virginia, there will

4        be a Motion to Dismiss, or in the alternative to stay.

5        Because we believe this is the proper forum for this

6        litigation.

7            But you're right, there are going to be a number of

8        defenses raised, venue defenses, jurisdictional defenses.

9        We haven't analyzed them all, but there are going to be

10       defenses.  And there is no guarantee that that case is

11       going to go forward, certainly at this time.  We are

12       going to make --

13           THE COURT:  With respect to SFG and the matters that

14       are here in this litigation.

15           MR. ALPERT:  You're exactly right.  You're exactly

16       right.

17           And that brings up another point, and it has to do

18       with this, the argument that Mr. Brannan made with

19       respect to having it all balled up together in Virginia,

20       and let's all resolve it in one forum.  For a number of

21       reasons, Judge, I don't think it's going to be resolved

22       in one forum in Virginia.  Not the least of which is that

23       the dispute between defendants here and the developer is

24       subject to a completely different agreement and

25       development agreement which has an arbitration clause.

1    In fact, the developer filed a Motion to Compel

2    Arbitration in that action yesterday.  So that case, more

3    likely than not, is going to be resolved in arbitration,

4    not litigation, and I think that's an important point.

5        I think the other thing that's important to

6    understand, Your Honor, going back to the choice of law,

7    is whether it's this choice of law analysis or the

8    Virginia choice of law analysis, it's pretty similar.

9    Both Georgia and Virginia say you look to where the

10   injury occurred.  You look to where the contract was

11   entered into.  It didn't happen in Virginia.  So we're

12   not going to be applying Virginia law.

13       But I want to talk about some of the other factors,

14   and if I can get a demonstrative aid up here that would

15   be helpful.  It shows the equitable factors.

16       I'm creatively challenged here, Judge.

17       THE COURT:  It's great.

18       MR. ALPERT:  Art, can you see that?  The people in

19   the back might not be able to see it.

20       THE COURT:  If they need to move and wants to see

21   it, feel free to move.

22       MR. ALPERT:  We can put everybody in the jury box.

23       THE COURT:  You can go in the jury box, whatever you

24   want to do.  It's all right with me, as long as the

25   sheriff's all right with it.  I'm all right with it.

1          MR. ALPERT:  My thought is the most important people

2     are you and the court reporter.

3          You know, these are some of the equitable factors

4     that you look at in connection with determining what

5     makes the most sense.  And I think, Judge, you hit the

6     nail on the head when you said this is really what we

7     should be focusing on.

8          We talked about the location of witnesses,

9     documents, attorneys, applicable law, business location,

10     meetings, and I'm going to go through each of these

11     individually so you can understand how we see it.

12          We talked about applicable law, and I think that's

13     pretty clear.

14          And I want to talk about the witnesses and the

15     documents because I think that's very important as well.

16     In listening to defendant's counsel talk about the

17     witnesses and the documents, I think there may be a

18     little bit of confusion.  What defendant's counsel talked

19     about was, well, it would be inefficient to have the

20     witnesses go to both places.  It would be inefficient to

21     produce the documents in both places.  Nobody disagrees

22     with that.  Nobody disagrees with that at all.

23          But that's not really the analysis.  The analysis

24     here is which place is more convenient?  Which place is

25     more efficient?  And when you really drill down and look

34

1      at the witnesses, you're going to see that Georgia is the

2      most convenient.  And if not Georgia, maybe California,

3      but certainly not Virginia.

4          Let's think about this.  We have a suit on a note

5      and a guaranty.  Someone is going to introduce that note

6      and guaranty into evidence.  They are going to

7      authenticate it.  They are going to say this is my

8      signature, and then somebody is going to say whether or

9      not a default occurred, and why there was a default.

10          THE COURT:  And what the damages are?

11          MR. ALPERT:  And what the damages are.  Okay?  I'll

12      tell you where that person is not, all right?  That

13      person is not in Virginia.  Is not in Virginia.  All the

14      people that were involved in the note and guaranty on our

15      side are right here, are right here in Georgia.  And with

16      respect to the defendants, their contact in Virginia is

17      very, very loose, and I think we set it forth fairly

18      clearly in the brief.  Mr. Minor resides in Los Angeles.

19      Mr. Judson, his employee, he may or may not be involved,

20      he resides in California.  The developer, Mr. Danielson,

21      he resides in Los Angeles.

22          None of the people that are going to be involved in

23      connection with (a) proving that the note was entered

24      into, that it was breached, and if damages are

25      recoverable.  Ultimately with damages we think it's very

1    clear, maybe an expert, probably not.  They are not in

2    Virginia, they are here in Georgia or they are there in

3    California.  So there are no witnesses in Virginia.

4        Let's talk about what's most convenient for purposes

5    of documents.  Same analysis.  We've got original

6    documents that, like what will be introduced into court

7    to establish the validity of the loan and the promissory

8    note, the guaranty.  Those original documents are sitting

9    at our office here in Atlanta.  Okay?  If there are

10   copies of those documents, those documents will be in

11   California with Mr. Minor, and the defendants, if they

12   want to argue that somehow the signatures are not right,

13   or we have a different copy.  We think those are the only

14   documents that will be important in connection with

15   resolving this dispute.

16       Contract dispute, Georgia law or parol evidence

17   rule, unless there is an ambiguity, we're not going

18   outside the contract.  Now, they may try and argue fraud,

19   fraudulent inducement.  I get to bring in these

20   misrepresentations for the reasons we talked about

21   earlier, Your Honor, that's not going to happen.  That's

22   not going to happen.

23       But let's assume, let's assume for purposes of this

24   exercise that that could possibly happen.  Who made the

25   misrepresentations?  They allege somebody at SFG.  We're

36

1    here in Georgia.  Who were these misrepresentations made

2    to?  The people here in California.  E-mails, letters

3    going back and forth, everything went back and forth

4    between Georgia and California.  Nothing went to

5    Virginia.  Nothing is being maintained in Virginia.  So

6    as far as producing documents, the location of documents

7    favors Georgia as well.

8         THE COURT:  In terms of the development of the

9    budget and those kinds of things between the developer

10   and the lender, are those documents as well in Georgia?

11        MR. ALPERT:  They are in Georgia, Judge.

12        THE COURT:  But that's where I think part of the

13   fraud, if it comes in, as they allege.

14        MR. ALPERT:  I agree.  But let's talk about that for

15   a second, and this is an important point, and it's not,

16   maybe not an important point for you resolving this issue

17   today, but it's something we want you to make sure you

18   understand in connection with this dispute.  We did not

19   develop the budget.

20        THE COURT:  Okay.

21        MR. ALPERT:  Okay?  The budget was developed by the

22   owner and his developer, and it was submitted to our

23   client for review.  Not for purposes of telling them how

24   to build a hotel, but simply to see whether or not this

25   made sense for us to loan.

1        The evidence will show that clearly, and I don't

2    want the Court to lose sight of that.

3        THE COURT:  All right.  And I understand that's

4    hotly disputed, but the witnesses that you would bring

5    forward to prove that point would be in Georgia.

6        MR. ALPERT:  In Georgia and the documents are in

7    Georgia.

8        So when you talk about the location of the

9    attorneys, I was talking to Mr. Brannan earlier, or he's

10   just gotten involved in this, but it seems like he'll be

11   involved further, let's talk about the attorneys.

12   Nobody's attorneys are in Virginia.  The main lead

13   counsel for Mr. Minor is DLA Piper's LA office.  They've

14   been flying across the country for meetings, to attend

15   hearings and things like that.  They are not in Virginia.

16       So Mr. Minor has got his lawyers in California.

17   He's got his lawyers who have California offices and also

18   have an Atlanta, Georgia office.  They don't have a

19   Charlottesville, Virginia office.

20       And SFG's counsel is also based here in Atlanta,

21   Georgia.  And this, you know, this goes to the efficiency

22   of the administration of justice.  It also goes to the

23   prejudice and expense -- excuse me, the prejudice of SFG

24   of having to hire a whole another set of lawyers, get

25   them up to speed on a case, and go down and litigate this

1          thing in Charlottesville, Virginia.

2                  THE COURT:  Excuse me, DLA Piper does have offices

3          here in Atlanta as well.

4                  MR. ALPERT:  They do.  And Mr. Brannan is based

5          here, exactly.  And they also, to be fair, they also have

6          a Reston, Virginia office, which is up in northern

7          Virginia

8                  THE COURT:  I know where that is, yeah.

9                  MR. BRANNAN:  But we don't have such an office.  We

10         are based here and we are lead counsel for SFG in

11         connection with this matter.

12                 So when you look at these factors, you know, counsel

13         says, well, it weighs in favor of Georgia.

14                 The other one we can talk about is business

15         location, and again this is important.  The defendants

16         made a big deal in their papers about how Hotel

17         Charlottesville is a Limited Liability Company,

18         incorporated and organized under the laws of the state of

19         Virginia.  How Minor Family Hotels are organized in the

20         corporate, under the laws of the state of Virginia.  None

21         of them are there.  None of them.  There is no office

22         there.  There are no documents there.

23                 Mr. Minor, who is the sole member of Minor Family

24         Hotels, is in Los Angeles.  Mr. Danielson, who's the sole

25         member of Hotel Charlottesville, is in California.  And

1        SFG is right here in Atlanta, Georgia.

2            And the other thing, and the final point that I want

3        to make on some of these equitable factors, Judge,

4        because I think it's important, and a point that you made

5        earlier, which is we are not talking about viewing

6        property here.  You're exactly right.  This is not a

7        dispute about the real property.  This is a suit on a

8        note and a guaranty.

9            And what's telling is, that about three or four

10       months ago when we sat down -- I can't believe it's been

11       three or four months.  Three or four months ago, back in

12       2008, when we sat down to try and resolve this with the

13       defendants, we didn't meet them in Charlottesville,

14       Virginia.  There was no need to.  This is not about the

15       project.  This is about the note and the guaranty.  We

16       sat down here at SFG's offices in Atlanta, Georgia.

17           So when you review the equitable factors, Your

18       Honor, it's clear that Virginia is the least connected to

19       what's happening in this case.  What's most connected is

20       Georgia, and then there is some things going on in

21       California.  In fact, there is nothing happening in

22       Virginia.

23           And your point about the property is well taken, and

24       I want to have one more follow up on that point, and this

25       relates to the property.  Two things, talking about --

1       somebody referenced foreclosure.  There have been no

2       foreclosure -- no foreclosure has been initiated.

3               THE COURT:  Right.

4               MR. ALPERT:  That's number one.

5               Number two is, if there is a foreclosure, my

6       understanding of Virginia law is it is a nonjudicial

7       foreclosure state.  There is no proceeding.  There is an

8       advertisement in the newspaper, okay?

9               THE COURT:  You have to domesticate the judgment?

10              MR. ALPERT:  I don't think -- there is nothing -- I

11      have not seen anything that needs to be domesticated at

12      all.  There is no judgment.  I think it's here are your

13      obligations, and you defaulted on them, and you go down

14      to the paper and you sell it.

15              THE COURT:  I'm saying that we had a judgment here,

16      but you're saying you just sell it in the paper?  Okay.

17              MR. ALPERT:  Correct.  We're just talking about the

18      paper here.  If we ultimately get a judgment here, we are

19      going to seek to enforce it against the borrower and the

20      guarantor, maybe go after the property, maybe you don't.

21              THE COURT:  That's what I was thinking along those

22      lines, as opposed to what you're talking about, the

23      transfer in the paper?

24              MR. ALPERT:  Well, yeah.

25              THE COURT:  I think the last thing, though, that you

1    all would want to do, I assume, you would first rely on

2    collection.  And we are way down the road, I mean, I'm

3    assuming as soon as you can get a judgment, but we were

4    looking at it from a practical standpoint.

5        MR. ALPERT:  No, you're exactly right, but there

6    would be no proceedings.  And then if, I guess

7    theoretically defendants could try to institute some

8    proceedings to seek to stop us from foreclosing on a

9    property, if we did do it.

10        But they tried to do that already, and what the

11    judge of Virginia said, he looked at it and said, listen,

12    you have to -- and I think we attached a transcript --

13    for me to issue a TRO defendants, Mr. Minor, you have to

14    show a likelihood of success on the merits, and I don't

15    see it.  In fact, the only thing I see are defaults and

16    breaches of this agreement, and everything that the bank

17    has done is proper.  So I'm denying your motion for TRO.

18    That has been denied, nothing has changed.

19        So if we were even moving to foreclose, there's not

20    going to be a TRO, there aren't going to be any

21    proceedings up there.  You know, your point about the

22    property is right, this is about the note and the

23    guaranty.

24        Another point that Mr. Brannan made earlier in

25    connection with the equitable considerations was whether

42

1       or not we could get all the parties here in Georgia.  And

2       the point that he made was specifically with respect to

3       Mr. Danielson and Hotel Charlottesville, the developer of

4       the property.

5           Now, Your Honor, I want to make a couple of points

6       on that.  First, I want you to know that we think that's

7       a red herring, and we don't think the dispute with Mr.

8       Danielson and Hotel Charlottesville has anything to do

9       with our dispute with him.

10          Second is, I'm going to tell you it's moot, and I'll

11      tell you in a second why I think it's moot.  Let's talk

12      about first why it's not an issue.  If you look at the

13      necessary party analysis, look right at the Georgia

14      statute, I think it says it clear:  A party is only

15      necessary for when (a) you need them to obtain full

16      relief.

17          THE COURT:  Right.

18          MR. ALPERT:  Or they seek an interest in the

19      litigation.

20          THE COURT:  Right.

21          MR. ALPERT:  Okay?  Two prongs, either or.  Here

22      let's deal with the second prong first.  Mr. Danielson

23      isn't seeking an interest in this litigation.  He's not

24      -- he hasn't sought to intervene, and we have no reason

25      to believe he's going to seek to intervene.  That's

1    number one.

2          The second one is, let's talk about the claim for

3    full release.  If you look at the claims they assert in

4    the amended complaint, the claim against us, they can get

5    full relief against SFG.  We've got the agreement with

6    them.  If we committed fraud on them, then they've got a

7    claim for damages against us.  They are not a necessary

8    party.  They're not.  And even if they were a necessary

9    party, Your Honor, they have established that Mr.

10   Danielson is not subject to the jurisdiction of this

11   court.  Haven't done it.

12         So, with respect to resolving something in one

13   forum, I guess that's the other point, which it looks

14   like that's going to be arbitrated, you're not getting

15   any efficiencies there.

16         So when you talk about the equitable facts, I think

17   you laid out three prongs when we first started.  One is

18   location of documents and witnesses and things like that,

19   the fact it's an efficient administration of justice.

20         I think your point earlier about there being an

21   efficient administration of justice in Georgia,  when the

22   Georgia courts know the Georgia law and how to apply it,

23   especially in this area, where it's a little bit

24   different.  That's very important.  That's going to be

25   the most efficient way to resolve it.

1      Having a Virginia judge and the judge's clerks spend

2      hours and hours and hours on Westlaw or Lexis or in a

3      stack trying to figure out Georgia law and figure out

4      these issues, that doesn't sound very efficient to us.

5      And I think the third is the prejudice, and I think

6      it's important to talk about the potential prejudice --

7      THE COURT:   Hang on one minute, I've got an exciting

8      memo just coming hot off the press.  They're coming to

9      talk?   I've got a $10 million emergency, talk fast.

10     They can wait a few minutes, if they have to.  I really

11     don't rush.

12     Compucredit is coming at 12:00.  I apologize for

13     the interruption of the easy flow of these proceedings.

14     MR. ALPERT:   Let's talk about the prejudice to SFG

15     and why this is important.  And this is, I think we have

16     established that Georgia would be the appropriate place

17     to litigate this based on the factors that we've talked

18     about, Judge.

19     Let's talk about the prejudice to SFG.  For the

20     reasons we set forth earlier, we think this is a

21     straightforward suit on a note.  We think it's going to

22     proceed expeditiously in Georgia.  We don't think the

23     defenses with respect to fraud are going to hold up.  We

24     think they're gone, and we would like to move forward

25     quickly.

45

1     We think that one of the things that's happening

2     here is that defendants are concerned about having to

3     move quickly, and that's why we are up in Virginia.  And

4     the concern is this, it's a real concern not only will we

5     be prejudiced by having to spend more money on lawyers,

6     there is a concern about the guarantor's financial

7     condition, and whether or not he, if ultimately the

8     borrower can't do it, whether or not he will be able to

9     satisfy any judgment.  And that is important, Judge,

10    because obviously that's why you get a guaranty.

11        If things happen -- this borrower is a single

12    purpose entity.  The borrower doesn't have anything.  The

13    borrower is formed simply to construct the hotel, and we

14    are interested in recovering, getting the loan paid for

15    the amounts that are owed.  We need to be able to seek to

16    recover against the guarantor, if possible, and there is

17    a concern based on the number of lawsuits that are out

18    there and other stock market woes and things like that,

19    whether or not he's going to be able to satisfy it.

20        THE COURT:  Your concern is that if this thing gets

21    embroiled either (a) stayed; or (b) embroiled in Virginia

22    where there are other matters, the delay may jeopardize

23    your ability to have a solvent, or appropriately solvent

24    guarantor under the note as time progresses, given where

25    we all know we are in the market, and given the status as

1          I read of some other litigation against the guarantor.

2              MR. ALPERT:  I could not have said it better.

3              THE COURT:  You probably could have, but at least

4      we're following the --

5              MR. ALPERT:  Last point on the equitable

6      consideration, Judge, is like Mr. Brannan, I'm not going

7      to worry about the first filed.  I think that's laid out

8      in the papers, and I don't think you're concern about it.

9              THE COURT:  I'm not.

10             MR. ALPERT:  Who has an interest in making sure this

11     matter is resolved properly?  Defendant's counsel talked

12     about Virginia having an interest, the property is up

13     there.  We talked about this isn't about the property.

14     This is about the note and guaranty.

15             And Georgia has an interest in making sure that

16     contracts that are entered into under its law, and with

17     defendants out of state with its banks, that those are

18     enforced and that those are resolved properly.  Georgia

19     has a strong interest in resolving this property as

20     anyone.  As anyone.

21             So for all of those reasons we do not think

22     defendants have sustained their burden, and you made a

23     good point earlier, discretion is not unfettered.  They

24     bear the burden.  They've got to come over and move that

25     ball over the goal line, and they haven't done it.

1          THE COURT:  You must have been reading The

2     Associate.  Y'all been reading The Associate?  Anybody

3     been reading that?  No?  All right.  Well, are you

4     reading it?  There is a little scene where he's meeting

5     with a guy -- I won't give it away -- and they're having

6     a real discussion about what's going to happen, and he

7     says, you've got to get this ball, before I give you the

8     information you want, you've got to get it over the 50.

9     So he keeps answering questions and answering questions

10    where, we're already the jury now.  So just think about

11    that analogy, it's a John Grisham.

12          But I understand what you're saying.  It's not

13    unfettered.  And, also, our courts have held it can't be

14    unending.  It has got to have brackets and it has to be

15    in accordance with due process principles, and I'm

16    mindful of that.

17          MR. ALPERT:  You're exactly right, and we don't know

18    what's going to happen in Virginia.  To do anything here

19    would be premature regardless, even if they had somehow

20    pushed it over the goal line.

21          They haven't satisfied their burden, Your Honor, and

22    therefore we would ask that you deny their Motion to

23    Stay.

24          Would you like Ms. Ballard to come up and argue

25    briefly on the Motion to Dismiss?

48

1          THE COURT:  All right.  And thank you, again, a very

2     nice argument.  Very well reasoned.  Very responsive to

3     the Court.  Very much appreciated.

4          MR. ALPERT:  Thank you very much, Your Honor.  I

5     appreciate that.

6          THE COURT:  I love having such good lawyers in my

7     courtroom.  Just love it.

8          MR. ALPERT:  Well, you're going to get another one.

9          THE COURT:  I know.

10          MS. BALLARD:  Good morning, Your Honor.

11          THE COURT:  Good morning, Ms. Ballard.

12          MS. BALLARD:  I'm just briefly going to address the

13     Motion to Dismiss.  As you know, defendants argue that

14     SFG has failed to state a claim, as we did not provide an

15     option to cure prior to filing our lawsuit, and this

16     argument fails for really two reasons.

17          As the Court very appropriately pointed out, SFG to

18     the extent that we are required to give such opportunity

19     to cure we did, in fact, give that opportunity to cure,

20     and we alleged so in our complaint.

21          Therefore, you know, for purposes of Motion to

22     Dismiss, we satisfied everything we are required to do.

23     And any issue on whether that notice was sufficient is an

24     issue of fact, which is not ripe for a Motion to Dismiss.

25          And second, SFG arguably was not required to provide

1    defendants with an opportunity to cure, and this is

2    because there are 16 different events of default under

3    the loan agreement and only one event of default requires

4    an opportunity to cure.  As SFG has alleged in its

5    complaint, there are numerous events of default, and

6    numerous of those events to default do not require an

7    opportunity to cure.

8          Therefore, once any of the conducts that fall under

9    these more specific events of default occurred, they were

10   allowed to go ahead and file their lawsuit and accelerate

11   the balance without giving any opportunity to cure.

12         And for those two reasons the Motion to Dismiss, it

13   should be denied.

14         THE COURT:  Thank you, Ms. Ballard.

15         MS. BALLARD:  You're welcome.

16         THE COURT:  Appreciate that.

17         Do you want to add anything else, Mr. Alpert (sic)?

18         MR. BRANNAN:  Brannan.

19         THE COURT:  Brannan, I'm so sorry.  I'm so sorry.  I

20   apologize.  But is your first initial named?

21         MR. BRANNAN:  No.

22         THE COURT:  That's why I'm confused.  I have Mr.

23   Alpert and you are --

24         MR. BRANNAN:  Art.

25         THE COURT:  Art Brannan.  So I apologize.  Please

1        accept my apologies.

2            MR. BRANNAN:  All right.  I will.  I will keep this

3        brief.

4            THE COURT:  Sure.

5            MR. BRANNAN:  First, with respect to choice of law,

6        with respect to the loan documents, as we mentioned,

7        Georgia law does apply, and if this is as straightforward

8        and as simple as Mr. Alpert intends, I'm sure that the

9        Virginia judge will be able to understand it and apply

10       the law.

11           THE COURT:  Good one.  And you're going to send a

12       copy of this to that Virginia judge, I know.

13           MR. BRANNAN:  Secondly, as you, as we discussed and

14       clarified, this is not a forum non conveniens --

15           THE COURT:  I understand that.

16           MR. BRANNAN:  -- argument here.  This is a Motion to

17       Stay.

18           THE COURT:  I understand.  I understand.

19           MR. BRANNAN:  I was wondering why these charts were

20       brought in for a simple Motion to Stay, and I suspect

21       it's preparatory work for a Motion for Forum Non

22       Conveniens that's going to be argued in Virginia.

23           THE COURT:  You might get your little camera phone

24       out and photograph that or take it with you perhaps.

25           MR. BRANNAN:  But the point is is all -- the entire

1        argument that has just been made is all about whether

2        it's more convenient to be here or there.  It's not about

3        whether this case should be stayed because there is

4        already a case proceeding that is better suited, given

5        the involvement of all of the parties.

6            And when looking at the factors for a Motion to

7        Stay, the equitable consideration, the convenience of the

8        witnesses and the parties, not that this is a more

9        convenient forum or that is, but the witnesses and

10       parties should not have to proceed or participate in two

11       separate parallel proceedings.  That's the issue here,

12       regardless of where they're located.

13           The point made with respect to Mr. Danielson and

14       Hotel Charlottesville, LLC, I believe it was

15       characterized as a red herring, and then we went and

16       launched into a discussion, I guess of whether or not

17       they are a, you know, a necessary party under the Georgia

18       rules, for instance.  Okay?  What we are arguing and

19       contending is that, you know, we have not made that

20       argument.

21           THE COURT:  Okay.

22           MR. BRANNAN:  Our argument is that from the, you

23       know, the efficient administration of justice, let's do

24       this in one lawsuit, not in two, and we may not have

25       jurisdiction over him here.  We don't know.

1          THE COURT: All right.

2          MR. BRANNAN: It's best that this go forward in one

3    case.

4          THE COURT: You're almost in a Catch 22 because you

5    may not have jurisdiction over SFG in Virginia, and you

6    may not have jurisdiction over the other folk here. So

7    consequently you may be faced with that. It's a

8    difficult --

9          MR. BRANNAN: We may be faced, and I was not aware

10    of the Motion to Compel Arbitration, which apparently was

11    filed yesterday.

12          MR. ALPERT: Yes.

13          MR. BRANNAN: Yeah. I'm not aware of that, haven't

14    seen it, don't know if he's, you know, whether that's

15    been waived at this point, where that's going to go.

16          THE COURT: Who knows.

17          MR. BRANNAN: There are a lot of, there are a lot of

18    pieces here that are still up in the air.

19          THE COURT: All right.

20          MR. BRANNAN: But with respect to Danielson and

21    Hotel Charlottesville, if they are going to be involved

22    in a lawsuit, we know they are involved in the Virginia

23    lawsuit. Now, maybe their motion will get granted, maybe

24    it won't. Maybe there will be a Motion to Stay with

25    respect to the lender, and maybe that will be granted in

1    Virginia, maybe it won't.

2        I mean, you, it's kind of a circular argument as you

3    mentioned, or perhaps a Mexican stand off between two

4    courts.  Who's going to blink?  Are we going to really go

5    forward with two lawsuits and dare the other person, the

6    other judge to stay his?  No, you stay yours.  No, you

7    stay yours, because this doesn't make sense.

8        And what we do know is we have two lawsuits right

9    now.  One is proceeding, and for the factors that I

10   articulated, and I will, one last point on this, I

11   started to wrap up.

12       THE COURT:  Sure, sure.  That's all right.

13       MR. BRANNAN:  Is with respect, you know, to

14   weighing, it's the prejudice to the parties, and you have

15   to balance all of the factors.

16       And I appreciate Mr. Alpert's point, you know, with

17   respect to the guarantor's financial condition, but in

18   every lawsuit where we sue a defendant, you always worry

19   about whether the defendant's financial condition is

20   going to be -- what it's going to be down the road at

21   some point.  And that is a fact of life we live with in

22   this business, and when you weigh that against the risk

23   of inconsistent rulings, which I believe is by far the

24   most significant potential prejudice to the parties, both

25   of them.  This isn't about, isn't about just a potential

1    prejudice to one party, it's to both, that it weighs very

2    much in favor of the stay.

3        And with respect to the Motion to Dismiss, I think

4    our position is in the papers.

5        THE COURT:  I understand.

6        MR. BRANNAN:  So really, just on balance, looking at

7    the fact, the equitable considerations that come into

8    play when addressing a Motion for Stay, as opposed to a

9    Motion for Forum Non Conveniens, that the, they weigh in

10    favor of this Court granting a stay.

11        THE COURT:  Thank you.  I'm sorry, I didn't mean to

12    interrupt, I thought you were done.

13        MR. BRANNAN:  I have one last sentence.

14        THE COURT:  Sure.  You can have two or three or

15    four.  I'm sorry.

16        MR. BRANNAN:  Which was simply to say, and I think

17    we made the point earlier though, that if a stay is

18    entered and it's appropriate today, if at some point that

19    stay becomes inappropriate it certainly can be revisited.

20        THE COURT:  We can revisit it.

21        MR. BRANNAN:  So, all right.

22        THE COURT:  All right.

23        MR. BRANNAN:  Thank you, Your Honor.

24        THE COURT:  Thank you.  Anybody else want to say

25    anything else?

1        MR. ALPERT:  Your Honor, unless you have questions,

2    nothing.

3        THE COURT:  I have no questions.  Y'all have done

4    such a great job.  Thank you.

5        I've read everything in advance because I know that

6    this is important for all parties for a decision to be

7    made, and one of the sort of quid pro quo for agreeing to

8    a process of a Motion to Stay prior to filing the answer

9    and delaying that, was that I would give you a quick, a

10   quick ruling on this.

11       Mr. Brannan, I'm not going to be the one to blink, I

12   regret to tell you.  I do believe that this is a garden

13   variety suit on a note between a lender and a borrower

14   and a guarantor.  And while there may be defenses to it,

15   it is a document entered into in Georgia by agreement of

16   the parties.  The venue is in Georgia, and Georgia is the

17   choice of law.

18       I am also convinced that the equitable factors,

19   which you very, very ardently advocated on behalf of your

20   client, I still believe that they favor Georgia.

21       And in addition, I find that, you know, this

22   Virginia lawsuit, first of all, from what I understand

23   there is a real good chance it won't even progress

24   against this plaintiff potentially in Virginia.  Given

25   the fact that there is arbitration, there may not even be

1    a suit in Virginia.  And even so they may not follow,

2    because of those kinds of things, they may not follow

3    through parallel courses.

4         I take your point that the biggest risk is

5    inconsistent judgments, rulings.  But I, at this point,

6    am not convinced that that's going to happen given the

7    way the Virginia cases teed up and given the way this

8    case is teed up.

9         With respect to matters of documents and witnesses,

10   those are matters that the Court can address in discovery

11   orders, to make sure that we are not taking witnesses

12   depositions twice and documents, you know, are not having

13   to be produced at two places, at two times.  We can work

14   through those issues with the Virginia court, if need be.

15        In addition, this Court is prepared to handle this

16   matter on an expedited basis.  Certainly with the

17   consideration of due process, we are teed up and ready to

18   go on these kind of things.

19        And so I think for all of those reasons a stay is

20   appropriately denied and the matter ought to go forward.

21        With respect to the Motion to Dismiss, it's also

22   denied.  As you know in Georgia it's a very slight

23   threshold that one has to meet to survive a Motion to

24   Dismiss, and I find that SFG has come forward with enough

25   evidence and or claims that, in fact, they were not

1    required, or at least there is a justiciable issue as to

2    whether they were required to give an appropriate cure

3    period under the circumstances in this case and under the

4    provisions of the loan document.  So I deny the Motion to

5    Dismiss without prejudice, so we'll go forward.

6        But to your point about a stay, you know, I want to

7    also say that if something changes, Mr. Brannan, as much

8    as you say when it changes if I have a stay I can lift

9    it.  Well, if something changes, you're free to bring it

10   at another time.  If something comes up that we haven't

11   considered today, or the landscape changes in some way,

12   you know, I'm always here to hear that.  But the

13   landscape, based on what I have heard today, based on the

14   documents I have read, based on the argument says to me

15   this case needs to go forward here in Georgia.

16       So would you prepare an order to that effect, make

17   sure Mr. Brannan sees it?

18       MR. ALPERT:  I will, Your Honor.

19       What would you like to do about time to answer?

20       THE COURT:  That's my next -- well, I want to finish

21   that, and then that's my next issue.

22       Mr. Brannan, I'm hopeful that because I gave your

23   client the opportunity to have a Motion to Dismiss heard,

24   before you had to file the answer, that we can have a

25   little shorter time to file your answer, and I was

1    thinking not ten days, and not 30, but 20.  Would that be

2    agreeable to have your answer filed within ten days?

3        MR. BRANNAN:  That certainly is agreeable.

4        THE COURT:  I mean 20 days, 20 days, give you 20

5    days to file your answer.  Okay?

6        MR. BRANNAN:  That would be agreeable.  Thank you.

7        THE COURT:  All right.  Fair enough.  Is that okay?

8    Do you have any real objection to that?

9        MR. ALPERT:  No, that's fine, Your Honor.

10        THE COURT:  It's expedited, but I tried to expedite

11    this whole thing for everybody.

12        The other thing I would ask you to do is to get,

13    come together and prepare a case management scheduling

14    order that's agreeable to both parties.  If you can't

15    agree, let me know.  I'll sit down with y'all, we'll do

16    it informally, and we'll crank one of these out.  You

17    know, but we have to wait until the answer is filed to do

18    that because you've got to see it, whether there is going

19    to be defenses, what motions that's going to be required.

20    But after that y'all get together and do that and then

21    we'll move this case along.  We will.  We'll see what

22    happens, and keep me posted on Virginia.

23        MR. ALPERT:  We will.

24        THE COURT:  If you need me to go up and try that

25    case in Charlottesville, I love Charlottesville.  That

1    will just be great.  Just teasing.

2         MR. ALPERT:  Thank you, Your Honor, very much.

3         THE COURT:  Thank y'all very much.

4         You all have a great day, and y'all have a great

5    holiday weekend, regardless of which holiday you

6    celebrate.

7         MR. ALPERT:  Thank you very much, Your Honor.

8         MR. BRANNAN:  Thank you, Your Honor.

9         THE COURT:  All right.  Thank you.

10         (Whereupon, the hearing was concluded.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

STATE OF GEORGIA

COUNTY OF FULTON

## C E R T I F I C A T E

The foregoing transcript of the proceedings
was taken before me as Official Court Reporter for
the State Court of Fulton County, and reduced to
typewriting under my direction and supervision,
and that the foregoing pages 2 through 60
represent a true and correct transcript of the
proceedings, and pages * through * represent
the actual exhibits admitted in said proceedings.

This 2nd day of June, 2009.


_____

CAROL JOHNSON, CCR, RPR
STATE COURT OF FULTON COUNTY
CERTIFICATE NO. B-651

# EXHIBIT "3"

1          IN THE STATE COURT OF FULTON COUNTY

2                     STATE OF GEORGIA

3    SPECIALTY FINANCE GROUP, LLC.,        )

4          PLAINTIFF,                       )
                                           )    CIVIL ACTION
5    VS.                                    )    NO. 09EV006754
                                           )
6    MINOR FAMILY HOTELS, LLC, ET. AL,     )
                                           )
7          DEFENDANTS.                      )    COPY
     _____)

8

9

10         RULE NISI PROCEEDINGS BEFORE THE HONORABLE SUSAN
     FORSLING, JUDGE, MARCH 19, 2010, IN ATLANTA, FULTON COUNTY,
11   GEORGIA.

12

     APPEARANCES OF COUNSEL:
13

     FOR THE PLAINTIFF:        ROBERT P. ALPERT, ESQUIRE
14                             JEFFREY K. DOUGLASS, ESQUIRE
                               JASON EAKES, ESQUIRE
15

16
     FOR THE DEFENDANT:        BETTY M. SHUMENER, ESQUIRE
17                             ARTHUR D. BRANNAN, ESQUIRE

18

19

20

21   _____

                 **JOLANDA L. HARRISON , RPR**
22               **OFFICIAL COURT REPORTER**
             **STATE COURT OF FULTON COUNTY**
23               **160 PRYOR STREET - J122**
                   **ATLANTA, GEORGIA**
24                   **(404) 612-5055**

25

1       MORNING SESSION          MARCH 19, 2010

2

3       (THEREUPON, THE FOLLOWING PROCEEDINGS WERE HAD.)

