## UNITED STATES BANKRUPTCY COURT FOR THE
## WESTERN DISTRICT OF VIRGINIA
### Lynchburg Division

| | |
|---|---|
| In re:<br><br>MINOR FAMILY HOTELS, LLC,<br><br>        Debtor. | Chapter 11 Case<br><br>Case No. 10-62543-WEA |
| MINOR FAMILY HOTELS, LLC, et al.<br><br>        Plaintiffs,<br>    v.<br><br>HOTEL CHARLOTTESVILLE, LLC, et al.<br><br>        Defendants. | Adv. No. 10-06108-WEA |
| CLANCY & THEYS CONSTRUCTION COMPANY,<br><br>        Plaintiff and Counterdefendant,<br>    v.<br><br>MINOR FAMILY HOTELS, LLC,<br><br>        Defendant and Counterclaimant. | Adv. No. 10-6109-WEA |
| SPECIALTY FINANCE GROUP, LLC,<br><br>        Plaintiff and Counter-Defendant,<br>    v.<br><br>MINOR FAMILY HOTELS, LLC and HALSEY MINOR,<br><br>        Defendants, Counter and Third Party Plaintiffs,<br><br>    v.<br><br>HOTEL CHARLOTTESVILLE, LLC and LEE DANIELSON,<br><br>        Third Party Defendants. | Adv. No. 10-6112-WEA |

## MINOR FAMILY HOTELS, LLC AND HALSEY MINOR'S MOTION TO CONSOLIDATE RELATED ACTIONS AND TO SET A TRIAL DATE

COMES NOW Plaintiff Minor Family Hotels, LLC ("Debtor"), the debtor and debtor in possession in the above-entitled chapter 11 case (the "Chapter 11 Case"), and Halsey Minor (with Debtor, collectively referred to as "Owners"), by and through the undersigned attorneys, and in accordance with Rule 7042 of the Federal Rules of Bankruptcy Procedure ("Bankruptcy Rules") and Rule 42(a) of the Federal Rules of Civil Procedure ("Civil Rules"), hereby move the Court to consolidate three closely related adversary proceedings before the Court: *Minor Family Hotels, LLC, et al. v. Hotel Charlottesville, et al.*, Adv. No. 10-06108 (the "VA Lead Action"); *Specialty Finance Group, LLC v. Minor Family Hotels, LLC, et al.*, Adv. No. 10-06502 (the "GA Twin Action"); and *Clancy & Theys Construction Company v. Minor Family Hotels, LLC, et al.*, Adv. No. 10-06109 (the "VA Lien Action" and together with the VA Lead Action and GA Twin Action, collectively, the "Adversary Proceedings").

## I.    PRELIMINARY STATEMENT

All three Adversary Proceedings arise out of the same set of operative facts, involve the same parties, the same witnesses, the same hotel construction project in Charlottesville, Virginia and the same documents.  The only forum in which one consolidated trial can dispose of all three Adversary Proceedings is Virginia.   Any other forum will result in multiple trials in multiple jurisdictions that will deplete Debtor's resources and make it impossible for Debtor to reorganize.  This is not an effort to delay trial.  To the contrary, Debtor is seeking a trial date as close as reasonably practicable to November 1, 2010 as the Court's calendar permits.

The focus of Debtor's reorganization efforts is to complete The Landmark Hotel, an upscale, 101-room, 10-story boutique hotel in Charlottesville, Virginia ("Project").  The Debtor, who owns the Project, is a Virginia limited liability company, the Developer is a Virginia limited liability company, the General Contractor is licensed in Virginia and the Project is in the heart of downtown Charlottesville, Virginia.  There is no reason to be in any other forum.

Owners paid $4.5 million to acquire the site for the Project in August 2007, only to have their Project undermined by the collective efforts of four parties to the Adversary Proceedings: Specialty Finance Group LLC ("Lender"), Hotel Charlottesville, LLC ("Developer"), Lee Danielson ("Danielson") and Clancy & Theys Construction Company ("General Contractor"). Debtor has already proven its case once, in a week-long arbitration against the Developer in Charlottesville, Virginia before the Hon. Donald H. Kent (ret.) that was decided in Debtor's favor after nine witnesses testified under oath and literally hundreds of documents were introduced (the "Arbitration"). The Arbitration was ordered in the VA Lead Action and a judgment has already been entered against the Developer in that case.

To run Debtor into the ground financially, however, Lender has engaged in an onslaught of litigation in multiple forums. Debtor filed the VA Lead Action first in Virginia state court on February 11, 2009 against the Developer and Mr. Danielson. After Debtor filed a motion in the VA Lead Action on February 20, 2009 to add Lender as a defendant, Lender engaged in blatant forum shopping by filing the GA Twin Action in Georgia state court on February 24, 2009, rather than filing a compulsory counterclaim in the VA Lead Action.

Where, as here, cases have been removed from state courts to federal courts, the "first-filed" rule is determined by the dates the cases were filed in the state courts. Allied-General Nuclear Serv. V. Commonwealth Edison Co., 675 F.2d 610, 611 n.1 (4th Cir. 1982) ("Ordinarily, when multiple suits are filed in different Federal courts upon the same factual issues, the first or prior action is permitted to proceed to the exclusion of another subsequently filed."); Manuel v. Convergys Corp., 430 F.3d 1132, 1135 (11th Cir. 2005) ("Where two actions involving overlapping issues and parties are pending in two federal courts, there is a strong

presumption across the federal circuits that favors the forum of the first-filed suit under the first-filed rule.").  The VA Lead Action was filed first.

The VA Lead Action and GA Twin Action among Debtor, Mr. Minor, Lender, Developer and Mr. Danielson involve the same issues, the same claims, the same witnesses (most of whom are in Virginia), the same documents and the same Project (which is in Virginia).  The parties agreed that all pre-trial discovery taken in these two Adversary Proceedings would be used in both actions to avoid duplication.  (Declaration of Betty M. Shumener ("Shumener Decl."), ¶ 7.)  Nevertheless, Lender argues that the GA Twin Action, which was recently transferred to this Court in Virginia (where the other Adversary Proceedings are pending), should be remanded to Georgia state court, necessitating two (if not three) trials.

The VA Lien Action is not pending in Georgia.  Accordingly, to remand the GA Twin Action would ensure multiple trials of the same set of operative facts.  The only forum in which a single trial will dispose of all three Adversary Proceedings is in the Western District of Virginia.  Any other forum will require two, if not three, trials of the same issues, waste scarce judicial resources, deplete the Debtor's scarce resources and burden the same witnesses with multiple trials, many of whom already testified in the Virginia Arbitration.

In the interest of judicial economy, in the interest of avoiding the risk of inconsistent and irreconcilable rulings and to ensure the resolution of the Debtor's Chapter 11 Case, which depends upon the resolution of the Adversary Proceedings, it is imperative that the three Adversary Proceedings be consolidated and proceed to a single, speedy trial in Virginia.