4           THE COURT:  ALL RIGHT.  WE'RE ON THE RECORD.  THERE

5       WERE A NUMBER OF MOTIONS THAT WERE FILED AND WERE

6       SCHEDULE TO BE TAKEN UP TODAY, BUT I HAVE TO GIVE KUDOS

7       AND CONGRATULATIONS TO COUNSEL FOR ROLLING UP THEIR

8       SLEEVES AND TALKING TO ONE ANOTHER AS OPPOSED TO JUST

9       SUBMITTING BRIEFS AND RESOLVING, AS I UNDERSTAND IT, ALL

10      EXCEPT FOR THE ISSUE ON THE FEE SHIFTING, AS WELL AS

11      PERHAPS SOME HOUSEKEEPING MATTERS.  IF THAT'S CORRECT,

12      LET ME HEAR FROM THE PLAINTIFF, IF THAT'S CORRECT,

13      ESPECIALLY FINANCE GROUP; IS THAT CORRECT?

14          MR. ALPERT:  YES, YOUR HONOR; BOB ALPERT ON BEHALF

15      OF SPECIALTY FINANCE GROUP.  YOU'RE EXACTLY RIGHT.

16          THE COURT:  GOOD, AND THANK YOU AGAIN FOR YOUR HARD

17      WORK YOU DID.

18          MR. ALPERT:  YOU'RE WELCOME.  I HAVE TO THANK THESE

19      TWO GENTLEMEN.  THEY'RE THE ONE WORKED THE HARDEST.

20          THE COURT:  REMEMBER THAT AT REVIEW TIME.

21          MR. ALPERT:  THAT'S WHY WE GOT THE COURT REPORTER.

22      JUST SO YOU KNOW THEM, THIS IS JEFFREY DOUGLASS WITH OUR

23      LAW FIRM.

24          THE COURT:  RIGHT; I'VE SEEN HIS PAPERS, YES.

25          MR. DOUGLASS:  GOOD MORNING, YOUR HONOR.

2

1          THE COURT:  GOOD MORNING, MR. DOUGLASS.

2          MR. ALPERT:  AND JASON EAKES IS A COLLEAGUE OF OURS

3     AS WELL AT MORRIS, MANNING & MARTIN.

4          THE COURT:  GREAT; WONDERFUL.  ALL RIGHT.  AND NOW

5     DO YOU AGREE WITH THAT ON BEHALF OF THE MINOR FAMILY

6     HOTELS AND PAUL C. MINOR; DO YOU AGREE WITH THAT,

7     MA'AM.

8          MS. SHUMENER:  YES, YOUR HONOR.  THANK YOU VERY

9     MUCH.

10         THE COURT:  I ALWAYS TO THE CALL YOU SHUMER, BUT I

11    WON'T DO THAT TO YOU.  IT'S SHUMINER -- SHUMENER.

12         MS. SHUMENER:  THANK YOU VERY MUCH.  AND I HAVE WITH

13    ME ART BRANNAN, OR HE HAS ME WITH HIM.

14         THE COURT:  EITHER WAY.  JOEL, WE DIDN'T REALLY NEED

15    OUR MUGS.  DO YOU ALL NOTICE WHAT IS ON OUR MUGS?  WELL,

16    WHEN BOTH OF US HAVE THESE MUGS IN COURT, IT IS CLEARLY A

17    NO BULL DAY.  AND WE THOUGHT MAYBE WE NEEDED THAT TODAY,

18    BUT -- NO, I ACTUALLY GOT THESE MUGS IN A SMALL LITTLE

19    SHOP --

20         ALL RIGHT.  WHY DON'T WE GO FORWARD AND TAKE UP THE

21    MOTION TO SHIFT CERTAIN DISCOVERY COST TO THE DEFENDANTS.

22    AND -- ALL RIGHT?

23         MR. ALPERT:  THANK YOU, YOUR HONOR.

24         THE COURT:  THANK YOU VERY MUCH.

25         MR. ALPERT:  JEFF DOUGLASS IS GOING TO HANDLE THAT

1      ARGUMENT ON BEHALF OF THE PLAINTIFF.

2          THE COURT:  THAT'S GREAT; MR. DOUGLASS, WONDERFUL.

3      AND EVEN THOUGH I HATE ORANGE, I HIGHLIGHTED YOUR BRIEF

4      IN ORANGE, WHICH IS WHY I DIDN'T PICK TENNESSEE.  I HATE

5      ORANGE.  ALL RIGHT.  GO AHEAD; LET'S GET DOWN TO

6      BUSINESS.

7          MR. DOUGLASS:  GOOD MORNING, YOUR HONOR, JEFF

8      DOUGLASS.  WE'RE HERE TO TALK ABOUT PLAINTIFF'S MOTION TO

9      SHIFT CERTAIN DISCOVERY COST TO THE DEFENDANTS

10     SPECIFICALLY AND ONLY THOSE COST ASSOCIATED WITH THE

11     RESTORATION OF PRODUCTION OF E-MAILS FROM SFG'S BACKUP

12     TAPES.  MY MOTION TODAY AND MY PRESENTATION WILL PROBABLY

13     BE 15 MINUTES AND CONSISTS OF TWO PARTS.

14         FIRST, I WOULD LIKE TO GIVE THE COURT A LITTLE BIT

15     OF A FACTUAL CONTEXT SO THAT IT UNDERSTANDS.

16         THE COURT:  I NEED THAT, I THINK, IN LIGHT OF THE

17     LAW TO MAKE SURE I UNDERSTAND IT, YES.

18         MR. DOUGLASS:  EXACTLY; EXACTLY.  TO GIVE YOU SOME

19     CONTEXT TO UNDERSTAND WHAT YOU'RE DECIDING HERE; AND THEN

20     SECONDLY, I WOULD LIKE TO TALK ABOUT WHY COST SHIFTING IS

21     APPROPRIATE UNDER THESE CIRCUMSTANCES.

22         THE COURT:  THAT'S PERFECT, AND TAKE YOUR TIME.

23         MR. DOUGLASS:  THANK YOU.

24         THE COURT:  THIS IS ALL I HAVE TODAY.

25         MR. DOUGLASS:  HOPEFULLY WE WON'T BE HERE THAT

1    LONG.

2         THE COURT:   ALL RIGHT; SIR, JUST TAKE YOUR TIME.

3         THE COURT:   YOUR HONOR, WE'VE OUTLINE IN OUR BRIEFS

4    TO SOME EXTENT THE EXTRAORDINARY LENGTHS TO WHICH SFG HAS

5    GONE IN THIS CASE IN CONNECTION WITH RESPONDING TO

6    DEFENDANT'S DISCOVERY REQUEST.   IT'S OUR POSITION THAT

7    THIS IS A VERY SIMPLE CASE.   IT'S A SUIT ON A NOTE.   AND

8    NOTWITHSTANDING THAT, THEY'VE SERVED SOME VERY BROAD

9    DISCOVERY REQUESTS AND A LOT OF THEM.

10         WITH RESPECT TO THE WRITTEN DISCOVERY, YOUR HONOR,

11    THEY HAVE SERVED IN THIS LITIGATION SEVEN SETS OF WRITTEN

12    DISCOVERY; THAT'S INTERROGATORIES, REQUEST FOR ADMISSION,

13    REQUEST FOR PRODUCTION, COMPRISING 300 AND SIX SEPARATE

14    REQUESTS.   AND THIS BINDER RIGHT HERE, YOUR HONOR, IS A

15    BINDER OF THE WRITTEN DISCOVERY THAT THEY'VE PROPOUNDED

16    ON US IN THIS CASE.

17         IN CONNECTION WITH RESPONDING TO THE DISCOVERY,

18    INITIALLY WE HAD ABOUT TWO ATTORNEYS ON THIS CASE.   AND

19    IN CONNECTION WITH THE CONFERENCE CALL WITH OPPOSING

20    COUNSEL, THEY SUGGESTED THAT IN CONNECTION WITH

21    RESPONDING TO THEIR DISCOVERY REQUEST, THAT WAS

22    INSUFFICIENT AND WE NEEDED TO HIRE MORE LAWYERS.   WE

23    DISAGREED WITH THAT STATEMENT, BUT WE DID IT.   WE WENT

24    OUT AND WE GOT SOME CONTRACT LAWYERS AND WE GOT IN SOME

25    CONTRACT PARALEGALS.

1    ALL IN ALL WE HAD 15 LAWYERS AND SIX PARALEGALS THAT

2    WE UTILIZED IN CONNECTION WITH RESPONDING TO DEFENDANT'S

3    WRITTEN DISCOVERY REQUEST.  WE HAVE PROCESSED -- THIS IS

4    OUT OF A TOTAL UNIVERSE, OVER 25 MILLION PAGES OF

5    DOCUMENTS.  THAT'S ABOUT 9500 BANKER'S BOXES.  AND AFTER

6    REVIEWING AND PROCESSING THOSE DOCUMENTS, WE ULTIMATELY

7    PRODUCED AROUND 75,000 PAGES OF DOCUMENTS, WHICH IS ABOUT

8    30 BANKER'S BOXES.

9    IN CONNECTION WITH THAT PROCESS, WE SPENT OVER

10    $500,000 OVER A HALF MILLION DOLLARS IN CONNECTION WITH

11    JUST THE WRITTEN DISCOVERY REQUESTS IN RESPONDING TO

12    THAT.  THAT COMPRISES ABOUT 1700 HOURS IN ATTORNEY AND

13    PARALEGAL TIME JUST IN CONNECTION WITH RESPONDING TO THE

14    WRITTEN DISCOVERY REQUESTS.

15    PUTTING THE WRITTEN DISCOVERY REQUESTS ASIDE, YOUR

16    HONOR, THEY ALSO INDICATED THAT THEY INTEND TO TAKE A LOT

17    OF DEPOSITIONS.  THEY'VE ALREADY TAKEN EIGHT DEPOSITIONS

18    AND THEY'VE INDICATED THAT THEY ARE PLANNING ON TAKING A

19    TOTAL OF 24 DEPOSITIONS IN THIS CASE.

20    SO FAR IT HAS COST US ABOUT ANOTHER 150 TO $250,000

21    TO PREPARE AND ATTEND THE DEPOSITIONS THAT HAVE BEEN

22    TAKING.  IT'S GOING TO COST A GOOD BIT MORE THAN THAT IF

23    WE HAVE TO GO FORWARD IN CONNECTION WITH THE OTHER 16

24    DEPOSITIONS THAT THEY STATED THEIR INTENT TO TAKE.

25    IN ADDITION TO THAT, I THINK YOUR HONOR HAS SEEN

1    SOME OF THEM, 30 THIRD-PARTY SUBPOENAS IN THIS ACTION, IN

2    A RELATED VIRGINIA ACTION.  YOUR HONOR, THIS IS A BINDER

3    WITH THE SUBPOENAS THAT HAVE BEEN SERVED IN THIS CASE.

4         THE COURT:  PRIMARILY TO THE PARTICIPATING BANKS; IS

5    THAT WHAT THAT PRIMARILY IS?

6         MR. DOUGLASS:  I WOULDN'T SAY PRIMARILY.  I WOULD

7    SAY IT'S JUST ABOUT EVERYBODY UNDER THE SUN, JUST ABOUT

8    EVERY NAME THAT'S POPPED UP IN THE DOCUMENTS.

9         THE COURT:  OKAY.

10        MR. DOUGLASS:  A SUBPOENA HAS GONE OUT TO THEM.  I

11   THINK SEVEN OR EIGHT OUT OF THE APPROXIMATELY 30

12   SUBPOENAS HAVE BEEN SERVED ON THE PARTICIPATING BANKS.

13        THE COURT:  OKAY.

14        MR. DOUGLASS:  OBVIOUSLY IT'S GOING TO TAKE UP

15   ADDITIONAL COST IN CONNECTION WITH REVIEWING DOCUMENTS

16   PRODUCED IN RESPONSE TO THESE SUBPOENAS.

17        NOW, FOLLOWING SFG'S DOCUMENT PRODUCTION IN THIS

18   CASE, WE APPROACHED OPPOSING COUNSEL AND WE SAID:  YOU

19   KNOW, LOOK; WE'VE BOTH PRODUCED E-MAILS FROM OUR E-MAIL

20   SERVERS.  THAT'S -- I GUESS, TO MAKE IT SIMPLE, I ASSUME

21   IN YOUR E-MAIL BOX, YOU HAVE AN INBOX, A SENT BOX, MAYBE

22   SOME OTHER FOLDERS THAT YOU'VE CREATED, AND WE'VE

23   PRODUCED E-MAILS OF THAT; THEY DID, TOO.

24        THE ISSUE AROSE THAT SFG, IN ADDITION TO JUST HAVING

25   AN E-MAIL SERVER LIKE BOTH PARTIES DO, SFG ALSO HAS

1      BACKUP TAPES.  NOW, THIS IS SOMETHING THAT -- IT IS MY

2      UNDERSTANDING THAT THE OTHER SIDE DOESN'T HAVE, SO IT'S

3      NOT AN ISSUE FOR THEM.

4          THE COURT:  AND TELL ME WHAT THAT BACKUP TAPE --

5      IT'S NOT LITERALLY -- IS IT LITERALLY A TAPE?

6          MR. DOUGLASS:  I THINK IT IS, YOUR HONOR.  IT'S A

7      BIG SPOOL AND IT --

8          THE COURT:  OKAY.

9          MR. DOUGLASS:  IT PERIODICALLY CAPTURES EVERYTHING

10     THAT'S ON THE SERVER.

11         THE COURT:  IS IT LIKE MICROFICHE OR HOW DOES -- IS

12     IT DIGITALLY CAPTURED?  I MEAN, I JUST DON'T UNDERSTAND.

13     I MEAN, I HEARD YOU TALK ABOUT IT, BUT I'M JUST CURIOUS

14     AS TO WHAT IT LOOKS LIKE.

15         MR. DOUGLASS:  YOUR HONOR, I THINK JASON EAKES MAYBE

16     KNOWS.

17         THE COURT:  ALL RIGHT.

18         MR. DOUGLASS:  HE KIND OF UNDERSTANDS.

19         THE COURT:  YOU'RE THE TECH GUY.  JUST TELL ME

20     BECAUSE I WANT TO KNOW WHAT IT LOOKS LIKE.

21         MR. EAKES:  THE TAPES VARY IN SIZE AND TYPE.  THEY

22     ARE ELECTRO MAGNETIC TAPES THAT -- IT'S KIND OF ALMOST

23     LIKE A CASSETTE TAPE.

24         THE COURT:  OKAY.

25         MR. EAKES:  IT'S THE SAME TYPE TECHNOLOGY.  IT'S AN

1    ELECTRO MAGNETIC TAPE.

2          THE COURT:  I'M OLD  ENOUGH TO REMEMBER THOSE AND

3    VHS, BEFORE YOU WERE BORN, DARLING.  OKAY.

4          MR. EAKES:  BUT IT IS A PHYSICAL TAPE, AND THE

5    INFORMATION IS SAVED TO IT DIGITALLY, JUST LIKE YOU WOULD

6    SAVE TO A HARD DRIVE OR ANY OTHER FORMAT.

7          THE COURT:  OKAY.

8          MR. EAKES:  IT'S JUST A COMPRISED HIGH VOLUME FORMAT

9    OF A TAPE, BUT THEY ARE PHYSICAL TAPES.

10          THE COURT:  THEY ARE PHYSICAL TAPES.

11          MR. EAKES:  YEAH; LIKE A SPOOL.

12          THE COURT:  OKAY.  THAT MAKES SENSE TO ME.  I

13    UNDERSTAND.

14          MR. DOUGLASS:  YOUR HONOR, IT'S MY UNDERSTANDING

15    THAT IF BOTH PARTIES HAVE E-MAIL SERVERS AND IF BOTH

16    SIDES PRODUCED E-MAILS FROM THAT, IN ADDITION TO THAT SFG

17    ALSO HAS THESE BACKUP TAPES.

18          THE COURT:  RIGHT.

19          MR. DOUGLASS:  I GUESS IT'S DISASTER RECOVERY, THAT

20    SORT OF THING.

21          THE COURT:  RIGHT.

22          MR. DOUGLASS:  BUT IT'S JUST ANOTHER LEVEL OF

23    SECURITY THAT SFG HAS IMPLEMENTED.  WE BROUGHT THAT TO

24    THEIR ATTENTION THAT THESE BACKUP TAPES EXISTED.  WE

25    WANTED TO BE FORTHCOMING.

1    THE COURT: RIGHT.

2    MR. DOUGLASS: AND WE SAID, LISTEN, THERE ARE THESE

3    BACKUP TAPES OUT THERE THAT MIGHT CONTAIN SOME ADDITIONAL

4    E-MAILS; WE WANTED TO BRING IT TO YOUR ATTENTION; WE

5    DON'T THINK THAT IT MAKES ANY SINCE TO UNDERTAKE THE

6    PROCESS OF RESTORING THOSE, PROCESSING THE DATA. THERE'S

7    JUST ABOUT 104 FOUR OF THEM, YOUR HONOR, RESTORING THEM,

8    PROCESSING THE DATA AND THEN REVIEWING WHATEVER IS ON IT

9    IN CONNECTION WITH PRODUCING IT.

10    THE COURT: AND LET ME STOP YOU THERE.

11    MR. DOUGLASS: SURE.

12    THE COURT: AS I UNDERSTAND THE RECORD, THERE WAS

13    NOT A SITUATION WHERE SOMEONE, EITHER SIDE, WAS AWARE OF

14    A DOCUMENT THAT HAD BETWEEN GENERATED BY VIRTUE OF E-MAIL

15    AND SHOULD HAVE BEEN ON THE SERVER AND WASN'T; SO

16    THEREFORE, THERE WAS SOME SPECIFIC NEED TO GO BACK TO THE

17    BACKUP TAPE; AM I CORRECT ON THAT?

18    MR. DOUGLASS: ABSOLUTELY; ABSOLUTELY.

19    THE COURT: ALL RIGHT.

20    MR. DOUGLASS: IT WAS, THERE WAS THESE TAPES OUT

21    THERE.

22    THE COURT: RIGHT.

23    MR. DOUGLASS: WHO KNOWS WHAT'S ON THEM.

24    THE COURT: RIGHT.

25    MR. DOUGLASS: BUT, YOU KNOW --

1          THE COURT:  BECAUSE SOMETIMES A WITNESS WILL

2     RECOLLECT AND THEN IT'S NOT ON THE SERVER.  AND THEN IT'S

3     LIKE, OH, MY GOSH; WE NEED TO GO BACK AND LOOK AT THAT

4     AND FIND IT.  NO; THIS WAS A GENERALIZED INQUIRY TO SAY

5     WE WANT TO SEE WHAT'S ON IT WITHOUT A SPECIFIC

6     UNDERSTANDING THAT THERE WAS SOMETHING THERE THAT MAY BE,

7     A, GERMANE AND, B, NOT PREVIOUSLY PRODUCED .

8          MR. DOUGLASS:  THAT'S EXACTLY RIGHT.

9          THE COURT:  OKAY; I GOTCHA.

10          MR. DOUGLASS:  AND WE SAID -- WE LAID OUT THE

11     REASONS WHY WE DIDN'T THINK IT MADE SENSE; NUMBER ONE

12     IT'S EXPENSIVE.  WE CAN'T DO IT OURSELVES.  WE DON'T HAVE

13     THE MANPOWER OR THE TECHNOLOGICAL SAVVY TO GO RESTORE

14     THESE THINGS; YOU HAVE TO HIRE AN ELECTRONIC VENDOR TO GO

15     GO DO IT.  IN THIS CASE IT WAS ABOUT $50,000 TO RESTORE

16     THEM, ABOUT $50,000 TO PROCESS THE DATA TO -- THAT

17     MEANS TO GET IT INTO A REVIEWABLE FORMAT SO WE CAN EVEN

18     LOOK AT IT, AND THEN IT TOOK ANOTHER $50,000 FOR OUR

19     ATTORNEYS TO GO THROUGH THOSE DOCUMENTS, TAKE A LOOK AT

20     THEM AND SEE WHAT'S RESPONSIVE AND PRODUCE THEM TO THE

21     OTHER SIDE.

22          THE COURT:  ALL RIGHT.  LET ME STOP YOU THERE.

23          MR. DOUGLASS:  SURE.

24          THE COURT:  THIS IS A PROBLEM WHEN THE COURT READS

25     YOUR PAPERS.  I HAVE A NOTE THAT THEY CLAIM THAT OF THE

11

1    $159,933, $106,433 WERE ATTORNEY FEES.  BUT WHAT YOU'VE

2    JUST TOLD ME, THAT WAS INCORRECT.  THAT IF WE'RE LOOKING

3    AT BALL PARK NUMBERS, IT'S ABOUT $100,000 IN HARD VENDOR

4    COST AND ONLY ABOUT 50,000 IN ATTORNEY FEES.  IS THAT

5    CORRECT?

6         MR. DOUGLASS:  THAT'S EXACTLY RIGHT.  OUR AFFIDAVIT

7    SHOULD SPELL THAT OUT.

8         THE COURT:  THEY DO.

9         MR. DOUGLASS:  OKAY.  I WANTED TO MAKE SURE THAT WE

10   WERE CLEAR IN CONNECTION WITH WHAT WE'RE RECEIVING.

11        THE COURT:  OKAY.

12        MR. DOUGLASS:  THERE IS AN AFFIDAVIT OF KEVIN

13   JACOBS.  HE'S THE VENDOR.

14        THE COURT:  RIGHT.

15        MR. DOUGLASS:  HE SAYS IN HIS AFFIDAVIT THAT THE

16   HARD RECOVERY COST ARE ABOUT -- THEY'RE ABOUT $100,000,

17   AND THEN THE ATTORNEY FEES WERE ABOUT $50,000.

18        THE COURT:  OKAY.

19        MR. DOUGLASS:  SO ASIDE FROM THE FACT THAT THEY'RE

20   EXPENSIVE, THESE ARE GOING BACK TO WHAT WAS SAID BEFORE

21   WE UNDERTOOK THE PROCESS.  WE SAID IT'S ALSO TIME

22   CONSUMING.  WE'VE HAD OUR SUMMARY JUDGMENT MOTION PENDING

23   SINCE JULY AND THEY WANTED TO TAKE SOME DISCOVERY.  WE

24   SAID, LOOK, IF WE UNDERTAKE THIS PROCESS, IT'S A TWO OR

25   THREE-MONTH PROCESS.  IT TAKES A LONG TIME FOR SOMEBODY

1    TO GO IN THERE; THAT'S GOING TO PUSH EVERYTHING BACK.

2        WE ALSO SAID IT'S UNLIKELY TO YIELD A LOT OF

3    INFORMATION; AS YOU SAID, THERE WASN'T A SPECIFIC

4    DOCUMENT THAT THEY WERE LOOKING FOR.  IT WAS JUST, WHO

5    KNOWS WHAT'S ON IT; LET'S TAKE A LOOK.

6        NOW, KEEP IN MIND THE TIME FRAME OF THIS CASE IS

7    FAIRLY LIMITED.  THE PARTIES ENTERED INTO THE LOAN

8    DOCUMENTS IN MARCH OF 2008.  THE LAWSUIT WAS FILED IN

9    FEBRUARY OF 2009.

10        THE COURT:  CORRECT.

11        MR. DOUGLASS:  SO WE'RE NOT TALKING ABOUT A HUGE

12    TIME FRAME.  AND ANOTHER IMPORTANT POINT, STARTING IN, I

13    BELIEVE, MAY OF 2008, WE DID AWAY WITH BACKUP TAPES AND

14    WE USED ANOTHER SYSTEM WHERE EVERYTHING IS KEPT, AND

15    THOSE HAVE ALREADY BEEN PRODUCED.  SO, REALLY, IF YOU'RE

16    LOOKING AT A WINDOW OF MAYBE MARCH WHEN THE PARTIES

17    ENTERED IN TO MAY WHEN WE SHIFTED OVER AND THE BACKUP

18    TAPES AREN'T AT ISSUE ANYMORE, YOU'RE LOOKING AT A SMALL

19    WINDOW AND WE DIDN'T THINK THERE WOULD BE THAT MUCH

20    INFORMATION ON THE TAPES.

21        THE COURT:  AND I ASSUME THAT BECAUSE THESE TAPES,

22    MR. TECHNO MAN, CORRECT ME IF I'M WRONG; IN OTHER WORDS,

23    THESE ARE -- WOULD BE FROM THE ENTIRE SERVER ON ALL

24    MATTERS, AND CERTAINLY THE TAPES ARE, ONE NOT LIMITED TO

25    THIS TRANSACTION AND MY GUESS IS, TWO, CATEGORIZED WHERE

1     THEY COULD BE ACCESSED BY TRANSACTION; IS THAT RIGHT,

2     SIR?

3          MR. EAKES:  THAT'S RIGHT, YOUR HONOR.  THEY'RE

4     ORGANIZED BY SERVER OR TYPES OF DOCUMENTS, EITHER E-MAIL

5     SERVER, DOCUMENT SERVER, ET CETERA.

6          THE COURT:  IT MAKES SENSE, OKAY.

7          MR. EAKES:  AND WITHIN THOSE; SAY, FOR EXAMPLE, THE

8     E-MAIL SERVER, YOU KNOW, WE COULD IDENTIFY CERTAIN MAIL

9     BOXES OF RELEVANT PEOPLE.

10         THE COURT:  RIGHT.  THAT MAY BE INVOLVED.

11         MR. EAKES:  RIGHT.  BUT BEYOND THAT, THERE'S NOT

12    MUCH MORE IDENTIFICATION AT THAT POINT.

13         THE COURT:  OKAY.

14         MR. EAKES:  AND WE STILL CAN'T DO THAT UNTIL THE

15    TAPE ARE RESTORED.

16         THE COURT:  ALL RIGHT.

17         MR. EAKES:  YOU CAN'T JUST LOOK AT THE TAPE AND

18    SAY --

19         THE COURT:  SURE; THAT MAKES SENSE.  IT'S NOT LIKE

20    AN INDEX OR SOMETHING.  THANK YOU, SIR; I APPRECIATE

21    THAT.  SEE, IT'S IMPORTANT THAT YOU CAME.

22         MR. DOUGLASS:  SO, YOUR HONOR, GIVEN THAT, GIVEN THE

23    EXPENSE, THE TIME ISSUES, THE FACT THAT WE DIDN'T THINK

24    IT WOULD YIELD THAT MUCH RESPONSIVE INFORMATION, WE SAID

25    WE DON'T THINK IT'S WORTH WHILE TO UNDERTAKE THIS

1    PROCESS.  THEY SAID, WE WOULD LIKE YOU TO UNDERTAKE THIS

2    PROCESS.  AND RATHER THAN FIGHT WITH THEM AND GET INTO A

3    DISCOVERY DISPUTE, WE SAID, FINE; WE'LL DO IT; BUT WE

4    WANT YOU TO KNOW AT THE OUTSET THAT WE WILL SEEK TO

5    RECOVER OUR COST.  THIS ISN'T AN AFTER THE FACT --

6         THE COURT:  A SABOTAGE, A SANDBAG APPROACH.

7         MR. DOUGLASS:  NO, NOT AT ALL.  WE TOLD THEM THAT.

8    AND IN FACT, THEY HAD PREVIOUSLY ACKNOWLEDGE, YOUR HONOR,

9    THAT SUCH COSTS WERE RECOVERABLE.  AND IF I COULD

10   APPROACH, YOUR HONOR.

11        THE COURT:  YOU MAY, SIR.  MAKE SURE WHATEVER YOU'RE

12   HANDING ME, THEY HAVE.

13        MR. DOUGLASS:  ABSOLUTELY.

14        THE COURT:  OKAY.  THANK YOU, SIR.

15        MR. DOUGLASS:  IF YOU FLIP TO PAGE TWO, I THINK I

16   MAY HAVE USED --

17        THE COURT:  I HAVE BRAND NEW GLASSES TODAY, SO THIS

18   IS GOING TO BE FUN, A GOOD TEST.

19        MR. DOUGLASS:  IF YOU FLIP TO PAGE TWO AND TAKE A

20   LOOK AT THE SECOND FOOTNOTE, PAGE TWO, THIS IS A LETTER

21   FROM MS. SHUMENER.

22        THE COURT:  PAGE TWO, FOOTNOTE TWO.

23        MR. DOUGLASS:  IT'S RIGHT AT THE BOTTOM, ABOUT TWO

24   LINES INTO THE SECOND FOOTNOTE.

25        THE COURT:  ALL RIGHT; FOOTNOTE TWO, RATHER THAN THE

1    SECOND FOOTNOTE ON THE PAGE; AM I CORRECT?

2          MR. ALPERT:  CORRECT.

3          THE COURT:  OKAY.

4          MR. DOUGLASS:  AND DOWN THERE IN FOOTNOTE TWO, THE

5    SECOND LINE, DO YOU SEE WHERE IT SAYS:  AS YOU KNOW,

6    COURTS DO NOT REQUIRE COST SHIFTING --

7          THE COURT:  YES, SIR.

8          MR. DOUGLASS:  -- UNLESS THE ELECTRONIC DATA RESIDES

9    IN INACCESSIBLE MEDIA SUCH AS BACKUP TAPES.  THIS IS A

10   LETTER THAT THEY SENT BEFORE THE PROCESS, SO IN ADDITION

11   TO US TELLING THEM AT THE OUTSET THAT WE WOULD SEEK TO

12   RECOVER THESE COSTS, THIS IS A LETTER FROM OPPOSING

13   COUNSEL ACKNOWLEDGING THAT THESE COSTS ARE RECOVERABLE.

14         SO AFTER INFORMING THEM THAT WE WOULD SEEK TO

15   RECOVER OUR COSTS, WE WENT FORTH AND WE DID IT.  AND

16   EXACTLY AS WE TOLD THEM, IT WAS EXPENSIVE.  WE HAD TO

17   HIRE A VENDOR AS WE DISCUSSED; IT WAS ABOUT $50,000 TO

18   RESTORE IT; IT WAS ABOUT $50,000 TO PROCESS IT; IT WAS

19   ANOTHER $50,000 IN ATTORNEY'S TIME TO LOOK AT IT.

20         WITH RESPECT TO THE TIME, AGAIN EXACTLY AS WE

21   INDICATED, TWO TO THREE MONTHS; THAT'S TIME THAT WE COULD

22   HAVE SPENT FINISHING UP DEPOSITIONS IN THIS CASE,

23   BRIEFING THE SUMMARY JUDGMENT, GETTING THE SUMMARY

24   JUDGMENT MOTIONS HEARD; THAT'S ANOTHER TWO OR THREE

25   MONTHS THAT WE'RE NOW PUSHED BACK AS A RESULT OF THIS.

1    AND IT DIDN'T YIELD MUCH.  WE LOOKED AT IT AND THERE

2    WERE ABOUT 169,000 E-MAILS ON THE TAPES THAT WERE

3    REVIEWABLE.  ONLY ABOUT ONE OUT OF EVERY 650 OF THOSE

4    E-MAILS WERE EVEN RESPONSIVE TO THEIR REQUEST.  NOW, KEEP

5    IN MIND THESE ARE FAIRLY BROAD REQUESTS AND THEY CAPTURE

6    ANYTHING RELATING TO THE PROJECT, ANYTHING RELATING TO

7    THE LOAN.  OUT OF 169,000, ONLY ONE OUT OF 650 WERE EVEN

8    RESPONSIVE.

9         THE COURT:  THAT GIVES ME A TOTAL OF ABOUT -- HOW

10   MANY ARE RESPONSIVE, IF YOU'LL DO THE MATH FOR ME.

11        MR. DOUGLASS:  .15 PERCENT OUT OF THE E-MAILS

12   CAPTURED ON THE BACKUP TAPES, WHICH MEANS OBVIOUSLY 99.85

13   PERCENT WERE NOT EVEN RESPONSIVE TO THE REQUEST.  AND OF

14   THE E-MAILS THAT WERE RESPONSIVE, WE'RE NOT TALKING ABOUT

15   ANY CRITICAL IMPORTANT DOCUMENTS THAT THEY'VE IDENTIFIED.

16   AS YOU MENTIONED THEY HAVEN'T IDENTIFIED ANYTHING THAT

17   THEY WERE LOOKING FOR GOING IN, AND I'M NOT AWARE OF

18   ANYTHING PARTICULARLY IMPORTANT THAT CAME OUT OF THIS

19   PROCESS.

20        THE COURT:  THAT'S MY QUESTION:  WAS THERE ANY

21   SMOKING GUN, ANY NEW WITNESS IDENTIFIED, ANY NEW

22   INFORMATION THAT CAME OUT OF THIS.

23        MR. DOUGLASS:  NOT TO MY KNOWLEDGE.  IN THE BRIEFING

24   THEY CITE THREE OR FOUR E-MAILS, NONE OF WHICH CAME OUT

25   OF THIS PROCESS.  PRESUMABLY, IF THERE WERE SOME SORT OF

1    E-MAIL THAT THEY CONTEND WAS A SMOKING GUN, THEY WOULD

2    HAVE CITED IN THEIR PAPERS.  BUT I'M NOT AWARE OF ABOUT.

3        THE VAST MAJORITY OF THE E-MAILS WERE E-MAILS THAT

4    WHILE THEY WERE RESPONSIVE TO THEIR REQUEST, THEY WERE

5    E-MAILS THAT WERE BEFORE DEFENDANTS EVEN GOTTEN INVOLVED

6    IN THIS PROJECT AND ONLY A HANDFUL EVEN REFERENCED THE

7    DEFENDANTS.  AND NONE OF THE E-MAILS SAID ANYTHING ABOUT

8    THE PARTY'S LEGAL OBLIGATION OR ANYTHING LIKE THAT.

9        THE COURT:  ANY OF THEM HAVE TO DO WITH THE BUDGET?

10       MR. DOUGLASS:  NOT THAT I'M AWARE OF.

11       THE COURT:  SO IT WOULD HAVE BEEN BEFORE THIS

12   CONTRACT -- IS IT DANIELSON?  WHAT THAT THE GUY'S NAME?

13       MR. DOUGLASS:  LEE DANIELSON, YOUR HONOR.

14       THE COURT:  I MEAN, ONE OF THEIR ISSUES, AS I

15   UNDERSTAND IT, AND, OF COURSE, I UNDERSTAND TO BE

16   CORRECTED, IS THAT SOMEHOW THERE WAS HANKY PANKY IN TERMS

17   OF COMING UP WITH A BUDGET THAT WASN'T REALISTIC, WHETHER

18   THAT'S TRUE OR NOT OR WHETHER THAT'S GERMANE OR NOT.  WAS

19   THERE ANYTHING LIKE THAT IN HERE THAT ALLUDED TO THE

20   BUDGETARY PROCESS?

21       MR. DOUGLASS:  YOUR HONOR, I CAN'T SAY WITH

22   CERTAINTY.  THERE WERE NO E-MAILS THAT REFERENCED THE

23   BUDGET.  I CAN TELL YOU WITH CERTAINTY THAT THERE WERE NO

24   E-MAILS IN THERE SAYING ANYTHING ABOUT SFG PREPARED THIS

25   BUDGET.  AND THE REASON IS, BECAUSE --

1          THE COURT:  COLLUDED WITH DANIELSON OR WHATEVER --

2          MR. DOUGLASS:  THERE'S NOTHING IN THERE ABOUT THAT.

3  AND THE REASON IS SFG HAD NO INVOLVEMENT IN THE BUDGET.

4  ALL THE WITNESSES HAVE TESTIFIED TO THAT.

5          THE COURT:  OKAY.

6          MR. DOUGLASS:  SO I CAN TELL YOU WITH CERTAINTY THAT

7  THERE WAS NONE OF THAT.

8          THE COURT:  ALL RIGHT.

9          MR. DOUGLASS:  AFTER WE PERFORMED THE RESTORATION

10  PROCESS, WE WENT BACK AND DID WHAT WE SAID WE WERE GOING

11  TO DO:  WE ASKED THEM FOR REIMBURSEMENT AND THEY STARTED

12  FIRING OFF LETTERS TO THEM AND THEY RAISED WHAT WE

13  THOUGHT WERE A HOST OF COLLATERAL ISSUES AND THAT IT

14  APPEARS AS THOUGH THEY WERE TRYING TO DODGE THE

15  RESPONSIBILITY AND AVOID PAYING.

16      WE ANSWERED ALL OF THOSE QUESTIONS.  YOU CAN TAKE A

17  LOOK AT THE CORRESPONDENCE.  WE SAID, LISTEN, WE DON'T

18  THINK ANY OF THIS HAS TO DO WITH YOUR OBLIGATION TO

19  REIMBURSE US; WE THINK YOU'RE GETTING INTO COLLATERAL

20  ISSUES THAT HAVE NOTHING TO DO WITH THIS, BUT WE'RE GOING

21  TO ANSWER THEM ANYWAY.  AND WE DID THAT, AND THEY SENT US

22  ANOTHER LETTER AND WE ANSWERED; THEY SENT US ANOTHER

23  LETTER AND WE ANSWERED THAT AND WE REITERATED OUR REQUEST

24  FOR REIMBURSEMENT, AND FINALLY THEY JUST IGNORED OUR PAST

25  LETTER AND WE FILED THE MOTION.

1    YOUR HONOR, THAT'S KIND OF THE FACTUAL CONTEXT SO

2    THAT YOU UNDERSTAND WHERE WE'RE COMING FROM.

3    I WOULD LIKE TO TALK A LITTLE BIT ABOUT WHY WE THINK

4    DEFENDANTS SHOULD BEAR THESE COSTS: IT'S NOT ONLY FAIR

5    FOR THEM TO BEAR WITH THESE COSTS, IT WOULD BE UNFAIR IF

6    THEY DIDN'T BEAR THESE COSTS. AS YOU KNOW, YOUR HONOR,

7    THERE IS AN OBLIGATION, THERE IS AN INHERENT OBLIGATION

8    IN CONNECTION WITH RESPONDING TO DISCOVERY REQUESTS THAT

9    A PARTY SHOULD DO WHAT'S REASONABLE. THAT'S A WORD THAT

10   WE ALL HEAR IN LAW SCHOOL, REASONABLE. YOU'VE GOT AN

11   OBLIGATION TO DO WHAT'S REASONABLE, AND WE DID WHAT'S

12   REASONABLE.

13   WE WENT IN AND AMONGST VARIOUS OTHER SOURCES OF

14   ELECTRONIC INFORMATION, WE PRODUCED ALL OF THE RESPONSIVE

15   AND RELEVANT DOCUMENTS FROM OUR E-MAILS -- FROM OUR

16   E-MAIL SERVERS AND E-MAIL INBOXES JUST LIKE THEY DID;

17   THEY PRODUCED THE SAME THING. THERE'S NOTHING IN GEORGIA

18   LAW THAT SAYS WE HAVE TO GO RESTORE OUR BACKUP TAPES.

19   AND SFG, JUST BECAUSE IT HAS THIS PROCESS IN PLACE

20   WHERE AS THE OTHER SIDE DOESN'T, SFG SHOULDN'T BE

21   PENALIZED FOR HAVING THAT PROCESS IN PLACE. IF SOMEBODY

22   IS GOING TO TELL US THAT WE NEED TO GO RESTORE BACKUP

23   TAPE AND COURTS ARE GOING TO SADDLE THE PRODUCING PARTIES

24   WITH THOSE COSTS, IT'S GOING TO DISINCENTIVISE COMPANIES

25   TO HAVE THESE SORTS OF RECOVERY MEASURES.

1      THE COURT:  YEAH, THEN YOU'LL BE FACED WITH THE

2    SPOLIATION ISSUE.

3      MR. DOUGLASS:  EXACTLY.  THEY MAKE A POINT, YOUR

4    HONOR, IN THE BRIEF; THEY SAY THAT TO THE EXTENT THAT

5    THEY'RE SADDLED WITH THESE COST IT'S GOING TO INCENTIVISE

6    COMPANIES LIKE US TO HIDE DOCUMENTS IN OUR BACKUP TAPES;

7    THAT WE SHOULDN'T BE PERMITTED TO DO THAT.

8      WE DON'T HIDE DOCUMENTS IN OUR BACKUP TAPES.  WE

9    DON'T TRANSFER DOCUMENTS.  THESE BACKUP TAPES TAKES

10   SNAPSHOTS --

11     THE COURT:  YOU DON'T PICK AND CHOOSE, EITHER.

12     MR. DOUGLASS:  NO.

13     THE COURT:  AM I RIGHT, MR. TECHNO MAN?  IT JUST ALL

14   GOES IN.

15     MR. EAKES:  CORRECT, YOUR HONOR.

16     THE COURT:  AND, PLEASE, TAKE NO DISRESPECT.

17   ANYBODY KNOWS TECHNOLOGY HAS MY HIGHEST RESPECT.  THANK

18   YOU.

19     MR. DOUGLASS:  SO GIVEN THAT, THE CASES SAY -- AND

20   WE'VE CITED THEM IN OUR BRIEF AND THE DEFENDANTS HAVE

21   ACKNOWLEDGED THAT WHERE A PARTY DEMANDS ANOTHER PARTY TO

22   RESTORE THESE BACKUP TAPES AND PRODUCE DOCUMENTS FROM

23   THEM, THAT PARTY SHOULD BEAR THE COST.  THAT'S WHAT'S IN

24   MS. SHUMENER'S LETTER RIGHT IN FRONT OF ME.

25     AND WE BRIEFED THE FACTORS IN CONNECTION WITH THE

1   BRIEFS, AND I WON'T RUN THROUGH ALL OF THEM BUT AT THE --

2   HEART OF IT, IT'S NOTHING MORE THAN A COST BENEFIT

3   ANALYSIS.  THAT'S REALLY WHAT IT IS.  YOU'RE LOOKING AT

4   THE FACTORS AND YOU'RE SAYING DO THE BENEFITS ASSOCIATED

5   WITH THIS PROCESS OUTWEIGH THE COST?  AND IN THIS CASE

6   THERE'S NO QUESTION THAT THE COST HEAVILY OUTWEIGH THE

7   BENEFITS.

8       WE TALKED ABOUT SOME OF THE COSTS, THE MONETARY

9   COSTS, 150,000 IN CONNECTION WITH THE HIRING OF VENDOR,

10   RESTORING THE TAPES, PROCESSING THEM, REVIEWING THEM.

11   AND THEY SAY THAT -- THEY IMPLY IN THEIR BRIEF THAT

12   THAT'S NOT A LOT OF MONEY; THERE'S A LOT OF MONEY AT

13   ISSUE THIS THIS CASE.  WELL, I CAN TELL YOU, IT'S A LOT

14   OF MONEY TO OUR CLIENT, $150,000.  I DON'T CARE HOW BIG

15   THE CASE IS; IT'S A LOT OF MONEY AND WE'RE THE ONES

16   PAYING THIS MONEY.

17       THE COURT:  I UNDERSTAND.  AND THAT'S NOT REALLY

18   PART OF THE ISSUE.  THE ISSUE IS, IS IT RIGHT TO TRANSFER

19   THE COST OR NOT, WHETHER IT'S --

20       MR. DOUGLASS:  IS IT FAIR.

21       THE COURT:  IS IT FAIR; IS IT FAIR.  SO, YEAH.

22       MR. DOUGLASS:  AND ONE THING TO KEEP IN MIND, THESE

23   AREN'T $150,000 COSTS THAT ARE ASSOCIATED WITH ALL OF OUR

24   DISCOVERY.  WE'VE GOT ANOTHER $100,000 THAT WE'RE NOT

25   EVEN TALKING ABOUT, WE'RE NOT SEEKING TO RECOVER.  WE'RE

1    TALKING ABOUT A VERY LIMITED PORTION OF COMPLYING WITH

2    THEIR WRITTEN DISCOVERY REQUEST.

3         ALONG THE COST LINE, AGAIN, WE TALKED ABOUT THE

4    TIMING ISSUE, THE TWO TO THREE MONTHS THAT THIS PROCESS

5    TOOK WHERE WE COULD HAVE BEEN FINISHING DISCOVERY AND

6    THEN THE BRIEFING ON THE SUMMARY JUDGMENT MOTIONS, AND

7    WHAT WE'VE FOUND IS THAT NOW THIS CASE HAS GOTTEN BOGGED

8    DOWN IN CONNECTION WITH THIS BROAD DISCOVERY.  AND

9    THEY'VE GONE UP TO VIRGINIA -- JUST, YOU'LL RECALL THAT

10   THERE'S A RELATED VIRGINIA ACTION.

11        THE COURT:  YES, I DO.

12        MR. DOUGLASS:  THEY WENT UP THERE TWO OR THREE WEEKS

13   AGO AND REQUESTED THE VIRGINIA JUDGE TO SET THAT CASE FOR

14   TRIAL IN JUNE, TRIAL IN JUNE.  WE'RE TALKING ABOUT THREE

15   MONTHS FROM NOW.  AND HERE WE ARE DOWN IN GEORGIA, WE'VE

16   HAD A SUMMARY JUDGMENT BRIEF PENDING SINCE JULY.  WE

17   CAN'T EVEN GET THEIR DEPOSITIONS.  WE HAVEN'T EVEN

18   FINISHED DISCOVERY.

19        THE BENEFITS, WHEN YOU'RE TALKING ABOUT THE COST,

20   YOU ALSO LOOK AT THE BENEFITS; THE BENEFITS HERE WERE

21   MINIMAL.  WE TALKED ABOUT THE 169,000 E-MAILS ON THE

22   TAPES, 99.85 PERCENT WERE NOT EVEN RESPONSIVE.  AS YOUR

23   HONOR MENTIONED, THERE WASN'T A PARTICULAR DOCUMENT THAT

24   THEY WERE LOOKING FOR, GOING INTO THIS PROCESS.  IT WAS

25   REALLY JUST A -- LET'S SEE WHAT'S OUT THERE TYPE OF

THING.