## II.   BACKGROUND AND FACTS

### A.   The Three Cases To Be Consolidated

On or about February 11, 2009, Owners filed a complaint in the Circuit Court of Charlottesville in the Commonwealth of Virginia, Case No. CL 09-64 ("VA Lead Action")

against Developer and Danielson for: Breach of Contract, Breach of the Implied Covenant of Good Faith and Fair Dealing, Breach of Fiduciary Duty, Fraud in the Inducement, Fraud, and Constructive Fraud. (Shumener Decl., ¶ 2, Ex. 1.)  On February 20, 2009, Owners filed a motion to add Lender as a defendant to the VA Lead Action.  (Shumener Decl., ¶¶ 3,4, Exs. 2-3.)

On February 24, 2009, four days after Owners moved to add Lender to the VA Lead Action, Lender filed a complaint against Owners in the State Court of Fulton County, State of Georgia, Case No. 2009EV006754F ("GA Twin Action") involving the same parties, the same witnesses and the same issues as in the VA Lead Action.  (Shumener Decl., ¶ 5, Ex. 4.)  After a stay of the GA Twin Action was denied, on May 5, 2009, Owners filed a counterclaim in the GA Twin Action alleging the same claims as alleged in the VA Lead Action for: Breach of Contract, Breach of the Implied Covenant of Good Faith and Fair Dealing, Breach of Fiduciary Duty, Fraud in the Inducement, Fraud and Constructive Fraud.  (Shumener Decl., ¶ 6, Ex. 5.)

The General Contractor filed a complaint on June 5, 2009 in Virginia state court against Debtor and Lender, among others, for the foreclosure of mechanic's liens recorded against the Project ("VA Lien Action").  (Shumener Decl., ¶ 8, Ex. 6.)   The VA Lien Action arose out of Lender's wrongful failure to fund the Loan at issue in the VA Lead Action and GA Twin Action.

On November 25, 2009, Debtor filed a counterclaim alleging Breach of Contract against General Contractor in the VA Lien Action for, *inter alia*, concealing facts about the budget and loan at issue in the VA Lead Action and GA Twin Action. (Shumener Decl., ¶ 9, Ex. 7.)

All three actions arise out of a $23.6 million construction loan made by Lender to Debtor ("Loan").  (Shumener Decl., ¶ 10, Ex. 8.)  All three actions involve a fraudulent scheme in which Developer, Danielson, Lender and General Contractor colluded to enrich themselves at the expense of Owners. (Shumener Decl., ¶¶2-6, 8-9, Exs. 1-7.)

In early 2007, Lender and Developer negotiated a loan for the Project.  After Developer's former partners refused to execute the guarantees Lender required, Lender instructed Developer to ████████████ and Developer found Mr. Minor.  (Shumener Decl., ¶ 11, Ex. 9.)

To seal the sales pitch to Mr. Minor, Lender and Developer colluded on a sham construction budget, stating that the Project could be completed for $30 million.  The sham budget was then given to Lender's appraiser to prepare an appraisal of the Project.  A few weeks later, Lender sent its appraisal of the Project to Developer to forward to Mr. Minor on July 10, 2007.  The purpose of sending the appraisal to Mr. Minor was to induce the Debtor to close the Loan with Lender.  Lender assured Owners that the terms given to Owners for the Loan would be much more favorable than the terms offered to Developer's former partners.

In reliance on Lender's appraisal, budget and assurances, Owners purchased the site for the Project in August 2007 for $4.5 million.  Days after Owners' acquisition of the site, knowing that they were now heavily invested in the Project and needed construction financing, Lender made material changes to the terms of the Loan, bumping Mr. Minor's exposure under the guaranty ██████ to 100% of the Loan post-construction.  After being called on its bait-and-switch tactics, Lender agreed to ████████████████████████████████
████████████████████████████████████████████████

Lender and Developer knew from the outset that Owners had no experience in hotel construction.  It was precisely because Owners lacked this experience that they agreed to pay Developer $900,000 in fees for Mr. Danielson's expertise, who claimed to have 30 years experience in real estate development, and to obtain the Loan from Lender, who made only hotel construction loans.  Indeed, Lender professed to have made $1.5 billion in hotel construction loans before making the Loan to Debtor.

One week before the Loan closed, the General Contractor delivered to Lender a Contractor's Consent and Certificate ("Certificate") with the construction contract ("GC Contract") which contained the General Contractor's Preliminary Budget for the Project. The General Contractor's Preliminary Budget for hard construction costs was ██████████████ Lender's budget. Regardless, Lender attached its sham budget to the Loan Agreement and closed the Loan one week later, on March 12, 2008. Unbeknownst to Owners, Lender, General Contractor and Developer omitted essential items (e.g., millwork, doors, frames, and hardware), not only from Lender's sham budget, but also from the General Contractor's Preliminary Budget.

Six weeks after the Loan closed, having induced Owners to purchase the site for $4.5 million, fund $2 million in Project costs, pay Developer $200,000, pay Lender $230,000 in loan origination fees, and close the Loan under Lender's onerous terms, in April 2008, Lender suddenly declared a $4 million "gap" in the budget based on nothing more than the difference between Lender's sham budget and the General Contractor's Preliminary Budget. (Shumener Decl., ¶ 12, Ex. 10.) Lender knew nothing had changed with respect to the Project and that Lender's demand was based on information that Lender had accepted before the Loan closed.

Lender and Developer soon learned that if Lender persisted in its demand for an additional $4 million, Owners would simply stop the Project and make no further draws on the Loan. At the time, only $700,000 had been drawn on the Loan, whereas Owners had put at least $6.3 million of their own money into the Project. To ensure that Owners would not withdraw from the Project and the Loan, Lender – in concert with Developer and General Contractor – created a fraudulent change order ("Change Order No. 1") which purported to reduce construction costs by $2.3 million. (Shumener Decl., ¶13, Ex. 11.) In later correspondence, Developer and General Contractor admitted that they and the Lender knew that all the items

deducted in Change Order No. 1 would have to go back into the budget to complete the Project. (Shumener Decl., ¶ 14, Ex. 12.)  Only Owners were kept in the dark.

To "rebalance" the $30 million sham budget in April 2008, Lender (at Developer's suggestion) also required that Owners provide furniture and artwork for the Project from Mr. Minor's private collection, to "save" over $1 million.  With these two changes – the $2.3 million "reduction" in Change Order No. 1 and the contribution of Mr. Minor's artwork and furniture – Lender made the final demand that Owners contribute another $400,000 to rebalance the budget. Having been led to believe that the budget had been reduced by $2.3 million and that, with Owners' contribution of furniture and artwork, the Project would be within the $30 million sham budget, Owners reluctantly agreed to fund the additional $400,000 to rebalance the budget which, unbeknownst to Owners, was out of balance from the outset.  Owners' additional equity was to be funded in four monthly installments of $100,000, for a total of $400,000.  Owners funded each installment as and when required, bringing their equity to nearly $7 million.