OF THE REMAINING E-MAILS, ABOUT A QUARTER OF THOSE THEY COULD HAVE GOTTEN FROM OTHER SOURCES; FOR EXAMPLE, IF THERE'S AN E-MAIL BETWEEN SOMEBODY AT SFG, OUR CLIENT, AND MR. MINOR, WELL, MR. MINOR'S GOT THAT E-MAIL.  THERE IS NO REASON YOU HAVE TO GO TO THE BACKUP TAPES TO GET THAT.

WITH RESPECT TO THE OTHER DOCUMENTS, AS I'VE MENTIONED, A LOT OF THOSE DON'T EVEN REFERENCE DEFENDANTS.  AND THE VAST MAJORITY ARE BEFORE DEFENDANTS EVEN GOT INVOLVED IN THIS AND NONE OF THEM EVEN TALKED ABOUT THE LEGAL OBLIGATIONS.  SO GOING BACK TO FAIRNESS, AGAIN, IT'S NOT ONLY FAIR FOR THEM TO BEAR THESE COSTS, IT WOULD BE UNFAIR FOR US TO BEAR THESE COSTS.

WE TOLD THEM BEFORE WE WENT INTO THIS PROCESS EXACTLY WHAT WOULD HAPPENED, AND EXACTLY WHAT WE SAID WAS GOING TO HAPPEN HAPPENED.  WE TOLD THEM BEFORE THE PROCESS, NOT AFTERWARDS THAT WE WERE GOING TO SEEK THESE COSTS.  AND THEY ASKED US TO MOVE FORWARD WITH THE PROCESS; WE DID IT; WE REQUESTED THE COSTS, AND THEY SAID NO..

BASED ON THE ABOVE, YOUR HONOR, WE WOULD RESPECTFULLY REQUEST THE COURT TO GRANT OUR MOTION.  THE NUMBER WHICH IS IN THE PROPOSED ORDER IS $159,933.80, AND I'VE GOT A BREAKDOWN OF THOSE COSTS, TOO, YOUR HONOR.

1     $52,000 OF THAT FIGURE IS IN CONNECTION WITH RESTORING

2     THE BACKUP TAPES; $56,235.50 ARE IN CONNECTION WITH

3     TAKING THE RESTORED BACKUP TAPES AND PROCESSING THEM,

4     AGAIN, SOMETHING THE VENDOR DID, INTO A REVIEWABLE

5     FORMAT; AND $51,698.30 IN ATTORNEY'S TIME.  THANK YOU,

6     YOUR HONOR.

7          THE COURT:  THANK YOU FOR AN EXCELLENT ARGUMENT.

8     MS. SHUMENER ARE YOU GOING TO ARGUE ON BEHALF OF THE

9     MINOR, STANLEY GROUP?

10          MS. SHUMENER:  YES, JUDGE.

11          THE COURT:  THANK YOU, MA'AM.  IF YOU'RE MORE

12     COMFORTABLE FROM THERE -- WHATEVER IS BEST FOR YOU,

13     MA'AM.

14          MS. SHUMENER:  I'M ACTUALLY -- I THINK, I'M MORE

15     COMFORTABLE STANDING.

16          THE COURT:  ALL RIGHT.

17          MS. SHUMENER:  I'LL TRY TO TOUCH ON MOST OF THE

18     POINTS IF I CAN RECOLLECT THEM.

19          THE COURT:  SURE;  TAKE YOUR TIME, TOO.

20          MS. SHUMENER:  THANK YOU VERY MUCH.  YOUR HONOR, FOR

21     PARTIES WHO KEEP SAYING THIS IS JUST A SIMPLE BREACH OF

22     THE LOAN AND WE DON'T NEED DISCOVERY, THEY HAVE

23     PROPOUNDED DISCOVERY REQUESTS ON US.  WE HAVE INCURRED

24     WELL OVER A MILLION DOLLARS IN RESPONDED TO THEIR

25     DISCOVERY REQUESTS.

1      THEY, UNLIKE US, DID NOT PROVIDE US SEARCH TIME.

2   THEY DID A SHOTGUN APPROACH.  WE DID NOT THINK IT WOULD

3   BE WORTHWHILE CREATING OBSTACLE AFTER OBSTACLE AFTER

4   OBSTACLE TO EVERY DOCUMENT REQUEST, TO EVERY DISCOVERY

5   REQUEST THAT THEY POSED TO US.

6      FOR THEM TO SAY THEY INCURRED OVER $500,000 IN

7   DISCOVERY, THEY'VE CAUSED US TO INCUR OVER A MILLION

8   DOLLARS IN DISCOVERY.  AND SO JUST TO PUT IT IN --

9      THE COURT:  I UNDERSTAND THAT CONTEXT.  OF THAT, HOW

10  MUCH OF IT RELATES TO THE TECHNICAL BREACH OF THE NOTE

11  AND/OR THE LIABILITY GUARANTOR AS OPPOSED TO SORT OF THE

12  FRAUD AND OTHER DEFENSES YOU SET UP?  BECAUSE, YOU KNOW,

13  IT'S ONE THING TO SAY SORT OF WE HAVE DOUBLED -- AND I

14  JUST WANT GENERAL CONTEXT; BUT WHEN YOU HAVE DEFENSES

15  THAT YOU SET UP WHICH ARE VERY BROAD BASED, THEN

16  NECESSARILY PART OF THEIR DISCOVERY IS EXPANDED BECAUSE

17  IT GOES BEYOND THE SCOPE OF THE ORIGINAL COMPLAINTS; AND

18  I DON'T KNOW IF I'M SAYING THAT CLEARLY.

19     MS. SHUMENER:  NO, NO; YOU'RE SAYING IT PERFECTLY

20  CLEAR.

21     THE COURT:  BUT WHEN YOU ALLOCATE THAT, SOME OF THAT

22  HAS GOT TO BE ATTRIBUTABLE.  AM I RIGHT OR WRONG THAT

23  SOME OF THAT IS ATTRIBUTABLE?

24     MS. SHUMENER:  THERE IS NO QUESTION THAT SOME OF IT

25  IS ATTRIBUTABLE.

1        THE COURT:  OKAY; FAIR.

2        MS. SHUMENER:  BUT WE HAVE TO REALLY UNDERSTAND THIS

3    LOAN IN THE CONTEXT IN WHICH IT WAS MADE.

4        THE COURT:  UNDERSTOOD.

5        MS. SHUMENER:  THERE WAS NO MONEY OWED UNDER THIS

6    LOAN.  THERE WAS A QUESTION AS TO WHETHER THEY WERE

7    ENTITLED TO STOP FUNDING AND ACCELERATE THE LOAN.

8        THE COURT:  I UNDERSTAND, AND I UNDERSTAND THAT'S

9    YOUR ARGUMENT.  I UNDERSTAND THE CLAIM THAT -- THIS

10   NOTION THAT MR. MINOR WASN'T FINANCIALLY STABLE AND HAD A

11   CHANGE OF FINANCIAL CONDITION AS AN ISSUE.  I UNDERSTAND

12   THE COLLUSION ISSUE.  I UNDERSTAND ALL THAT.  MY ONLY

13   GENERAL CONTEXT POINT WAS WHEN WE LOOK AT, YOU KNOW,

14   WE'VE PRODUCED "X" AND SPENT "Y"; WE'VE PRODUCED.

15   "A" AND SPENT "B".