In May 2008, Alex Judson, Developer's employee, began to question the validity of the budget and what Owners had been told about it.  Mr. Judson communicated his concerns to the Developer, who ignored him.  Shortly thereafter, Developer stopped paying Mr. Judson's salary, and Mr. Judson quit in July 2008.  Mr. Judson was rehired by Owners, resumed work on the Project and, in August 2008, blew the whistle on the sham budget.

As soon as the $400,000 of additional equity was fully funded, Lender once again stopped funding the Loan, while a September 2008 draw request was pending.  Lender provided Owners no explanation for not funding, which was causing tension among General Contractor and the subcontractors at the Project.

In the meantime, Owners notified Developer that they were looking to get a realistic assessment of the cost to complete the Project. As the facts about the budget were bound to come to light, Developer hurried to pressure Owners to invest another $3 million to $5 million in equity to ensure that Owners would not back out. Owners were not willing to do so, however, until they had the opportunity to engage independent consultants to determine the true costs.

To increase the pressure on Owners, and without Owners' knowledge or consent, Developer then "notified" Lender of a rumor that the General Contractor was about to prepare a proposed change order that would seek a substantial increase to the budget. Having stirred up the Lender to join in Developer's scheme, Developer then went to the General Contractor and instructed the General Contractor to prepare that proposed change order.

On October 13, 2008, apparently realizing that the sham budget could no longer be concealed, and to pressure Owners to put up another $3 million to $5 million, Developer asked the General Contractor to write a letter to Developer pretending to notify Developer that General Contractor would be issuing the proposed change order requesting a substantial increase to the budget. The General Contractor even sent a draft of the letter to Developer for review before sending it to Developer. In the October 13, 2008 letter, which Developer then forwarded to Owners, General Contractor confirmed that Developer and Lender knew that all the items that had been "removed" by Change Order No. 1 to "rebalance" the Loan would have to be put back into the budget to complete the Project. (Shumener Decl., ¶ 14, Ex. 12.) No longer trusting Developer, but not yet realizing the full extent of the collusion among Developer, Lender and General Contractor, Owners became extremely concerned about the budget, and instructed Developer not to go to Lender with the proposed change order because Owners had not approved it and had not yet had an opportunity to hire independent consultants to obtain a reliable budget.

Developer concealed from Owners that Developer already had spread the "rumor" to Lender.  Lender then used the rumor as a pretext to state to Owners that Lender would not resume funding the Loan.  Actually, Lender had not funded the Loan since September 2008, weeks before Developer spread the "rumor" to Lender, and had already caused General Contractor and the subcontractors to become "skittish" and the media to swirl around the Project.

When asked about the status of General Contractor's September draw request, on November 6, 2008, Lender stated that ████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████ (Shumener Decl., ¶ 15, Ex. 13.)

Lender's November 6 announcement ████████████████████████ ██████████████████████ ("November Default Letter").  (Shumener Decl., ¶ 16, Ex. 14.)  The "potential" change order was the same alleged overrun that had been cured when Owners paid $400,000 to fill the "$4MM gap" "found" in Lender's budget seven months earlier.  Now, Lender again demanded that Debtor $3.5 to $4 million, admitting that its ████████████████████████████████████████████████████████████ ████████████████ (Id.) ██████████████████████ identify a single default on the part of Owners because none had occurred.  Owners had lived up ██████████████ As a result of Lender's wrongful refusal to fund the Loan, however, General Contractor filed a mechanic's lien against the Project.

Lender and Developer then schemed to "take over" the Project.  On November 8, 2008, Developer sent an E-mail to Cliff Harrison (a construction consultant who was supposed to be acting as Debtor's representative at the Project) stating, ████████████████████████████

████████████████████████████████ (Shumener Decl., ¶ 17, Ex. 15.)    Although Mr.

Harrison was close friends with Mr. Danielson, he was drawing a salary from Debtor to represent

Debtor in dealings with the General Contractor, ████████████████████████████████████

██████████████████████    Nevertheless, on November 17, 2008, Mr. Harrison sent an E-mail to

Developer and General Contractor, ████████████████████████



(Shumener Decl., ¶ 17, Ex. 15.)

Notably, Owners were not copied on these E-mails, even though Mr. Harrison was paid by

Debtor to act as Debtor's representative, just as Developer was paid to act as Debtor's agent.

During that time, in response to inquiries from the press, Owners reported that Lender

had stopped funding the Loan.    To counteract the negative publicity to Lender, Lender had

Developer make statements to the press maligning Owners and supporting Lender.    The

████████████████████████████████████████████████████████ Lender's Managing

Director – its highest ranking official – stated in a November 14, 2008 E-mail:



(Shumener Decl., ¶ 18, Ex. 16.)

Lender and Developer then tried to replace Owners with other prospective investors.  In a

November 17, 2008 E-mail, Developer wrote to Lender:

(Shumener Decl., ¶ 19, Ex. 17.)

Neither Developer nor Lender notified Owners of Riverstone Properties' interest in their Project.

Effective November 17, 2008, Owners terminated Developer under the Development Agreement. (Shumener Decl., ¶ 20, Ex. 18.) Unbeknownst to Owners, Lender, Developer and General Contractor continued to collude behind the scenes to fabricate "Events of Default" under the Loan so that Lender could foreclose on the Project and rehire Developer. In a November 21, 2008 E-mail, Developer wrote the following to Lender:

> Greg == this is my understanding of the documents.
> …
> * Under the terms of my Developers Consent I am required to notify the bank if the Borrower is in default.
>
> * Under paragraph 3.25 of the Loan Agreement I believe that the Borrower has demonstrated that they do not have the funds to complete the project.
>
> * Under paragraph 6.01 of the Loan Agreement I believe that the Borrower is in default.
>
> If this is true then the bank should be able to continue my contract and I shouldn't have to leave the project… (Shumener Decl., ¶ 21, Ex. 19.)

These were the same bogus "defaults" that Lender later asserted in complaint. However, there were no defaults committed by Owners under the Loan, and Lender knew it, which is why Lender resumed funding the Loan.

On December 4, 2008, at Lender's request, Owners attended a meeting with Lender in Georgia, in which Lender agreed to slow down construction to allow Owners time to determine the budget. Although Owners sought to stop construction while its consultants were looking into the costs, Lender insisted that Owners create the appearance of on-going construction so that Lender's participating banks and the media would not learn of the problems. Owners lived up to

their end of the bargain and slowed down construction, keeping up appearances while their consultants attempted to get their arms around the budget.

At the time, Owners had no idea that Lender and Developer were scheming to find a way



(Shumener Decl., ¶ 22, Ex. 20.)

At the time, Owners knew only that Developer was instigating subcontractors to record liens against the Project so that Lender could declare a default.  Owners did not know that Developer was colluding with Lender.  Accordingly, on February 11, 2009, Owners filed the VA Lead Action against Developer, not realizing Lender's involvement.  (Shumener Decl., ¶ 2, Ex. 1.)