16       PART OF THAT, IN LARGE MEASURE IS DUE TO THE FACT

17   THAT THIS CASE INVOLVES DEFENSES THAT YOUR CLIENTS

18   RAISED, NOT THAT THEY'RE NOT APPROPRIATE, AS LONG AS

19   WE'RE FAIR ON THAT AND CHALLENGES TO THE BREACH.

20       MS. SHUMENER:  NO, NO, NO, NO.  NO, NO, NO.  WE HAVE

21   TO UNDERSTAND WHAT THE BREACHES ARE BECAUSE IT REALLY

22   ISN'T THE DEFENSES.  THE WHOLE CASE STARTS WITH THEY

23   CLAIM THE LOAN IS OUT OF BALANCE.  THAT IS THE ISSUE OF

24   THE BUDGET.

25       THE COURT:  THAT'S THE BREACH.

1          MS. SHUMENER:  THAT'S THE BREACH.

2          THE COURT:  RIGHT.

3          MR. DOUGLASS:  THEY CLAIM THAT MY CLIENTS

4     FINANCIAL --

5          THE COURT:  I UNDERSTAND.  IT'S A DEFAULT.

6          MS. SHUMENER:  SO THE DEFAULTS THAT THEY'RE ALLEGING

7     AND THE DEFENSES ARE MERE IMAGES OF EACH OTHER.  AND TO

8     SAY THAT THE DEFENSES ARE THE ONE THAT -- ARE THE MATTERS

9     THAT ARE DRIVING THIS CASE IS PUTTING THE CART BEFORE THE

10    HORSE.

11         IT'S IF THEY HAD -- IF THIS WAS A STRAIGHT FORWARD

12    LOAN WHERE THEY HAD MADE A LOAN FOR 30 MILLION DOLLARS

13    AND WE WERE OBLIGATED TO MAKE MONTHLY PAYMENTS OF

14    PRINCIPLE AND INTEREST EVERY MONTH AND THEN A BALLOON

15    PAYMENT AT MATURITY AND WE HAD DEFAULTED ON ONE OR MORE

16    OF THOSE MONTHLY PAYMENTS OR WE HAD DEFAULTED MATURITY, I

17    CAN COULD UNDERSTAND THEM SAYING:  COME ON WHAT'S THE

18    ISSUE.  AND I COULD UNDERSTAND THEM SAYING, WAIT A

19    MINUTE; YOU KNOW, YOUR DEFENSES HAVE CHANGED THE NATURE

20    OF THIS CASE.  THAT'S NOT WHAT HAPPENED HERE.

21         THE COURT:  OKAY.

22         MS. SHUMENER:  MY CLIENT PUT UP EVERY DIME THAT THE

23    BANK EVER REQUESTED.  MY CLIENT PUT UP $7 MILLION IN THIS

24    CASE.  WITHIN FOUR WEEKS AFTER THIS LOAN CLOSED, THEY

25    DECLARED THE LOAN OUT OF BALANCE.  NOTHING HAD CHANGED ON

1   THE PROJECT, NOT A SINGLE DESIGN ELEMENT HAD CHANGED,

2   NOTHING.   MY CLIENTS GO, WHAT?   $4 MILLION OUT OF

3   BALANCE?   WHAT ARE PEOPLE TALKING ABOUT.

4        OKAY; WELL, WE'RE DECLARE IT BACK IN BALANCE IF YOU

5   PUT UP ANOTHER $400,000.   SO HE PUTS UP $100,000 A MONTH,

6   MAY, JUNE, JULY, AUGUST -- OH, SURPRISE, SURPRISE.   IT

7   COMES TIME THE 400,000 IS EXHAUSTED.   NOW THEY DECLARE IT

8   OUT OF BALANCE AGAIN.

9        OKAY; IN A SPAN OF NINE MONTHS, NINE TO TEN MONTHS,

10  THEY DECLARED THIS LOAN OUT OF BALANCE AND THREATENED TO

11  STOP FUNDING MORE THAN THREE OR FOUR TIMES; OKAY?   AND

12  EACH TIME WHEN THERE'S BEEN AN ISSUE OF WHETHER MY CLIENT

13  WILL PUT UP THE MONEY OR MY CLIENT WILL PUT UP ARTWORK OR

14  MY CLIENT WILL DO A, B, C, MY CLIENT DID IT.

15       THE COURT:   OKAY.

16       MS. SHUMENER:   SO TO SAY THAT IT'S THE DEFENSES, I'M

17  SORRY, BUT IT -- I LISTENED TO SOME OF THIS STUFF AND I

18  ALMOST WANT TO SAY, WELL, THEY GET SAY THAT MY CLIENT'S

19  FINANCIAL CONDITIONS HAS CHANGED; THEY GET TO SAY THE

20  LOAN IS OUT THE BALANCE, BUT THE MINUTE I SAY, THIS LOAN

21  ISN'T OUT OF BALANCE; YOU CREATED A SHAM BUDGET, OKAY,

22  THEN IT'S -- OH, WAIT; WAIT A MINUTE; HOW COME YOU NEED

23  ANY EVIDENCE OTHER THAN --

24       THE COURT:   NO, THAT'S NOT WHAT I WAS SAYING.   WHAT

25  I WAS SIMPLY SUGGESTING IS DESPITE THE FACT THAT THERE IS

1     LEGITIMATE ISSUES IF WE'RE LOOKING AT CONTEXT, YOU'VE

2     RAISED THOSE ISSUES, YOU'RE ENTITLED TO DISCOVERY ON

3     THOSE ISSUES, SO IT'S -- WHEN YOU MAKE THE STATEMENT TO

4     THE COURT, WELL, THEY CLAIM IT'S A SIMPLE STRAIGHT

5     FORWARD -- WELL, IT'S NOT BY VIRTUE OF YOUR DEFENSES.

6     THAT'S ALL I'M SAYING.  I'M NOT BLAMING, SO LET'S MOVE

7     ON.

8          MS. SHUMENER:  I UNDERSTAND --

9          THE COURT:  SO LET'S MOVE ON.

10         MS. SHUMENER:  NO, NO.

11         THE COURT:  I HEAR WHAT YOU'RE SAYING.  I THINK

12    YOU'RE MISINTERPRETING MY COMMENTS; NO WORRIES.  LET'S

13    MOVE ON.

14         MS. SHUMENER:  YOUR HONOR, I APOLOGIZE.  I WASN'T

15    EVEN ADDRESSING YOUR COMMENTS.  I WAS ADDRESSING THE

16    ARGUMENTS THAT THEY WERE MAKING.

17         THE COURT:  OKAY.  LET'S TALK ABOUT FEE SHIFTING

18    HERE, PLEASE.

19         MS. SHUMENER:  OKAY.  WITH THE FEE SHIFTING, WHAT

20    THEY'RE TALKING ABOUT, FIRST OF ALL, WE CAN'T KNOW WHAT'S

21    ON THEIR BACKUP TAPES.

22         THE COURT:  RIGHT.

23         MS. SHUMENER:  WE WERE LOOKING -- THEY ASKED US,

24    WHEN WE SERVED THEM WITH DISCOVERY, THEY SAID:  OH, IT'S

25    SO BROAD.  FIRST, THEY DIDN'T RESPOND FOR TWO MONTHS

1    OTHER THAN TO SEND US BACK THE BOILER PLATE LOAN

2    DOCUMENTS THAT WE ALL KNEW WE HAD.  THEY DIDN'T RESPOND

3    TO US FOR MONTHS.  AND THEN ALL OF A SUDDEN WE SAY, COME

4    ON.  WE FILED A MOTION TO COMPEL IN VIRGINIA TO GET THE

5    DOCUMENTS AND THAT'S WHEN THEY SAY, OH, WELL, YOUR

6    REQUESTS ARE SO BROAD, YOU KNOW.  ACTUALLY, YOU'RE ASKING

7    US FOR EVERY DOCUMENT ABOUT THIS LOAN AND YOU'RE ASKING

8    US FOR EVERY DOCUMENT ABOUT THIS PROJECT; HOW CAN YOU BE

9    SO BROAD.  IT'S THE SAME REQUEST, BY THE WAY, THAT THEY

10   MADE OF US, BUT OUR REQUESTS WERE SOMEHOW BROAD.

11       I UNDERSTOOD THEIR CONCERN.  IT'S AN INSTITUTION.  I

12   DON'T KNOW HOW MANY PEOPLE IN THAT INSTITUTION WERE

13   INVOLVED WITH THE LOAN; I COULD UNDERSTAND THAT THEY

14   MIGHT HAVE A HERCULEAN TASK, IF YOU WILL.

15       SO THEY COME TO US AND SAY, GIVE US A SEARCH LIST.

16   OKAY, GIVE US A LIST OF TERMS THAT WILL NARROW THE SCOPE.

17   WE TURN AROUND AND WE GIVE THEM A SEARCH LIST THAT

18   NARROWS THE SCOPE.  THERE WERE SOME BACK AND FORTH ON

19   THIS IS STILL -- LOOKS BROAD.  OKAY; WE NARROWED THE

20   SCOPE.

21       THE COURT:  AND THAT WAS ALL OFF THE SERVE.

22       MS. SHUMENER:  THAT'S ALL OFF THE ENTIRE SEARCH.

23   REMEMBER, WE HAVE THE STUFF THAT OCCURRED AND STARTED IN

24   2007, BUT THE LOAN COMMENCED MARCH '08 AND BLEW UP BEFORE

25   FEBRUARY BUT FEBRUARY WAS THE FIND FINAL BLOW-UP OF '09.

1      SO WE'RE LOOKING AT AT MOST TEN MONTHS AND MAYBE EVEN

2      LESS; OKAY.

3          AFTER WE NARROWED THE SEARCH, WE ARE TOLD THERE ARE

4      GAPS; OKAY?   THERE ARE GAPS DURING THIS TIME PERIOD AND

5      IT LOOKS LIKE IN MAY OF '08 SOME DOCUMENTS HAVE BEEN

6      DELETED AND IT IS DURING THIS CRITICAL TIME PERIOD AND IT

7      COVERS AT MOST TWO YEARS -- I DON'T EVEN KNOW IF IT'S THE

8      FULL TWO YEARS.

9          THE COURT:   LET ME STOP YOU THERE:   DID THEY MAKE A

10     LIST OF DOCUMENTS THAT WERE DELETED DURING THIS SPECIFIC

11     TIME PERIOD?

12         MS. SHUMENER:   NO.   ALL WE WERE TOLD IS THERE ARE

13     GAPS AND THERE ARE DOCUMENTS THAT HAVE BEEN DELETED AND

14     THERE ARE BACKUP TAPES THAT NEED TO BE RESTORED.

15         THE COURT:   WELL, WHERE AND HOW WERE YOU TOLD THAT?

16     DO YOU HAVE A RESPONSE?

17         MS. SHUMENER:   BY TELEPHONE.

18         THE COURT:   DO YOU HAVE AN E-MAIL OR SOMETHING THAT

19     BACKS THAT UP THAT SAYS THAT YOU WERE TOLD THERE WERE

20     GAPS AND DOCUMENTS DELETED?

21         MS. SHUMENER:   I BELIEVE THERE WAS A PHONE

22     CONVERSATION, AND WE'LL PROVIDE YOU WITH AFFIDAVITS, YOUR

23     HONOR.

24         THE COURT:   THAT'S ALL RIGHT.

25         MS. SHUMENER:   THAT, AND I BELIEVE IT'S IN OUR

1    PAPERS.  BUT I REMEMBER BEING ON THE TELEPHONE WITH

2    MR. ALPERT AND I BELIEVE IT WAS MR. DOUGLASS, AND I DON'T

3    REMEMBER WHO ELSE FROM OUR OFFICE WAS THERE BUT I'M SURE

4    THAT IF I GO BACK, I COULD FIND OUT.

5         THE COURT:  WELL, MY QUESTION REALLY SPECIFICALLY IS

6    WERE DOCUMENTS THAT WERE ALLEGED TO HAVE BEEN DELETED

7    IDENTIFIED BY DATE, BY AUTHOR, BY SUBJECT, OR JUST A

8    GENERAL STATEMENT -- WELL, SOME OF THE DOCUMENTS HAVE

9    BEEN DELETED; DO YOU RECALL?

10        MS. SHUMENER:  IT WAS NOT BY DATE.  THERE WERE TIME

11   GAPS.

12        THE COURT:  TIME GAPS.

13        MS. SHUMENER:  THERE WERE TIME GAPS IN THE DELETED

14   DOCUMENTS.

15        THE COURT:  TIME GAPS; NOW, WHEN WE TALK ABOUT

16   DOCUMENTS, MY UNDERSTANDING IS THIS BACKUP TAPE DEALT

17   WITH THE E-MAIL SERVER.

18        MS. SHUMENER:  CORRECT.

19        THE COURT:  ARE YOU TALKING ABOUT DOCUMENTS THAT

20   WOULD HAVE BEEN -- THAT SHOULD HAVE BEEN ON THE E-MAIL

21   SERVER BECAUSE HE TOLD ME THERE'S ALL KINDS OF SERVERS;

22   AM I RIGHT MR. TECH MAN, THERE'S A DOCUMENT SERVER, AN

23   E-MAIL SERVER?  AM I RIGHT?  DID YOU TELL ME THAT?

24        MR. EAKES:  CORRECT, YOUR HONOR.  THE BACKUP TAPES

25   THAT WE'VE BEEN TALKING ABOUT ARE WITH THE E-MAIL SERVER

1           THE COURT:  THAT'S CORRECT.  SO MY QUESTION IS, EVEN

2    IF THERE WERE GAPS IN DOCUMENTS OCCURRING SOME PERIOD OF

3    TIME, WHERE IS THE LINK BETWEEN THOSE ALLEGED --

4           MS. SHUMENER:  IT'S IN THE E-MAILS.

5           THE COURT:  WELL, THAT WAS MY QUESTION.

6           MS. SHUMENER:  I'M SORRY.

7           THE COURT:  BECAUSE YOU DIDN'T MAKE THAT CLEAR.

8           MS. SHUMENER:  I APOLOGIZE.

9           THE COURT:  AND THAT WAS WHERE I WAS HEADED.  THOSE

10   WERE ON -- YOU'RE CONTENDING THOSE WERE ON THE E-MAIL

11   SERVER, SHOULD HAVE BEEN?

12         MS. SHUMENER:  THAT IS WHAT WE WERE LED TO BELIEVE,

13   THAT WHEN THEY WENT TO PRODUCE THE DOCUMENTS, THE E-MAILS

14   ON THEIR SERVERS, THEY HAD DETECTED A GAP.

15         THE COURT:  OKAY.

16         MS. SHUMENER:  AND CERTAIN DOCUMENTS HAD BEEN

17   DELETED.  AND THE ONLY WAY TO GET THOSE DOCUMENTS BACK

18   WAS TO RESTORE THE BACKUP TAPES.

19         THE COURT:  WERE YOU ABLE TO IDENTIFY A GAP FROM THE

20   INITIAL ROUND THAT THEY SENT YOU WHICH WAS THE PRODUCTION

21   FROM THE SERVER?

22         MS. SHUMENER:  I DON'T BELIEVE THAT WHEN THE -- AND

23   I DON'T WANT TO MISREPRESENT ANYTHING TO THE COURT.

24         THE COURT:  NO, I KNOW YOU'RE NOT.  WE'RE JUST

25   TRYING TO WORK THROUGH THIS.

1    MS. SHUMENER:  YEAH, I DON'T BELIEVE AT THE TIME

2    THAT WE GOTTEN ALL OF THEIR OTHER DOCUMENTS.  I THINK

3    THIS HAD COME UP IN A TELEPHONE CONVERSATION.  AND IT

4    WASN'T AS IF WE LOOKED AND SAID, UH-HUH; THERE'S A GAP

5    HERE.  NO; THEY TOLD US THERE WAS A GAP.

6        THE COURT:  ALL RIGHT.

7        MS. SHUMENER:  THEY TOLD US THAT E-MAILS HAD BEEN

8    DELETED AND THAT BECAUSE THEY'VE BEEN DELETED AND THERE

9    WAS A MIGRATION TO A NEW SYSTEM --

10       THE COURT:  CORRECT.

11       MS. SHUMENER:  -- THAT CERTAIN DOCUMENTS HAD BETWEEN

12   STORED ON BACKUP TAPES.

13       THE COURT:  ALL RIGHT.  BEFORE WE GET THERE, WHEN

14   YOU MADE THE REQUEST FOR THE BACKUP TAPE, DID YOU HAVE IN

15   PLACE THE PRODUCTION FROM THE SERVER?

16       MS. SHUMENER:  WE HAD SOME OF IT.

17       THE COURT:  ALL RIGHT.  SO IT WASN'T A MATTER OF

18   SAYING I'VE GOT THE PRODUCTION FROM THE SERVER; I KNOW

19   GENERALLY THEY'VE SUGGESTED THAT THERE MAY BE SOME GAPS,

20   BUT BEFORE YOU REQUESTED BACKUP TAPES YOU WHEN THROUGH --

21   DID YOU TRY TO GO THROUGH AND PIECE TO MAKE SURE "A",

22   THEY WERE IMPORTANT GAPB" WERE THINGS MISSING?

23       MS. SHUMENER:  I DON'T THINK IT WAS POSSIBLE AT THAT

24   POINT TO DO THIS.  I DON'T THINK WE HAD --

25       THE COURT:  WELL, THAT'S WHAT I'M ASKING.

1       MS. SHUMENER:  WELL, WE DIDN'T HAVE ALL THE

2   DOCUMENTS.

3       THE COURT:  BUT YOU DIDN'T WAIT, EITHER; THAT'S MY

4   QUESTION.  YOU DIDN'T WAIT UNTIL YOU HAD A FULL SERVER

5   PRODUCTION THAT HAD BEEN REVIEWED AND ANALYZED BEFORE YOU

6   SAID, COUNSEL, I THINK WE'RE GOING TO NEED THOSE BACKUP

7   TAPES BECAUSE BASED ON YOUR SERVER PRODUCTION AND BASED

8   UPON OUR GENERAL DISCUSSION ABOUT MAYBE THERE BEING SOME

9   GAPS, THERE IS AN APRIL TO MAY GAP; THERE'S A JULY TO

10   AUGUST, WHATEVER YOU WANT TO SAY; IT WASN'T -- IT DIDN'T

11   GO THAT DOWN THAT WAY IS WHAT I'M ASKING.

12       MS. SHUMENER:  NO, BECAUSE WE WERE LEARNING ALL OF

13   THIS STUFF FROM THEM.

14       THE COURT:  I UNDERSTAND.

15       MS. SHUMENER:  WE DIDN'T --

16       THE COURT:  BUT YOU COULD HAVE WAITED, MA'AM, UNTIL

17   ALL OF THE SERVER PRODUCTION WAS DONE AND REVIEWED BY

18   YOUR CLIENTS AND YOUR FOLKS BEFORE YOU MADE THE REQUEST

19   FOR A BACKUP; COULD YOU NOT?  THAT'S MY ONLY QUESTION.

20       MS. SHUMENER:  I DON'T THINK WE COULD HAVE AND I'LL

21   TELL YOU WHY.

22       THE COURT:  SURE.

23       MS. SHUMENER:  I DON'T KNOW HOW WE COULD HAVE EVER

24   DETERMINED WHAT WE WEREN'T GETTING.  AND IF WE KNEW IT

25   WAS DURING THE CRITICAL TIME PERIOD, WE KNEW IT WAS IN

1    TURN -- THE E-MAILS WERE INTERNAL COMMUNICATIONS TO SFG

2    SO THAT WE HAD NO ACCESS TO THEM FROM ANY OTHER SOURCE.

3         THE COURT:  OKAY.

4         MS. SHUMENER:  AND EVEN IF WE HAD LOOKED AT EVERY

5    SHRED OF PAPER THAT THEY PRODUCED TO US, WE HAD NO WAY OF

6    KNOWING WHAT WASN'T THERE.

7         THE COURT:  WHAT WAS THERE.

8         MS. SHUMENER:  AND THEY WERE TELLING US THAT IT WAS

9    DURING THE CRITICAL TIME FRAME AND THEY COULDN'T

10   REPRESENT TO US BECAUSE I DON'T EVEN BELIEVE THEY KNEW

11   WHAT WAS THERE, COUNSEL, ANYWAY.

12        THE COURT:  UH-HUH.

13        MS. SHUMENER:  WHOSE E-MAILS WERE THERE AND/OR WHAT

14   THE E-MAILS CONTAINED.

15        THE COURT:  I TAKE YOUR POINT ON THAT.  SO I GUESS

16   WHAT I NOW NEED TO KNOW IS, IS THERE ANYTHING IN THE

17   RECORD THAT DOCUMENTS THAT YOUR CLIENTS WERE MADE AWARE

18   THAT WHEN, ONE WERE GAPS AND, TWO, THAT DURING THE

19   CRITICAL TIME FRAME AND THAT THERE WERE GAPS IN THE

20   E-MAILS AND THE DOCUMENTS DURING THE CRITICAL TIME

21   PERIOD.  WHAT DO I HAVE IN THIS RECORD AS OF NOW TO

22   VERIFY THAT?

23        MS. SHUMENER:  YOU KNOW, YOUR HONOR, I WILL

24   SINCERELY APOLOGIZE TO THE COURT.  WE WILL GET YOU

25   AFFIDAVITS TO SUPPLEMENT THAT, BUT WE CAN CERTAINLY DO

1    THAT.

2           THE COURT:  ALL RIGHT.

3           MS. SHUMENER:  WE ALSO DID TELL SFG AT THE TIME THAT

4    THEY RAISED THE COST SHIFTING ISSUE, THAT WE WERE NOT

5    CONCEDING THE COST SHIFTING ISSUE.

6           THE COURT:  SURE.

7           MS. SHUMENER:  WE NEVER SAID TO THEM IN ADVANCE AND

8    THEY NEVER SAID, WELL, LET'S DUKE THIS OUT BEFORE WE

9    PRODUCE.

10          THE COURT:  THIS DISCUSSION WOULD BE VERY DIFFERENT

11    IF YOU HAD DONE THAT.  I KNOW YOU DIDN'T DO THAT.  IF YOU

12    HAD DONE THAT, THE DISCUSSION WOULD BE THEY AGREED.

13          MS. SHUMENER:  YEAH.

14          THE COURT:  AND THEY WERE LEANING ON THEIR

15    AGREEMENT.

16          MS. SHUMENER:  WE SAID WE'LL FIGHT ABOUT THAT LATER

17    BECAUSE WE WERE VERY CONCERNED AS TO WHY DOCUMENTS HAD

18    BEEN DELETED DURING THE TIME FRAME BECAUSE IT'S OUR

19    CONTENTION AND HAS BEEN OUR CONTENTION THAT STARTING IN

20    APRIL WHEN THEY DECLARED THE LOAN OUT OF BALANCE, THEY AT

21    THAT TIME AT MINIMUM THEY WERE AWARE THAT THEY SHOULDN'T

22    BE DELETING DOCUMENTS.

23          THE COURT:  WELL, LET ME STOP YOU THERE BECAUSE NOW

24    YOU'RE ARGUING THERE WAS SOME KIND OF INTENTIONAL

25    DELETION TO HIDE EVIDENCE WHEN YOU SAY THAT.

1         MS. SHUMENER:  I DON'T MEAN --

2         THE COURT:  AND THAT'S NOT COMING -- IF I ALLOW YOU

3    TO FILE AFFIDAVIT, THAT IS NOT COMING IN THAT AFFIDAVIT,

4    THAT THEY INTENTIONALLY DELETED IT?

5         MS. SHUMENER:  NO; NO; NO.

6         THE COURT:  OKAY.  WELL, THAT'S WHAT I HEAR YOU

7    SUGGESTING.  YOU SAID THEY SHOULD HAVE KNOWN NOT TO

8    DELETE IT.

9         MS. SHUMENER:  NO; SHOULD HAVE KNOWN NOT TO DELETE

10   IS DIFFERENT THAN -- AND I DON'T MEAN TO SUGGEST THAT

11   WHEN I SAY THAT THEY SHOULD HAVE KNOWN NOT TO DELETE,

12   SOMEBODY SHOULD HAVE PUT THEM ON ALERT THAT THERE MIGHT

13   BE LITIGATION COMING.

14        THE COURT:  OH.

15        MS. SHUMENER:  OKAY?  AND THEY SHOULDN'T HAVE BEEN

16   DELETING.  I DIDN'T EVER MEAN TO SUGGEST, YOUR HONOR --

17        THE COURT:  THAT IT WAS INTENTIONAL?

18        MS. SHUMENER:  OH, NO; THAT THEY WERE DELETING IT

19   FOR SOME UNDERHANDED PURPOSE, NO.

20        THE COURT:  YOU MADE IT SOUND LIKE THEY SHOULD HAVE

21   KNOWN THIS INTENTION.

22        MS. SHUMENER:  NO.

23        THE COURT:  ALL RIGHT.  LET'S GO.

24        MS. SHUMENER:  NO.  WHAT I'M DOING IS SIMPLY SAYING

25   THAT THE OBLIGATION SHIFTED TO THEM.

1          THE COURT:  ALL RIGHT.  AND WHAT PERIOD OF TIME ARE

2     WE TALKING ABOUT WHEN YOU CLAIM THE OBLIGATION SHIFTED TO

3     THEM?

4          MS. SHUMENER:  APRIL.  IT STARTED APRIL OF '08.

5          THE COURT:  THE FIRST TIME THAT THEY SUGGESTED --

6          MS. SHUMENER:  ABSOLUTELY, THAT THE LOAN WAS OUT THE

7     BALANCE AND THAT IT DIDN'T COMPORT WITH THE BUDGET.

8          THE COURT:  ALL RIGHT; ALL RIGHT.  OKAY.  AND THAT'S

9     ABOUT THE TIME, I THINK, THEY WERE MIGRATING TO A NEW

10    SYSTEM.  OKAY.

11         MS. SHUMENER:  NOW, I DO WANT TO ADDRESS A COUPLE OF

12    ISSUES THAT WERE KIND OF -- PUT IN THIS BACKGROUND

13    BECAUSE I DO WANT TO ADDRESS THE RECORD.  WE HAVE NEVER

14    REFUSED TO PRODUCE ANYONE FOR A DEPOSITION.

15         THE COURT:  WELL, THAT'S NOT BEFORE ME RIGHT NOW;

16    NOT BEFORE ME; NOT ON MY RADAR SCREEN.

17         MS. SHUMENER:  ALL RIGHT.  THERE WERE JUST CERTAIN

18    COMMENTS THAT WERE MADE.

19         THE COURT:  WELL, LET'S FOCUS ON THE FEE SHIFTING

20    ISSUE.

21         MS. SHUMENER:  THE FEE SHIFTING ISSUE, WHEN -- I

22    WANT TO PUT INTO CONTEXT, OKAY, THE PRESUMPTION IS -- AND

23    ESPECIALLY IN A CASE OF THIS COMPLEXITY, SFG IS SEEKING

24    OVER $14,000,000 RIGHT NOW; OKAY?  WE ARE SEEKING OVER 10

25    MILLION AND IT COULD BE AS HIGH AS 20 MILLION IN THIS

1     LITIGATION.  THE COST RELATIVE TO THE AMOUNT THAT IS AT

2     STAKE IN THIS LITIGATION IS INORDINATE.

3          WE DID NOT CAUSE THE DOCUMENTS TO MIGRATE ONTO THE

4     BACKUP SERVERS.  WE BELIEVE THAT THEY SHOULD HAVE KNOWN

5     NOT TO DELETE DOCUMENTS; SOMEBODY SHOULD HAVE BEEN ON

6     ALERT; IT SHOULD HAVE BEEN PUBLIC POLICY WITHIN SFG THAT

7     WHEN YOU START DECLARING THE LOAN OUT OF BALANCE AND WHEN

8     YOU START THESE KINDS OF PROBLEMS, YOU'RE INITIATING

9     THEM; THAT THERE SHOULD BE SOME ANTICIPATION THAT

10    LITIGATION MAY BE FORTHCOMING.

11         THE DOCUMENTS, WHEN WE START LOOKING AT THE FACTORS,

12    WHEN YOU START LOOKING AS TO WHETHER THE DOCUMENT

13    REQUESTS WERE SPECIFICALLY TAILORED, NARROWLY TAILORED TO

14    US, THAT WAS -- OUR DOCUMENT REQUESTS WERE ABOUT THIS

15    LOAN ONLY.  WE'RE NOT ASKING ABOUT ANYBODY'S BACKGROUND

16    INFORMATION; WE'RE NOT ASKING ABOUT ANY PERSONAL

17    INFORMATION; WE'RE NOT TAKING DETOURS; WE'RE ASKING

18    PURELY AND SIMPLY ABOUT OUR LOAN.

19         OKAY.  WE COULDN'T GET THESE DOCUMENTS ELSEWHERE.

20    IF WE COULD HAVE, WE WOULD HAVE.  THERE WAS ABSOLUTELY

21    NO -- WE HAD NO INCENTIVE.

22         FRANKLY, WHEN YOU LOOK AT THE SITUATION, FACING THE

23    RISK THAT WE'RE GOING TO HAVE TO REIMBURSE THEM, JUST

24    FACING THAT RISK, WE WOULDN'T HAVE BEEN ASKING FOR THESE

25    DOCUMENTS IF WE DIDN'T THINK THAT THERE MIGHT BE

1     SOMETHING CRITICAL.  WHEN YOU'VE GOT A GAP IN A TIME

2     PERIOD THAT'S LESS THAN A YEAR AND WITHIN THAT LESS THAN

3     A YEAR TIME PERIOD THERE IS A GAP OF INFORMATION THAT HAS

4     BEEN MIGRATED ONTO BACKUP TAPES, WE WOULD BE NEGLIGENT IN

5     NOT REQUIRING THAT THOSE DOCUMENTS BE PRODUCED.

6          THE COURT:  AND I GUESS MY PROBLEM IS I'M

7     CONSTRAINED BECAUSE I DON'T KNOW WHAT KIND OF GAP YOU'RE

8     TALKING ABOUT, WHETHER IT'S 24 HOURS --

9          MS. SHUMENER:  NO, TWO MONTHS.

10         THE COURT:  NO, IT'S NOT ONE LONG TWO-MONTH GAP; IS

11    THAT WHAT YOU'RE TELLING ME?

12         MS. SHUMENER:  MY UNDERSTANDING IS THERE WERE

13    E-MAILS DELETED FROM MARCH -- NOT ALL OF THE E-MAILS.

14         THE COURT:  THAT'S MY POINT.

15         MS. SHUMENER:  OH, NO, I DON'T MEAN TO --

16         THE COURT:  ALL RIGHT.  OKAY; THAT'S WHY I'M

17    ASKING.

18         MS. SHUMENER:  I'M HAVING A HARD TIME MAKING MYSELF

19    CLEAR.

20         THE COURT:  I'M SORRY; YEAH, AND APPARENTLY I AM, AS

21    WELL.  ALL RIGHT; I UNDERSTAND.  AND SO YOU SAID IN YOUR

22    JUDGMENT IT WAS NARROWLY TAILORED, YOU COULDN'T GET THEM

23    ELSEWHERE, YOU KNEW THAT YOU NEEDED TO NARROWLY TAILOR

24    THEM BECAUSE YOU WERE FACING THE RISK OF PERHAPS FEE

25    SHIFTING, AND IN YOUR JUDGMENT IT WAS CRITICAL BECAUSE

1    YOU WERE AWARE OF GAPS.  THAT'S -- I'M FOLLOWING YOU SO

2    FAR.

3         MS. SHUMENER:  AND AT LEAST TEN PERCENT OF THE

4    E-MAILS THAT HAVE BEEN PRODUCED IN THIS CASE CAME FROM

5    THE BACKUP TAPES, WHICH IS NOT AN INSIGNIFICANT NUMBER.

6    SO WHILE THEY CLAIM THAT IT'S 260 E-MAILS, THAT'S OUT OF

7    2000 E-MAILS.  AND WHILE THERE MAY BE A MILLION DOCUMENTS

8    WHEN WE'RE TALKING ABOUT THE E-MAILS AT ISSUE, TEN

9    PERCENT IS NOT INSIGNIFICANT.

10        THE COURT:  BUT LET ME ASK YOU THIS -- AND, AGAIN,

11   THIS MAY JUST SHOW MY LACK OF UNDERSTANDING, BUT ISN'T IT

12   FAIR TO SAY THAT A MAJORITY OF WHAT YOU GOT ON THE BACKUP

13   TAPES YOU HAD ALREADY GOTTEN FROM THE SERVER PRODUCTION?

14        MS. SHUMENER:  I DON'T KNOW THAT TO BE THE CASE,

15   YOUR HONOR.

16        THE COURT:  ALL RIGHT.  I'LL ASK THE DEFENDANTS

17   THAT.

18        MS. SHUMENER:  I HONESTLY DON'T KNOW THAT TO BE THE

19   CASE.

20        THE COURT:  ALL RIGHT.  WELL, TO ME THAT'S PRETTY

21   IMPORTANT.

22        MS. SHUMENER:  IF YOUR HONOR -- I WOULD LIKE IF THAT

23   IS I A MATTER OF CONCERN BECAUSE I DON'T KNOW -- AND I'LL

24   TELL YOU WHAT MY STRUGGLE IS, IF I HAD REALIZED THAT THAT

25   WOULD BE A MATTER OF CONCERN, I WOULD HAVE STUDIED THAT,

1   BUT IT WOULD NEVER HAVE OCCURRED TO ME FOR THE FOLLOWING

2   REASON:  AND THAT IS THAT BEFORE YOU GET THOSE E-MAILS,

3   YOU CAN'T KNOW THAT.  AND SO I MIGHT BE SITTING THERE

4   LOOKING AT THE SAME THING AS -- THERE WERE ONLY ONE MEMO

5   IN THE PINTO CASE WHERE THOSE CARS BLEW UP THAT KIND OF

6   SHOWED THAT THE PEOPLE INTERNAL TO THAT INSTITUTION,

7   OKAY, HAD MADE A CONSCIOUS DECISION --

8   THE COURT:  THERE'S NO QUESTION THE MEMO GETS

9   PRODUCED; THE QUESTION HERE IS IF THERE'S ONE MEMO OUT OF

10   MANY, MANY BANKER'S BOXES, WHO BEARS THE COST OF THE

11   PRODUCTION OF THE MEMO?  IT'S NOT WHETHER IT SHOULD BE

12   PRODUCED; IT'S NOT WHETHER IT'S RELEVANT; IT IS WHO BEARS

13   THAT COST.  THAT'S ALL WE'RE TALKING ABOUT.

14   AND SO MY -- YOU KNOW, AND PART OF THAT ANALYSIS HAS

15   BEEN NATURALLY TAILORED.  AND IT KEEP GOING BACK TO WHEN

16   YOU ASK THEM JUST TO PRODUCE THEM ALL BEFORE YOU HAVE --

17   AT LEAST AT THIS POINT I HAVE NO UNDERSTANDING OF A GAP.

18   AND BEFORE YOU'VE ANALYZED WHAT YOU HAVE -- YOU KNOW, I

19   UNDERSTAND THIS NOTION OF I WANT TO BE SAFE.  YOU DON'T

20   HAVE TO ARGUE THAT WITH ME.  I UNDERSTAND THAT.  I WANT

21   TO KNOW EVERYTHING THAT'S OUT THERE.  I WANT THE PINTO

22   MEMO.  BUT THERE COMES A POINT IN WHAT WE'RE ADDRESSING

23   TODAY IS WHETHER YOU WANT TO BEAR THE COST OF BECOMES

24   BEING THAT ABSOLUTELY CERTAIN GIVEN THE CONTEXT OF

25   EVERYTHING.  THAT'S WHAT WE'RE LOOKING AT, NOT YOUR

1    ENTITLEMENT TO IT.

2         MS. SHUMENER:  WE WERE TOLD -- WE WERE TOLD -- I WAS

3    ON THAT PHONE CONVERSATION I WILL REPRESENT TO THE COURT

4    AND I WILL FOLLOW IT UP WITH AN AFFIDAVIT IF ALLOWED TO;

5    BUT, YOUR HONOR, WE WERE TOLD THE DOCUMENTS WERE DELETED.

6         THE COURT:  ALL RIGHT.

7         MS. SHUMENER:  WE WERE HOLD THAT THEY WERE PUT ON

8    BACKUP TAPES AND WE WERE TOLD BY SFG THAT THERE WERE

9    GAPS.  WE DIDN'T EVEN USE THAT WORD; THEY DID.

10        THE COURT:  ALL RIGHT.

11        MS. SHUMENER:  THANK YOU, YOUR HONOR.

12        THE COURT:  WELL, I APPRECIATE THAT, AND I DIDN'T

13   MEAN TO GIVE YOU A HARD TIME.  BUT I JUST HAVE TO -- WHEN

14   I HEAR THINGS AND I'M NOT SURE ABOUT IT, I'VE GOT TO ASK

15   REAL GOOD QUESTIONS ABOUT IT.  ALL RIGHT, SIR.  LET ME

16   HEAR FROM YOU.

17        MR. DOUGLASS:  I'LL KEEP IT VERY SHORT, YOUR HONOR.

18        THE COURT:  THAT'S OKAY.  WE HAVE PLENTY OF TIME.

19        MR. DOUGLASS:  TWO THINGS:  THE FIRST, THAT

20    MS. SHUMENER SAID THAT SHE WAS NOT IMPLYING THAT SFG

21   DELIBERATELY DELETED E-MAILS.  I'VE GOT THEIR BRIEF RIGHT

22   HERE IF I MAY APPROACH.

23        THE COURT:  SURE.

24        MR. DOUGLASS:  I DON'T THINK THAT IT COULD BE SAID

25   ANY CLEARER THAN THEY SAY IT.  TAKE A LOOK AT THE HEADING

1        THAT I'VE UNDERLINED.

2              THE COURT:  OH, YEAH.

3              MR. DOUGLASS:  THEY SAY ONE THING IN THE BRIEFS AND

4        THEN THEY GET UP HERE AND SAY SOMETHING COMPLETELY

5        DIFFERENT.

6              THE COURT:  AND I'M RIGHT; THERE'S NO AFFIDAVIT THAT

7        BACKS THIS UP OF ANY ALLEGATION OF EITHER, ONE

8        INTENTIONAL DELETION OR, TWO, ANY ADMISSION THAT THERE'S

9        SIGNIFICANT GAPS OR ANYTHING LIKE THAT IN THE RECORD.

10             MR. DOUGLASS:  THERE IS NO INTENTIONAL DELETION.

11        AND I WOULD LIKE MR. EAKES TO ADDRESS THIS GAP WORD THAT

12        THEY'VE USED.

13             THE COURT:  YEAH.

14             MR. DOUGLASS:  I CAN TELL YOU THAT'S NOT OUR WORD.

15        AND I WOULD LIKE MR. EAKES TO CLEAR THAT UP.

16             THE COURT:  WELL, IT'S PRETTY IMPORTANT, SO HOW

17        ABOUT CLEARING THAT ONE UP FOR ME, COUNSEL.

18             MR. EAKES:  SURE, YOUR HONOR.  TO PUT THIS IN

19        CONTEXT, THE PROCESS WE WENT THROUGH AS HAS BEEN

20        DESCRIBED IS WE FIRST PULLED ALL THE E-MAILS FROM THE

21        ACTIVE SERVER, WE PROCESSED THOSE AND WE REVIEWED THEM

22        AND PRODUCED THEM.  DURING THAT PROCESS IT CAME TO OUR

23        ATTENTION THAT AS OF MAY 2008, SFG HAD CHANGED FROM A

24        BACKUP TAPE SYSTEM TO AN ARCHIVE SERVER SYSTEM.

25             ONE THING I WANT TO POINT OUT, YOUR HONOR, THEY'VE

1      GOT THE CHRONOLOGY A LITTLE BACKWARDS.  THEY SEEM TO BE

2      IMPLYING THAT WE WENT FROM A SITUATION WHERE ALL E-MAILS

3      WERE ACCESSIBLE TO A SITUATION WHERE NOW OUR E-MAILS ARE

4      ON BACKUP TAPES.  IT'S ACTUALLY THE REVERSE.

5           THE COURT:  OKAY.

6           MR. EAKES:  EVERYTHING UP TO MAY 2008 WAS BACKED UP

7      ON BACKUP TAPES.  AFTER MAY OF 2008 IT WAS PUT ON AN

8      ARCHIVE SERVER WHICH WE HAVE EASY ACCESS TO.

9           THE COURT:  AND YOU'VE GIVEN THEM EVERYTHING THEY

10     WANTED ON THAT?

11          MR. EAKES:  CORRECT, YOUR HONOR.  SO THERE WASN'T

12     ANY SORT OF INTENTIONAL WENT OUT TAKING DOCUMENTS THAT

13     WERE ACCESSIBLE AND MAKING THEM INACCESSIBLE.  IT WAS THE

14     EXACT OPPOSITE.  AND, OF COURSE, YOUR HONOR, YOU PROBABLY

15     REALIZED THIS, BUT THIS WAS PART OF THE NORMAL COURSE OF

16     BUSINESS OF SFG.  THIS PROCESS, THE MIGRATION PROCESS,

17     HAD NOTHING TO DO WITH THIS LAWSUIT.  SO THAT'S THE FIRST

18     POINT.

19          NOW, GETTING TO THE GAP ISSUE, WE NEVER SAID THAT

20     THERE WERE GAPS.  WHAT WE SAID WAS, LOOK, THERE WAS THIS

21     BACKUP TAPE -- THERE WAS THIS CHANGE IN THE BACKUP

22     PROCESS.  ANY DOCUMENT, ANY E-MAIL THAT WAS ON THE ACTIVE

23     SERVER AS OF MAY 25TH, 2008, THAT INCLUDES ANY E-MAIL

24     DATED PRIOR TO THAT TIME, INCLUDES E-MAILS IN 2007, 2006,

25     ANYTHING ON THE SERVER, WAS COPIED AND TRANSFERRED TO

1    THIS NEW ARCHIVE SERVER.

2         SO WHAT WE TOLD THEM IN THE SENSE OF GAPS WAS THAT,

3    LOOK, THERE MAY BE SOME E-MAILS THAT ARE RESPONSIVE TO

4    YOUR REQUEST THAT ARE WITHIN THIS TIME PERIOD THAT ONLY

5    AVAILABLE IN BACKUP TAPES.  BUT WE STRESSED TO THEM THAT

6    WE BELIEVE THAT IS GOING TO BE A VERY SMALL UNIVERSE.

7    YOU'RE TALKING ABOUT THE ONLY E-MAILS THAT ARE

8    EXCLUSIVELY ON BACKUP TAPES WERE ONE SENT OR RECEIVED

9    PRIOR TO MAY 25TH, 2008, THAT ARE ONLY INTERNAL TO SFG --

10   IF THEY WERE EXTERNAL, OTHER SOURCES COULD POSSIBLY HAVE

11   THOSE -- AND WERE DELETED BY EVERYONE AT  SFG PRIOR TO

12   MAY 25TH, 2008; AND, YOU KNOW SOMEONE HADN'T PRINTED OUT

13   AND STUCK IN A FILE WHEN WE PRODUCED THEM.

14        THE COURT:  RIGHT.

15        MR. EAKES:  SO WE EXPECTED THE UNIVERSE TO BE PRETTY

16   SMALL, AND IT TURNED OUT IT WAS.  I DO WANT TO ADDRESS

17   ONE QUESTION YOU HAD TO DEFENSE COUNSEL:  THE E-MAILS

18   THAT WE PRODUCED, ONE OF THE BACKUP TAPES, THOSE WOULD

19   HAVE BEEN DE-DUPLICATED AGAINST ANYTHING WE HAD

20   PREVIOUSLY PRODUCED.

21        THE COURT:  THAT WAS MY QUESTION.

22        MR. EAKES:  RIGHT.

23        THE COURT:  IT SEEMS TO ME WHETHER YOU TALK ABOUT

24   NARROWLY TAILORED AND YOU END UP PRODUCING A SECOND TIME

25   THINGS YOU'VE PRODUCED A FIRST TIME, IT WEIGHS ON THE

1          ISSUE OF NARROWLY TAILORED.  THAT WAS MY ONLY REASON FOR

2          THAT QUESTION.

3               MR. EAKES:  SURE.  AND PART OF THE -- PART OF THE

4          PROCESSING COST WE GO THROUGH AS WELL AS SOME ADDITIONAL

5          REVIEW TIME IS TAKING THOSE DUPLICATE E-MAILS OUT.

6               THE COURT:  RIGHT.

7               MR. EAKES:  THAT YOU KNOW THE E-MAILS THAT HADN'T

8          BEEN DELETED.

9               THE COURT:  RIGHT; AND THAT WAS THE BULK OF IT, AS I

10         UNDERSTAND .

11              MR. EAKES:  YES, YOUR HONOR; OR THOSE E-MAILS THAT

12         WERE NOT RESPONSIVE TO OUR SEARCH, YOUR HONOR.

13              THE COURT:  RIGHT.

14              MR. EAKES:  AND, OF COURSE, THERE WERE A HANDFUL OF

15         PRIVILEGED E-MAILS.

16              THE COURT:  UNDERSTOOD.

17              MR. EAKES:  THE OTHER THING I WANT TO TALK ABOUT IS

18         THIS IDEA -- AND I'VE TOUCHED ON IT ALREADY, BUT THIS

19         IDEA OF DELETING E-MAILS.  YOU KNOW, NO ONE WAS GOING IN

20         AND DELETING E-MAILS.  THIS WAS A CHANGE IN THE BACKUP

21         PROCESS; IT WAS PART OF THE NORMAL COURSE OF BUSINESS,

22         NOT RELATED THIS LAWSUIT, AND THOSE ARE THINGS WE

23         EXPLAINED TO THEM.  AND THIS IS -- IN THE COURSE OF

24         DISCOVERY WE CAME TO THEM AND SAID, LOOK, WE HAVE BEEN

25         MADE AWARE OF THIS CHANGE; WE WANT TO NOTIFY YOU ABOUT

1   IT; WE DON'T THINK ANYTHING'S THERE, BUT WE WANTED TO LET

2   YOU KNOW.

3        THE COURT:  OKAY.  GIVE ME AN EXAMPLE; LIKE, PRETEND

4   LIKE I'M IN THE FIFTH GRADE BECAUSE WHEN IT COMES TO

5   THESE THINGS I MIGHT AS WELL HAVE BEEN -- OF AN E-MAIL

6   THAT WOULD NOT HAVE BEEN, YOU KNOW, INTENTIONALLY DELETED

7   BUT WOULD HAVE ENDED UP ON THE BACKUP TAPE BUT WOULDN'T

8   BE ON THE E-MAIL SERVER; HOW WOULD THAT HAVE HAPPENED?

9        MR. EAKES:  SURE.  LET'S SAY TWO INTERNAL PEOPLE AT

10   SFG, TWO SFG EMPLOYEES HAD EMAILED EACH OTHER IN LAT

11   '07, EARLY '08, LET'S SAY JANUARY 2008.

12        THE COURT:  OKAY.

13        MR. EAKES:  AND LET'S ALSO ASSUME THAT IT'S ABOUT

14   THIS LOAN.

15        THE COURT:  ALL RIGHT.

16        MR. EAKES:  SO IT'S A RESPONSE -- YOU KNOW, A

17   POTENTIALLY RELEVANT E-MAIL.  IF BOTH PEOPLE HAD DELETED

18   THAT E-MAIL BEFORE MAY 25TH, 2008, THEN IT WOULD ONLY BE

19   AVAILABLE ON THE BACKUP TAPES.

20        THE COURT:  GOTCHA.

21        MR. EAKES:  IF ONE OF THEM HAD NOT DELETED IT.

22        THE COURT:  IT WOULD HAVE BEEN ON THE SERVER.

23        MR. EAKES:  OR, YOU KNOW -- AND YOUR HONOR IS WELL

24   AWARE OF THIS WHEN USING E-MAILS, E-MAILS ARE CHAINS.  IF

25   SOMEONE HAD FORWARDED THAT E-MAIL TO SOMEONE ELSE --

1        THE COURT:  IT WOULD HAVE COME UP.

2        MR. EAKES:  THAT E-MAIL CHAIN WOULD NOT, YOU KNOW --

3    SO THERE'S -- FOR ALL OF THESE REASONS WE DIDN'T FEEL

4    LIKE THERE WOULD BE MUCH UNIQUE INFORMATION ON THE BACKUP

5    TAPES.

6        THE COURT:  SO IT WOULD BE VERY LIMITED TO A

7    SITUATION WHERE BOTH SIDES JUST HAPPENED TO DELETE IT AS

8    OPPOSED TO FORWARDING IT ON THROUGH A CHAIN OR ARCHIVED

9    IT OR WHATEVER ELSE FOLKS DO WITH IT OR COPIED AND

10   PRINTED THEM IN FILES WHICH OLD FOLKS CONTINUE TO DO.

11       MR. EAKES:  AS YOU CAN IMAGINE AS MR. DOUGLASS HAS

12   STATED, THE E-MAILS THAT CAME OUT OF THIS WERE NOT, YOU

13   KNOW, AS YOUR HONOR ADDS, YOU KNOW, SMOKING GUNS OR BIG

14   RED HERRINGS WHICH MAKES SENSE BECAUSE THESE ARE AVERAGE

15   DAY TO DAY BUSINESS TRANSMITTAL E-MAILS THAT PEOPLE

16   DELETED BECAUSE THEY HAD NO CONTINUING NEED FOR THEM.

17   SO, YEAH, ALL OF THAT FITS TOGETHER.  THERE'S NOTHING

18   HERE THAT DOESN'T MAKE SENSE.

19       THE COURT:  OKAY.  THAT CLARITY REALLY HELP ME.  I

20   APPRECIATE THAT, SIR.  ALL RIGHT.  I'M SORRY, WE

21   INTERRUPTED YOUR ARGUMENT.  DO YOU WANT TO --

22       MR. DOUGLASS:  THAT'S IT, YOUR HONOR.  THANK YOU.

23       THE COURT:  ALL RIGHT.  I THINK I'VE GOT -- YEAH.

24   ANYTHING -- MS. SHUMENER, ANYTHING ELSE YOU WANT TO ADD

25   AT THIS POINT?

1    MS. SHUMENER:  JUST A COUPLE OF THINGS.

2    THE COURT:  IN RESPONSE TO WHAT THEY'VE JUST KIND OF

3    BROUGHT UP.

4    MS. SHUMENER:  ENTIRELY A RESPONSE.  FIRST, I

5    DON'T -- ALL I WANT TO SAY WAS THAT I DON'T RECALL EVER

6    HAVING A CONVERSATION WITH MR. EAKES, BY THE WAY, ABOUT

7    ANY OF THESE THINGS.  I DO RECALL SEEING SOME LETTERS

8    FROM HIM DELIVERING DOCUMENTS TO US, BUT I DON'T RECALL

9    HIM BEING ON THE TELEPHONE WITH US.

10    THE SECOND IS -- AND I DON'T WANT TO MAKE MUCH OF

11    IT:  WHEN WE SAID THEY WERE DELIBERATELY DELETED, IT

12    WASN'T AN OOPS.  IT WASN'T  -- WHAT -- I'M NOT TRYING TO

13    SUGGEST THAT THEY WERE TRYING TO HIDE SOMETHING OR USE IT

14    TO ADVANTAGE IN THE LITIGATION, BUT THEY WERE

15    INTENTIONALLY DELETED E-MAILS AND THEY WERE DELETED

16    DURING THE TIME FRAME WHEN THEY SHOULD HAVE BEEN

17    PRESERVING THOSE AS A MATTER OF POLICY BECAUSE LITIGATION

18    SHOULD HAVE BEEN ANTICIPATED.

19    BUT THE MOST IMPORTANT THING IS THAT IT WAS DURING

20    THE CRITICAL TIME PERIOD IN THIS CASE FOR THE MATTERS

21    THAT ARE AT ISSUE IN THIS CASE, AND -- I DON'T WANT TO

22    REPEAT THE ARGUMENTS.

23    THE COURT:  I DON'T THINK ANYBODY DISPUTES THAT

24    ANYWAY.  YOU'RE RIGHT.  ALL RIGHT.

25    MS. SHUMENER:  THANK YOU.

1            THE COURT:  ALL RIGHT.  I KNOW THERE'S A LOT OF

2     FEDERAL CASES ON IT, BUT THIS COURT GENERALLY FOLLOWS

3     GEORGIA CASES.  AND THE KEY WORDS THE COURT REVIEWED ON

4     THIS WAS THE GEORGIA ADMISSION TESTING VERSUS HAROLD

5     REHEIS.  AND IN THAT CASE THE COURT AUTHORIZED FEE

6     SHIFTING WHILE UNDER CERTAIN SPECIFIC CIRCUMSTANCES.  YOU

7     KNOW, GENERALLY IT'S EVEN -- AGAINST A GOVERNMENTAL

8     ENTITY IT'S EVEN HARDER TO SHIFT COST BECAUSE UNDER

9     GOVERNMENTAL ENTITY THERE'S OPEN RECORDS ACT.  YOU KNOW,

10    WE'RE JUST AS A GOVERNMENT WE'RE REQUIRED TO PRODUCE

11    THOSE AT OUR OWN EXPENSE, HAVING BEEN THE FORMER COUNTY

12    ATTORNEY FOR A NUMBER OF YEARS, I'M VERY FAMILIAR WITH

13    THAT.

14            BUT EVEN SO IN THE CASE IT SAID, YOU KNOW, THE KEY

15    THING HERE WAS THAT THE REQUEST INVOLVED THE CREATION OF

16    REPORT THAT OTHERWISE DID NOT EXIST AND INVOLVED

17    INFORMATION THAT WAS NOT THE SUBJECT OF A REGULARLY

18    PRODUCED REPORT.  I THINK THAT'S THE SAME THING HERE IN

19    TERMS OF A BACKUP TAPE.  AND, "B", IT HAD TO BE

20    SPECIFICALLY CREATED BY A NON-PARTY CONTRACTOR AT

21    SIGNIFICANT COST.

22            AND TO ME, THERE'S NO QUESTION THAT BOTH OF THOSE

23    FACTORS ARE PRESENT.  IN ADDITION, JUST EVEN LOOKING AT

24    THE FACTORS IDENTIFIED BY A FEDERAL COURT, IN MY

25    JUDGMENT, THEY WEIGH IN FAVOR OF FEE SHIFTING IN THIS

1   CASE BECAUSE -- WELL, ONE, I UNDERSTAND THE NEED TO BE

2   OVERLY CAUTIOUS, BUT I DO THINK THAT FUNDAMENTALLY YOU

3   BEAR THE RISK OF EXPENSE WHEN YOU'RE OVERLY CAUTIOUS AND

4   GIVEN THE ENTIRE CONTEXT, WHICH WAS QUITE HELPFUL.

5   TWO, THERE'S NO EVIDENCE SPECIFICALLY OF ANY

6   INTENTIONAL DELETION OR ANY GAPS THAT PEOPLE WERE TRYING

7   TO FIND THAT THEY KNEW WAS THERE AND COULD BE PRODUCED.

8   THIRD, A MORE CONSCIOUS APPROACH IN TERMS OF REVIEWING

9   THE E-MAILS AND TRY TO IDENTIFY MORE TO NARROWLY TAILORED

10   WINDOWS COULD HAVE HAPPENED AND IT DIDN'T. DEFENDANTS

11   PUT YOU ON NOTICE.

12   SO FOR THE REASONS THAT YOU HAVE IDENTIFIED IN YOUR

13   BRIEF, I BELIEVE IT'S IMPORTANT TO HAVE COST SHIFTING.

14   NOW, WHERE I HAVE TO DRAW THE LINE AND I THINK IT'S WHERE

15   THE GEORGIA COURTS IS, I'M WILLING TO GIVE YOU ALL OF THE

16   COST, THE HARD VENDOR COST, BUT I DON'T SEE ANYTHING IN

17   GEORGIA LAW THAT REALLY LET'S ME GIVE ATTORNEY FEES. AND

18   I BELIEVE LIKE THAT'S, A, A FAIR BALANCE AND, B,

19   CONSISTENT WITH REHEIS.

20   SO I'M NOT SUGGESTING THAT YOUR HOURS WERE

21   UNREASONABLE; I'M NOT SUGGESTING THE AMOUNT WAS

22   UNREASONABLE. I FEEL CONSTRAINED. BUT I AM WILLING TO

23   GIVE YOU -- AND I WROTE DOWN THE MATH; IT LOOKS LIKE IT'S

24   $ONE8,000 -- $108,235,000.