On February 19, 2009, Lender and Owners held a conference call to discuss the Project. When Owners confronted Lender about the budget, Lender terminated the call.  In the call, it became apparent that Lender had engaged in delay tactics so that Lender could contain the negative publicity that would follow its wrongful failure to fund the Loan.[1]  Accordingly, the next day, February 20, 2009, Owners filed a motion to add Lender as a defendant to the VA Lead Action.  (Shumener Decl., ¶ 3, Ex. 2.)  Four days later, on February 24, 2009, Lender filed a complaint commencing the GA Twin Action.  (Shumener Decl., ¶ 5, Ex. 4.)

In discovery, Owners acquired further evidence of Lender's and Developer's clandestine conspiracy,

---

[1] Indeed, in February 2009, Silverton Bank – of which Lender is a wholly owned subsidiary – was seized by the Office of the Comptroller Currency and was later taken over by the Federal Deposit Insurance Corporation.



(Shumener Decl., ¶ 23, Ex. 21.)

E-mails show that Lender and Developer

(Shumener Decl., ¶ 24, Ex. 22.)

The next day, Lender filed the GA Twin Action, claiming Debtor breached the Loan Agreement. Debtor's complaint in the first-filed VA Lead Action claims that Lender (not Debtor) breached the Loan Agreement and fraudulently induced Owners to enter into the Loan. Thus, Lender should have filed its Complaint as a compulsory counterclaim to Owners' first-filed Virginia complaint, instead of engaging in forum-shopping and causing two separate proceedings in Virginia and Georgia on the same issues.

It has been over one year and four months since Lender filed in Georgia, and the parties are still engaged in discovery.   No dispositive motions have been heard.   Due to Lender's unwarranted refusal to fund the Loan and its last minute, scorched earth litigation tactics in the GA Twin Action, Lender has required Owners to produce approximately 200,000 pages of documents, forced Debtor to incur over $5 million in attorneys' fees to date, and driven Debtor into bankruptcy.   Unless the GA Twin Action is consolidated with the VA Lead Action and VA Lien Action in a single forum, for a single trial, valuable judicial resources will be wasted on duplicative litigation, millions of dollars will be wasted, and the parties will risk inconsistent and irreconcilable results.   Debtor has already gone through and prevailed in the Arbitration in Virginia on these issues.   It should not be forced into multiple trials on the same issues.

While the GA Twin Action has been stalled by Lender's needless discovery disputes, the VA Lead Action has already resulted in an Arbitration Award and judgment against the Developer.   Issues pertaining to the very same facts presented in the GA Twin Action and VA Lead Action as between Developer and Debtor have already been decided in favor of Debtor by the Honorable Donald H. Kent (Ret.) during the Arbitration between Debtor and Developer in Virginia.   Indeed, the Arbitration Award finds that Developer  (i) "misrepresented the projected construction costs of the project" to "convince Owner to invest" in the Project; (ii) made "material misrepresentations and omissions regarding the budget"; (iii) "misrepresent[ed] the true costs regarding Change Order #1; (iv) "fail[ed] to inform the Owner that the restaurant costs were not included in the construction estimates; (v) failed to "act[] in the Owner's best interests in dealing with the media and the lender"; and more.   (Shumener Decl., ¶¶ 28-29, Exs. 25-26.)  The Arbitration Award was entered by the Virginia state court as a judgment against Developer on August 25, 2010.  Id.  The evidence shows that Developer did not act alone.

Given the Arbitration, a consolidated trial will be a second run at the same issues.  If multiple forums are involved, however, Debtor will be forced to try the same issues at least two, and possibly three, more times.  Such waste is unconscionable.

**B.    Procedural History**

On September 1, 2010, Debtor filed a petition (Chapter 11) in the United States Bankruptcy Court for the Western District of Virginia, Lynchburg Division, Case No. 10-62543 ("Virginia Bankruptcy Case") to complete the Project.  The Project, a half-built eyesore, concerns the residents and merchants of Charlottesville, as well as Debtor and Mr. Minor.

On September 3, 2010, Owners timely removed the VA Lead Action and VA Lien Action to the United States Bankruptcy Court for the Western District of Virginia, Lynchburg Division.

On September 4, 2010, Debtor timely removed the GA Twin Action to the United States Bankruptcy Court for the Northern District of Georgia, Atlanta Division, and filed a Motion to Transfer Venue of the GA Twin Action to the Virginia Bankruptcy Case to consolidate that action with the VA Lead Action and VA Lien Action, as all three actions involve the same Loan, the same Project (in Virginia), the same parties (Debtor, Developer and General Contractor are in Virginia), the same facts, the same third party witnesses (most of whom are in Virginia), and the same evidence (virtually all of which is in Virginia).  All three actions materially affect the administration of the Debtor's estate and reorganization.  The parties already agreed that pre-trial discovery in the VA Lead Action and GA Twin Action can be used in both actions to avoid duplication of the 30 depositions taken and thousands of documents produced.

On September 9, 2010, the Honorable James E. Massey, U.S. Bankruptcy Court Judge for the Northern District of Georgia, entered an order granting Debtor's Motion to Transfer Venue to the Western District of Virginia, in which the Court held: "It is obvious that the resolution of the Chapter 11 case depends on the resolution of [the GA Twin Action]," and that

"the resolution of the [GA Twin Action] appears to be at the heart of the Chapter 11 case."

(Shumener Decl., ¶ 30, Ex. 28.)  No less is true of the VA Lead Action and the VA Lien Action.

The three cases should be consolidated in one forum and resolved with finality in one trial.

## III.    ARGUMENT

### A.    Applicable Law

Pursuant to Bankruptcy Rule 7042, Civil Rule 42(a) governs consolidation.  Civil Rule

42(a) provides as follows:

> When actions involving common questions of law or fact are
> pending before the court, it may order a joint hearing or trial of any
> or all the matters in issue in the actions; it may order all the actions
> consolidated; and it may make such orders concerning proceedings
> therein as may tend to avoid unnecessary costs or delay.

In determining consolidation, courts consider whether "the specific risks of prejudice and

possible confusion [from consolidation are] overborne by the risk of inconsistent adjudications of

common factual and legal issues, the burden on the parties, witnesses and available judicial

resources posed by multiple lawsuits, the length of time required to conclude multiple suits as

against a single one, and the relative expense to all concerned of the single trial, multiple-trial

alternatives."  Arnold IV v. Eastern Airlines, 681 F.2d 186, 193 (4th Cir. 1982).

The threshold question is whether the actions concern common factual or legal issues.  In

re MicroStrategy Inc. Secs. Litig., 110 F. Supp. 2d 427, 431 (E.D. Va. 2000) ("consolidation is

often warranted where multiple securities fraud class actions 'are based on the same public

statements and reports.'") (quoting Werner v. Satterlee, Stephens, Burke & Burke, 797 F. Supp.