25   MR. DOUGLASS: THAT'S EXACTLY RIGHT, YOUR HONOR.

1    THE COURT: ALL RIGHT. I'LL GIVE YOU THAT. AND

2    WHAT I WOULD LIKE FOR Y'ALL TO DO IS PREPARE AN ORDER AND

3    PLEASE PREPARE THE ORDER THAT KIND OF GOES THROUGH NOT

4    ONLY THE REHEIS ANALYSIS BUT THE FEDERAL ANALYSIS AND

5    IDENTIFY -- YOU KNOW, QUITE FRANKLY, MR. DOUGLASS, JUST

6    IDENTIFY WHAT YOU IDENTIFIED IN YOUR ORAL ARGUMENT

7    BECAUSE IT'S COMPELLING.

8    AND I UNDERSTAND WHY THE MINOR FAMILY HOTELS GROUP

9    AND MR. MINOR HAVE CONTESTED THIS, AND THAT'S ANOTHER

10   REASON WHY I DON'T WANT TO AWARD FEES BECAUSE I

11   UNDERSTAND THAT, BUT I BELIEVE IN THIS CASE, GIVEN ALL

12   THE PRODUCTIONS, GIVEN THE ISSUES IN THE CASE, THAT THE

13   BURDEN OF BEING SORT OF MORE SAFE THAN SORRY OR FINDING

14   THE ONE MEMO AS IN THE PINTO CASE, THE COST OF THAT

15   SHOULD FALL ON THE OTHER PARTY. SO THAT'S MY ORDER.

16   MS. SHUMENER: YOUR HONOR, MAY I JUST GET SOME

17   CLARIFICATION ON ONE THING?

18   THE COURT: SURE.

19   MS. SHUMENER: IT'S MY UNDERSTANDING THAT 50-SOME

20   ODD THOUSAND WAS USED TO RESTORE THE DOCUMENT. AND THEN

21   THERE'S THIS VERY VAGUE TERM CALLED "PROCESSING" FOR

22   ANOTHER 50,000. AND I'M NOT SURE I UNDERSTAND WHAT

23   PROCESSING IS, IF IT'S ANY DIFFERENT THAN THEY DID WITH

24   E-MAILS THAT DID NOT HAVE TO BE RESTORED.

25   THE COURT: I DON'T KNOW.

1        MS. SHUMENER:  AND --

2        THE COURT:  I DON'T KNOW, MA'AM.  IT'S THEIR VENDOR

3    COST AND I'M WILLING TO GIVE THEIR VENDOR COST.  I DON'T

4    KNOW.  THAT'S SOMETHING YOU SHOULD HAVE MAYBE TAKEN UP

5    WITH THEM BEFORE NOW.  I'M GOING TO GIVE THEM THEIR

6    VENDOR COST, HARD COST.  I'LL GIVE YOU THE VENDOR COST TO

7    GET IT WHERE THEY WANTED IT.

8        I ALSO, I THINK WE NEED TO PUT IN THIS ORDER THAT

9    THERE'S NO -- THERE'S NO EVIDENCE BEFORE THIS COURT THAT

10   THE DEFENDANTS INTENTIONALLY DELETED OR INTENTIONALLY

11   CREATED A GAP.  I MEAN, THAT'S GOT TO BE -- BECAUSE I

12   DON'T HAVE ANY EVIDENCE OF THAT IN THE RECORD.  SO I WANT

13   TO CLEAR UP THAT, AS WELL.

14       WHAT WOULD BE, MS. SHUMENER, A REASONABLE TIME

15   PERIOD FOR YOUR CLIENT TO MAKE THIS PAYMENT?

16       MS. SHUMENER:  I DON'T KNOW.  I HAVE TO TALK TO

17   HIM.

18       THE COURT:  WELL, NOW, YOU NEED TO TELL ME NOW

19   BECAUSE WE HAVE TO PUT IT IN THE ORDER AND I'VE GOT TO

20   DECIDE IT.  I MEAN, WHAT WOULD YOU SAY IS REASONABLE?

21       MS. SHUMENER:  30 DAYS.

22       THE COURT:  ALL RIGHT.  I'LL GIVE YOU 45.

23       MS. SHUMENER:  THANK YOU.

24       THE COURT:  OKAY.  I THINK THAT'S FAIR.  ALL RIGHT.

25   ANYTHING ELSE ON THIS ISSUE?  ALL RIGHT.  YOU'LL WRITE

1    THE ORDER AND MAKE SURE MR. SHUMENER SEES IT, MR. BRANNAN

2    SEES IT, BOTH OF THEM.  YOU CAN E-MAIL IT TO ME.  WE HAVE

3    A SERVER.  WE DON'T BACK THEM UP.  AT LEAST MINE; THE

4    COURT DOESN'T.  NOW, I ALSO UNDERSTAND YOU HAVE SOME

5    SCHEDULING ISSUES.  DO WE NEED OUR COURT REPORTER FOR

6    THIS OR NOT?

7         MR. ALPERT:  YOU KNOW, I'M NOT SURE THAT WE DO, YOUR

8    HONOR.

9         THE COURT:  I DON'T THINK WE DO.  DO YOU, MS.

10   SHUMENER?

11        MS. SHUMENER:  YOUR HONOR, I ACTUALLY WOULD PREFER A

12   COURT REPORTER.

13        THE COURT:  YES, MA'AM, YOU'RE WELCOME TO HAVE IT.

14   OKAY.  WHAT ARE THE SCHEDULING ISSUES YOU WOULD LIKE THE

15   COURT TO TAKE UP?  JUST FREE REIGN STAY IN YOUR SEAT; YOU

16   CAN TAKE YOUR JACKET OFF; YOU CAN SIT DOWN; YOU KNOW YOU

17   DON'T EVEN HAVE TO STAND, EITHER SIDE

18        MR. ALPERT:  THANK YOU, YOUR HONOR.  THANK YOU VERY

19   MUCH.  I THINK ONE OF THE THINGS THAT WE NEED TO DO IS

20   KIND OF GET A CONTROL OF THIS CASE.

21        THE COURT:  SCHEDULING ORDER.

22        MR. ALPERT:  AND GET IT MOVING.

23        THE COURT:  DO WE HAVE A SCHEDULING ORDER?

24        MR. ALPERT:  WE HAD A SCHEDULING ORDER, BUT IT

25   CONNECTS WITH SOME OF THE DISCOVERY AND THAT KIND OF GOT

1       BLOWN UP BECAUSE WE'VE BEEN OPERATING IN A UNIVERSE

2       WITHOUT BOUNDS.

3               THE COURT:  I THINK THAT'S A GOOD IDEA.

4               MR. ALPERT:  I THINK IT'S VERY IMPORTANT THAT WE

5       AGREE, YOUR HONOR, TO A COMPLETION OF DISCOVERY AND THEN

6       A BRIEFING SCHEDULE IMMEDIATELY TO FOLLOW.

7               THE COURT:  OKAY.

8               MR. ALPERT:  AND THEN A HEARING ON A MOTION FOR

9       SUMMARY JUDGMENT.

10              THE COURT:  ALL RIGHT.

11              MR. ALPERT:  I THINK THAT'S THE MOST IMPORTANT

12      THING.

13              THE COURT:  ALL RIGHT; THAT'S FAIR.

14              MR. ALPERT:  I THINK THE OTHER THING WE WOULD LIKE

15      TO DO, YOUR HONOR, IS I REALLY FEEL LIKE THE PARTIES NEED

16      TO START TO PUT A BOX AROUND WHAT REMAINING DISCOVERY IS

17      GOING TO BE TAKING PLACE.

18              THE COURT:  THAT'S RIGHT.

19              MR. ALPERT:  BECAUSE WE HAVE A VERY SERIOUS CONCERN.

20      YOU HEARD A LITTLE BIT ABOUT THE COST.  I CAN TELL YOU

21      THAT OUR CLIENT'S COST TO DATE ARE APPROACHING

22      $2,000,000.  OUR CLIENT'S COST TO GET TO SUMMARY JUDGMENT

23      WILL BE $2.5 MILLION.  IT WILL BE CLOSE TO $3 MILLION.

24      WE THOUGHT WE HAD A GOOD MOTION FOR SUMMARY JUDGMENT BACK

25      IN JULY; WE WANTED TO DO THE DISCOVERY TO MAKE SURE

1    EVERYBODY UNDERSTOOD WE'RE NOT HIDING ANYTHING, BUT WE

2    FEEL LIKE WE NEED TO GET OUR ARMS AROUND THIS.

3         THE COURT:  I AGREE.  AND I'M SURE THEIR COST ARE

4    ESCALATING, AS WELL.  I'M SURE.

5         MR. ALPERT:  NO QUESTION; NO QUESTION.

6         THE COURT:  SO MY JOB IS TO BRING IT IN A LITTLE

7    BIT.

8         MR. ALPERT:  HERE'S MY SUGGESTION, YOUR HONOR:  THE

9    DEFENDANTS HAVE ALREADY TAKEN ABOUT EIGHT DEPOSITIONS.

10   WE HAVE NOT TAKEN A SINGLE DEPOSITION YET, PRIMARILY

11   BECAUSE WE HAVEN'T GOTTEN A LOT OF THE DOCUMENTS THAT WE

12   WANT TO ASK WITNESSES QUESTIONS ABOUT.  I THINK THAT FROM

13   OUR STANDPOINT WE CAN PROBABLY TAKE FOUR TO SIX

14   DEPOSITIONS TOTAL.

15        THE COURT:  AND HOW LONG DO YOU THINK THAT WILL

16   TAKE?

17        MR. ALPERT:  I WOULD LIKE TO, PROVIDED WE GET

18   COOPERATION WITH SCHEDULING, YOUR HONOR.

19        THE COURT:  RIGHT.

20        MR. ALPERT:  I THINK WE CAN GET THOSE DONE BY THE

21   END OF APRIL.

22        THE COURT:  OKAY.

23        MR. ALPERT:  AND --

24        THE COURT:  WHAT ABOUT EXPERTS?  ARE Y'ALL GOING TO

25   NEED ANY EXPERTS IN THIS KIND OF CASE?

1   MR. ALPERT: A GOOD QUESTION, YOUR HONOR. PART OF

2   IT WOULD DEPEND ON THE FINANCIAL INFORMATION THAT WE

3   FINALLY GET THAT WE REQUESTED THREE OR FOUR MONTHS AGO.

4   THE COURT: RIGHT.

5   MR. ALPERT: WE PROBABLY WOULD HAVE SOMEONE HELP US

6   REVIEW THOSE. AND DEPENDING, IT MAY OR MAY NOT INCLUDE

7   SOME EXPERTS.

8   THE COURT: OKAY. BUT I WOULD TACK THAT ON BECAUSE

9   I BELIEVE YOU DO THE FACT -- ALL OF THE FACT WITNESSES,

10   IF POSSIBLE, BEFORE YOU START THE EXPERT NAMING ROUND.

11   MR. ALPERT: I DON'T DISAGREE, YOUR HONOR.

12   THE COURT: I UNDERSTAND.

13   MR. ALPERT: I WOULD LIKE TO TRY AND SHORTEN THAT A

14   LITTLE BIT, BUT I AGREE WITH YOU.

15   THE COURT: WE'LL SHORTEN IT, BUT IT'S GOING TO BE

16   REASONABLE. AND MS. SHUMENER, WHAT DO YOU NEED? LET'S

17   START FIRST WITH WHAT YOU THINK YOU NEED IN TIME-WISE AND

18   CONTENT-WISE IN TERMS OF YOUR FACT DISCOVERY?

19   MS. SHUMENER: FOR FACT DISCOVERY WE ARE TAKING THE

20   DEPOSITIONS OF PLANSIENT VAZE [PH], WHICH IS THE GENERAL

21   CONTRACTOR. THAT'S ALREADY SCHEDULED FOR APRIL 15.

22   THE COURT: OKAY.

23   MS. SHUMENER: AND I AM GOING TO BE TAKING ONE OF

24   THE BRODLINS' DEPO NEXT WEEK IN NEW YORK. SO I THINK WE

25   NEED -- I HAVE THE DEPOSITION OF SFG AT THE END OF THE

1        MONTH, ONE OF THE SFG WITNESSES.

2            THE COURT:  OKAY.

3            MS. SHUMENER:  AND I THINK WE NEED TO GET THE

4        PARTICIPANT BANKS, WHETHER I'M GOING TO NEED ALL THE

5        PARTICIPANT BANKS OR SOME OF THE PARTICIPANT BANKS.

6        THERE ARE, I BELIEVE, SIX TO EIGHT PARTICIPATING BANKS.

7        I WOULD PROBABLY KNOW WHETHER I WANT TO TAKE THEM ALL

8        AFTER I'VE TAKEN TWO OR THREE.

9            THE COURT:  LET ME JUST STOP YOU, ARE YOU LOOKING AT

10       DOING A 30(B)6 FOR THESE FOLKS?

11           MS. SHUMENER:  YES.

12           THE COURT:  OKAY.  AND HAVE YOU-ALL -- MY

13       UNDERSTANDING IS YOU'VE WORKED OUT THE DISCOVERY DISPUTE

14       ON THOSE.

15           MS. SHUMENER:  WELL, WE HAVEN'T YET GOTTEN THE

16       DOCUMENTS.

17           THE COURT:  THAT'S NOT MY -- BUT YOU'VE WORKED IT

18       OUT, GENERALLY?

19           MS. SHUMENER:  YES; YES.

20           THE COURT:  AND WILL YOU WAIT UNTIL YOU GET THE

21       DOCUMENTS TO DECIDE WHICH BANKS YOU WANT TO TAKE 30(B)6

22       REPS OF?

23           MS. SHUMENER:  I THINK THAT MAKES SENSE.

24           THE COURT:  IT DOES TO ME.

25           MS. SHUMENER:  I DON'T KNOW HOW LONG IT'S GOING TO

1   TAKE THE PARTICIPATING BANKS TO GET THE DOCUMENTS, SFG,

2   OR HOW LONG SFG -- AND SFG, I THINK -- I KNOW THAT WE

3   AGREED WITH THE COURT IN VIRGINIA THAT SFG WOULD HAVE TEN

4   DAYS FROM THE DATE THAT THEY RECEIVE COUNSEL RECEIVE

5   DOCUMENTS FROM THE PARTICIPATING BANKS TO TURN THEM OVER

6   TO US.  SO I THINK -- I DON'T KNOW WHEN I CAN EXPECT

7   THOSE DOCUMENTS FROM SFG, BUT I CERTAINLY WOULD BE

8   WILLING TO TAKE THE PARTICIPANT'S DEPOSITION QUICKLY

9   THEREAFTER, AS POSSIBLE.

10   THE ONLY WRINKLE THAT WE HAVE, WHICH IS A VERY SHORT

11   TIME WRINKLE IS WE NOW HAVE IN THE VIRGINIA ACTION LEE

12   DANIELSON'S COMPANY MOVED TO COMPEL ARBITRATION BECAUSE A

13   DEVELOPMENT AGREEMENT BETWEEN MINOR FAMILY HOTELS AND

14   HOTEL CHARLOTTESVILLE ARBITRATION CLAUSE, THAT

15   ARBITRATION HAS NOW SCHEDULED.  IT'S GOING TO GO FORWARD

16   THE WEEK OF APRIL 19TH, SO I DON'T THINK WE'RE GOING TO

17   BE ABLE TO BE COMPLETED WITH DISCOVERY BY THE END OF

18   APRIL, YOUR HONOR.

19   THE COURT:  NO; THAT WAS SORT OF WHAT THEY NEEDED TO

20   DO.

21   MS. SHUMENER:  I THINK THE END OF MAY FOR DISCOVERY

22   SHOULD DO IT.  I'M NOT PLANNING TO TAKE ANY VACATIONS.

23   I'M GOING TO GO STRAIGHT THROUGH.

24   THE COURT:  WELL, YOU KNOW -- YEAH, BECAUSE, YOU

25   KNOW, TAKING EIGHT PARTICIPATING BANK 30(B)6'S MAY NOT BE

1    A PRODUCTIVE USE OF YOUR TIME.

2         MS. SHUMENER:  NOR DO I THINK IT WOULD BE NECESSARY,

3    YOUR HONOR.  I JUST CAN'T TELL IN ADVANCE.  IF EACH ONE

4    COMES UP WITH A DIFFERENT -- IF I TAKE TWO OR THREE DEPOS

5    AND THEY COME UP WITH DIFFERENT STORIES -- AND I DON'T

6    MEAN STORIES TO IMPLY ANYTHING WRONG.

7         THE COURT:  BE VERY CAREFUL WITH WHAT YOU SAY.

8         MS. SHUMENER:  I KNOW.  IF THEIR TESTIMONY IS

9    DIFFERENT, NOT SO MUCH THAT THEY'RE EVEN CONTRADICTING

10   EACH OTHER, BUT THAT CERTAIN BANKS HAVE BEEN INVOLVED

11   WITH THIS ASPECT WITH THE BUDGET AND OTHER BANKS HAVE

12   BEEN INVOLVED, YOU KNOW, MR. MINORS -- I CAN'T TELL.

13        THE COURT:  ALL RIGHT.  WELL, WE'LL SEE ABOUT

14   THAT.

15        MS. SHUMENER:  I DON'T WANT TO TAKE EIGHT

16   DUPLICATIVE DEPOSITIONS.

17        THE COURT:  NO, I DON'T THINK ANYBODY WANTS THAT.

18   ALL RIGHT.  SO LET ME HEAR FROM YOU NOW.

19        MR. ALPERT:  YOUR HONOR, BRIEFLY ON THAT THERE'S A

20   COUPLE OF THINGS.  WE ARE GOING TO RESIST TAKING EIGHT

21   PARTICIPANT BANKS.  WE'RE PROBABLY GOING TO RESIST TAKING

22   ANY.  THEY ARE COMPLETELY NOT RELATED TO THE ISSUES IN

23   THIS LAWSUIT.  HERE'S OUR CONCERN, AND THIS IS THE MOST

24   IMPORTANT THING I WILL SAY TO THE COURT TODAY:  WE CAME

25   DOWN HERE ABOUT A LITTLE OVER A YEAR AGO OR A LITTLE

1    UNDER A YEAR AGO TO ARGUE A MOTION TO STATE THIS CASE

2    FILED BY MR. MINOR.

3         THE COURT:  I KNOW.

4         MR. ALPERT:  AND IT WAS CLEAR WHAT HE WANTED AT THAT

5    TIME.  HE WANTED TO SHUT THIS CASE DOWN; HE WANTED TO

6    MOVE HIS VIRGINIA CASE FORWARD.

7         THE COURT:  WELL, IT'S NOT GOING TO HAPPEN.  I'M

8    GOING TO MOVE IT.  AND WHAT I'M LEANING TOWARD IS THAT

9    SINCE YOU'RE GOING TO CONTEST THIS, THAT WE'LL RUN

10   SIMULTANEOUSLY FACT DISCOVERY WITH ME HEARING THE MOTION

11   FOR A PROTECTIVE ORDER ON THE PA BANKS IF YOU CAN'T WORK

12   IT OUT.

13        YOU KNOW, WHAT ARE OCCURRED TO ME WAS SEEMS LIKE YOU

14   OUGHT TO BE ABLE TO HANDLE THIS BY WRITTEN DISCOVERY; BUT

15   YOU KNOW WHAT?  I KNOW WHAT HAPPENS WITH THAT.  THAT

16   TAKES LONGER.  SOMETIMES IT'S FASTER TO LINE THEM UP.

17   SO, WE'LL RUN THOSE TRACKS SIMULTANEOUSLY SO AS NOT TO

18   EXPAND THE BRACKETS IN TERMS OF GETTING FACT DISCOVERY.

19        SECONDLY, IT SEEMS TO ME THAT IF YOU'RE GOING TO

20   TAKE PA BANKS DEPOSITIONS, DEPENDING ON HOW I RULE ON

21   THAT, THEY CAN BE DONE BY TELEPHONE.  I DON'T SEE YOU

22   HAVING TO TRAVEL ALL OVER AND WAIT FOR SCHEDULES.  AGAIN,

23   IT SEEMS TO ME YOU CAN DO THEM TELEPHONICALLY AND NAIL

24   THEM BECAUSE YOU KNOW IT'S NOT LIKE THE SITUATION

25   WHERE -- THAT WILL SAVE A TON OF TIME AND A TON OF MONEY;

1    RIGHT?

2         MR. ALPERT:  AGREED, YOUR HONOR.

3         THE COURT:  OKAY.  SO THINK ABOUT THAT.  NOW, HAVING

4    SAID THAT, IT LOOKS TO ME THAT I'VE GOT FOUR TO SIX

5    DEPOSITIONS, NOT INCLUDING EXPERTS, ON THE PLAINTIFF'S

6    SIDE, AND I'VE GOT ONE TWO -- AT LEAST THREE MORE

7    DEPOSITIONS ASIDE FROM PARTICIPATING BANKS ON THE

8    DEFENDANT'S SIDE.  OKAY; THAT'S A MINIMUM OF NINE

9    DEPOSITIONS.  IT'S ALREADY HALFWAY THROUGH MARCH, SO I'M

10   SAYING 60 DAYS TO GET THAT DONE, FOR ALL OF THAT, AND WE

11   WILL SIMULTANEOUSLY RUN THE ISSUE.

12        AND IF I ALLOW THOSE PARTICIPATING BANKS, I WILL DO

13   IT TELEPHONICALLY, SO I REALLY DON'T SEE WHY THEY

14   COULDN'T BE DONE AT THE SAME 60-DAY WINDOW.  AND AGAIN,

15   BECAUSE THEY'RE GOING TO BE -- UNLESS YOU FIND SOMETHING

16   TO YOUR POINT, MS. SHUMENER; IF I ALLOW YOU TO TAKE THEM,

17   THAT IS, IRREGULAR, IT'S PRETTY MUCH GOING TO BE YOUR

18   BOILER POINT -- I MEAN, IN TERMS OF YOUR ARRANGEMENT AND

19   IN TERMS OF YOUR QUESTIONS UNLESS SOMETHING COMES UP.

20        ALL RIGHT; 60 DAYS, AND WE'RE KIND OF CRAPPY [PH].

21   ALL RIGHT; LET'S ASSUME THAT WE NEED EXPERTS.  SO FROM

22   THAT 60-DAY PERIOD, WHICH, I GUESS, REALLY BRINGS US

23   INTO -- SHALL WE SAY -- SHALL WE SAY -- SHALL WE SAY THE

24   14TH OF MAY; IS THAT GOING TO BE ENOUGH?  THAT'S SORT OF

25   60 DAYS, PLUS OR MINUS.

1         ALL RIGHT.  LET'S SAY -- OR DO YOU WANT TO GO OVER

2    TO THAT MONDAY THE 17TH; THAT'S FAIR.  LET'S GO MONDAY

3    THE 17TH.  THAT GIVES YOU A WEEKEND.  I'M NOT TRYING TO

4    GET ANYBODY TO WORK ON A WEEKEND, BUT I KNOW YOU-ALL DO.

5         ALL RIGHT.  HOW MUCH TIME -- TO PLAINTIFF FIRST, IF

6    WHAT ARE YOU LOOKING AT IF YOU WERE TO HAVE AN

7    ACCOUNTING, WHATEVER KIND OF EXPERT, FORENSIC ACCOUNTING,

8    WHATEVER IT IS YOU MAY NEED, WHAT WOULD YOU NEED TO

9    IDENTIFY AND MAKE AVAILABLE FOR DEPOSITION, THOSE

10   EXPERTS?

11        MR. ALPERT:  YOUR HONOR, THAT'S A GOOD QUESTION.  I

12   THINK WE COULD IDENTIFY THE EXPERT --

13        THE COURT:  TEN DAYS AFTER?

14        MR. ALPERT:  WITHIN A WEEK WE COULD IDENTIFY THE

15   EXPERT.

16        THE COURT:  YOU COULD IDENTIFY THEM BY MAY THE 24TH;

17   SOMEBODY ELSE IS BEING A GOOD SCRIBBLER OVER THERE,

18   RIGHT, BECAUSE YOU-ALL ARE GOING TO PREPARE THIS BECAUSE

19   YOU ASKED FOR IT.  ALL RIGHT; MAY 24TH, ALL RIGHT.  AND

20   THEN SO YOU'VE IDENTIFIED.  AND LET ME JUST SAY THAT THIS

21   COURT FOLLOWS THE RULE 26, IDENTIFICATION.  SO WHEN YOU

22   IDENTIFY, GIVE HER OUR RULE 26 EXPERT IDENTIFICATION,

23   FEDERAL RULE 26; OKAY?  ALL RIGHT; SO THAT TENDS TO HELP.

24        THEN REASONABLY, GETTING ONE EXPERT, KNOWING HOW

25   BUSY EXPERTS ARE, WHAT DO YOU THINK WOULD BE REASONABLE

1        IN TERMS OF MAKING AVAILABLE SAID EXPERT, NOT KNOWING WHO

2        HE OR SHE IS?  30 DAYS?

3            MR. ALPERT:  I WOULD SAY A COUPLE WEEKS, YOUR HONOR,

4        AFTER THE -- A COUPLE OF WEEKS AFTER DISCLOSURE.

5            THE COURT:  ALL RIGHT.  LET US SAY -- THAT WOULD

6        BRING US THROUGH THE 7TH OF JUNE.  JUNE 7TH YOU WOULD

7        MAKE A PERSON AVAILABLE, WHICH MEANS THAT THE DEFENDANTS

8        HAVE TO BE KIND OF AVAILABLE.  NOW, WHEN IS YOUR

9        ARBITRATION?  THAT CASE, WHEN IS THAT, MA'AM?

10           MS. SHUMENER:  IT'S APRIL 19TH THROUGH THE 23RD.

11           THE COURT:  OH, FINE.  OKAY; SO BEFORE THAT.  OKAY.

12       I KNEW THERE WAS SOME TRIAL OR SOMETHING THAT MIGHT BE

13       SET IN JUNE.  ALL RIGHT.  THEN, OKAY, MS. SHUMENER --

14           MS. SHUMENER:  YES.

15           THE COURT:  BASED ON 30 YEARS IN THE COURTROOM, IF

16       HE NAMES AN EXPERT, I'VE GOT TO BELIEVE YOU'RE GOING TO

17       WANT ONE TWO.  IF HE WANTS ONE, YOU'RE GOING TO HAVE TWO.

18           MS. SHUMENER:  YES.

19           THE COURT:  GOT IT.  WHAT WOULD BE REASONABLE AFTER

20       JUNE THE 7TH -- I WOULD LIKE FOR YOU TO HAVE AN

21       OPPORTUNITY TO DEPOSE SO YOU'LL KNOW WHAT YOU'RE DEALING

22       WITH BEFORE YOU HAVE TO GET AN EXPERT.  I THINK THAT IS

23       FAIR.  HOW MUCH TIME WOULD YOU NEED AFTER THE 7TH?

24           MS. SHUMENER:  ONE WEEK, YOUR HONOR.

25           THE COURT:  OKAY; BECAUSE YOU'LL  BE THINKING ABOUT

1    THAT NOW.  YEAH, WHENEVER IT STARTS TO GET NAMED, YOU'RE

2    GOING TO BE THINKING ABOUT IT.  LIKE AS OF THE 24TH,

3    YOU'LL BE THINKING ABOUT IT.  ALL RIGHT; JUNE 14TH, LET'S

4    SAY THAT, THAT YOU WILL NAME.  AND WHAT YOU DO NEED,

5    MAYBE 30 DAYS TO MAKE AVAILABLE YOUR WITNESS?

6        MS. SHUMENER:  YES, I ANTICIPATE THE EXPERT IN

7    TOTAL, YOUR HONOR.

8        THE COURT:  ALL RIGHT.  I'LL GIVE YOU THAT.  SO

9    LET'S SAY THROUGH JULY 15TH UNTIL YOU MAKE THEM

10   AVAILABLE.  ALL RIGHT; QUERY.  ON A SCALE OF ONE TO TEN

11   WHAT ARE THE CHANCES I'M GOING TO HAVE TO HEAR DALBERT

12   MOTIONS ON THE EXPERTS?  TELL ME IT'S ZERO.

13       MR. ALPERT:  YOUR HONOR, I WOULD LOVE TO SAY ZERO.

14       THE COURT:  I KNOW YOU WOULD.  I LOVE DALBERT, BUT

15   DON'T GET ME WRONG BECAUSE I ALWAYS BUILD IT INTO THE

16   SCHEDULING ORDER.  AND IF WE DON'T NEED IT, WE DON'T NEED

17   TO IT.

18       MR. ALPERT:  I WOULD LOVE TO SEE ZERO, YOUR HONOR, I

19   JUST DON'T KNOW AT THIS TIME, WITHOUT HAVING A CHANCE

20   WHATEVER EXPERTS MAY BE DEEMED.

21       THE COURT:  LET ME GIVE YOU 30-DAY WINDOW, TWO WEEKS

22   AFTER JULY 15TH, AUGUST 1, DALBERT MOTIONS SHOULD BE

23   FILED.  AND JUST FOR Y'ALL'S CLARIFICATION, WHEN YOU FILE

24   DALBERT MOTIONS, YOU KNOW, WHAT I NEED TO KNOW IS WHAT

25   OPINION YOU'RE CHALLENGING, WHAT IS THE BASIS, WHICH OF

1    THE PRONGS, PROBABLE PRONGS, UNDER GEORGIA LAW YOU'RE

2    CHALLENGING IT, AND UNDER WHICH PRONG, AND THEN WHAT IS

3    THE TESTIMONY IN THE RECORD SO FAR THAT JUSTIFIES THE

4    CHALLENGE; AND, OF COURSE, IF IT'S CHALLENGED TO THE

5    QUALIFICATIONS, YOU NEED TO LET ME KNOW THE CV OR

6    WHATEVER THE ISSUE IS ON THAT; OKAY? WELL, AT LEAST IT'S

7    NOT MEDICAL, SO WE DON'T HAVE ALL THOSE ISSUE S TO DEAL

8    WITH.

9    ALL RIGHT. AND THEN TWO WEEKS LATER -- I'M PUTTING

10   YOU ON A REALLY SHORT TIME FRAME. TWO WEEKS LATER YOU'RE

11   GOING TO RESPOND; OKAY?

12   MR. ALPERT: TO THE DALBERT MOTIONS, YOUR HONOR?

13   THE COURT: IN OTHER WORDS, YOU FILE IT TWO WEEKS

14   AFTER. YOU FILE IT AUGUST 1ST AND THEN AUGUST 15TH

15   RESPONSES TO DALBERT ARE DUE. AND THEN I WILL SCHEDULE

16   YOU A DALBERT HEARING, IF NECESSARY. I'VE GOT A NON-JURY

17   WEEK OF SEPTEMBER 6TH; SOMETIME DURING THAT WEEK. LABOR

18   DAY IS MONDAY THE 6TH, BUT I'VE GOT A NON-JURY WEEK, AND

19   I WILL SCHEDULE YOU-ALL AT SOME POINT AND I WILL EVEN

20   WRITE IT DOWN; ALL RIGHT, DALBERT.

21   THEN -- OKAY. LET ME ASK YOU THIS QUESTION, AND

22   AGAIN, I'M THINKING ABOUT BRIEFING ON SIMULTANEOUS AND

23   PARALLEL TRACTS TO MOVE THIS AROUND: YOU-ALL KNOW THIS

24   CASE BETTER THAN I DO, BUT WOULD THE ACCOUNTING OR

25   FINANCIAL EXPERTS -- IT SEEMS TO ME IN THIS CASE THEY

1    POTENTIALLY MAY AFFECT LIABILITY NOT JUST DAMAGES BECAUSE

2    THEY'RE GOING TO ARGUE THAT THE LOAN REALLY WASN'T OUT OF

3    KILTER OR WHATEVER YOU CALL IT -- OUT OF BOUNDS OR

4    WHATEVER WORDS YOU USED, SO I WOULD HAVE TO WAIT TO DO

5    DALBERT BEFORE SUMMARY JUDGMENT.  AND IT SEEMS TO ME IN

6    THIS CASE THAT IS A REAL POTENTIAL; AM I RIGHT ON THAT?

7         MR. ALPERT:  WELL, I THINK THERE IS A POTENTIAL,

8    YOUR HONOR.

9         THE COURT:  POTENTIAL.

10        MR. ALPERT:  POTENTIAL, BUT KNOW HOW WE'VE DONE IT

11   IN THE PAST WHERE YOU HAVE EXPERTS ON LIABILITY ISSUES.

12   WE JUST DOUBLE TRACT, THEN, AND YOU TAKE UP THE DALBERT

13   ISSUES TO THE EXTENT THERE ARE ANY AT THE SAME TIME THAT

14   YOU TAKE UP THE MOTION FOR SUMMARY JUDGMENT.  THE

15   AFFIDAVITS WILL BE SUBMITTED IN CONNECTION WITH THE

16   MOTION FOR SUMMARY JUDGMENT BRIEFING.

17        THE COURT:  YEAH, I COULD; I'LL DO THAT.  I DON'T

18   USUALLY, BUT I WILL.  I WILL.  I WILL.  I WILL.  I

19   USUALLY DON'T, BUT I WILL BECAUSE WE'RE ON  A TIME FRAME.

20   OKAY.  SO THEN THAT NOW, HAVE YOU -- YOU HAVE NOT EVEN

21   RESPONDED TO SUMMARY JUDGMENT BECAUSE YOU HAD TO WAIT FOR

22   YOUR DISCOVERY, AND I GET THAT.  I'M NOT CRITICIZING YOU.

23   I -- SMART.

24        SO WHEN WOULD BE A REASONABLE TIME, GIVEN DISCOVERY

25   WE'RE PUTTING TOGETHER FOR TO YOU RESPOND TO -- AND THEN

1    WE NEED A LITTLE REPLY TIME AND THEN WE NEED ORAL

2    ARGUMENT TIME.

3         MS. SHUMENER:  I WOULD THINK IN AUGUST, YOUR HONOR,

4    AFTER THE EXPERTS HAVE BEEN DEPOSED.

5         THE COURT:  OKAY; GOOD; PERFECT; AND THEN WE CAN DO

6    THE REPLY.

7         MR. ALPERT:  I THINK WE HAVE -- IF I RECALL

8    CORRECTLY, WE BOTH HAVE MOTIONS FOR SUMMARY JUDGMENT.

9         THE COURT:  OKAY.

10        MR. ALPERT:  AND I THINK WE'RE BOTH WAITING TO

11   RESPOND.

12        THE COURT:  OKAY.  I DIDN'T REALIZE Y'ALL -- THAT

13   THEY HAD ONE, TOO.  SO I THINK WHAT MS. SHUMENER SUGGESTS

14   IS PROBABLY RIGHT, MAYBE THAT FIRST WEEK IN AUGUST.

15        THE COURT:  GOT IT.

16        MR. ALPERT:  AUGUST 6TH.

17        THE COURT:  AND THEN REPLY.

18        MR. ALPERT:  AND THEN IT'S THREE WEEKS AFTER THE

19   CONCLUSION OF THE EXPERT DEPOSITION.

20        THE COURT:  I LIKE IT.

21        MR. ALPERT:  AND THEN THAT ALSO GIVES US THREE WEEKS

22   IF WE WANT TO DO REPLIES BY THE 27, AND THEN THAT GIVES

23   US ABOUT A WEEK OR SO BEFORE THAT NON-JURY WEEK WHEN WE

24   CAN DO THAT MOTION FOR SUMMARY JUDGMENT HEARING.  I WOULD

25   SUGGEST, POSSIBLY, YOUR HONOR -- I KNOW YOU WANT TO LIMIT

1    YOUR TIME WITH US --

2         THE COURT:  NO, I DON'T.  THIS IS MY JOB, AND I

3    LIKE, PERSONALLY, AS A LITIGANT BACKGROUND, BIG CASES

4    WITH EXCELLENT ORDERS.  SO THIS IS MORE IMPORTANT TO ME

5    THAN SOME OF THE OTHER THINGS IN TERMS OF WHAT I LIKE TO

6    DO.  I'LL JUST TRY TO BE DIPLOMATIC SINCE I'M ON THE

7    RECORD.

8         SO YOU'RE LOOKING AT DOING THE WHOLE BALL OF WAX ON

9    THE 6TH?

10        MR. ALPERT:  YOUR HONOR, I SUGGEST THAT WE JUST COME

11   DOWN FOR THE DAY.

12        THE COURT:  YEAH.

13        MR. ALPERT:  I THINK IT WOULD TAKE A DAY.

14        THE COURT:  I'LL GIVE YOU THE WHOLE DAY.

15        MR. ALPERT:  I WOULD ASK ONE INDULGENCE OF THE

16   COURT.

17        THE COURT:  WE'RE NOT DOING IT ON THE 7TH.

18        MR. ALPERT:  WE'RE NOT DOING IT ON THE 7TH.

19        THE COURT:  BECAUSE I DON'T EVER, EVER REQUIRE

20   LAWYERS TO EITHER, A, TRY CASES OR, B, HAVE MAJOR MOTIONS

21   THE DAY AFTER A HOLIDAY, WHETHER IT'S MOTHER'S DAY,

22   FATHER'S DAYS, NEW YEARS, CHRISTMAS, EASTER, PASSOVER,

23   HANUKKAH; DON'T DO IT.

24        MR. ALPERT:  WE CERTAINLY APPRECIATE THAT, YOUR

25   HONOR.

1    THE COURT:  WELL, YOU RUIN YOUR WHOLE HOLIDAY WITH

2    YOUR FAMILY.

3    THE COURT:  I HAVE DONE IT.  AND I SAID IF I EVER

4    GET IN CHARGE, WHICH IS SCARY THE THOUGHT THAT I'M A

5    LITTLE BIT IN CHARGE, I WILL NEVER, EVER.  I DON'T DO IT

6    BEFORE JULY.  I JUST DON'T DO IT.  I SPENT TOO MANY

7    HOLIDAYS, MOTHER'S DAY, GETTING UP FROM THE TABLE, DOING

8    DISHES AND READING DEPOSITIONS AND I'M SUPPOSED TO BE ON

9    TRIAL THE NEXT DAY.  NO..

10    SO, IN FACT, THE ONLY DAY THAT DOESN'T WORK THAT

11    WEEK -- I RUN THE DUI COURT HERE, AND THAT WOULD BE THAT

12    AFTERNOON ON THE THURSDAY, SO I HAVE ALL DAY, AND THAT'S

13    ALSO ROSH HASHANAH.  SO WE COULD EITHER DO IT THE 8TH OR

14    WE COULD DO IT THE 10TH.

15    MR. ALPERT:  WE WOULD PREFER THE 10TH.

16    MS. SHUMENER:  THE 10TH IS GREAT.

17    THE COURT:  ALL RIGHT.  YOU'RE ON.  AND YOU'VE GOT

18    ALL DAY.  ALL RIGHT.  THAT'S WHAT WE'LL DO.  AND THEN

19    THAT WILL GIVE ME -- I WILL TRY TO RULE FROM THE BENCH.

20    I WILL REALLY TRY TO DO THAT.  BUT THAT WILL STILL GIVE

21    ME A COUPLE OF WEEKS BEFORE I LEAVE TOWN TO --

22    HOW MANY HOURS DO YOU THINK YOU NEED, EIGHT?  YOU

23    NEED A WHOLE, FULL DAY?

24    MR. ALPERT:  I THINK THAT WOULD BE THE SAFEST THING

25    TO DO.

1        THE COURT:  LET'S START AT 9:00 BECAUSE IT IS FRIDAY

2     AND WE'LL BE TIRED, THE EARLIER WE START.  LET'S START AT

3     9:00 O'CLOCK ON THE 10TH.  NO WORRIES ON THAT; OKAY?