1196, 1211 (S.D.N.Y. 1992).  The MicroStrategy court held that consolidation was warranted

where the cases involved "two central claims, namely (i) that the defendants intentionally or

recklessly misrepresented material facts with respect to MircroStrategy's revenues . . . and (ii)

that certain individual defendants are liable" to  plaintiffs.  MicroStrategy, 110 F. Supp. 2d at 431

"Judicial economy generally favors consolidation." <u>Switzenbaum v. Orbital Sciences Co.</u>, 187 F.R.D. 246, 248 (E.D. Va. 1999). Indeed, "the existence of slight differences in class periods, parties, or damages among the suits does not necessarily defeat consolidation where the essential claims and factual allegations are similar." See <u>MicroStrategy</u>, 110 F. Supp. 2d at 431.

**B.    The Three Actions Involve Common Questions Of Fact And Law**

All three Adversary Proceedings share common questions of fact and law – e.g., whether Lender or Debtor breached the Loan Agreement; whether Lender was able to fund the Loan; whether Lender, Developer, Danielson and General Contractor knew the budget was a sham, misled Owners about the budget and/or colluded to defraud Owners.

Indeed, in both the VA Lead Action and GA Twin Action, Debtor asserts causes of action for Breach of Contract (Loan Agreement); Breach of Implied Covenant of Good Faith and Fair Dealing, and Rescission of Guaranty against Lender; Breach of Fiduciary Duty and Aiding and Abetting Breach of Fiduciary Duty against Lender, Developer and Danielson; Fraud in the Inducement, Fraud and Constructive Fraud against Lender and Danielson; Interference with Contract against Danielson; and Breach of the Development Agreement, Breach of the Restaurant Lease, and Declaratory Relief against Developer. (Shumener Decl., ¶¶ 2, 4, 6, Exs. 1, 3, 5.) The gravamen of these claims arise out of the efforts of Lender, Developer, Danielson and General Contractor to conceal the truth about the budget from Owners. In the VA Lead Action, Owners assert, among other things that:

> ¶ 113. SFG materially breached the Loan Agreement and the loan documents related thereto by, among other things, (1) colluding with Mr. Danielson in preparing a fraudulent Budget, (2) concealing that the Budget was not realistic, declaring the Loan out of balance less than 45 days after the closing and refusing to fund the Loan, in breach of its obligations under the Loan Agreement to do so, unless Owners agreed to contribute an additional $400,000.... (Shumener Decl., ¶ 4, 3.)

Similarly, in the GA Twin Action, Owners assert, among other things, that:

> ¶ 88: SFG materially breached the Loan Agreement by, among other things, colluding with [Developer and Danielson] about the Construction Budget and against Owner and Mr. Minor, concealing that the Construction Budget was not realistic and declaring the Construction Loan out of balance less than 45 days after the closing, inducing and requiring Owner to contribute an additional $400,000 . . . (Shumener Decl., ¶ 6 Ex. 5.)

In Owners' counterclaim against General Contractor, Owners allege that "Contractor's deceptive practices" regarding the budget caused Owners' damages, that "Contractor concealed the details of the budget numbers," and that "Contractor materially breached the contract and its duty of loyalty to act in Owner's best interest by … failing to inform Owner, at all times, of the true estimated cost of the project." (Shumener Decl. ¶ 9, Ex. 7.)

The gravamen of each action is that Lender, Developer, Danielson and General Contractor colluded to induce Owners to obtain the Loan with material misrepresentations and omissions regarding the budget. Owners, Lender, Developer and Danielson are parties to both the VA Lead Action and GA Twin Action, and Debtor and Lender are parties to all three Adversary Proceedings. All three proceedings arise out of the same facts. Even Lender admits the "Georgia and Virginia actions are nearly identical."[2]

The three Adversary Proceedings are similar to the cases in MicroStrategy, which were consolidated because they involved "two central claims, namely (i) that the defendants intentionally or recklessly misrepresented material facts with respect to MircroStrategy's revenues ... and (ii) that certain individual defendants are liable" to the plaintiffs. Here, all three Adversary Proceedings involve the claims that Lender, Developer, Danielson and General

---

[2] Despite notice of the Debtor's reorganization efforts, notice of the removal of the GA Twin Case, Fed. R. Bankr. P. 9027(c)'s direction that the "parties shall proceed no further in that court unless and until the claim or cause of action is remanded," and the fact that the Georgia state court no longer has jurisdiction over the GA Twin Action, Lender continues to communicate with the Georgia state court regarding its arguments in the GA Twin Action, ignoring this Court's exclusive jurisdiction.

Contractor (i) misrepresented and concealed material facts regarding the budget, and (ii) are each liable to Debtor for their conduct. (Shumener Decl., ¶ 2, 4, 6, 9 Exs. 1, 3, 5, 7.)   Even as to Lender and General Contractor, Lender claims it stopped funding the Loan as a result of purported increases in the budget, and General Contractor asserts mechanic's lien claims against Debtor because Lender stopped funding the Loan. (Shumener Decl., ¶¶ 5, 8 , Exs. 4, 6.)

In sum, all three cases involve the same Loan, Project, budget, witnesses and documents.

**C.**    **The Three Actions Involve The Same Evidence**

The Virginia Arbitrator has already found that Developer breached its contractual and fiduciary duties to Debtor and is liable to Debtor for its material misrepresentations and omissions regarding the budget, the Project and the Lender.  (Shumener Decl., ¶¶ 28-29, Exs. 26-27.)  Evidence obtained during discovery and adduced at the Arbitration against Developer makes it evident that Lender and General Contractor knew the budget was a sham, but colluded with Developer to conceal these and other material facts from Owners.

1.        The Three Actions Involve The Same Documents

Documents central to the three cases include, among others, the Loan Agreement, the budget, Lender's Initial Project Evaluation, Lender's Inspection Reports, the GC Contract and Preliminary Budget, Change Order No. 1 and related documents, proposed Change Order No. 2 (which was never signed or approved) and related documents, the default letters, the E-mails regarding Lender's repeated refusals to fund the Loan, the various versions of the budgets, internal E-mails concerning the budget, efforts to oust Debtor from the Project and efforts to manufacture defaults under the Loan so Lender could hire the Developer.

Indeed, Change Order No. 1 and the communications related to it are central to the resolution of all three cases.  The Arbitrator already found that the Developer "misrepresent[ed] the true costs of Change Order #1," and the evidence demonstrates that Lender and General

Contractor knew that the items purportedly taken out by Change Order No. 1 would have to be put back into the budget to complete the Project. Only Owners were duped into believing that the budget had been reduced by $2.3 million. (Shumener Decl., ¶¶ 28-29, Exs. 26-27.)