4        ALL RIGHT.  NOW, TO THE PLAINTIFFS, WILL YOU-ALL

5     PLEASE CRAFT THE SCHEDULING ORDER AND MAKE SURE EVERYBODY

6     SEES IT?

7        MR. ALPERT:  WE'LL DO BOTH.

8        THE COURT:  OKAY.  GREAT.  ANY OTHER HOUSEKEEPING

9     ORDERS, TO THE PLAINTIFF?

10       MR. ALPERT:  YOUR HONOR, I THINK THERE MIGHT --

11    THERE ARE TWO ISSUES.  AND ONE IS -- AND THIS IS KIND OF

12    IN THE SPIRIT OF WHAT WE'VE BEEN TALKING ABOUT TODAY:  I

13    JUST WANT -- WE'RE ALL BUSY, YOU'RE BUSY, WE'RE BUSY,

14    COUNSEL FOR THE DEFENDANTS ARE BUSY.  WE'RE DOING OUR

15    BEST TO COMPRESS THIS A LITTLE BIT.

16       THE COURT:  SURE.

17       MR. ALPERT:  I CERTAINLY RECOGNIZE I CAN'T BE

18    EVERYWHERE AND BE DOING EVERYTHING AND JEFF AND JASON AND

19    OTHER LAWYERS AT OUR FIRM ARE GOING TO TAKE ON THE

20    RESPONSIBILITY BECAUSE THEY'RE CAPABLE OF IT AND THEY

21    NEED TO DO IT.

22       THE COURT:  SURE, AND IT'S A GOOD WAY TO LEARN.

23       MR. ALPERT:  AND I JUST WANT TO MAKE SURE THAT

24    COUNSEL WORK TOGETHER TO RECOGNIZE THAT THAT'S GOING TO

25    BE A FACT AND THAT NOT ONE LAWYER NEEDS TO BE HANDLING

1    EVERY SINGLE DEPOSITION BECAUSE IF THAT HAPPENS IT'S NOT

2    GOING TO GET DONE.

3         THE COURT:  IN OTHER WORDS, WHAT YOU'RE SUGGESTING

4    IS THAT YOU DO NOT WANT DELAYS IN THE SCHEDULING ORDER

5    THAT ARE ASSERTED BECAUSE NOT EVERY LAWYER CAN BE AT

6    EVERY EVENT.

7         MR. ALPERT:  YOU'RE EXACTLY RIGHT, YOUR HONOR.

8         THE COURT:  UNDERSTOOD; UNDERSTOOD.

9         MR. ALPERT:  AND DO YOU KNOW WHAT'S FAIR?  I

10   RECOGNIZE THAT, YOU KNOW, WITH RESPECT TO CERTAIN

11   EXECUTIVES AT SFG THEY'RE GOING TO WANT ME TO BE THERE

12   BECAUSE I'VE BEEN PRACTICING LAW FOR X AMOUNT OF YEARS.

13   I UNDERSTAND THAT WITH RESPECT TO COUNSEL FOR DEFENDANTS

14   THAT WITH RESPECT TO CERTAINLY MR. MINOR AND MAYBE A

15   COUPLE OF OTHER FOLKS THAT THEY MAY NEED TO BE THERE.

16        THE COURT:  SURE, BUT THAT'S -- YOU'RE SAYING THAT

17   THAT'S NOT TRUE WITH EVERY SINGLE EVENT, AND I AGREE WITH

18   THAT.  AND IT WILL BE OPERATING INSTRUCTIONS.  ON THE

19   OTHER HAND, IF THERE'S A SITUATION WHERE, FOR WHATEVER

20   REASON, NOBODY CAN BE THERE BECAUSE YOU-ALL ARE BUSY, YOU

21   KNOW, A DAY OR TWO ADJUSTMENT ON THE SCHEDULES AS LONG AS

22   WE HOLD TIGHT TO THE DATE I'VE GIVEN YOU, YOU DON'T EVEN

23   NEED TO ASK ME IF YOU AGREE, AND JUST DO AN E-MAIL AND

24   BACK IT UP ON SOME TAPE.  NO, I'M JUST KIDDING.

25        SO IF IT'S LIKE THE DEADLINE IS "X" AND IT REALLY

1    NEEDS TO BE "X" PLUS ONE, I'M OKAY WITH THAT.  I'M EVEN

2    OKAY WITH THE DAY OR SO DELAYED GETTING IT TO ME AS LONG

3    AS I HAVE ENOUGH TIME TO READ IT, AND YOU DON'T EVEN HAVE

4    TO ASK PERMISSION; JUST LET US KNOW; OKAY?  SO THAT'S

5    FAIR TO BOTH SIDES.

6         ANYTHING ELSE, TO THE PLAINTIFFS, IN TERMS OF

7    HOUSEKEEPING?  TO THE PLAINTIFF -- I'M COMING O YOU IN

8    JUST A MINUTE.  MAKE YOUR LIST.  I CAN'T THINK TWO SIDES

9    AT ONE TIME.

10        MR. DOUGLASS:  YOUR HONOR?

11        THE COURT:  YES, SIR, MR. DOUGLASS.

12        MR. DOUGLASS:  ONE ISSUE, WITH RESPECT TO OUR MOTION

13   TO COMPEL I THINK WE RESOLVED THE DOCUMENT EXCHANGE.

14   WE'LL WORK WITH EACH OTHER ON THAT.  THERE WERE A COUPLE

15   OF REQUEST FOR ADMISSION THAT WE HAD ASKED THE COURT TO

16   DEEM ADMITTED.  I'VE GOT IT RIGHT HERE.  YOU DON'T HAVE

17   TO DIG BACK --

18        THE COURT:  THAT IS DEFINITELY BURIED ON MY TABLE

19   BACK THERE.  ALL RIGHT.

20        MR. DOUGLASS:  REQUEST FOR ADMISSION TWO, WE'VE

21   ASKED THE DEFENDANTS TO ADMIT THAT THE PROJECTS REMAINS

22   UNCOMPLETED TO THIS DAY.

23        THE COURT:  OH, I REMEMBER THAT.  AND THE QUESTION

24   IS WHAT DOES UNCOMPLETED MEAN?  AND THE RESPONSE WAS, IT

25   MEAN IT'S NOT COMPLETE.  I THINK I READ ALL THAT.

1      MR. DOUGLASS:  THIS IS A PICTURE THAT I TOOK A

2  COUPLE OF WEEKS AGO.  IT'S A CONCRETE BLOCK.  WE THINK

3  THAT -- ENOUGH PLAYING GAMES.  WE THINK THAT THE COURT

4  SHOULD DEEM THAT ADMITTED.

5      THE COURT:  ALL RIGHT.  WELL, THAT'S NOT

6  HOUSEKEEPING; BUT MS. SHUMENER, DO YOU HAVE ANY PROBLEMS

7  WITH JUST ADMITTING THAT IT'S NOT COMPLETE?

8      MS. SHUMENER:  WELL, YOUR HONOR, THE ONLY CONCERN

9  WE'VE EVER HAD IS THE QUESTION IS WHO'S RESPONSIBLE FOR

10  IT NOT BEING COMPLETED.

11      THE COURT:  EXCUSE ME, WAS THAT THE QUESTION?  THE

12  QUESTION WASN'T WHO WAS RESPONSIBLE.  THE QUESTION WAS

13  ADMIT THAT IT'S NOT COMPLETE OR IT'S UNCOMPLETED; IS THAT

14  THE WORD?

15      MS. SHUMENER:  I THINK WE ADMITTED IN OUR RESPONSES

16  THAT IT WAS NOT COMPLETE BUT WE ADDED THAT WE -- THAT IT

17  WAS OUR POSITION THAT IT WAS DUE TO SFG'S FAILURE TO

18  FUND.

19      THE COURT:  ALL RIGHT.  THE ISSUE OF WHETHER IT IS

20  UNCOMPLETED IS DEEMED ADMITTED.  WE'LL TAKE UP -- THAT

21  DOESN'T WAIVE YOUR RIGHT TO SAY WHY; FAIR ENOUGH.

22  ANYTHING ELSE?

23      MR. DOUGLASS:  THANK YOU, YOUR HONOR.

24      THE COURT:  ALL RIGHT.  YOU MIGHT WANT TO STICK THAT

25  IN THE ORDER SOMEWHERE, TOO.

77



1    ALL RIGHT.  NOW, MS. SHUMENER, IT'S YOUR TURN TO

2    TAKE UP WITH ME ANY AND ALL HOUSEKEEPING MATTERS THAT YOU

3    MAY HAVE.

4    MS. SHUMENER:  YOUR HONOR, THE ONLY HOUSEKEEPING

5    MATTER THAT I HAVE IS, DEPENDING ON -- DOES IT MAKE

6    SENSE -- AND I'M NOT SUGGESTING ONE WAY OR ANOTHER DOES

7    IT MAKES SENSE TO SET A TRIAL DATE NOW IF THERE ARE

8    ISSUES THAT REMAIN UNRESOLVED --

9    THE COURT:  SURE; GOOD IDEA.  EXCELLENT IDEA;

10   EXCELLENT IDEA.  YES, IT DOES MAKE PERFECT SENSE.

11   ALL RIGHT.  BECAUSE WHAT GOOD IS IT TO GET THE THE

12   CASE READY TO TRY AND NOT SET IT DOWN FOR TRIAL.  ALL

13   RIGHT; FIRST OFF, ASSUMING WE HAVE TO TRY -- ASSUME BOTH

14   MOTIONS FOR SUMMARY JUDGMENT ARE DENIED WE'RE GOING TO

15   TRY THE WHOLE CASE.  HOW MUCH TIME ARE Y'ALL GOING TO

16   NEED?

17   MS. SHUMENER:  I WOULD ASSUME THAT THE TRIAL WOULD

18   TAKE ABOUT THREE WEEKS.

19   THE COURT:  OKAY.  DO YOU-ALL --

20   MR. ALPERT:  MY SENTIMENTS, YOUR HONOR, IS IT WOULD

21   TAKE A LITTLE BIT LESS, TWO WEEKS.

22   THE COURT:  HERE'S WHAT I'M REALLY LOOKING AT, I

23   COULD DO THE WEEK OF THE 18TH AND THE 25TH AND THE FIRST

24   OF NOVEMBER.  THAT'S A THREE-WEEK CIVIL JURY CALENDAR.

25   AND WE DON'T HAVE ANYTHING SPECIALLY SET.  I'VE GOT TO

1    CONFESS TO YOU I'M GOING TO BE JET LAGGED STARTING ON THE

2    18TH; BUT, YOU KNOW, IF Y'ALL ARE WILLING TO PUT UP WITH

3    A LITTLE BIT OF JET LAG, THAT'S ONE OPTION.

4        YES, SIR, THAT'S ONE OPTION THAT WE WOULD START THE

5    WEEK OF THE 18TH, THE 25TH AND 1ST, RIGHT, AND THEN THAT

6    WOULD BE THREE WEEKS.  I DON'T THINK YOU WANT TO DO

7    DECEMBER, COUNSEL.  I JUST THINK WITH CHRISTMAS AND --

8        MR. ALPERT:  AGREED.  YOUR HONOR, THAT'S FINE WITH

9    US.  IF YOU WOULD LIKE -- AND I DON'T UNDERSTAND HOW THE

10   JURY PANELING SYSTEM WOULD WORK WITH THE WEEK STARTING ON

11   MONDAY; BUT IF YOU WANT TO START ON A TUESDAY, THE 19TH,

12   IF THAT WOULD BE HELPFUL.

13       THE COURT:  IT DOESN'T MATTER.  I COME HOME ON THE

14   8TH, SO THAT WOULD HAVE GIVEN ME TEN DAYS.  I OUGHT TO BE

15   ALL RIGHT.  OKAY.  THE OTHER OPTION I CAN GIVE IS JANUARY

16   IS TOTALLY FULL.  NO, HE SAYS NO.  NO.  SO YOU WANT TO --

17   YOU'RE WILLING TO TAKE A JUDGE WITH -- MAY HAVE A

18   RESIDUAL OF JET LAG ON THE 18TH; IS THAT ALL RIGHT WITH

19   YOU, MR. BRANNAN?  ARE YOU ALL RIGHT WITH THAT?

20       MR. BRANNAN:  YES, YOUR HONOR; ABSOLUTELY.

21       THE COURT:  OKAY.  SO LET'S LOOK AT -- AND, YOU

22   KNOW, JOEL, QUITE FRANKLY, THAT'S THREE WEEKS OF CIVIL,

23   SO WE'LL JUST PUT IT DOWN FOR THE 18TH, THE 25TH AND THE

24   1ST.  AND YOU-ALL, WE'LL START ON THAT MONDAY.  OKAY.

25       MR. BRANNAN:  I WAS JUST GOING TO ASK, DO YOU WANT

1     TO SET A PRETRIAL CONFERENCE?

2          THE COURT:  THANK YOU; IF COURSE I DO.  IT SEEMS TO

3     ME A PRETRIAL MAKES SENSE AFTER SUMMARY JUDGMENT.  WHAT

4     ABOUT FRIDAY THE 24TH OF SEPTEMBER AS A PRETRIAL.  THAT

5     WOULD SORT OF -- YOU KNOW, THAT'S REALLY TWO WEEKS AFTER

6     SUMMARY JUDGMENT AND WE SORT OF WILL KNOW A PRETTY GOOD

7     FEELING BY THAT; DOES THAT WORK FOR EVERYBODY?  OKAY.

8     LET'S PUT THAT DOWN AT 11:00 O'CLOCK, THEN, PRETRIAL;

9     OKAY, THAT'S GOOD.  THANK YOU, MR. BRANNAN. I APPRECIATE

10    THAT.  THAT WAS REAL SMART.

11         AND WE'LL TAKE UP MOTIONS IN LIMINE AT THAT TIME,

12    TOO.  AND AGAIN, WHILE I HAVE Y'ALL HERE, I MIGHT AS WELL

13    JUST TELL YOU HOW I DO THE MOTIONS IN LIMINE.  THERE'S A

14    BUNCH OF THEM THAT EVERYBODY FILES AND EVERYBODY KNOWS

15    THEY'RE NOT CONTESTED.  HERE'S WHAT I DO:  Y'ALL TALK AND

16    GIVE ME A REAL CERTIFICATE.  BASICALLY IT SAYS:  WE

17    CONFIRM IN GOOD FAITH AND WE HEREBY STIPULATE THAT THE

18    FOLLOWING DOES NOT COME IN OR WILL COME IN.  AND THEN I

19    ONLY TAKE UP THE ISSUES THAT ARE REALLY HOTLY CONTESTED

20    BETWEEN YOU TO; OKAY?  THAT SAVES EVERYBODY PAPER TIME.

21    YES, SIR?

22         MR. ALPERT:  YOUR HONOR, I APOLOGIZE FOR

23    INTERRUPTING.

24         THE COURT:  YOU'RE NOT INTERRUPTING.

25         MR. ALPERT:  I JUST REMEMBERED SOMETHING.

1      THE COURT:  WHAT?

2      MR. ALPERT:  I HAVE MY ANNUAL COLLEGE GRAND GOLF

3  TRIP THAT START -- WE LEAVE ON FRIDAY, SEPTEMBER 10TH.

4  SO COULD WE DO WEDNESDAY, SEPTEMBER 8TH FOR THE MOTION

5  FOR SUMMARY JUDGMENT HEARING?

6      THE COURT:  OR WE COULD GO WITH YOU.

7      MR. ALPERT:  I'LL TELL YOU, MY TEAMMATES WOULD

8  PROBABLY WANT ME HERE.

9      MS. SHUMENER:  YOU KNOW, IT'S A LITTLE HARD FOR ME

10  BECAUSE IT'S ROSH HASHANAH.

11      THE COURT:  YEAH, IT IS ROSH HASHANAH.  IT BEGINS AT

12  SUNDOWN AND THEN THE NEXT DAY YOU WOULDN'T BE ABLE TO GET

13  HOME.  THAT'S THE PROBLEM. ALL RIGHT LET ME FIND YOU-ALL

14  ANOTHER DATE.  WELL, HERE'S WHAT WE CAN DO:  WHEN DO YOU

15  GET BACK FROM SAID GOLF TRIP?  HOW LONG IS THE GOLF TRIP?

16      MR. ALPERT:  IT'S ONLY A WEEKEND.  I WOULD --

17      THE COURT:  YOU GET BACK SUNDAY?  SO YOU DON'T WANT

18  TO DO IT ON MONDAY?

19      MR. ALPERT:  I WOULD SUGGEST THIS:

20      THE COURT:  AND THE 9TH IS ROSH HASHANAH, SO I

21  COULDN'T DO IT THAT WAY.  WE'VE DECIDED WE DON'T WANT TO

22  DO IT THAT TUESDAY.

23      MR. ALPERT:  WHAT ABOUT BEFORE LABOR DAY, ANY

24  POSSIBILITIES?

25      THE COURT:  I COULD DO IT THE 3RD; BUT, SEE, YOU

1      GUYS, THAT'S GOING TO CHANGE YOUR WHOLE SCHEDULE.   YOU

2      WOULD HAVE TO BACK YOUR SCHEDULE UP A FEW DAYS.   THAT'S

3      THE FRIDAY BEFORE LABOR DAY AND PEOPLE ARE ALWAYS GOING

4      OUT OF TOWN.

5           MS. SHUMENER:   YOU KNOW WHAT, YOUR HONOR, LET ME --

6      I'LL FOREGO ROSH HASHANAH.   IT'S ALL RIGHT.

7           THE COURT:   NO, I DON'T LIKE THAT.   THAT BOTHERS ME.

8      AND JOEL DOESN'T WANT TO BE HERE.

9           MS. SHUMENER:   OKAY; GOOD.

10          THE COURT:   I'M JUST TELLING YOU, I DON'T WANT TO

11     START THAT SLIPPERY SLOPE WHERE I DON'T RESPECT PEOPLE'S

12     FAITH CELEBRATIONS.   I JUST CAN'T DO THAT.   WE WILL FIND

13     A WAY.   I COULD -- YOU KNOW, WE COULD DO IT THE 2ND OF

14     SEPTEMBER, BUT YOU'RE GOING TO HAVE TO MOVE ALL YOUR

15     DATES BACK.

16          MS. SHUMENER:   I WAS THINKING BECAUSE WE'RE --

17     PRETRIAL IS NOT UNTIL SEPTEMBER 24TH, WHAT WOULD HAPPEN

18     IF WE DID IT INSTEAD OF THE MONDAY FOLLOWING THE 10TH,

19     WHICH I GUESS IS THE 15TH, THE FOLLOWING MONDAY?

20          THE COURT:   THAT'S PRETTY LATE.   YOU WANT ME TO HAVE

21     TIME IF -- MY CONCERN IS THAT IF I CAN'T RULE FROM THE

22     BENCH, WHICH I DON'T KNOW, THEN I'M GOING TO MAYBE HAVE

23     TO REREAD THINGS, MAYBE EVEN ASK Y'ALL -- GOD FORBID --

24     TO SUBMIT MORE THINGS.   AND SO I WOULD LIKE TO HAVE THAT

25     DELIBERATIVE TIME.   SO WHAT ABOUT THE 2ND?

1        MR. ALPERT:  THE 2ND MAY BE A GOOD OPTION, YOUR

2    HONOR.  I THINK RIGHT NOW WE'VE GOT THE RESPONSE BRIEFS

3    ON THE SIXTH AND THEN WE'VE GIVEN OURSELVES THREE WEEKS

4    FOR REPLIES.

5        THE COURT:  YOU DON'T NEED THAT.

6        MR. ALPERT:  THAT'S A LITTLE BIT GENEROUS.

7        THE COURT:  TEN DAYS ARE PLENTY.

8        MR. ALPERT:  I THINK WE COULD PROBABLY GET THOSE

9    DONE BY THE 16TH.

10        THE COURT:  IF YOU WANT TO GO ON HOLIDAY, YOU WILL.

11        MR. ALPERT:  GIVE US TWO WEEKS; GIVE US AUGUST 20TH.

12        MS. SHUMENER:  YEAH, IF THAT WORKS FOR THE COURT,

13    YOUR HONOR.

14        THE COURT:  I'M MAKING IT WORK.  ALL RIGHT.  SO

15    WE'RE GOING TO GO AT 9:00 A.M. ON THURSDAY THE 2ND.  AND

16    THEN THAT WAY IF ANYBODY HAS LONG WEEKDAY LABOR DAY

17    PLANS.  AND WHERE ARE YOU GOING ON YOUR GOLF TRIP?

18        MR. ALPERT:  GRANVILLE, OHIO.  IT'S NOT TOO FAR

19    AWAY.

20        THE COURT:  ALL RIGHT, EVERYBODY.  SO THAT'S THE

21    PLAN IN TERMS OF THE COURT'S KEY DATES.  AND YOU-ALL CAN

22    WORK ON YOUR DATES AND YOUR SCHEDULING, BUT THE COURT'S

23    KEY DATES ARE 9:00 O'CLOCK ALL ON THE 2ND, ALL DAY FOR

24    MSG, MOTION FOR JUDGMENTS, AND DALBERT IF NECESSARY;

25    CORRECT?

1              MS. SHUMENER:  YES, YOUR HONOR.

2              THE COURT:  ALL RIGHT.  AND THEN THE PRETRIAL MFSG

3         IS 11:00 O'CLOCK ON SEPTEMBER THE 24TH.  AND THEN ON THE

4         18TH AND THE 25THV85.

5               AND THE 1ST, THE COURT WILL DEDICATE THREE WEEKS TO

6    A TRIAL.  AND, YOU KNOW, IF WE MOVE ALONG, I'M WILLING TO KIND

7    OF GIVE Y'ALL SOME FRIDAYS IF YOU WANTED TO FLY BACK HOME.

8    YOU KNOW, WE'LL WORK WITH THAT AS LONG AS WE'RE MOVING THINGS

9    ALONG BECAUSE I RESPECT YOU MAY HAVE TO ACTUALLY MOVE EAST;

10   MAYBE YOUR DAUGHTER CAN COME DOWN FROM NEW YORK.  THAT WOULD

11   BE CLOSE, YEAH.  AND WE'LL HAVE SOME FLEXIBILITY IN THAT

12   THREE-WEEK PERIOD OF TIME THERE.

13             MS. SHUMENER:  YOUR HONOR, MAY I ASK ONE QUESTION?

14             THE COURT:  YES, MA'AM.

15             MS. SHUMENER:  IS THERE -- THE MOTIONS IN LIMINE, I

16        UNDERSTAND YOU WANT US TO MEET AND CONFER.

17             THE COURT:  SURE.

18             MS. SHUMENER:  WHEN WOULD YOU LIKE TO HAVE THOSE?

19             THE COURT:  I'LL TAKE THEM UP AT THE PRETRIAL.  SO I

20        DON'T CARE IF YOU FILE TWO DAYS BEFORE AS LONG AS I HAVE

21        AN OPPORTUNITY TO READ THEM BEFORE THE PRETRIAL, AND I'LL

22        TAKE THEM UP ON THAT DAY AND ANY QUESTIONS.  ALSO, MS.

23        SHUMENER, I KNOW YOU PRACTICE IN ANOTHER JURISDICTION YOU

24        PRACTICE WITH A VERY FINE FIRM; BRING ALL YOUR QUESTIONS

25        ABOUT HOW WE TRIAL IN THIS DIVISION, WHERE WE PUT JURORS;

1   I MEAN, IT'S JUST THE WHOLE POINT OF THE PRETRIAL,

2   ANYTHING YOU WANT.

3        MS. SHUMENER:  I APPRECIATE THAT.  THANK YOU.

4        THE COURT:  WE'LL, LOOK AT ALL THOSE KIND OF ISSUES,

5   AS WELL, JUST ENOUGH TIME TO BE ABLE TO READ THEM BEFORE

6   YOU-ALL SHOW UP BECAUSE I WOULD REALLY LIKE TO READ

7   EVERYTHING.  ALL RIGHT.  IS THERE ANYTHING ELSE?  THANK

8   YOU.

9        (COURT ADJOURNED AT 1:00 P.M.)

10        .

11        .

12        .

13        .

14        .

15        .

16        .

17        .

18        .

19        .

20        .

21        .

22        .

23        .

24

25

1   STATE OF GEORGIA

2   COUNTY OF FULTON

3

4                    C E R T I F I C A T E

5

6   THE FOREGOING TRANSCRIPT OF THE PROCEEDINGS WAS TAKEN BEFORE

7   ME AS OFFICIAL COURT REPORTER FOR THE STATE COURT OF FULTON

8   COUNTY AND REDUCED TO TYPEWRITING UNDER MY DIRECTION AND

9   SUPERVISION, AND THAT THE FOREGOING PAGES 1 THROUGH 85

10  REPRESENT A TRUE AND CORRECT TRANSCRIPT OF THE PROCEEDINGS.

11

12  THIS 20TH DAY OF MARCH, 2010.

13

14

15

16

17

18

19  _____

20  JOLANDA L. HARRISON, RPR,
    STATE COURT OF FULTON COUNTY
21  CERTIFICATE NO. B-2046

22

23

24

25

# EXHIBIT "4"

072910Specialty Finance v Minor Family Hotels.txt

1

2                    IN THE STATE COURT OF FULTON COUNTY

3                              STATE OF GEORGIA
SPECIALTY FINANCE GROUP)
4  ,LLC,                )
            PLAINTIFF,  )
5                       )
VS.                     )CIVIL ACTION FILE NO. 09EV006754
6                       )
MINOR FAMILY HOTELS,LLC)
7                       )
            DEFENDANTS. )
8  _____ )

9

10

11

12                    EXPEDITE MOTION HEARING

13                          — — —

14          BEFORE THE HONORABLE SUSAN FORSLING, JUDGE
     FULTON COUNTY JUSTICE CENTER TOWER — COURTROOM 2F
15       FULTON COUNTY STATE COURT, ATLANTA, GEORGIA
                      JULY 29, 2010
16

17

18

19

20  APPEARANCES OF COUNSEL:

21          FOR THE PLAINTIFF:   ROBERT ALPERT
                                 ATTORNEY AT LAW
22          FOR THE DEFENDANT:   BETTY SHUMENER
                                 ATTORNEYS AT LAW
23  _____
                    OCTAVIA L. WINFREY
24                 CERTIFIED COURT REPORTER
           FULTON COUNTY JUSTICE CENTER TOWER
25             ATLANTA, GEORGIA  30303
                     770-873-5548

                                                        1

⚲

1              THE COURT:  ALL RIGHT. WE'RE HERE ON SPECIALTY
                          Page 1

072910Specialty Finance v  Minor Family Hotels.txt

```
2       FINANCE GROUP, LLC VERSUS MINOR HOTEL, LLC AND PAUL C.
3       MINOR.  THIS MATTER WAS SPECIALLY SET FOR DEPOSITIONS
4       THAT THE COURTHOUSE TODAY AND ALL OF THE PARTIES WHO WERE
5       TO BE DEPOSED, AS WELL AS THEIR LAWYERS, HAVING APPEARED
6       THIS MORNING.  I UNDERSTAND THE DEPOSITIONS HAVE
7       COMMENCED; IS THAT CORRECT, COUNSEL?
8            MR. ALPERT:  YES, YOUR HONOR.
9            THE COURT:  IN ADDITION, THOUGH, SINCE THE LAST TIME
10      WE WERE HERE, THE COURT HAS BEEN ADVISED THAT THERE WERE
11      SEVERAL MATTERS THAT THE COURT NEEDED TO TAKE UP AND THE
12      COURT AGREED TO TAKE THEM UP TODAY IN BETWEEN THE BREAKS
13      OF THE DEPOSITIONS.  AS FAR AS THE COURT IS CONCERNED,
14      THERE WERE TWO ISSUES AND ONE DEALS WITH THE SFG'S, INC.
15      EMERGENCY MOTION FOR A RESTRAINING ORDER AND THEN, TOO,
16      SOME DISCOVERY ISSUES BROUGHT BY MINOR ABOUT DOCUMENTS
17      THEY HAVE NOT RECEIVED OR WANT TO RECEIVE FROM SFG.
18      THOSE ARE THE TWO CATEGORIES THAT THE COURT UNDERSTANDS,
19      SO WOULD EACH LET ME KNOW IF, ONE, IF THAT'S THE CORRECT
20      CATEGORIES AND, TWO, IF THERE'S MORE I NEED TO BE AWARE
21      OF?
22           MR. ALPERT:  ON THE BEHALF OF SPECIALTY, FROM A
23      GENERAL STANDPOINT, YOU'RE CORRECT.  THERE ARE BASICALLY
24      TWO CATEGORIES OF DISCOVERY DISPUTES.  ONE FOCUSES ON THE
25      RESTRAINING ORDER FROM SFG WITH RESPECT TO CERTAIN
```

2

```
1       COMMUNICATION WITH THE FDIC.  AND THE OTHER IS ON A
2       MOTION FOR SPECIAL PROTECTIVE ORDER ON FDIC'S EMPLOYEES.
3            THE COURT:  AND, OF COURSE, THEIR MOTIONS.
```

072910Specialty Finance v  Minor Family Hotels.txt

4        MR. ALPERT:  THEIR MOTIONS ASKING FOR A DOCUMENT.

5     AND THERE'S ANOTHER MINOR ISSUE, NO PUN INTENDED, WITH

6     RESPECT TO THE SCOPE OF SFG'S 30(B)6 DEPOSITION AND

7     MAKING SURE WE'RE ON THE SAME PAGE.

8        THE COURT:  THAT'S GOOD.

9        MR. ALPERT:  I WOULD LIKE TO TAKE A MOMENT NOW, YOUR

10    HONOR, IF I COULD, TO INTRODUCE YOU TO ANOTHER ATTORNEY

11    HERE.

12        THE COURT:  OH MY, JUST WHAT WE NEED.

13        MR. ALPERT:  I KNOW THAT'S COMPLETELY UNEXPECTED.

14        THE COURT:  I WOULD LIKE YOU TO MAKE THAT

15    INTRODUCTION, MR. ALPERT.

16        MR. ALPERT:  AARON MOORE IS WITH THE FDIC AND

17    MR. MOORE IS HERE TO TALK AND PROVIDE ARGUMENT WITH

18    RESPECT TO THE PROTECTIVE ORDER, WITH RESPECT TO THE

19    DEPOSITION OF MRS.  COTTER, AS WELL AS WITH RESPECT TO

20    THE COMMUNICATION OF THE FDIC.

21        THE COURT:  MS. SHUMENER --

22        MS. SHUMENER:  THANK YOU.

23        THE COURT:  MR. MOORE, WELCOME TO COURT.  MS.

24    SHUMENER, DO YOU AGREE WITH -- IN TERMS OF ASSESSMENT

25    ISSUES THAT WE NEED TO TAKE UP TODAY?

3

1        MS. SHUMENER:  YES, YOUR HONOR.

2        THE COURT:  IS IT AGREEABLE THAT WE BEGIN WITH SFG'S

3     EMERGENCY ADMISSION FOR THE RESTRAINING ORDER?  IS THAT

4     APPROPRIATE TO START WITH THAT, MR. ALPERT?

5        MR. ALPERT:  THAT'S FINE.  WOULD YOU MIND IF I TALK

6     TO MS. SHUMENER FOR ONE SECOND?

072910Specialty Finance v  Minor Family Hotels.txt

```
 7              THE COURT:  SURE. I THINK IT'S A GREAT IDEA.  TAKE
 8      ALL THE TIME YOU NEED IF YOU'RE RESOLVING IT.
 9              MR. ALPERT, YOU WANT TO TELL ME THAT THE DISCUSSIONS
10      WERE FRUITFUL, I HOPE.
11              MR. ALPERT:  I THINK THEY'RE GOING IN THE RIGHT
12      DIRECTION, YOUR HONOR, IS WHAT I THINK I CAN SAY TO YOU.
13      I THINK WE HAVE THESE OTHER TWO OR THREE ISSUES THAT WE
14      CAN DEAL WITH NOW.  AND THEN, WHILE WE ALLOW THIS OTHER
15      ONE TO GESTATE A LITTLE BIT, WE MAY BE IN A POSITION TO
16      RESOLVE THAT ONE.
17              THE COURT:  ALL RIGHT.  SO I THINK THE ONE YOU WANT
18      TO GESTATE IS THE RESTRAINING ORDER ONE?
19              MR. ALPERT:  THE RESTRAINING ORDER ABOUT THE
20      COMMUNICATIONS WITH THE FDIC, YES, YOUR HONOR, FOR SFG.
21              THE COURT:  ALL RIGHT.  WE'LL PUT THAT RIGHT HERE.
22      SO I ASSUME -- BUT PERHAPS IMPROPERLY, THAT THAT WOULD
23      ALSO ENCOMPASS THE PROTECTIVE ORDER ON MRS. COTTER OR IS
24      THAT A SEPARATE ISSUE?
25              MR. ALPERT:  I THINK THAT'S A SEPARATE ISSUE, YOUR
```

4

♀

```
 1      HONOR.
 2              THE COURT:  ALL RIGHT.  SO WE NEED THAT AND THEN WE
 3      NEED THEIR DISCOVERY ISSUE, RIGHT? ALL RIGHT.  LET'S GO
 4      FORWARD ON THE MOTIONS FOR A PROTECTIVE ORDER ON THE
 5      DEPOSITION OF MRS. COTTER.
 6              MS. SHUMENER:  WE SHOULD TALK ABOUT THIS ONE ALSO.
 7              THE COURT:  ALL RIGHT.  WHERE ARE WE, COUNSEL?
 8              MS. SHUMENER:  YOUR HONOR, WE'RE GOING TO TRY TO
```

072910Specialty Finance v  Minor Family Hotels.txt

```
 9      AMICABLY RESOLVE THIS ISSUE.  WE'RE GOING TO TRY TO

10      AMICABLY RESOLVE THE DIFFERENCES BETWEEN OURSELVES.  AND

11      IF WE SUCCEED, GREAT.  AND IF NOT, WE'LL RESUME THE ISSUE

12      WITH MRS. COTTER'S DEPOSITION.

13           THE COURT:  FAIR ENOUGH.  AND PERHAPS THE ISSUES

14      WILL BE MORE CRYSTALIZED AT THAT POINT, SYNTHESIZED.

15      THAT'S OUR WORD FOR THIS CASE.  OKAY.

16           ALL RIGHT.  SO ARE WE NOW GOING TO MOVE ONTO YOUR

17      MOTION, MS. SHUMENER?

18           MS. SHUMENER:  YES.

19           THE COURT:  OKAY.

20           MS. SHUMENER:  AND IT'S A SIMPLE ONE, YOUR HONOR.

21           THE COURT:  OKAY.  WAIT. MR. ALPERT, YOU'RE

22      SCOWLING.  AND I KNOW IT'S NOT A DISRESPECTFUL SCOWL, BUT

23      IS THERE SOMETHING YOU WANT TO SAY BEFORE MS. SHUMENER

24      BRINGS HER MOTION?

25           MR. ALPERT:  I APOLOGIZE.  UNFORTUNATELY, THE LOOK
```

```
 1      THAT COMES OVER MY FACE WHEN I COGITATE, IT LOOKS LIKE A

 2      SCOWL.

 3           THE COURT:  IT DOES.  A COGITATIVE SCOWL.  I LOVE

 4      ALL THESE NEW WORDS.

 5           MR. ALPERT:  IT'S ONE OF THE REASONS -- ONE OF A

 6      NUMBER OF REASONS I'M NOT OUT IN L.A.  IT'S MY

 7      UNDERSTANDING -- JUST -- AND TELL ME IF I MISSTATE

 8      SOMETHING, BETTY, THAT THE DEFENDANTS ARE BASICALLY GOING

 9      TO WITHDRAW, FOR THE TIME BEING, THEIR REQUEST TO TAKE

10      THE DEPOSITION OF MS. COTTER, THAT WE'RE GOING TO, AS

11      PART OF A GLOBAL EFFORT, ATTEMPT TO RESOLVE ALL THE
```

072910Specialty Finance v  Minor Family Hotels.txt

12      ISSUES BETWEEN THE PARTIES OVER THE NEXT COUPLE OF MONTHS

13      AND THAT ULTIMATELY --

14          THE COURT:  WAIT, WAIT, WAIT.  ALL ISSUES?

15          MR. ALPERT:  YES.

16          THE COURT:  ALL ISSUES?

17          MR. ALPERT:  YES.

18          MS. SHUMENER:  I WAS TRYING TO BE MORE CRYPTIC.

19          THE COURT:  YOU GOT MY ATTENTION NOW.  GO AHEAD.

20          MR. ALPERT:  THAT IF THOSE RESULTS ARE UNSUCCESSFUL,

21      FINANCE ARE RESERVING THEIR RIGHT TO SEEK AGAIN TO DEPOSE

22      MS. COTTER.  OBVIOUSLY, WE'RE OBSERVING OUR RIGHT TO

23      OBJECT AND MOVE FOR A PROTECTIVE ORDER.

24          THE COURT:  ALL RIGHT.

25          MS. SHUMENER:  THAT'S EXACTLY.


                                                            6
♀

1           THE COURT:  ALL RIGHT.  AND THEN I GUESS THAT GOES,

2       HAND-IN-HAND WITH THE COMMUNICATIONS WITH EMPLOYEES OF

3       FDIC BECAUSE IF YOU-ALL WANT TO MOVE FORWARD IN GOOD

4       FAITH, WHICH I KNOW YOU BOTH DO AND YOU-ALL DO, THEN WE

5       CAN'T HAVE THE TENSION WITH RESPECT TO THE FDIC EMPLOYEES

6       PARALLELING EFFORTS IN GOOD FAITH TO BRING THIS TO A

7       RESOLUTION, SO THAT'S GOOD. NEITHER SIDE IS WAIVING

8       ANYTHING BUT, HOPEFULLY, WE'RE GOING TO BRING THIS DOWN A

9       FEW LEVELS.

10          MR. ALPERT:  I THINK YOU'RE EXACTLY RIGHT, YOUR

11      HONOR.  WE STILL HAVE -- WITH RESPECT TO THE FDIC, THAT

12      STILL NEEDS TO BE A LITTLE BIT GESTATED AND FINALIZED,

13      BUT THAT'S WHAT WE'RE HOPING.  THAT'S THE DIRECTION THAT

072910Specialty Finance v  Minor Family Hotels.txt

```
14    THAT IS GOING AS WELL.

15         THE COURT:  ALL RIGHT.  GOOD.

16         MR. ALPERT:  SO THAT LEAVES US, IF MY CHART IS

17    CORRECT, WITH -- SFG HAS A MOTION TO COMPEL THE

18    PRODUCTION OF CERTAIN DOCUMENTS.  I THINK THAT MINOR

19    FAMILY HOTELS OR MR. MINOR HAS A MOTION TO COMPEL

20    PRODUCTION OF CERTAIN DOCUMENTS AND THEN I THINK THERE IS

21    FINALLY AN ISSUE RELATING TO JUST THE SCOPE OF SFG'S

22    30(B)6 DEPOSITION AND THE DOCUMENT RETENTION POLICY

23    ISSUES THAT SEEM TO BE A FOLLOW UP TO A CONVERSATION WE

24    HAD EARLIER.  I'M NOT SURE IT'S A FULL BLOWN MOTION, BUT

25    WE DO NEED SOME GUIDANCE FROM THE COURT ON THAT.
```

7

♀

```
1          THE COURT:  RIGHT. AND I REMEMBER READING LETTERS TO

2     THAT EFFECT TO ME.  ALL RIGHT.  MS. SHUMENER, DO YOU

3     AGREE WITH THAT ASSESSMENT, MA'AM, IN TERMS OF KIND OF

4     WHAT'S ON THE TABLE FOR THIS AFTERNOON?

5          MS. SHUMENER:  YES.

6          THE COURT:  ALL RIGHT.  WOULD YOU LIKE TO GO AHEAD

7     AND GO FORWARD WITH YOUR MOTION TO COMPEL?

8          MS. SHUMENER:  VERY MUCH SO, YOUR HONOR.

9          THE COURT:  ALL RIGHT.  GO AHEAD.

10         MS. SHUMENER:  YOUR HONOR, IN THIS CASE SO FAR THERE

11    HAS BEEN -- BOTH SIDES HAVE ALLEGED THAT THE FINANCIAL

12    CONDITION OF THE OTHER SIDE IS AT ISSUE.  SFG HAS ALLEGED

13    THAT MR. MINOR'S FINANCIAL CONDITION IS AT ISSUE AND

14    WHETHER HE WAS OR IS ABLE TO PAY OFF THE LOAN.

15         MINOR FAMILY HOTELS AND MR. MINOR ARE ALLEGING THAT

16    SFG'S FINANCIAL CONDITION IS AT ISSUE AND THAT IT WAS NOT
```

Page 7

072910Specialty Finance v  Minor Family Hotels.txt

17    ABLE TO FUND THE LOAN.  WE HAVE, FROM OUR SIDE, PRODUCED
18    OVER 170,000 PAGES OF DOCUMENTS REGARDING EVERY NOOK AND
19    CRANNY OF MR. MINOR'S FINANCIAL CONDITIONS.  AND I DON'T
20    WANT TO ARGUE THE MERITS OF IT, SO I WILL TRY TO KEEP IT
21    FOCUSED ON THE DISCOVERY ISSUES.  I THINK WE COULD
22    PRODUCE -- NO MATTER HOW MANY DOCUMENTS WE COULD PRODUCE,
23    I THINK WE'LL BE ABLE TO SHOW THAT MR. MINOR'S FINANCIAL
24    CONDITION IS QUITE SOUND.  HE WAS NEVER IN A POSITION
25    WHERE HE COULDN'T PAY OFF THE LOAN.

8

♀

1    BY THE SAME TOKEN, WE HAVE VERY SERIOUS CONCERNS AND
2    ALWAYS DID SINCE THE FUNDING STOPPED ON THIS LOAN, THAT
3    SFG DOESN'T HAVE THE ABILITY.  SFG'S PARENT -- PARENT
4    SPECIALTY FINANCIAL CORP -- I THINK SPECIALTY FINANCIAL
5    GROUP -- NO, SILVERTON FINANCIAL SERVICES CORP OR
6    SOMETHING LIKE THAT, IS IN BANKRUPTCY.  MY UNDERSTANDING
7    IS THAT IS THE ENTITY THAT IS THE PARENT OF SILVERTON
8    BANK THAT IS AN FDIC RECEIVERSHIP.  AND IT IS AS A RESULT
9    OF THAT RECEIVERSHIP.  AND IT'S THROUGH THAT RECEIVERSHIP
10    THAT SFG IS CONTROLLED BECAUSE IT'S A WHOLLY-OWNED
11    SUBSIDIARY OF SILVERTON BANK.
12    WE NEED DOCUMENTS.  IT'S A BIG BLACK HOLE THAT WE'RE
13    LOOKING INTO TO SEE WHETHER SFG COULD HAVE FUNDED THIS
14    LOAN.  WE KNOW THAT WHEN THE OFFICE OF THE COMPTROLLER
15    DID AN AUDIT OF SFG, WHEN THEY EVALUATED SFG'S BOOKS AND
16    RECORDS, THEY CAME UP WITH A REPORT SAYING THEY ARE
17    FINANCIALLY SOUND.  THEY ARE NOT FINANCIALLY SOUND.  THEY
18    HAVE THE CAPITAL.  THEY NEED TO RAISE CAPITAL, ET CETERA.