In addition, the E-mails exchanged among Developer, Lender and General Contractor further evidence their collusion. Cliff Harrison's November 17, 2008 E-mail where he discusses ████████████████████████████████████████████████ (Shumener Decl., ¶ 17, Ex. 15.) Developer's E-mail to Lender about the defaults that Lender should declare under the Loan so that Lender can hire Developer is another example. (Shumener Decl., ¶ 21, Ex. 19.) Lender's internal E-mails, █████████████████████████████████████████████
████████████████████████████████████████████████████
██████████████████ (Shumener Decl., ¶ 18, Ex. 16.) ██████████████
████████████████████████████████████████ (Shumener Decl., ¶ 22, Ex. 20.) The emails exchanged between Lender and Developer ███████████████
████████████████████████████ (Shumener Decl., ¶¶ 23-24, Exs. 21-22.) The number of E-mails that cut across all three Adversary Proceedings are voluminous, yet they will need to be used again and again unless the actions are consolidated.

The documents Lender will introduce are also bound to be used in all three cases. Lender claims that the alleged budget overruns constitute a default on the part of Owners. (Shumener Decl., ¶ 5, Ex. 4.) Therefore, Lender will seek to introduce the Loan Agreement, the construction costs, including the GC Contract and Preliminary Budget, Change Order No. 1 and proposed Change Order No. 2 (as prepared by the General Contractor), and various E-mails regarding the budget. Those documents will be used by Debtor as well in all three cases.

In sum, as Owners' claims in the VA Lead Action and its counterclaims in the GA Twin Action are virtually identical, the documents used in the one action will definitely be used in the other action.   However, the commonality does not end there.   All the issues and documents regarding the budgets pertain equally to the General Contractor and the role that the General Contractor played in the actions taken by the Developer and the Lender.

        2.        The Fact Witnesses Will Be The Same

Since all three cases arise from the same Loan, the same Project, the same work and the same conduct, the trial of all three Adversary Proceedings will rely on the same fact witnesses. Indeed, the parties have already acknowledged that the fact witnesses will be the same by agreeing that the pre-trial discovery conducted in the VA Lead Action and GA Twin Action can and will be used in both actions, so as not to duplicate the 30 depositions taken.   (Shumener Decl., ¶ 7.)    No additional depositions have been sought in the VA Lien Action.

## IV.    CONSOLIDATION WILL ACHIEVE JUDICIAL EFFICIENCY

Having one trial to resolve the claims between Owners, Lender, Developer, Danielson and General Contractor will achieve significant judicial efficiency, conserve resources and minimize the risk of inconsistent verdicts.   Indeed, "Judicial economy generally favors consolidation." Switzenbaum, 187 F.R.D. at 248.   Here, consolidation will achieve judicial economy because, as shown below, the Court will be applying the state law of this forum, and the party and non-party witnesses will avoid being forced to testify three times regarding the same issues and facts.   Absent consolidation, the risk of inconsistent judgments is significant.

### A.    The State Law Of This Forum Predominates

First, it is undisputed that Virginia law applies to the claims between Debtor and Developer.   The Development Agreement was entered into in Virginia by two Virginia parties, the performance of which was in Virginia.   (Shumener Decl., ¶ 31, Ex. 29.)   The Development

Agreement itself states that Virginia law applies to the claims between Developer and Debtor. Id. Those claims have been resolved in favor of Debtor through Arbitration and resulted in a judgment in Virginia state court. (Shumener Decl., ¶¶ 28, 29, Exs. 26, 27.)   Imputation of Developer's wrongful acts and liability to Danielson, Lender and General Contractor, under "alter ego" and conspiracy, among other legal principles, will involve Virginia law.

Second, Virginia law applies to the claims between the Debtor and Mr. Danielson. Owners' claims against Mr. Danielson for fraud are governed by the state where the injury occurred. Insurance Company of North America, Inc. v. U.S. Gypsum Co., 639 F. Supp. 1246, 1248-49 (W.D. Va. 1986) (as to tort actions such as fraud and misrepresentation, "Virginia law has consistently recognized that it is the place of the wrong (lex loci delicti) that determines which state's substantive law applies in the tort action brought in Virginia"). Mr. Danielson's fraudulent scheme to induce Owners to enter into the Loan with Lender and to procure the sham budget and Change Order No. 1 caused damage to the Project, which is located in Virginia. Since the damage occurred in Virginia, Virginia law governs.

Similarly, the agreements between Debtor and General Contractor are governed by Virginia law. Pursuant to the GC Contract, the General Contractor's performance was in Virginia and General Contractor's claims are based on Virginia's mechanic's lien law. Id. (state law of place of contract performance governs) (Shumener Decl., ¶ 32, Ex. 30.)

Third, as to Lender and Owners, it cannot be disputed that Virginia law applies to Owners' claims for fraud because Lender's fraudulent actions, specifically its role in fraudulently inducing Owners to obtain the Loan and collusive efforts with the Developer and General Contractor to conceal the true costs of the Project, resulted in injury to the Project in Virginia. Lender's acts brought construction at the Project to halt and caused numerous

mechanic's liens to be filed against the Project. Accordingly, the injury occurred in Virginia, and Virginia law applies. Both Virginia and Georgia law are in accord. <u>Insteel Industries, Inc. v. Costanza Contracting Co., Inc.</u>, 276 F. Supp. 2d 479, 486 (E.D. Va. 2003) ("as the decisional law reflects, the settled choice of law rule for tort claims in Virginia is lex loci delicti-the law of the place of the wrong [citation omitted] The place of the wrong for purposes of lex loci delicti rule is defined as the place where the last event necessary to make the actor liable for an alleged tort takes place, even if the actor has no control over the location of the last event."); <u>IBM Corp. v. Kemp</u>, 244 Ga. App. 638, 641 (2000) ("the 'last event' necessary to make an actor liable for fraud is the injury, and consequently, for purposes of the lexi loci delicti, the place of the wrong is where the injury is sustained"); <u>Management Science America, Inc. v. NCR Corp.</u>, 765 F. Supp. 738, 739 (N.D. Ga. 1991) ("For claims sounding in tort, Georgia continues to apply the traditional choice of law principles of lexi loci delicti. [citation omitted] Under this system, the law of the place where the injury occurred, rather than the place where the act was committed, determines the substantive rights of the parties."). Thus, even under Georgia law, Virginia law applies to Debtor's claims for fraud.

In addition, since Owners alleged that Lender fraudulently induced them to enter into the Loan, the choice of law provision in the Loan documents is unenforceable as a matter of law. <u>Khosla v. Global Mortg., Inc.</u>, No. 2006-8458, 2006 WL 3420304, at *3, (Nov. 8, 2006 Va. Cir. Ct.) (holding choice of law provision unenforceable when contract's "validity is challenged in that they are part of an unenforceable contract because it was fraudulently induced."). Thus, even Lender's breach of contract claims are not governed by Georgia law.