072910Specialty Finance v  Minor Family Hotels.txt

19        WE BELIEVE THAT THE FDIC DOESN'T SIMPLY STEP IN AS A

20        RECEIVER WITHOUT HAVING REPORTS AND RECORDS AS TO THE

21        FINANCIAL VIABILITY OF AN INSTITUTION.  AND WE SEE NO

22        REASON WHY SFG SHOULD DIG INTO THE MINUTIA AND EVERY

23        PRIVATE ASPECT OF MR. MINOR'S RIGHT TO FIND OUT HIS

24        FINANCIAL CONDITION BUT, YET, AN INSTITUTION THAT'S BEEN

25        TAKEN OVER BY THE GOVERNMENT SHOULD BE ABLE TO WITHHOLD

9

♀

1         RECORDS THAT WE THINK ARE DIRECTLY RELEVANT TO WHETHER OR

2         NOT SFG COULD HAVE FUNDED THIS LOAN.  AND THAT'S THE LONG

3         AND SHORT OF OUR POSITION. THANK YOU VERY MUCH, YOUR

4         HONOR.

5              THE COURT:  ALL RIGHT.  THANK YOU.  WHO IS GOING TO

6         TEE THIS UP FOR YOUR SIDE, MR. ALPERT?

7              MR. ALPERT:  I THINK MR. EAKES IS GOING TO TAKE THE

8         LEAD ON THE SPECIFICS ON THIS, YOUR HONOR.  I DO WANT TO

9         MAKE ONE POINT BEFORE MR. EAKES GETS STARTED AND IT'S

10        THIS; I THINK OPPOSING COUNSEL ARE COMPARING APPLES AND

11        ORANGES IN THIS SITUATION.  AND WHAT I MEAN BY THAT IS

12        THIS, IN CONNECTION WITH OUR BREACH OF CONTRACT CLAIM

13        UNDER THE NOTE AND GUARANTEE, THERE ARE SPECIFIC

14        PROVISIONS THAT IDENTIFY EVENTS OF DEFAULT.  ONE OF THE

15        EVENTS OF DEFAULT IS A CHANGE -- AN ADVERSE CHANGE IN THE

16        FINANCIAL CONDITION OF THE GUARANTOR.  WE'VE ASSERTED

17        THAT AS A DEFAULT.

18             DEFENDANTS HAVE COME BACK IN AN ATTEMPT TO REBUT

19        THAT AND PRODUCED A MAY 2009 BALANCE SHEET THAT THEY

20        PROVIDED TO THIS COURT AND BROUGHT THAT INTO EVIDENCE AS

21        WELL.  AND WE HAVE DONE A SIGNIFICANT AMOUNT OF DISCOVERY

072910Specialty Finance v  Minor Family Hotels.txt

22      IN CONNECTION WITH REVIEWING IT.  THE MAIN ISSUE, IT IS

23      AN ISSUE IN THE CASE.  IT HAS BEEN RAISED AS A DEFENSE

24      AND IT IS A PART OF OUR CLAIM AGAINST MINOR FAMILY HOTELS

25      AND MR. MINOR.  THIS ISSUE ABOUT THE ABILITY OF SFG TO

10

♀

1       FUND THE LOAN IS NOT AND NEVER HAS BEEN A MAIN AREA IN

2       THIS CASE.  IN FACT, YOU CAN'T FIND A SINGLE SPECIFIC

3       REQUEST FOR PRODUCTION OF DOCUMENTS THAT SEEKS THIS

4       INFORMATION.  NOW, IN ADDITION TO THAT, THE ISSUE ABOUT

5       THE RECEIVER AND THE FDIC IS NOTHING BUT A RED HERRING.

6            THE COURT:  SILVERTON?

7            MR. ALPERT:  SFG NEVER HAS BEEN TAKEN OVER BY THE

8       FDIC.  IT HAS NEVER BEEN DECLARED INSOLVENT BY THE FDIC.

9       IN FACT, THE LOANS THAT SFG HAS -- OR OVER THE HUNDRED

10      LOANS THAT IT HAS FOR ALL INTENTS ARE PERFORMING.  THERE

11      HAS NEVER BEEN ANY EVIDENCE WHATSOEVER THAT THEY DON'T

12      HAVE THE ABILITY TO FUND THIS LOAN.  THEY STOPPED FUNDING

13      THE LOAN BECAUSE THERE WAS A BREACH.  SO THAT'S THE

14      OVERALL CONTEXT WITHIN WHICH I THINK THE COURT NEEDS TO

15      UNDERSTAND THIS.  AND I THINK MR. EAKES SPEAK TO THE

16      SPECIFICS.

17           THE COURT:  PULL IT ON UP, MR. EAKES, OR RIGHT THERE

18      IS FINE, WHATEVER IS BEST FOR YOU, SIR.

19           THE REPORTER:  EXCUSE ME.  COULD YOU PLEASE SPELL

20      YOUR LAST NAME?

21           MR. EAKES:  IT'S E-A-K-E-S.  GOOD MORNING, YOUR

22      HONOR.

23           THE COURT:  GOOD MORNING, AGAIN.

072910Specialty Finance v  Minor Family Hotels.txt

24          MR. EAKES:  JUST TO ADD A LITTLE BIT MORE CONTEXT TO

25     WHAT MR. ALPERT TALKED ABOUT, AS YOU KNOW FROM OUR LAST


                                                11

♀

 1     HEARING, WE'VE HAD AN EXTENSIVE DISCOVERY PROCESS IN THIS

 2     CASE.  WE STARTED, YOU KNOW, LATE LAST FALL OR LAST FALL.

 3     AND WHEN WE RECEIVED THE OTHER SIDE'S EXTENSIVE DISCOVERY

 4     REQUEST, DOCUMENT REQUEST, WE SAT DOWN WITH THEM AND

 5     TALKED ABOUT THE FACT THAT THERE'S GOING TO BE LOTS OF

 6     ELECTRONIC DOCUMENTS OUT THERE.  THERE'S GOING TO BE LOTS

 7     OF DOCUMENTS OUT THERE.  YOU SERVED LOTS OF REQUESTS.

 8     HOW DO WE MOVE THROUGH THIS PROCESS?  AND AS PARTIES

 9     TYPICALLY DO NOWADAYS, WE CAME UP WITH A FRAMEWORK TO --

10     AN AGREEMENT TO PROCESS, COLLECT AND PRODUCE SFG'S

11     DOCUMENTS.  THAT AGREEMENT INCLUDED IDENTIFYING CERTAIN

12     CUSTODIANS, IDENTIFYING CERTAIN SEARCH TERMS, IDENTIFYING

13     A TIME PERIOD AT ISSUE.  WE HAD THINGS WE TOUCHED ON AT

14     THE LAST HEARING.  WE AGREED TO THAT PROCESS.  WE WENT

15     THROUGH THAT PROCESS.  IT RESULTED IN MILLIONS OF PAGES

16     OF DOCUMENTS.  WE REVIEWED THOSE DOCUMENTS.  WHATEVER WAS

17     RELATED TO THIS PROJECT, TO THIS LOAN, THAT WAS NOT

18     PRIVELEDGED, WE PRODUCED.

19          THAT PROCESS OF PRODUCING DOCUMENTS ENDED MONTHS AGO

20     SUBSTANTIALLY FOR SFG.  IT'S ONLY BEEN IN THE LAST WEEK

21     THAT THERE HAS BEEN ANY CLAIM THAT THAT PRODUCTION IN

22     SOME WAY WAS SUFFICIENT, ASSUMING THAT THESE DOCUMENTS

23     ARE RELEVANT.  IT'S ONLY BEEN IN THE LAST WEEK THAT THERE

24     HAS BEEN ANY CLAIM THAT THAT PRODUCTION WAS EFFICIENT AS

25     TO SFG'S FINANCIAL CONDITION.  I WILL LEAVE IT TO -- I

072910Specialty Finance v Minor Family Hotels.txt

12

1          THINK MR. ALPERT HAS SUCCINCTLY ARGUED WHY THIS

2          INFORMATION IS NOT RELEVANT AND WHY IT'S A DIFFERENT

3          ANIMAL THAN MR. MINOR'S FINANCIAL CONDITION.  BUT FROM A

4          DISCOVERY PERSPECTIVE, IT'S VERY LATE IN THE PROCESS AND

5          DISCOVERY ENDS TOMORROW.  THESE ISSUES COULD HAVE BEEN

6          BROUGHT UP MONTHS AGO AND WERE NOT.  AT THIS POINT IT

7          SEEMS TO BE A FAR-RANGING FISHING EXPEDITION ABOUT SFG'S

8          FINANCIAL CONDITION ON THE EAVE OF DISCOVERY.  AND FOR

9          THAT REASON, AS WELL AS REASONS MR. ALPERT INDICATED,

10         IT'S IMPROPER.

11              THE COURT:  WELL, LET ME ASK JUST A COUPLE OF

12         QUESTIONS.  AS I UNDERSTAND IT, THE DEFENDANT'S POSITION

13         IS AND HAS BEEN THAT THERE REALLY WEREN'T LEGITIMATE

14         GROUNDS FOR A DEFAULT.  AND SO, WHAT THE DEFENDANTS ARE

15         ARTICULATING HERE IS THIS DEFAULT WAS SIMPLY A

16         PRE-EMPTIVE STRIKE, THE COURT'S WORDS NOT YOURS, BECAUSE

17         THEY WEREN'T, FOR WHATEVER REASON, MS. SHUMENER, GOING TO

18         BE ABLE TO FUND THE LOAN ANYWAY.  SO RATHER THAN SAY

19         WELL, WE'RE NOT GOING TO BE ABLE TO FULFILL OUR

20         OBLIGATION, WE'RE GOING TO DO A PRE-EMPTIVE STRIKE AND

21         PUT THIS IN DEFAULT.

22              Y'ALL'S POSITION IS, YOU KNOW, ABSOLUTELY NOT.

23         WE'VE FUNDED EVERY OTHER LOAN.  OUR POSITION IS FINE.  WE

24         WERE FULLY PREPARED TO DO THIS, BUT THERE WAS, AMONG

25         OTHER EVIDENCES OF DEFAULT, THERE WAS AN ADVERSE CHANGE

13

072910Specialty Finance v  Minor Family Hotels.txt

```
1     IN THE FINANCIAL CIRCUMSTANCES OF THE GUARANTOR AND THE
2     DEFENDANT.
3        NOW, LET ME ASK, HAVING SAID THAT, AM I RIGHT ON
4     THAT CONTEXT?  I HAVEN'T MISSED THE CONTEXT.  ALL RIGHT.
5     MY UNDERSTANDING IS -- AND CORRECT ME AGAIN IF I AM
6     WRONG, BUT SILVERTON IS NOT A SIGNATORY IN ANY WAY TO ANY
7     OF THE DOCUMENTS AT ISSUE IN THE CASE; IS THAT CORRECT?
8        MR. ALPERT:  YES, YOUR HONOR, THAT'S CORRECT.
9        THE COURT:  ALL RIGHT.  SILVERTON IS THE PARENT
10    COMPANY OF SFG, CORRECT?
11       MR. ALPERT:  CORRECT.
12       THE COURT:  IT IS SILVERTON THAT FDIC STEPPED IN AND
13    TOOK OVER?
14       MR. ALPERT:  CORRECT.
15       THE COURT:  ALL RIGHT.  TWO QUESTIONS, ONE, ARE
16    THERE ANY DOCUMENTS THAT YOU HAVE PRODUCED SO FAR WHICH
17    INDICATES THAT THE FUNDING CHANNEL OR THE SOURCE OF THE
18    FUNDS THAT SFG WAS USING TO FUND, THAT MR. MINOR'S LOAN
19    CAME FROM SILVERTON?  I MEAN, IS THERE A PAPER TRAIL THAT
20    SAYS IF SILVERTON IS IN TROUBLE, IF SOMEHOW THEY'RE
21    FUNDING SFG'S LOAN TO MINOR, SO IF THEY'RE IN TROUBLE,
22    CONSEQUENTLY, IT EFFECTS THE ABILITY TO FUND THE MINOR
23    LOAN?  IS THERE ANY DOCUMENTS THAT ARE PRODUCED THAT
24    SUGGEST THAT SO FAR?
25       MR. ALPERT:  YOUR HONOR, COULD I TALK TO OUR CLIENT
```

14

♀

```
1     BRIEFLY BEFORE I MAKE A REPRESENTATION TO THE COURT?
2        THE COURT:  YEAH.  SURE
```

072910Specialty Finance v  Minor Family Hotels.txt

3              MR. ALPERT:  IS THERE ANOTHER QUESTION?

4              THE COURT:  YEAH.

5              MR. ALPERT:  ALL RIGHT.  WELL, I WILL START WITH

6       THIS ONE.

7              THE COURT:  THE NEXT QUESTION IS WHETHER OR NOT

8       YOU-ALL PRODUCED ANY KIND OF A FINANCIAL STATEMENT OF SFG

9       ABOUT ITS ASSETS AND ABILITY TO FUND ABOUT THE TIME THIS

10      DEFAULT WENT IN?

11             MR. ALPERT:  OKAY.

12             THE COURT:  ALL RIGHT.

13             MR. ALPERT:  ALL RIGHT.  THANKS, YOUR HONOR.

14             (WHEREUPON, THERE WAS A BRIEF BREAK.)

15             THE COURT:  I DIDN'T KNOW I ASKED SUCH A SATIRICAL

16      QUESTION.  I CLEARED THE ROOM.

17             ALL RIGHT.  NOW I DON'T EVEN REMEMBER WHAT THE

18      QUESTIONS WERE.  I THINK QUESTION ONE WAS, BASICALLY, WAS

19      A THERE A STREAM OF FUNDING FROM SILVERTON TO SFG FOR

20      THIS LOAN?  IS THERE ANY EVIDENCE IN THE RECORD THAT'S

21      BEEN PRODUCED TO THAT?

22             MR. ALPERT:  I DON'T KNOW THAT THERE'S ANY EVIDENCE

23      IN THE RECORD, YOUR HONOR, BUT I THINK I HAVE GAINED, I

24      THINK, A BETTER UNDERSTANDING OF SOME THINGS WITHIN THE

25      STRUCTURAL FRAMEWORK.  AND I HAVE A SUGGESTION THAT MIGHT

                                                         15
♀

1       BE ABLE TO RESOLVE THIS.  I WANT TO MAKE SURE, I THINK,

2       OF ONE OR TWO POINTS BEFORE THEN.  AND ONE HAS TO DO WITH

3       THE THEORY THAT THIS WAS A PRE-EMPTIVE STRIKE BECAUSE SFG

4       DIDN'T HAVE THE MONEY TO FUND THIS LOAN.

                        Page 14

072910Specialty Finance v  Minor Family Hotels.txt

```
 5        THE COURT:  WELL, I THINK THAT'S MY WORDS, BUT THEIR
 6   OBJECTIVE.
 7        MR. ALPERT:  AND I UNDERSTAND, OKAY.  AND THIS IS
 8   WHY THIS IS A LITTLE BIT OF A WILD GOOSE CHASE.  SFG HAS
 9   MORE THAN A HUNDRED LOANS AT THIS TIME.
10        THE COURT:  OKAY.  WELL, THAT'S WHAT WENT TO MY
11   SECOND QUESTION.  THAT'S WHY I ASKED THE SECOND QUESTION.
12   DID YOU GIVE HIM A PL STATEMENT THAT BASICALLY SAID WE'RE
13   FUNDING ALL OUR LOANS; WE HAVE THESE KIND OF ASSETS OR
14   ANYTHING LIKE THAT, THAT THEY COULD RELY ON SO THEY DON'T
15   HAVE TO GO BEHIND ALL THIS?
16        MR. ALPERT:  AND I'M NOT SURE THAT THAT HAS BEEN
17   PRODUCED, BUT THE FACT OF THE MATTER IS ALL THOSE LOANS
18   WERE FUNDED AND IF THEY WEREN'T, WE WOULD BE SITTING HERE
19   WITH ALL THOSE BARS.
20        THE COURT:  WELL, THE ISSUE FOR US TODAY IS WHETHER
21   THEY HAVE THE ASSURANCE THAT THE MONEY WAS THERE TO FUND
22   SO THAT THEY CAN QUIT LOOKING DOWN INTO THE RABBIT HOLE,
23   FOR LACK OF A BETTER WORD.  AND IF THEY DON'T HAVE THAT,
24   I'M NOT SUGGESTING THEY CAN GO AS FAR AS THEY WANT TO GO.
25   MY SUGGESTION WAS A SIMPLE WAY TO ADDRESS THIS, IF YOU
```

16

♀

```
 1   ARE CORRECT, WHICH I TAKE YOUR POSITION AS AN OFFICER
 2   THAT YOU ARE.  YOU HAVE NEVER LIED TO ME YET, YOU SIMPLY
 3   GIVE THEM SOME KIND OF PL FOR SFG FOR THE APPLICABLE
 4   PERIOD, PERHAPS THE YEAR BEFORE OR THE YEAR AFTER AND
 5   THAT OUGHT TO PUT THIS TO BED.
 6        MR. ALPERT:  I THINK YOU'RE RIGHT, YOUR HONOR.  AND
 7   I THINK WHAT WOULD MAKE SENSE IF THERE'S A PL FOR THAT --
```
Page 15

072910Specialty Finance v  Minor Family Hotels.txt

8        FOR WHENEVER THE MONTH IS.  IS IT NOVEMBER OR IS IT

9        OCTOBER?

10           THE COURT:  MAYBE A YEAR BEFORE AND A YEAR AFTER

11       EVEN, SIR.  YEAH.

12           MR. SPURLING:  JOHN SPURLING.

13           THE COURT:  YES, SIR.

14           MR. SPURLING:  SFG -- THE EVIDENCE IS GOING TO SHOW

15       THAT SFG STOPPED FUNDING IN OR AROUND THE SEPTEMBER TIME

16       FRAME AND THE OCTOBER TIME FRAME.  THEY ASSERTED THEIR

17       INITIAL DEFAULT IN NOVEMBER, I THINK.  SO ANY OF THESE

18       FINANCIAL RECORDS, OBVIOUSLY, WE WOULD HAVE TO COVER

19       THOSE AS WELL.

20           THE COURT:  I'M NOT DISAGREEING WITH YOU.  I DON'T

21       THINK WE NEED TO BE SO NARROW WHERE WE LOOK AT A WEEK OR

22       WE EVEN LOOK AT A MONTH.

23           MS. SHUMENER:  AND, ALSO, IF I MIGHT, JUST FOR A

24       MOMENT, I EVEN HAVE MEMOS -- A MEMO FROM SFG IN OUR FILE

25       THAT WE LIST THE LOANS THAT WEREN'T FUNDED THAT ARE IN

17

♀

1        DEFAULT, THAT THEY CLAIMED ARE IN DEFAULT OR THEY HAVE A

2        COST OVER LENGTH.  WE DON'T HAVE ANYTHING ON SFG SHOWING

3        ITS ABILITY OR LACK OF ABILITY.  AND WE NEVER EVEN ASKED

4        FOR DOCUMENTS ON SILVERTON BANK OR SILVERTON FINANCIAL

5        SERVICES.  WHAT WE WANT ARE THE DOCUMENTS FOR SFG -- AND

6        MANY OF THE ASSETS OF SFG HAVE BEEN SOLD OFF, TOO, FROM

7        WHAT I UNDERSTAND, AT A SUBSTANTIAL DISCOUNT.  SO, FOR

8        THEM TO PORTRAY SFG AS IF IT'S A HEALTHY INSTITUTION, IT

9        JUST HAS NOTHING BUT PERFORMING LOANS AND IT HAS FUNDED

072910Specialty Finance v  Minor Family Hotels.txt

```
10      EVERYTHING, I THINK MISCHARACTERIZES AT LEAST WHAT I

11      KNOW.

12          THE COURT:  EXCUSE ME.  I DON'T THINK THE BOTTOM --

13      WE ARE CERTAINLY NOT GOING TO DRAW INTO THIS LITIGATION

14      THE PERFORMANCE OF OTHER LOANS, WHETHER THEY WERE FUNDED,

15      WHETHER THEY WERE IN DEFAULT.  WE'RE NOT GOING TO DO

16      THAT.

17          MS. SHUMENER:  AND WE DON'T WANT THAT.

18          THE COURT:  BUT WHAT I THINK IS FAIR -- AND FOR NO

19      OTHER REASON THAN TO PUT AN END TO AN ISSUE THAT MAY NOT

20      BE ONE WE HAVE ANY BUSINESS EVEN LOOKING AT, TO GET A PL

21      STATEMENT FROM SFG.  I MEAN, YEAR-END PL'S FOR THE YEAR

22      BEFORE, THE YEAR THAT THEY WERE PUT IN DEFAULT AND THE

23      YEAR THEREAFTER.  AND IT DOESN'T HAVE TO BE, YOU KNOW,

24      WHAT LOANS WERE FUNDED.  WHAT'S WRONG WITH DOING

25      SOMETHING LIKE THAT?  IT SHOULD BE FAIRLY SIMPLE AND
```

18

♀

```
 1      FAIRLY ACCESSIBLE.

 2          MR. ALPERT:  YOUR HONOR, I DON'T HAVE ANY PROBLEM

 3      TALKING --

 4          THE COURT:  BUT YOU GOT THAT SCOWL.  THAT'S WHAT

 5      WORRIED ME EARLIER. THAT'S YOUR COGNITIVE SCOWL.

 6          MR. ALPERT:  YEAH. I THINK WHEN YOU START TALKING

 7      ABOUT YEAR BEFORE AND YEAR AFTER, YOU'RE STUCK -- WITHIN

 8      THIS FRAME WORK, WHAT THEY'RE SAYING IS YOU DIDN'T HAVE

 9      THIS MONEY ON THIS DATE TO FUND THE LOAN.  AND I KNOW

10      MR. SPURLING HAS TALKED ABOUT SEPTEMBER, OCTOBER,

11      NOVEMBER.  I'M HAPPY TO GO AHEAD AND PROVIDE INFORMATION

12      DURING THAT TIME PERIOD TO SHOW THAT SFG HAD THE ABILITY
```

072910Specialty Finance v  Minor Family Hotels.txt

```
13      TO FUND THE LOAN.

14          THE COURT:  WELL, OKAY.  BUT I STILL THINK THEY'RE

15      ENTITLED TO PL STATEMENTS FOR THE YEAR THAT IT WENT INTO

16      DEFAULT AND PERHAPS THE YEAR AFTER BECAUSE WHAT THEY'RE

17      SAYING IS SORT OF YOU SAW THIS COMING AND SO YOU TOOK THE

18      PRE-EMPTIVE STRIKE.  I'M NOT SUGGESTING THAT'S A VALID --

19      AND I CERTAINLY DON'T WANT THAT TO BE A DEFENSE OR ISSUE

20      IN THIS LITIGATION IF IT IS NOT FOUNDED.  BUT THEY

21      CAN'T -- AND I ALSO AM NOT GOING TO ALLOW THEM TO GO IN

22      AND DIG IN FOR EVERY LOAN THAT YOU HAD ISSUED DURING THAT

23      PERIOD OF TIME.  BUT MY GUESS IS THAT IF YOU SHOW THEM A

24      PL STATEMENT FOR THE YEAR, YOU KNOW, FOR THOSE MONTHS,

25      THE YEAR OF THE THREE MONTHS WHERE YOU INDICATED YOU QUIT
```

19

♀

```
 1      FUNDING AND IN THE DEFAULT THAT YEAR AND THEN THE NEXT

 2      YEAR, YOU'RE GOING TO SHOW YOU HAD SUFFICIENT ASSETS TO

 3      FUND THAT LOAN AND WE'LL PROBABLY ADD TO THE SUMMARY

 4      JUDGMENT LIST OR THEY WILL VOLUNTARILY ABANDON IT.  SO

 5      THAT'S VERY LIMITED.  I'M ALLOWING VERY LIMITED DOCUMENT

 6      DISCOVERY ON THAT, ENOUGH TO GIVE YOU THE ASSURANCE THAT

 7      THIS IS NOT AN AVENUE.  BECAUSE I KNOW, MS. SHUMENER,

 8      WITH ALL THE DOCUMENTS PRODUCED ON ALL THE ISSUES YOU

 9      HAVE, YOU DO NOT WANT TO PURSUE ONE THAT'S GOING TO END

10      UP IN A DIRECTED VERDICT.  IT'S A WASTE OF YOUR TIME AND

11      A WASTE OF YOUR CLIENT'S MONEY.  AND I KNOW THAT'S NOT

12      WHAT EITHER ONE OF YOU ARE INTERESTED IN.

13          MS. SHUMENER:  YOU'RE ABSOLUTELY CORRECT, YOUR

14      HONOR.  AND THE YEARS THAT YOU'RE REFERRING TO -- OR
```

072910Specialty Finance v  Minor Family Hotels.txt
```
15        THAT'S BEEN REFERRED TO ARE 2008 AND 2009.

16             THE COURT:  OKAY.

17             MS. SHUMENER:  JUST FOR CLARITY ON THE RECORD.

18             THE COURT:  PL 2008 AND 2009 OF SFG.

19             MR. ALPERT:  END OF YEAR 2008 AND END OF YEAR 2009.

20        I DON'T UNDERSTAND ALL THE WAYS THAT OUR CLIENT RETAIN

21        AND PRODUCE INFORMATION, BUT I WILL FIGURE IT OUT, YOUR

22        HONOR, AND WE'LL GET IT.

23             THE COURT:  I GOT TO BELIEVE, SIR, THERE'S SOME KIND

24        OF REPORT IF IT'S NOT A STRICT PL, BUT SOME KIND OF

25        REPORT.  MY GUESS IS YOU GOT TO REPORT TO SILVERTON AND
```

20

♀

```
1        MAYBE EVEN TO FDIC ON THIS.  I DON'T KNOW.  BUT WHATEVER

2        THAT FORM LOOKS LIKE, IT MAY NOT BE A TRADITIONAL

3        BUSINESS PL STATEMENT BECAUSE YOU'RE A BANK, BUT

4        SOMETHING LIKE THAT.  OKAY.  I THINK THAT'S A GREAT WAY

5        TO.

6             MR. DOUGLASS:  HANDLE THAT FOR BOTH SIDES.

7             MR. ALPERT:  ALL RIGHT.  THANK YOU, YOUR HONOR.

8             THE COURT:  AND THAT'S MY RULING BECAUSE I THINK

9        THAT'S A GREAT WAY TO HANDLE IT. ALL RIGHT. WHAT ELSE?

10             MR. ALPERT:  I THINK WE HAVE SFG'S MOTION TO COMPEL

11        SOTHEBY'S DOCUMENTS.

12             THE COURT:  WHICH DOCUMENTS?

13             MR. ALPERT:  THESE ARE DOCUMENTS THAT WERE PRODUCED

14        IN MR. MINOR'S LITIGATION WITH THE SOTHEBY'S.

15             MR. DOUGLASS:  GOOD AFTERNOON, YOUR HONOR, JEFF

16        DOUGLASS?

17             THE COURT:  GOOD AFTERNOON.  YES, SIR.  GOOD TO SEE
```

072910Specialty Finance v  Minor Family Hotels.txt

18      YOU, MR. DOUGLASS.

19          MR. DOUGLASS:  YOU TOO.  THE DOCUMENTS THAT ARE IN

20      QUESTION HERE IS A FAIRLY NARROW SET.  AS THE COURT

21      KNOWS, THERE ARE SEVERAL LAWSUITS INVOLVING MR. MINOR

22      THAT WAS ONE OF THE DEFAULTS THAT WE DECLARED UNDER THE

23      LOAN AGREEMENT WAS THAT THE EXISTENCE OF VARIOUS LAWSUITS

24      AGAINST MR. MINOR.  ANOTHER DEFAULT UNDER THE LOAN

25      AGREEMENT IS, AS WE DISCUSSED, THE ADVERSE CHANGE IN

                                                         21

♀

1       MR. MINOR'S FINANCIAL CONDITION.  IN CONNECTION WITH TWO

2       OF THE LAWSUITS, IT'S A LAWSUIT FILED BY SOTHEBY'S, THE

3       AUCTION HOUSE, AND CHRISTY'S, ANOTHER AUCTION HOUSE,

4       AGAINST MR. MINOR.  THERE WAS A JUDGMENT ENTERED AGAINST

5       MR. MINOR IN THE SOTHEBY'S CASE RECENTLY.  I THINK IT WAS

6       AROUND SIX AND A HALF MILLION DOLLARS.  AND I BELIEVE

7       THERE'S ANOTHER TWO AND A HALF MILLION DOLLAR REQUEST FOR

8       ATTORNEY'S FEES THAT'S STILL PENDING IN THAT CASE.

9           WHAT HAPPENED IN THAT CASE WAS, ACCORDING TO THE

10      COURT RECORD THAT WE HAVE BEEN ABLE TO SEE, SOME OF ITS

11      UNDER SEAL, BUT SOME OF IT IS PUBLICLY AVAILABLE.  IT

12      LOOKS LIKE THERE WERE SOME ISSUES IN CONNECTION WITH --

13      AND I'M TRYING PUT IT AS POLITELY AS POSSIBLE, SOME

14      ISSUES IN CONNECTION WITH SATISFYING THE JUDGMENT.  AND

15      IN CONNECTION WITH THAT, SOTHEBY'S TOOK THE DEPOSITION OF

16      MR. MINOR AND SEVERAL OF THE PEOPLE AT MR. MINOR'S

17      COMPANY WITH KNOWLEDGE ABOUT HIS ASSETS.  THOSE

18      TRANSCRIPTS HAVE BEEN MARKED UNDER SEAL IN THAT CASE

19      BECAUSE THEY DEAL WITH MR. MINOR'S FINANCIAL INFORMATION,

072910Specialty Finance v  Minor Family Hotels.txt

20    WHICH WE WOULD AGREE IS CONFIDENTIAL.  WE GOT A SIMILAR

21    CONFIDENTIALITY ORDER IN THIS CASE.

22         THE ISSUE IS WE ARE -- WE HAVE REQUESTED COPIES OF

23    THOSE TRANSCRIPTS BECAUSE WE THINK THAT THEY ARE DIRECTLY

24    RELEVANT TO AN ISSUE IN THIS CASES, WHICH IS MR. MINOR'S

25    FINANCIAL CONDITION.  THEY'RE POST JUDGMENT PROCEEDINGS

22

1     IN THE SOTHEBY'S CASE.  AND IN CONNECTION WITH THAT,

2     THEY'RE LOOKING TO SEE WHAT HE HAS.  AND WE HAVE

3     REQUESTED THAT.  WE THINK IT'S DIRECTLY RELEVANT TO AN

4     ISSUE IN THIS CASE.  IT'S RESPONSIVE TO OUR DISCOVERY

5     REQUEST AND IT'S NOT PRIVILEGED.  SO IT'S OUR POSITION

6     THAT IT SHOULD BE PRODUCED.

7          THE COURT:  THE FINANCIAL CONDITION THAT MAY HAVE

8     BEEN AT ISSUE IN SOTHEBY'S, DOES IT ANY WAY RELATE BACK

9     TO THE TIME OF DEFAULT IN THIS CASE?  IN OTHER WORDS,

10    DOES THE TRANSCRIPT DEAL WITH THE FINANCIAL CONDITION

11    THAT WOULD BE GERMANE TO THE ASSERTIONS BY YOUR CLIENT

12    THAT IT WAS THE CHANGE -- AN ADVERSE CHANGE OF FINANCIAL

13    CIRCUMSTANCES IN TERMS OF TIMING?

14         MR. DOUGLASS:  I UNDERSTAND EXACTLY WHAT YOU'RE

15    ASKING.

16         THE COURT:  THE QUESTION WASN'T CLEAR SO I'M GLAD

17    YOU UNDERSTAND.

18         MR. DOUGLASS:  I GUESS THE FIRST ANSWER IS, I'M NOT

19    SURE EXACTLY WHAT THE TRANSCRIPTS SAY BECAUSE WE DON'T

20    HAVE THEM; BUT, OVERALL, IT'S OUR POSITION THAT IF

21    MR. MINOR IS HAVING THIS MUCH DIFFICULTY IN SATISFYING A

22    SIX AND A HALF MILLION DOLLAR JUDGMENT IN THE SOTHEBY'S

072910Specialty Finance v  Minor Family Hotels.txt

```
23      ACTION, WE THINK THAT HAS DIRECT RELEVANCE AS TO HIS
24      FINANCIAL CONDITION NOT TOO LONG AGO.  IF HIS FINANCIAL
25      CONDITION IS WHAT HE SAYS IT WAS, THEN WE DON'T THINK
```

23

♀

```
1      THERE SHOULD BE ANY ISSUE.
2          THE COURT:  I THINK WHAT YOU'RE SAYING IS AT THIS
3      POINT THE TEST IS WHETHER IT'S PRIVILEGED AND THEN
4      WHETHER IT'S LIKELY TO LEAD TO THE DISCOVERY OF
5      ADMISSIBLE EVIDENCE.  AND IT SEEMS TO ME, UNTIL YOU LOOK
6      AT IT, YOU DON'T KNOW.  IT MAY OR MAY NOT BE RELEVANT --
7      I MEAN IN TERMS OF ADMISSIBILITY.  IT MAY BE NOT
8      ADMISSIBLE BECAUSE THE SCOPE MAY BE OUTSIDE, BUT YOU
9      CAN'T TELL UNTIL YOU LOOK AT IT.
10         THE SECOND ISSUE, IT SEEMS TO ME, WHICH YOU HAVEN'T
11     RAISED, IS THE IMPEACHMENT ISSUE.  THERE MAY BE -- AND
12     I'M NOT SUGGESTING THERE IS, BUT IF THERE ARE
13     INCONSISTENCIES IN THAT, I THINK IT'S APPROPRIATE.  THAT
14     WOULD BE TWO ISSUES WHERE I SEE IT.
15         MR. DOUGLASS:  AND I SHOULD HAVE MENTIONED THAT.
16     THAT'S ONE OF OUR PRIMARY CONCERNS THAT IN CONNECTION
17     WITH POST JUDGMENT COLLECTIONS IN THE SOTHEBY'S CASE, HE
18     MIGHT BE TAKING ONE POSITION IN CONNECTION WITH
19     ATTEMPTING TO MINIMIZE WHAT HIS FINANCIAL OUTLOOK IS.  IN
20     OUR CASE, HE'S GOT A DIFFERENT OUTLOOK.  WE THINK THAT
21     BASED ON WHAT WE'VE SEEN FROM THE PUBLICLY AVAILABLE
22     DOCUMENTS, WE THINK THERE ARE SOME INCONSISTENCIES.
23         THE COURT:  WELL, THE ONLY THING I WANT TO MAKE SURE
24     WE UNDERSTAND IS, WE'RE LOOKING AT A TIME FRAME HERE IN
```

072910Specialty Finance v  Minor Family Hotels.txt
25      TERMS OF HIS FINANCIAL CIRCUMSTANCES THAT RELATE TO THE

24

♀

 1      EVENT OF DEFAULT.  AND IT'S GOT TO BE SOME NEXUS THERE

 2      BEFORE IT'S COMING IN IN THIS CASE.  IN OTHER WORDS, HIS

 3      OTHERWISE FINANCIAL CIRCUMSTANCE IS TOTALLY IRRELEVANT,

 4      BUT I DO TAKE YOUR POINT YOU MIGHT NEED A LOOK/SEE TO

 5      DETERMINE THAT.

 6          MR. DOUGLASS:  AGREED.  AND I WOULD SAY ONE THING

 7      WITH RESPECT TO THE SCOPE, I THINK THE TEST IN THIS CASE

 8      IS FROM THE TIME THAT HE ENTERED INTO THE LOAN AGREEMENT

 9      WITH US BACK IN 2007, HAS THERE BEEN AN ADVERSE CHANGE IN

10      IT?  SO IT MAY BE A LITTLE BROADER, BUT I AGREE WITH

11      EVERYTHING ELSE.

12          THE COURT:  I THINK THAT'S PROBABLY RIGHT.

13          MR. DOUGLASS:  AND THEN WITH RESPECT TO THE

14      PRIVILEGES, WE'RE NOT SEEKING PRIVILEGED INFORMATION.  WE

15      DON'T THINK THIS IS PRIVILEGED.  OBVIOUSLY IF IT IS, THEY

16      CAN PUT IT ON THE LOG.

17          THE COURT:  DID THE JUDGE PUT THIS UNDER SEAL OR WAS

18      THIS AN AGREEMENT OF THE PARTIES?

19          MR. DOUGLASS:  I BELIEVE IT WAS AN AGREEMENT BY THE

20      PARTIES.

21          THE COURT:  AND IS IT YOUR CLIENT'S POSITION YOU'RE

22      WILLING TO KEEP THE CONFIDENTIAL UNDER THE AUSPICES OF A

23      CONFIDENTIAL AGREEMENT THAT EITHER WE GOT IN PLACE OR WE

24      WILL PUT IN PLACE TO PROTECT MR. MINOR'S CONFIDENTIALITY,

25      IF I ORDER THE DISCLOSURE OF THOSE TRANSCRIPTS?

072910Specialty Finance v  Minor Family Hotels.txt
                                                            25

 1          MR. DOUGLASS:  ABSOLUTELY.  AND WE HAVE ALSO
 2     VOLUNTEERED TO PAY FOR THE COST ASSOCIATED WITH GETTING
 3     THE TRANSCRIPTS.
 4          THE COURT:  ALL RIGHT.  MS. SHUMENER, LET ME HEAR
 5     FROM YOU.
 6          MS. SHUMENER:  OKAY.  FIRST OF ALL, YOUR HONOR, THE
 7     SOTHEBY'S JUDGMENT, WHICH HAS BEEN SATISFIED, THERE'S AN
 8     ATTORNEY'S FEES DISPUTE BUT, YOU KNOW, ONCE THE
 9     ATTORNEY'S FEES AMOUNT IS SET IN WHATEVER AMOUNT, I'M
10     SURE MR. MINOR WILL PAY THEM.
11          THE SOTHEBY'S JUDGMENT WAS ENTERED IN MARCH 2010,
12     THIS YEAR, OKAY.  THIS LAWSUIT WAS STARTED IN
13     FEBRUARY 2009.  THIS IS A YEAR AFTER ANY OF THE ALLEGED
14     DEFAULT, MORE THAN A YEAR AFTER THEY CLAIMED HIS
15     FINANCIAL CONDITION CHANGED.  AND WHAT IS REALLY
16     TROUBLING TO ME ABOUT THIS REQUEST AT SOTHEBY'S IS NUMBER
17     ONE, WE HAVE SPENT AN INORDINATE AMOUNT OF MONEY
18     RESPONDING TO THEIR REQUESTS FOR DOCUMENTS REGARDING
19     MR. MINOR'S FINANCIAL CONDITION.
20          THE DOCUMENT PRODUCTION HAS BEEN UNBELIEVABLY
21     EXPENSIVE AND EXTENSIVE OVER 170,000 PAGES SO FAR, OKAY.
22          THE COURT:  WELL, WHAT ABOUT THE TRANSCRIPTS?
23          MS. SHUMENER:  THEY COULD HAVE SERVED MR. CAHILL,
24     COUNSEL FOR SOTHEBY'S IN THE SOTHEBY'S ACTION IF THEY
25     WANTED THOSE DOCUMENTS. NOTHING STOPPED THEM FROM DOING