Lastly, Lender admits that federal law governs expert witness designations and reports. Lender stated that, "The Georgia state court indicated that it would hear any <u>Daubert</u> motions at

the time as well." <u>Daubert</u> refers to <u>Daubert v. Merrell Dow Pharmaceuticals, Inc.</u>, 509 U.S. 579

(1993), which provides the standard for admitting expert testimony or evidence under the Federal

Rules of Evidence. Indeed, at the June 8, 2010 hearing, the Georgia state court stated, "they're

going to follow Rule 26. Okay. We're all agreed on that. Federal Rule 26." (Shumener Decl., ¶

33, Ex. 31.) It is axiomatic that a federal court would be better situated to apply Federal Rules of

Evidence and Procedure. Therefore, judicial economy would best be served by having the

matters consolidated, as Virginia state law and federal procedural law predominate.

### B.      The Burden Of Three Separate Trials Is Significant

As the issues that predominate the claims in all three cases involve the $23.6 million

construction loan, and Lender's use of a sham budget to fraudulently induce Debtor to obtain that

Loan, it is evident that witnesses with knowledge of the facts regarding the construction, the

budget, and the Loan Agreement will be called to testify. The overwhelming majority of

witnesses are located in Virginia or in states other than Georgia. Only some of Lender's

employees and attorneys are in Georgia. No other third party witness is in Georgia, and it is

questionable (at best) whether these third party witnesses can be compelled to testify in Georgia.

Indeed, **at least 17 third party witnesses are in Virginia**, not Georgia.[3] Accordingly, both the

availability of witnesses and the burden on those witnesses can be addressed only in Virginia.

For example, the General Contractor's designees will testify at trial as to their knowledge

about the budget. Their testimony will be relevant to all three cases. These designees, Bill

Goggins and David Wright, are residents of and work in Virginia. They have no apparent ties to

Georgia. Further, non-party witnesses who will be called to testify include the subcontractors

---

[3] Clifford Harrison, William Goggins, David Wright, Linda Rossman, Douglas Miller, Southern Air, Inc., Century Concrete, Capital Interiors Contractors, Inc., Bat Masonry Co., Inc., Froehling & Robertson, Inc., Suffolk Bank, Old Dominion National Bank, Pioneer Bank, Hometown Bank, River Community Bank, Virginia National Bank, Paxfire. (Shumener Decl., ¶ 17, 34-46, Exs. 15, 32-41.)

who worked on the Project, but have not been paid due to Lender's wrongful failure to fund the Loan. These non-party witnesses are either Virginia corporations or have their principal place of business in Virginia and include, among others: Century Concrete, Capital Interior Contractors, Inc., Bat Masonry Company, Inc., Froehling & Robertson, Inc., and Southern Air, Inc.

Similarly, Lender's third-party construction consultant, Broadlands Financial Group ("Broadlands"), will be called to testify to the construction costs and budget. Broadlands' designees, Brian Fortay and Allison Jensen, reside and work in Pennsylvania. (Shumener Decl., ¶¶ 48, 49, Exs. 42, 43.) Broadlands hired its own on-site inspector for the Project, Douglass Alan Miller, to inspect the Project in Virginia. Mr. Miller resides and works in Virginia.

Other witnesses who reside and work in Virginia include Linda Rossman, Mr. Minor's former bookkeeper, and Clifford T. Harrison who, as discussed above, was retained to serve as Debtor's representative in dealings with General Contractor, but colluded against Debtor instead.

The aforementioned witnesses are likely to have knowledge regarding the construction costs, the budget and the efforts made by Lender, Developer, Danielson and General Contractor to conceal material facts from Owners. Without consolidation, these witnesses will be forced to testify at least three times regarding the same facts and issues. In addition, some of these witnesses cannot be compelled to appear in Georgia, and are not likely to do so voluntarily. In that case, Debtor will be deprived of the opportunity to impeach them.

In addition, representatives of some of the eight participant banks may need to testify, as each bank owns an interest in the Loan. (Shumener Decl., ¶¶ 43-45, Ex. 41.) What they knew and when about Lender's alleged defaults may be relevant at trial. Five of the banks (to whom Lender sold the Loan) are in Virginia. None is in Georgia. (Shumener Decl., 43-44, Ex. 41.)

Based on the foregoing, consolidation clearly benefits third party witnesses.

### C.    None Of the Parties Will Suffer Prejudice If The Cases Are Consolidated

The parties will not suffer prejudice by consolidated because all three cases deal with the same set of operative facts and issues.  Lender will not suffer prejudice if the VA Lead Action and GA Twin Action are consolidated with the General Contractor VA Action because Lender is a party to each suit and is presently defending the VA Lien Action and the VA Lead Action in Virginia.  (Shumener Decl., ¶¶ 2, 4, 6, Exs. 1, 3, 5.)  As the three cases arise from the same Loan and implicate Lender, Developer, Danielson and General Contractor's misrepresentations regarding the budget, consolidation will avoid prejudice, confusion and inconsistent results.  Id.

Indeed, Lender is prepared for litigation in Virginia, just as it is in Georgia, as the issues, witnesses and documents are the same in both proceedings.  Lender not only has Virginia counsel, Lender also has Georgia counsel who has been admitted *pro hac vice* in Virginia and appeared before the Virginia Court in the past to resolve matters pertaining to the VA Lead Action.  Moreover, Lender and Debtor agreed to coordinate discovery in the VA Lead Action and GA Twin Action and to use that discovery interchangeably in the two actions.

The General Contractor will also benefit from consolidation as it will reap substantial savings from having to present its witnesses only once to testify as to the same facts, namely their work on the Project, the budget, the alleged overruns, the alleged completion date, Change Order No. 1, and proposed Change Order No. 2, among other things.

Through its Motion to Remand, Lender has already indicated its arguments regarding the prejudice it will allegedly suffer.  In its Motion to Remand, Lender has repeatedly stated that it has expended time and resources in "educating the Georgia state court."  Lender's self-professed role as "educator" to the Georgia state court is irrelevant.  To date, the Georgia state court has decided only discovery motions and scheduling matters, and has not ruled on any motion

adjudicating the merits of the parties' claims and defenses.[4]  (Shumener Decl., ¶ 47.)  In any event, Lender's alleged "education" of the Georgia state court fails to meet the standard of identifying "specific risks of prejudice" required in opposing consolidation.  See MicroStrategy, 110 Supp. 2d at 431 (question is whether there are "specific risks of prejudice and possible confusion [from consolidation] overborne by the risk of inconsistent adjudications of common factual and legal issues").  This Court is better suited to handle the remaining issues – expert witnesses and the parties' dueling summary judgment motions – because federal procedural law and the substantive law of Virginia predominate over the claims asserted in all three cases.  In sum, Lender will suffer no prejudice from consolidation.