                                                            26

072910Specialty Finance v  Minor Family Hotels.txt

1      IT. I DON'T HAVE THOSE DOCUMENTS IN MY POSSESSION.

2           THE COURT:  NO, I THINK THEY JUST WANT THE

3      TRANSCRIPT.  HE JUST WANTS THE TRANSCRIPT TO THE

4      DEPOSITION.

5           MS. SHUMENER:  I DON'T HAVE THAT.

6           THE COURT:  OKAY. NUMBER ONE, WE'LL FIND IT, BUT

7      WHAT'S YOUR OBJECTION TO THEM HAVING THE TRANSCRIPT OF

8      HIS DEPOSITION?

9           MS. SHUMENER:  NOT HAVING READ, SEEN OR KNOW

10     ANYTHING ABOUT THE CONTENT, I'M NOT SAYING THAT THERE IS

11     ANYTHING, BUT PROCEDURALLY THERE ARE A NUMBER OF THINGS

12     THAT BOTHERS ME ABOUT THE REQUEST.  ONE, WE ASKED THEM TO

13     SUPPLEMENT THEIR DOCUMENT REQUEST.  THEY SAID, NO, THERE

14     IS NO OBLIGATION UNDER GEORGIA LAW TO SUPPLEMENT, BUT WE

15     WANT YOU TO SUPPLEMENT.  AND SINCE WE'RE ONLY ASKING FOR

16     THIS CATEGORY OF DOCUMENTS, YOU HAVE TO SUPPLEMENT THEM,

17     I DON'T.  THAT'S ISSUE NUMBER ONE.  ISSUE NUMBER -- AND

18     IT'S THE TRUTH.

19          THE COURT:  WELL, THERE IS A DUTY IN CERTAIN

20     SUPPLEMENTS.  WE ALL KNOW THAT.

21          MS. SHUMENER:  OH, OKAY.

22          THE COURT:  THAT'S JUST UNDER THE STATUTE.  THERE IS

23     UNDER SOME CIRCUMSTANCES.

24          MS. SHUMENER:  WELL, I WOULD LIKE TO SEE IT GO BOTH

25     WAYS.

27

º

1           THE COURT:  WELL, I AGREE.  WE USE THE GOOSE-GANDER

2      RULE HERE.  LET'S FOCUS. I WANT TO FOCUS ON THIS

3      TRANSCRIPT BECAUSE WE CAN NAIL THIS THING.  WHY CAN'T

072910Specialty Finance v  Minor Family Hotels.txt

4      THEY HAVE THE TRANSCRIPT?

5           MS. SHUMENER:  THEY CAN.  WHY DON'T THEY SUBPOENA

6      THE COUNSEL WHO HAVE THE TRANSCRIPT AND GET IT FROM THEM?

7      WHY ARE THEY COMING TO ME AND HASSLING ME?

8           MR. ALPERT:  BECAUSE HE'S YOUR CLIENT.

9           MS. SHUMENER:  HE'S MY CLIENT, BUT I DON'T HAVE

10      POSSESSION OF THOSE DOCUMENTS AND IT VIOLATES OUR

11      AGREEMENT.

12           MR. ALPERT:  WELL, YOU CAN --

13           MS. SHUMENER:  LET ME MAKE JUST ONE MORE POINT, THIS

14      OTHER POINT.  YES, I CAN GET IT.  AND MAYBE IF THEY PAID

15      FOR IT --

16           THE COURT:  THEY WILL.

17           MS. SHUMENER:  OKAY.

18           THE COURT:  THEY'RE GOING TO PAY FOR YOU GETTING IT.

19           MS. SHUMENER:  THEN I'LL BE HAPPY TO GO GET IT.  I

20      WILL SAY ONE THING BECAUSE THIS ISSUE DID NOT COME UP

21      JUST NOW FOR THE FIRST TIME.  THE ISSUE REGARDING

22      LITIGATION HAD COME UP MONTHS BEFORE.  WE HAD REACHED AN

23      AGREEMENT THAT WE ACTUALLY NOTIFIED THIS COURT ABOUT --

24      AND IT'S IN THE RECORD, THAT THEY WOULD GET JUDGMENTS,

25      THAT THEY WOULD GET ANY SETTLEMENT AGREEMENTS, BUT THEY

28

♀

1      WOULD GET -- NOW, THEY'RE COMING BACK AND SAYING, WELL,

2      WE WANT MORE.  OKAY.  WE WANT MORE EVEN THOUGH WE'RE NOT

3      ENTITLED TO MORE AND THAT'S ALL.

4           THE COURT:  ALL RIGHT.  I HEAR YOU, BUT I WOULD LIKE

5      TO STAY FOCUSED ON THE LIMITED ISSUE THAT I HAVE,

072910Specialty Finance v  Minor Family Hotels.txt
```
 6        PARTICULARLY WHEN THIS CASE DISCOVERY ISSUES BECOME

 7        SOMETIMES AMORPHOUS AND THEY CERTAINLY EXPAND AT TIMES AT

 8        EXPEDIENTIAL RATES. WE'RE FOCUSED TODAY ON THE

 9        TRANSCRIPT; AM I CORRECT?

10           MR. DOUGLASS:  THERE IS THE TRANSCRIPT OF MR. MINOR

11        AND I BELIEVE OF A COUPLE OF OTHERS IN CONNECTION WITH

12        THAT, MR. MINOR'S OTHER ASSOCIATES WITH KNOWLEDGE OF HIS

13        ASSETS.  THERE'S A SPECIFIC LIST.

14           THE COURT:  OF TRANSCRIPTS?

15           MR. DOUGLASS:  YES.

16           THE COURT:  WE'RE TALKING TRANSCRIPTS.

17           MR. DOUGLASS:  ONLY TRANSCRIPTS.

18           MS. SHUMENER:  ONLY DEPOSITION TRANSCRIPTS?  IS THAT

19        ALL WE'RE SPEAKING OF?  BECAUSE, HONESTLY, THIS WILL

20        CHANGE.  AND THIS HAS BEEN GOING ON LIKE THIS FOR MONTHS

21        AND MONTHS AND MONTHS AND MONTHS.

22           THE COURT:  WELL, I'M FOCUSED ON THE TRANSCRIPTS.

23        HERE'S MY POSITION ON THE TRANSCRIPTS.  ONE, WHILE THEY

24        MAY NOT BE ADMISSIBLE, I THINK THAT THEY POTENTIALLY ARE

25        LIKELY TO LEAD TO THE DISCOVERY OF ADMISSIBLE EVIDENCE,
```

29

♀

```
 1        EITHER A, RELEVANT EVIDENCE WITH RESPECT TO THE FINANCIAL

 2        STATUS OF MR. MINOR DURING THE RELEVANT TIME PERIOD OR B,

 3        POTENTIALLY AN INCONSISTENT STATEMENT, WHICH CAN BE USED

 4        FOR IMPEACHMENT PURPOSES AND WHICH UNDER GEORGIA LAW IS

 5        CONSIDERED A SUBSTANTIVE STATEMENT.  SO, THE TRANSCRIPTS

 6        WILL BE PRODUCED.  THEY WILL BE SUBJECT TO A

 7        CONFIDENTIALITY ORDER.  SFG WILL PAY THE COST ASSOCIATED

 8        WITH PRODUCING THE TRANSCRIPTS AND WE'LL MAKE AN ORDER OF
```

072910Specialty Finance v  Minor Family Hotels.txt

9      THIS COURT SO THAT NEITHER PARTY IS DEEMED TO HAVE

10     VIOLATED THE PRIOR CONFIDENTIALITY ORDER, PARTICULARLY

11     YOU, MS. SHUMENER, I WANT TO PROTECT YOU.

12          MS. SHUMENER:  OKAY.

13          THE COURT:  BUT IT IS MY ORDER AND IT WILL BE UNDER

14     THE SAME TERMS AND CONDITIONS ESSENTIALLY IN TERMS OF

15     DISSEMINATION BECAUSE I DON'T WANT YOU TO GET JAMMED

16     UP -- AND BECAUSE YOU'RE TRYING TO ABIDE BY YOUR

17     AGREEMENT, WHICH I WOULD EXPECT NOTHING LESS OF YOU, SO

18     WE'LL PROTECT YOU ON THAT, BUT THAT NEEDS TO HAPPEN.

19          MS. SHUMENER:  CAN WE GET IT ON THE RECORD WHAT

20     TRANSCRIPTS WE'RE TALKING ABOUT -- OR A LETTER TO THAT?

21          THE COURT:  WE'LL GIVE YOU A LETTER TO THAT EFFECT

22     AND THEN WE'LL PUT IT IN THE ORDER BECAUSE Y'ALL ARE

23     GOING TO DO AN ORDER.

24          MR. DOUGLASS:  WE WILL.

25          THE COURT:  YES, SIR.  AND WHEN YOU DO THAT ORDER,

30

⚲

1      PUT THOSE IN SO WE KNOW EXACTLY AND THEN PUT THE TIME

2      FRAME THAT'S REASONABLE FOR MS. SHUMENER TO GET THEM.

3          MS. SHUMENER:  AND COULD WE PUT TOGETHER AN ORDER AS

4      WELL FOR THE DOCUMENTS THAT THEY'RE GOING TO PRODUCE FROM

5      SPECIALTY FINANCE GROUP?

6          THE COURT:  SURE. OF COURSE, THERE WILL BE AN ORDER

7      ON THAT AS WELL.

8          MR. DOUGLASS:  AND WE'LL PUT TOGETHER A LIST OF

9      DOCUMENTS.  THEY'RE THE SAME DOCUMENTS THAT WERE IN OUR

10     REQUEST, BUT WE'LL PUT IT IN THE ORDER SO IT'S CLEAR.

072910Specialty Finance v  Minor Family Hotels.txt

```
11          THE COURT:  ALL RIGHT.  AND I THINK THAT'S FAIR.

12     BUT IF YOU -- IN ADDITION, IF YOU-ALL FEEL THAT YOU NEED

13     TO AMEND THE EXISTING CONFIDENTIALITY ORDER IN THIS CASE,

14     DO SO.  IT IS CERTAINLY NOT MY INTENT ON BREACHING THE

15     PRIOR CONFIDENTIALITY ORDER OR TO ALLOW INAPPROPRIATE

16     DISSEMINATION OF MR. MINOR'S FINANCIAL INFORMATION.  THAT

17     IS CERTAINLY NOT MY INTENT.

18          MS. SHUMENER:  YOUR HONOR, I'M GOING TO HAVE TO TRY

19     TO GET THAT ORDER.

20          THE COURT:  SURE.

21          MS. SHUMENER:  I'VE NEVER EVEN SEEN IT.

22          THE COURT:  AND IF IT'S NOT RIGHT, YOU MIGHT WANT TO

23     NOTIFY COUNSEL THAT YOU'RE GOING TO HAVE AN ORDER FROM

24     THIS AND IF THERE'S ANY INPUT THEY WANTED IN THAT ORDER.

25     IN OTHER WORDS, MS. SHUMENER, IF THERE'S SOMETHING THEY
```

31

♀

```
 1     FEEL THEY NEED IN MY ORDER, YOU LET ME KNOW AND I WILL

 2     PUT IT IN MY ORDER BECAUSE, AGAIN, ALL I WANT IS TO MAKE

 3     SURE RELEVANT INFORMATION OR POTENTIALLY RELEVANT AND/OR

 4     ADMISSIBLE INFORMATION COMES FORWARD AND NOT JEOPARDIZE

 5     HIS PRIVACY AND INTEREST IN HIS FINANCIAL INFORMATION

 6     STATEMENTS.

 7          MS. SHUMENER:  I APPRECIATE IT, YOUR HONOR.  THANK

 8     YOU VERY MUCH.

 9          THE COURT:  I APPRECIATE THAT, TOO.  ALL RIGHT

10     ANYTHING ELSE?

11          MR. DOUGLASS:  YOUR HONOR, WE HAVE ONE HOUSEKEEPING

12     ISSUE, I WOULD CALL IT.  I THINK IT SHOULD BE PRETTY

13     QUICK.  THIS ISSUE HAS TO DO WITH THE SCOPE OF THE 30(B)6
```

072910Specialty Finance v  Minor Family Hotels.txt

14      DEPOSITION.

15          THE COURT:  OH, THAT'S RIGHT, ONE MORE ISSUE.  AND

16      THE SCOPE OF THE 30(B)6 DEPOSITION OF YOUR CLIENTS?

17          MR. DOUGLASS:  YES, YOUR HONOR.

18          THE COURT:  OKAY.

19          MR. DOUGLASS:  WE CAME DOWN HERE LAST TIME AND I

20      THINK WE HAVE AGREED TO COME BACK DOWN HERE TODAY TO DO

21      THE 30(B)6 DEPOSITION.  THE TRANSCRIPT THAT I HAVE IS

22      GOOSE-GANDER RULE, ONE EACH.  THE 30(B)6 WOULD BE EACH OF

23      YOU HAVE ONE.  THAT'S WHAT I HAVE IN THE TRANSCRIPT.

24          THE DEFENDANTS ARE TAKING THE POSITION THAT THEY

25      SHOULD HAVE TWO 30(B)6 DEPOSITIONS OF SFG.  ONE RELATING

32

1      TO -- FOR LACK OF A BETTER WORD, THE SUBSTANCE.

2          THE COURT:  DOCUMENT RETENTION.

3          MR. DOUGLASS:  AND A SECOND ONE RELATING TO DOCUMENT

4      RETENTION.

5          THE COURT:  DOES THIS WITNESS HAVE KNOWLEDGE OF THE

6      DOCUMENT RETENTION?

7          MR. DOUGLASS:  HE'S PREPARED. HE CAME IN FROM

8      PHILADELPHIA. HE'S PREPARED TO ADDRESS BOTH OF THEM.

9          THE COURT:  ALL RIGHT.  IT DOESN'T HAVE TO BE TWO

10      DIFFERENT PEOPLE AS FAR AS I'M CONCERNED AS LONG AS YOU

11      WILL CERTIFY HE IS THE PERSON.  BECAUSE WE JUST DON'T

12      WANT THIS WITNESS TO SAY TO MS. SHUMENER, OH, MY

13      COLLEAGUE IN SUCH AND SUCH TOWN IS REALLY THE GO-TO KIND

14      OF GUY.  SO LONG AS THIS IS THE MAN, PERSON, DESIGNEE ON

15      BOTH TOPICS, ONE PERSON IS FINE AS FAR AS THE COURT IS

072910Specialty Finance v Minor Family Hotels.txt

16    CONCERNED. IT WAS NEVER MY INTENT THAT THERE BE TWO

17    INDIVIDUALS HERE.

18        MR. DOUGLASS: OR I GUESS THE OTHER IS THERE ARE TWO

19    SEPARATE DEPOSITIONS?

20        THE COURT: NO, JUST NAIL IT. JUST NAIL IT NOW

21    WHILE YOU'RE HERE.

22        MR. DOUGLASS: THANK YOU, YOUR HONOR.

23        THE COURT: ANYTHING ELSE, MS. SHUMENER?

24        MS. SHUMENER: WE'RE FINE. WE'LL PREPARE IT.

25        THE COURT: ALL RIGHT. WHAT TIME IS YOUR FLIGHT?


                                                        33


1        MS. SHUMENER: WELL, I'M LEAVING NOW, BUT MY

2    COLLEAGUE, MR. SPURLING, HAS AGREED TO STAY FOR THIS

3    PART.

4        THE COURT: HAVE A SAFE JOURNEY UNTIL I SEE YOU LATE

5    AUGUST, I BELIEVE, FOR POTENTIALLY SOME DAUBERT MOTIONS

6    OR SOMETHING THAT WE HAVE.

7        MS. SHUMENER: OCTOBER.

8        THE COURT: OH, OCTOBER. I THOUGHT WE HAD YOU ALL IN

9    AUGUST. I'M GETTING CONFUSED ON ANOTHER CASE, OKAY. GO

10    AHEAD.

11

12

13

14

15                    **REDACTED**

16

17

18    **Filed Under Seal by the State Court**

072910Specialty Finance v  Minor Family Hotels.txt

19
20
21
22
23
24
25

♀

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20

# REDACTED

# Filed Under Seal by the State Court

072910Specialty Finance v  Minor Family Hotels.txt

21
22
23
24
25

♀

1
2
3
4

# REDACTED

5
6
7

# Filed Under Seal by the State Court

8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23

072910Specialty Finance v  Minor Family Hotels.txt

24

25

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

# REDACTED

# Filed Under Seal by the State Court

072910Specialty Finance v  Minor Family Hotels.txt

37

```
 1
 2
 3          MR. ALPERT:  GOOD THOUGHT, YOUR HONOR.
 4          THE COURT:  ALL RIGHT. GOOD JOB EVERYBODY.  NOW
 5     Y'ALL HAD A RECESS.  MS. SHUMENER IS GOING BACK TO NICE
 6     WEATHER ON THE COAST.
 7          MS. SHUMENER:  CORRECT.
 8          THE COURT:  AND THEN YOU-ALL ARE GOING TO RECESS TO
 9     MY JURY ROOM TO TAKE A JURY TRIAL(SIC).  I GOT TO LEAVE,
10     BUT I'M AVAILABLE BY PHONE IF YOU NEED ME TO RESOLVE ANY
11     ISSUE AND I CAN COME BACK.  DID YOU HEAR? I CAN COME
12     BACK, SO YOU-ALL PLAY NICE.  ALL RIGHT.  THANK YOU.  GOOD
13     DAY.
14          (WHEREUPON, THE HEARING WAS CONCLUDED.)
15
16
17
18
19
20
21
22
23
24
25
```

38

072910Specialty Finance v  Minor Family Hotels.txt

1
2                    C E R T I F I C A T E
3   STATE OF GEORGIA:
4   FULTON COUNTY:
5
6            I HEREBY CERTIFY THAT THE FOREGOING TRANSCRIPT WAS
7   TAKEN DOWN, AS STATED IN THE CAPTION, AND THE QUESTIONS AND
8   THERETO WERE REDUCED TO TYPEWRITING UNDER MY DIRECTION; THAT
9   THE FOREGOING PAGE 1 THROUGH 39 COMPLETES AND REPRESENTS A
10  TRUE AND CORRECT TRANSCRIPT OF THE EVIDENCE GIVEN UPON SAID
11  HEARING, AND I FURTHER CERTIFY THAT I AM NOT OF KIN OR COUNSEL
12  TO THE PARTIES IN THE CASE; AM NOT IN THE REGULAR EMPLOY OF
13  COUNSEL FOR ANY OF SAID PARTIES NOR AM I IN ANYWISE INTERESTED
14  IN THE RESULT OF SAID CASE.
15  THIS 11TH OF AUGUST, 2010.
16
17            _____
18                  OCTAVIA L. WINFREY, CSR B-2422
19                  MY COMMISSION EXPIRES THE
20                  31ST DAY OF MARCH 2011
21
22
23
24
25

                                                        39

Page 36

# EXHIBIT "5"

State Court of Fulton County
***EFILED***
LexisNexis Transaction ID: 26340914
Date: Jul 29 2009  2:27PM
Mark Harper, Clerk

## IN THE STATE COURT OF FULTON COUNTY
## STATE OF GEORGIA

| | | |
|---|---|---|
| SPECIALTY FINANCE GROUP, LLC, | ) | |
| | ) | |
| Plaintiff/Counter-Defendant, | ) | |
| | ) | CIVIL ACTION |
| v. | ) | |
| | ) | NO. 2009EV006754F |
| MINOR FAMILY HOTELS, LLC | ) | |
| and HALSEY MINOR, | ) | |
| | ) | |
| Defendants/Counter-Plaintiffs/ | ) | |
| Third-Party Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| LEE DANIELSON and | ) | |
| HOTEL CHARLOTTESVILLE, LLC, | ) | |
| | ) | |
| Third-Party Defendants. | ) | |

## STIPULATED CASE MANAGEMENT ORDER

The parties having reached an agreement regarding a case management schedule to assist in the efficient management of this litigation and to provide for the timely adjudication of same, IT IS HEREBY ORDERED as follows:

**A.     Discovery**

The discovery period shall expire on **December 11, 2009**.  Any motions to compel shall be filed no later than that date.

**B.     Dispositive Motions**

All dispositive motions shall be filed by **January 15, 2010**.  Responses to dispositive motions shall be filed **30 days** after the dispositive motion is filed.  Replies to dispositive motions shall be filed **10 days** after the response to the dispositive motion is filed.  Hearings on dispositive motions shall be scheduled according to the Court's availability.  Nothing contained herein shall prohibit any party from filing a dispositive motion at any time prior to this date.

2480370 v03

C. **Pre-trial/Trial Issues**

The parties shall submit a joint final pre-trial statement (including witness lists and exhibit lists) **30 days** before trial.

All other motions, including motions *in limine* and trial briefs also shall be submitted **30 days** before trial. Responses to any such motions shall be filed **20 days** before trial. Replies to any such motions shall be filed **15 days** before trial.

The final pre-trial conference shall be conducted by a date to be determined by the Court.

This case shall be called for trial on a date to be determined by the Court.

SO ORDERED this 29th day of July, 2009.

*Susan B. Forsling*

Susan B. Forsling, Judge
State Court of Fulton County

Copies furnished to:

All Counsel of Record

STIPULATED TO BY:

| **MORRIS, MANNING & MARTIN, LLP** | **DLA PIPER LLP** |
|---|---|
| /s/ Robert P. Alpert<br>Robert P. Alpert<br>Georgia Bar No. 013635<br>Jeffrey K. Douglass<br>Georgia Bar No. 227523<br>Elizabeth L. Ballard<br>Georgia Bar No. 142299<br><br>1600 Atlanta Financial Center<br>3343 Peachtree Road, N.E.<br>Atlanta, Georgia 30326-1044<br>(404) 233-7000<br>(404) 365-9532 (fax)<br><br>*Attorneys for Specialty Finance Group LLC* | /s/ Bethany M. Palmer<br>Betty M. Shumener<br>*Admitted pro hac vice*<br>Bethany M. Palmer<br>*Admitted pro hac vice*<br><br>550 South Hope Street Suite 2300<br>Los Angeles, California 90071<br>(213) 330-7713<br>(213) 330-7613 (fax)<br><br>Arthur D. Brannan<br>Georgia Bar No. 076695<br>D. Skye Masson<br>Georgia Bar No. 558740<br>1201 West Peachtree Street, Suite 2800<br>Atlanta, Georgia 30309<br>404-736-7809<br>404-682-7803 (fax)<br><br>*Attorneys for Minor Family Hotels, LLC and Halsey Minor* |
| **TRAMMELL CAMP LLC**<br><br>/s/ Robert T. Trammell, Jr.<br>Robert T. Trammel, Jr.<br>Georgia Bar No. 715351<br><br>8 LaGrange Street<br>Newnan, Georgia 30263<br>(770) 927-0085<br>(678) 884-9019 (fax)<br><br>*Attorneys for Hotel Charlottesville, LLC and Lee Danielson* | |

# EXHIBIT "6"

State Court of Fulton County
***EFILED***
LexisNexis Transaction ID: 30664699
Date:  Apr 20 2010  9:28AM
Mark Harper, Clerk

## IN THE STATE COURT OF FULTON COUNTY
## STATE OF GEORGIA

| | | |
|---|---|---|
| SPECIALTY FINANCE GROUP, LLC, | ) | |
| | ) | |
| Plaintiff/Counter-Defendant, | ) | |
| | ) | CIVIL ACTION |
| v. | ) | |
| | ) | NO. 2009EV006754F |
| MINOR FAMILY HOTELS, LLC | ) | |
| and HALSEY MINOR, | ) | |
| | ) | |
| Defendants/Counter-Plaintiffs/ | ) | |
| Third-Party Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| LEE DANIELSON and | ) | |
| HOTEL CHARLOTTESVILLE, LLC, | ) | |
| | ) | |
| Third-Party Defendants. | ) | |

## ORDER

This case involves a loan made by Plaintiff Specialty Finance Group, LLC ("SFG") to Defendant Minor Family Hotels, LLC ("MFH") and guaranteed by Defendant Halsey Minor ("Mr. Minor") (MFH and Mr. Minor collectively as "Minor").  SFG's January 5, 2010 motion ("Motion") requests the Court to shift certain of SFG's discovery costs to Minor, specifically the costs SFG incurred in connection with restoring, processing and reviewing emails from SFG's email backup tapes.  SFG seeks reimbursement for: (a) $52,000 in e-discovery vendor costs associated with restoring emails from SFG's email backup tapes; (b) $56,235.50 in e-discovery vendor costs associated with processing the restored emails into a reviewable format; and (c) $51,698.30 in attorneys' fees associated with SFG's counsel reviewing the restored emails for production to Minor.  For the reasons set forth below, the Court GRANTS SFG's Motion as to the shifting of the e-discovery vendor costs SFG incurred in connection with the restoration and

processing of the emails from SFG's backup tapes, and DENIES SFG's Motion as to the attorneys' fees SFG incurred in connection with having its counsel review the restored emails for production.

## I.    Background Facts

On March 12, 2008, MFH entered into a loan agreement with SFG.  As part of the loan agreement, MFH contemporaneously executed a promissory note to SFG.  That same day, Minor entered into a guaranty agreement with SFG, in which Minor guaranteed payment of the note when due.  The loan proceeds were to be used in connection with the construction of a hotel project in Charlottesville, Virginia.  In this lawsuit, SFG alleges that MFH defaulted under the terms of the loan agreement and note and that Minor is liable as guarantor for amounts owed under the note.  Minor denies SFG's allegations and has filed counterclaims against SFG and a third-party complaint against the project developer.

Minor has propounded extensive discovery to SFG in this case, which includes requests for production of SFG's electronic documents.  Upon receipt of these requests, SFG conducted a search of its "hard copy" documents and its electronic documents, including documents available on shared network drives, personal network drives, email servers and employee hard-drives. This search required SFG, with the assistance of an outside e-discovery vendor, to process over 25 million pages of documents.  The undisputed evidence shows that SFG spent over $500,000 to search for, process, review and produce the responsive electronic documents from this search.

As part of identifying and searching for responsive electronic documents, SFG determined that certain emails responsive to Minor's document requests may reside on SFG's email backup tapes.  Backup tapes are high capacity storage tapes used by some companies to

back up large amounts of data for disaster recovery and other business purposes.[1]  It is not possible to easily access or review data from backup tapes without first restoring and processing the data into a reviewable format.

Prior to May 2008, SFG's emails were located on SFG's "active" email server in the particular mailbox from which the emails were sent or received.  SFG backed up its active server on a regular basis, and these backups were then rolled into monthly backup tapes.  If a sender or recipient deleted an email from the active server, that particular copy of that email would only be available on a backup tape.  However, if an email was addressed to more than one of SFG's employees, and at least one recipient did not delete it from their mailbox, then that particular copy of the email remained on the active email server.  Moreover, if any sender or recipient of an email was not an employee of SFG (e.g. Mr. Minor, the project developer, etc.), that email could also reside on that recipient's email system.

After May 2008, SFG installed a second email server, on which SFG keeps a copy of every email sent from or received by a user of SFG's email system, regardless of whether that email was later deleted.  This is referred to as the "archive" server.

Thus, in summary:

- Any email sent or received after May 2008 is available, at a minimum, on SFG's archive server;

- Any email not deleted from any user mailbox as of May 2008 (regardless of when it was sent or received) is also available, at a minimum, on SFG's archive server; and

- Only those emails that were (a) sent or received before May 2008, (b) deleted by all senders and recipients before May 2008, and (c) included only SFG's employees as senders and recipients would be exclusively available on SFG's backup tapes.  All other emails would be available on SFG's active/archive servers or from other sources (e.g. non-SFG recipients of the email).

---

[1] While SFG utilized such tapes as part of its business operations, Minor did not.

SFG informed Minor that based on the above system and the date of the parties' loan agreement (March 2008), a search of SFG's backup tapes was unlikely to yield a substantial amount of responsive, important emails that were not already available on SFG's active/archive servers or from other sources.  Notwithstanding this, Minor requested SFG to move forward with restoring and searching its 104 backup tapes.  SFG again reiterated its belief that such a search was unnecessary and expensive, and requested that Minor bear the costs associated with Minor's requested restoration and search.  Minor refused SFG's request.

In the Fall of 2008, as requested by Minor, SFG moved forward with the restoration and processing of its backup tapes, but reserved its right to shift such costs to Minor after the process was completed.  The restoration process required SFG to retain the services of an outside e-discovery vendor to restore the backup tapes and to process the restored emails into a format reviewable by SFG's attorneys, at a total cost of $108,235.50.[2]  After removing duplicate emails and applying an appropriate date filter, SFG identified 169,168 emails for further review.  Of these 169,168 emails, less than .2% were discoverable, and SFG produced these documents to Minor.  After SFG's production was complete, SFG again requested reimbursement from Minor of SFG's costs to complete this process.  Minor refused to reimburse SFG for such costs, and SFG's Motion followed.

## II.     Discussion

Discovery matters, such as SFG's Motion, are within the inherent discretionary authority of this Court.  See Georgia Emission Testing Co. v. Reheis, 269 Ga. App. 560, 564 (2004).  This Court applies Georgia law.  The Court is not aware of any reported Georgia case specifically addressing the shifting of costs for email backup tapes.  However, in Reheis, the Georgia Court

---

[2] SFG has submitted the affidavits of Jason Eakes, counsel for SFG, and Kevin Jacobs, Vice-President of SFG's e-discovery vendor, detailing these costs and the process undertaken by SFG.  Minor has not disputed this information.

of Appeals did address some circumstances under which cost-shifting may be appropriate. The Court of Appeals' holding in that case is instructive.

The plaintiff in <u>Reheis</u>, an emissions inspection company, sued various Georgia public officials and agencies to recover fees that the plaintiff claimed were improperly assessed under Georgia's Motor Vehicle Emission Inspection and Maintenance Act. 269 Ga. App. at 561. The plaintiff filed suit on its behalf and on behalf of 113 other emission testing centers in the metro Atlanta area. <u>Id.</u> During discovery, the plaintiff made a request for documents evidencing the total number of emission tests performed between 1996 and 2001, the number of test certificates purchased by each tester during that time period and the date of each purchase. <u>Id.</u> at 564-65.

In response, the defendants noted that the requested information should already have been available to plaintiff and/or the emission testing centers plaintiff purported to represent. <u>Id.</u> at 565. Defendants also responded that such information was only available to defendants in an electronic database and was not available in a regularly produced report. <u>Id.</u> Production of this information would therefore require an outside contractor to create a special report, with an associated expense for the outside contractor's work. <u>Id.</u> Defendants provided the plaintiff with estimates to create the special report. <u>Id.</u> While the plaintiff acknowledged that the information would have to be extracted from a massive electronic database at a significant cost, the plaintiff insisted that the defendants produce the special report, at their expense, and moved to compel such production. <u>Id.</u> The trial court granted the plaintiff's motion to compel and ordered the parties to split the associated cost. <u>Id.</u>

Defendants appealed. The Court of Appeals affirmed the trial court's ruling compelling production of the special report, but found the trial court's splitting of costs "more troublesome" because:

> [The Plaintiff] requested information from the defendants that (1) should have
> been available in [plaintiff's] own records and the records of the other stations
> that it purportedly represented . . . and (2) involved the creation of a report that (a)
> otherwise did not exist and involved information that was not the subject of a
> regularly produced report, and (b) had to be specially created for [plaintiff] by a
> nonparty contractor at a significant cost to [defendants]."

Id.  Based on these facts, the Court of Appeals reversed the trial court's splitting of costs and held that the plaintiff should be solely responsible for costs associated with creating the special report.  Id.  In so holding, the Court of Appeals recognized that where requested discoverable information is not reasonably accessible, it may be appropriate to shift the costs associated with producing such information to the requesting party.

There are significant similarities between the facts in Reheis and the cost-shifting issue currently before the Court.  Here, Minor requested SFG to search for and produce emails that were only available to SFG on its backup tapes.  Like the electronic databases of the defendants in Reheis, emails on SFG's backup tapes are not easily accessible.  In order to access and review these emails, SFG was required to retain and pay for an outside e-discovery vendor to restore and process the emails into a reviewable format.  The Court also notes that at least some of these restored emails would have been sent to people outside of SFG and, therefore, may also have been available to Minor from sources other than SFG's backup tapes.  Based on the above, the Court finds the Reheis decision instructive in connection with the issue of whether to shift certain of the costs SFG incurred in connection with restoring and processing emails from its backup tapes for production to Minor.

Minor makes three primary arguments as to why Minor believes cost-shifting is not appropriate.  First, Minor argues that restoration of SFG's email backup tapes was necessary because the backup tapes at issue were made during the time period relevant to this litigation and, therefore, likely contained responsive emails.  However, the issue is not whether the

requested emails are responsive to Minor's discovery requests or generally discoverable in this litigation, but rather which party should appropriately bear the costs for accessing those emails. Again, <u>Reheis</u> is instructive in this regard, as the Court of Appeals recognized that the requested special report was discoverable, but still ordered the requesting party to bear the costs of its creation and production. <u>Reheis</u>, 268 Ga. App. at 564-65.

Second, Minor argues that cost-shifting is not appropriate because it was impossible for the Minor to know what responsive emails existed on the backup tapes without first restoring them. This argument likewise does not weigh against cost-shifting. SFG advised Minor of its belief (and reasons for this belief) that restoration of the backup tapes was not likely to yield a significant number of significant discoverable emails that Minor did not already have in its possession or were not otherwise available from other sources, and SFG also advised Minor that SFG would seek reimbursement for the costs of this process. Even so, Minor requested that SFG move forward with the process. Minor accepted the risk that the backup tape restoration would not yield a significant number of relevant emails, and Minor cannot now seek to avoid paying SFG's costs because the process yielded fewer emails than Minor had expected.[3]

Finally, Minor argues that cost-shifting is not appropriate because restoration of the backup tapes was only necessary as a result of SFG's failure to preserve emails in its system, and that SFG should have taken steps to prevent responsive emails from being deleted from SFG's active email server. While the parties dispute when their respective obligations to preserve evidence began,[4] it is not necessary for the Court to resolve this issue to decide SFG's Motion. Because SFG's archive server included copies of all emails still on the active server as of May

---

[3] It is also worth noting that this is not a case where Minor was aware of a specific document that it believed should have existed, but did not appear in SFG's document production. In fact, Minor did not wait until SFG had completed its document production before requesting SFG to undertake the backup tape restoration process.

[4] Minor asserts that SFG should have reasonably anticipated litigation in April 2008, one month before SFG transitioned from backup tapes to its archive server, while SFG disputes Minor's contention.

2008, and also included certain emails from April 2008 as a result of the transition in SFG's

backup system, it is unlikely that many, if any, emails would have been deleted by SFG during

the one month that Minor claims SFG failed to preserve emails.  Moreover, there is no evidence

in the record that any SFG employees intentionally deleted emails during this limited timeframe

for the purpose of preventing their use in this litigation.[5]

        In addition to the guidance provided by Reheis, the Court is also aware of, and the parties

have briefed, the federal case law regarding apportionment of costs for restoration of backup

tapes, including Zubulake v. UBS Warburg LLC, 217 F.R.D. 309 (S.D.N.Y 2003) and its

progeny.  Under Zubulake, the central question for the Court to determine is whether the request

for production of documents from inaccessible sources imposes an "undue burden or expense"

on the responding party.  Id. at 322.  Zubulake sets forth seven factors for a court to consider in

answering this central question, including:

1. The extent to which the request is specifically tailored to discover relevant
   information;
2. The availability of such information from other sources;
3. The total cost of production, compared to the amount of controversy;
4. The total cost of production, compared to the resources available to each
   party;
5. The relative ability of each party to control costs and its incentive to do so;
6. The importance of the issues at stake in the litigation; and
7. The relative benefits to the parties of obtaining the information.

Id.  While the Court is not required to follow this federal case law, the Court has

reviewed the analysis advocated in Zubulake, including the factors set forth above.  Applying

that analysis to this case would not dictate a different result.

---

[5] As explained by SFG at the March 19, 2010 hearing, SFG's transition from backup tapes to archive server in
May 2008 was part of SFG's normal business operations and was not related to this lawsuit.  Moreover, this
transition resulted in more, rather than less, emails being accessible to SFG.  Specifically, and as noted above, prior
to May 2008, certain of SFG's emails would have only been available on backup tape, while after the installation of
SFG's archive server in May 2008, all emails were available for review and production without having to restore
backup tapes.  SFG searched these emails on its archive server and produced them to Minor at a significant cost -- a
cost that SFG does not seek to recover from Minor in its Motion.

### III.     Conclusion

Based on the Court of Appeals' guidance in <u>Reheis</u>, the reasons set forth above, the pleadings and submissions by the parties, as well as argument presented to the Court at the March 19, 2010 hearing, and for good cause shown, the Court finds that Minor should bear the costs associated with SFG's restoration and processing of emails from its email backup tapes. With respect to SFG's request for reimbursement of attorneys' fees associated with reviewing the emails restored from the backup tapes, the Court finds no authority that dictates the shifting of such costs to Minor under these circumstances.  Accordingly, SFG's January 5, 2010 Motion is GRANTED as to SFG's request to recover costs associated with SFG's restoration and processing of emails from its email backup tapes in the amount of $108,235.50 and DENIED as to SFG's request to recover its attorneys' fees associated with reviewing the emails restored from its backup tapes.

Minor is ORDERED to remit payment to SFG in the amount of $108,235.50 by May 3, 2010, which is forty-five (45) days from the date SFG's Motion was initially ruled upon by the Court at the March 19, 2010 hearing.

In addition, after considering the pleadings and submissions by the parties, as well as argument presented to the Court at the March 19, 2010 hearing, and for good cause shown, IT IS HEREBY ORDERED that SFG's Request for Admission No. 2 to Minor is deemed admitted, pursuant to O.C.G.A. § 9-11-36(a)(3), without waiving Minor's right to explain why the project remains uncompleted.  Minor reserves all other objections to this Request for Admission.

SO ORDERED this 20th day of April, 2010.

*Susan B. Forsling*

Susan B. Forsling, Judge
State Court of Fulton County

Copies furnished to:
All Counsel of Record
via LexisNexis File & Serve