### D.    The Risk Of Inconsistent Judgments Is Great

In any event, the risk of inconsistent adjudication of common factual and legal issues outweighs any risk of prejudice.  Should consolidation be denied, Debtor would be forced to litigate the VA Lead Action, the GA Twin Action and the VA Lien Action separately and possibly simultaneously or back to back.  Debtor has asserted claims and defenses against each of the parties in the three cases which would allow Debtor to recover substantial damages against Lender, General Contractor, Developer and Danielson.  Specifically, Debtor has claimed that Lender fraudulently induced Debtor to enter into the Loan Agreement by procuring and presenting Debtor with a budget that Lender knew was a sham.  (Shumener Decl., ¶¶ 2-4, 6, Ex. 1-3,5.)  Lender was aided in its efforts by Developer and General Contractor.  Indeed, General Contractor and Developer created Change Order No. 1 which feigned to reduce the construction costs in the sham budget by $2.3 million.  (Shumener Decl., ¶13, Ex. 11.)  Had General Contractor and Developer not created Change Order No. 1, and had Lender not demanded that it

---

[4] Lender's argument ignores the fact that the VA Lead Action is half way adjudicated and judgment has been entered against Developer in favor of Debtor.  The Virginia state court has put as much (if not more) time and effort into this matter as the Georgia state court, and it is disrespectful to suggest otherwise.

be executed, Owners would have stopped the Project when only $700,000 had been drawn on the Loan. Instead, General Contractor, Developer, and Lender colluded with each other to induce Owners to proceed with the Project knowing that the budget was severely understated. Accordingly, a decision on Debtor's claims against Lender and General Contractor should resolve Lender and General Contractor's claims against Debtor.

If three trials were to proceed separately, it is possible that the three cases would result in judgments that are inconsistent and irreconcilable. For example, in the VA Lead Action, where Debtor has already obtained judgment against the Developer, the Court could find Lender liable for all the damages suffered by the Debtor. However, if the GA Twin Action were allowed to proceed, the Georgia state court might exonerate Lender.[5] The only way to avoid such inconsistent results is to consolidate the three actions and adjudicate them in this Court.

## V. <u>EQUITABLE SUBORDINATION</u>

11 U.S.C. §510 provides that:

> (c) Notwithstanding subsections (a) and (b) of this section, after notice and a hearing, the court may—
>
> (1) under principles of equitable subordination, subordinate for purposes of distribution all or part of an allowed claim to all or part of another allowed claim or all or part of an allowed interest to all or part of another allowed interest; or
>
> (2) order that any lien securing such a subordinated claim be transferred to the estate.

As Debtor alleged in its amended complaint in the VA Lead Action and counterclaim in the GA Twin Action, SFG and Developer engaged in grossly inequitable conduct by, among

---

[5] Debtor, who is protected by the automatic stay, does not concede that an adverse decision in Lender's action, to the extent it were to be severed and proceed against Mr. Minor in Georgia, would bind Debtor. <u>First Agricultural Bank v. Replogel (In re Replogel)</u>, 929 F.2d 836, 837 n.1 (1st Cir. 1991) (automatic stay meant that decision not binding on debtor); <u>Terry v. Chauffeurs, Teamsters and Helpers, Local 391</u>, 81 B.R. 394, 396 n.1 (M.D.N.C. 1987) (policy of automatic stay that prevents claims being decided against debtor directly should prevent claims being decided indirectly against debtor through res judicata or collateral estoppel).

other things, (a) fraudulently misrepresenting the budget, (b) engaging in collusion/fraudulent conspiracy to mislead and entrap Debtor into investing $7 million in a Project that was out of balance from inception, and (c) refusing to fund draw requests, thereby preventing Debtor from paying contractors and subcontractors at the Project. Such inequitable conduct on the part of SFG entitles Debtor to equitably subordinate SFG's claim to the claims of general unsecured creditors, holders of mechanic's liens, and priority and administrative claimants, so that they may resume work and complete the Project, as well as transfer any lien securing SFG's claim to the estate for the benefit of innocent claimants. Accordingly, Debtor's claim for equitable subordination will be critical to Debtor's efforts to complete the Project and reorganize.[6]

Although Debtor could not have asserted a claim for equitable subordination under 11 U.S.C. § 510 until Debtor filed bankruptcy, Debtor does not wish to amend its complaint to add an equitable subordination claim for relief at this point because to do so may delay Debtor from proceeding to trial as soon as possible. Rather, Debtor intends to request that the Court enter a judgment granting all relief to which Debtor and Mr. Minor are entitled, as plaintiffs and counterclaimants, in accordance with Civil Rule 54(c) (made applicable by Bankruptcy Rule 7054(a)), and, to the extent required, amend the pleadings to conform to proof, in accordance with Civil Rule 15(b) (made applicable by Bankruptcy Rule 7015), to equitably subordinate SFG's claims and transfer its mortgage to the estate at the conclusion of the trial. So that there is no claim of prejudice or unfair surprise, Debtor is hereby putting all parties on notice that Debtor intends to seek judgment for all relief to which it is entitled and to amend the pleadings to conform to proof at the conclusion of the trial to equitably subordinate SFG's mortgage.

---

[6] Debtor's claim for equitable subordination should eliminate any doubt as to whether Debtor's actions constitute core proceedings. Hudgins v. Shah (In re Systems Eng'g & Energy Mgmt. Assocs.), 252 B.R. 635, 650 (Bankr. E.D. Va. 2000) ("Virtually all courts that have considered the nature of equitable subordination claims under § 510 of the Bankruptcy Code have concluded such actions are core proceedings.") (citations omitted).

## VI.    REQUEST FOR TRIAL

First, although Lender is likely to argue that the GA Twin Action is ready for trial, the VA Lead Action is equally ready for trial, as is the VA Lien Action.  Second, this Court is better suited to hear the pending dispositive motions and motions regarding expert witnesses because federal law applies.  Only discovery disputes have been resolved in the GA Twin Action, none of which substantively changes the parties' motions for summary judgment.    Indeed, in the VA Lead Action, certain substantive pre-trial motions actually have been decided, and judgment was entered against the Developer.  Third, in conjunction with the request to consolidate, Owners hereby request that a consolidated trial be set as soon as reasonably practicable before this Court.

MINOR FAMILY HOTELS, LLC

_____/s/ Betty M. Shumener_____
Betty M. Shumener

Richard C. Maxwell (VSB #23554)
B. Webb King (VSB #47044)
WOODS ROGERS PLC
Wachovia Tower, Suite 1400
10 South Jefferson Street, P.O. Box 14125
Roanoke, Virginia 24038-4125
Telephone:  (540) 983-7600  Fax:  (540) 983-7711
*Proposed general bankruptcy counsel for Debtor Minor Family Hotels, LLC*

Betty M. Shumener, *Admitted pro hac vice*
Kurt Ramlo, *Admitted pro hac vice*
DLA PIPER LLP (US)
550 South Hope Street Suite 2300
Los Angeles, California 90071
Telephone:  (213) 330-7700  Fax :  (213) 330-7701

Ryan C. Berry (VSB #67956), *Application for admission pending*
DLA PIPER LLP (US)
1775 Wiehle Avenue, Suite 400
Reston, VA 20190
Telephone:  (703) 773-4000  Fax:  (703) 773-5000

*Proposed Special Counsel for Debtor and Plaintiff Minor Family Hotels, LLC*