UNITED STATES BANKRUPTCY COURT FOR THE
WESTERN DISTRICT OF VIRGINIA
Lynchburg Division

| | |
|---|---|
| In re: | |
| MINOR FAMILY HOTELS, LLC, | Chapter 11 Case |
| Debtor. | Case No. 10-62543-WEA |
| SPECIALTY FINANCE GROUP, LLC, | Adv. No. 10-06112-WEA |
| Plaintiff and Counter-Defendant, | |
| v. | |
| MINOR FAMILY HOTELS, LLC and HALSEY MINOR, | |
| Defendants, Counter and Third Party Plaintiffs, | |
| v. | |
| HOTEL CHARLOTTESVILLE, LLC and LEE DANIELSON, | |
| Third Party Defendants. | |

**DEBTOR'S MEMORANDUM OF POINTS AND AUTHORITIES
IN OPPOSITION TO MOTION TO REMAND**

COMES NOW Defendants and Counterclaimants Minor Family Hotels, LLC ("Debtor"),

debtor and debtor in possession in the above-entitled chapter 11 case (the "Chapter 11 Case"),

and Halsey Minor (collectively, "Owners" or "Counterclaimants"), by and through their

undersigned attorneys, hereby file this Opposition to the Motion for Remand filed by Specialty

Finance Group LLC ("Lender") in the United States Bankruptcy Court, Northern District of

Georgia ("Georgia Bankruptcy Court").  This adversary proceeding ("GA Twin Action") was transferred to the United States Court Bankruptcy Court, Western District of Virginia ("Virginia Bankruptcy Court") from the Georgia Bankruptcy Court, pursuant to an Order entered by the Honorable James E. Massey, United States Bankruptcy Judge.

## I.    PRELIMINARY STATEMENT

In granting the Motion to Transfer Venue, the Georgia Bankruptcy Court recognized that resolution of the GA Twin Action is "at the heart of the Chapter 11 case," and that "resolution of the Chapter 11 case depends on the resolution of the [GA Twin Action]."  (Declaration of Betty M. Shumener ("Shumener Decl."), ¶ 32, Ex. 30.)   That is why Counterclaimants moved to transfer the action to the Chapter 11 Case and why remand should be DENIED.

Counterclaimants sought a transfer of the GA Twin Action to the Virginia Bankruptcy Court to expedite a resolution of three related adversary proceedings that are essential to Debtor's reorganization.   Two of these proceedings – *Minor Family Hotels, LLC v. Hotel Charlottesville, LLC, et al.,* Adv. No. 10-06108 ("VA Lead Action") and *Clancy & Theys Construction Co. v. Minor Family Hotels, LLC, et al.*, Adv. No. 10-06109 ("VA Lien Action") – were pending in the Virginia Circuit Court and removed to the Virginia Bankruptcy Court two days after the Chapter 11 Case was filed.  Counterclaimants are separately seeking consolidation of the three adversary proceedings – the VA Lead Action, GA Twin Action and VA Lien Action – because they are inextricably intertwined, they are at the heart of the Chapter 11 Case and they should be tried together in one forum in Virginia.  Debtor has scarce resources and cannot afford to litigate the same issues over and over again with the same parties, the same witnesses and the same evidence in multiple forums.

Contrary to Lender's allegation, it is Lender – not Debtor – who engaged in forum shopping.  Before Lender filed the GA Twin Action, Debtor had filed the VA Lead Action.[1]  The VA Lead Action and the GA Twin Action mirror each other.  All parties to the VA Lead Action are parties to the GA Twin Action – Debtor, Halsey Minor, Lender, Hotel Charlottesville, LLC ("Developer") and Lee Danielson – and both actions arise out of the same $23.6 million loan ("Loan") that is secured by the same hotel construction project in Charlottesville, Virginia ("Project").  Had Lender not engaged in blatant forum shopping, Lender simply would have filed a counterclaim in the VA Lead Action, rather than run to the Georgia state court to start the separate GA Twin Action, as the gravamen of both actions is the same.[2]

Debtor contends that Lender breached its funding obligations under the Loan – funding only $10 million of the $23.6 million it was obligated to fund – and colluded with Developer and Lee Danielson to mislead Debtor and Mr. Minor with a sham construction budget regarding the cost to complete the Project.  As shown below, Debtor later learned that its general contractor, Clancy & Theys Construction Company ("General Contractor"), participated in the scheme.

---

[1] Where, as here, cases have been removed from state courts to federal courts, the "first-filed" rule is determined by the dates the cases were filed in the state courts.  Allied-General Nuclear Serv. V. Commonwealth Edison Co., 675 F.3d 610, 611 n.1 (4th Cir. 1982) ("Ordinarily, when multiple suits are filed in different Federal courts upon the same factual issues, the first or prior action is permitted to proceed to the exclusion of another subsequently filed."); Manuel v. Convergys Corp., 430 F.3d 1132, 1135 (11th Cir. 2005) ("Where two actions involving overlapping issues and parties are pending in two federal courts, there is a strong presumption across the federal circuits that favors the forum of the first-filed suit under the first-filed rule."); Igloo Prods. Corp. v. The Mounties, Inc., 735 F. Supp. 214, 217 (S.D. Tex. 1990) ("The Court considers the date of filing in state court to be the relevant benchmark.").  The VA Lead Action was filed first.

[2] The three adversary proceedings arise out of the same set of operative facts, involve the same parties, the same third party witnesses (most of whom are in Virginia), the same Loan, the same Project (in Virginia) and the same evidence.  These actions should be consolidated in one forum and proceed to one trial.  Virginia is the only forum in which all three adversary proceedings exist, and resolution of the adversary proceedings is essential to resolution of the Chapter 11 Case.  Put simply, there is no reason to be in any other forum.  Debtor hereby incorporates by reference the Motion for Consolidation filed with the Court on September 15, 2010.

Although Lender alleges that Debtor defaulted under the Loan, Debtor performed every obligation it was required to perform under the Loan.  Indeed, Debtor put up nearly $7 million in equity before Lender funded its first million.  Lender wrongfully stopped funding the Loan under the pretexts of bogus defaults by Debtor, just as the Office of the Comptroller of the Currency ("OCC") seized Lender's parent corporation, Silverton Bank, which only three months later was taken over by the Federal Deposit Insurance Corporation ("FDIC").  Lender's wrongful failure to fund the Loan caused General Contractor to record mechanic's liens against the Project and file the VA Lien Action against Debtor and Lender in Virginia.

Lender's contention that the GA Twin Action is further along than the VA Lead Action is misleading.[3]  Nothing more than discovery has been adjudicated in the GA Twin Action.  By comparison, Debtor already obtained a partial judgment in the VA Lead Action.  In the VA Lead Action, Debtor and Developer (who is also a counter-defendant in the GA Twin Action) were ordered to arbitration ("Arbitration") before the Hon. Donald H. Kent (ret.) in Virginia.  Debtor prevailed in the Arbitration and was awarded $7.9 million in damages, attorneys' fees and costs against Developer.  The award was entered as a judgment in the VA Lead Action on August 25, 2010, only one week before Debtor filed the Chapter 11 Case on September 1, 2010.  Thus, the VA Lead Action is further along than the GA Twin Action.

Lender claims that nothing changed to precipitate Debtor's bankruptcy filing and that Debtor is purportedly attempting to delay the hearing of the parties' dueling motions for

---

[3] Lender's claim that the GA Twin Action has undergone "extensive proceedings" is also misleading.  Of the ten discovery motions, only a few were decided.  The majority of the motions were withdrawn.  Moreover, having four hearings (including status conferences) before the state court in one and one half years is hardly extensive.  More hearings were held before the Virginia Circuit Court.  Lastly, the Georgia state court did not enter three case management orders.  To the contrary, Owners and Lender proposed competing case management orders to the court months ago, but a third case management order was not entered.

summary judgment on October 20-21, 2010 and trial on November 1, 2010.  Not so.  The fees

and costs incurred to prepare for the Arbitration were enormous, which is why Debtor attempted

to have even that matter decided in the VA Lead Action at one trial.  As stated in the Arbitration

award dated June 28, 2010, in addition to extensive opening and closing briefs, "eight witnesses

were duly sworn and testified," and "[s]everal thousand documents were presented along with

depositions."  (Shumener Decl., ¶¶ 30-31, Exs. 28-29.)  Even more documents will be introduced

and more witnesses will be called in each of the pending adversary proceedings.  After the

Arbitration concluded and Debtor prevailed, at great expense to Debtor, Lender suddenly

engaged in last-minute, scorched-earth discovery, deposing no less than eleven witnesses (most

two or three times) in three states (nine witnesses in July 2010 alone) and propounding last-

minute written discovery to force Debtor, Mr. Minor and their affiliates to produce hundreds of

thousands of additional documents.  The combined result nearly doubled the legal fees and costs

that Debtor incurred in the last six months, taking those legal expenses from approximately $3

million to over $5 million.  It is such last minute scorched-earth litigation tactics of Lender, not

Debtor's purported desire to "delay" resolution of the GA Twin Action, that finally drove Debtor

into bankruptcy.  Just as Debtor proved Developer's fraudulent misrepresentation before Judge

Kent in the Virginia Arbitration, Debtor is looking forward to proving Lender's collusion with

Developer as soon as possible.  Indeed, as Debtor previously informed the Georgia Bankruptcy

Court in the Motion to Transfer Venue, Debtor seeks and hereby requests a trial date in

November and hearing of the parties' motions for summary judgment in October.

While Lender argues that the GA Twin Action should be remanded as to Mr. Minor,

under these facts, there is no ground or authority justifying abstention and remand of the GA

Twin Action as to Mr. Minor to the Georgia state court.  To the contrary, there is ample authority which shows that under the facts present here, remand must be DENIED.

First, Debtor is the borrower under the Loan and disputes that it owes any obligations to Lender.  Mr. Minor is merely a guarantor.  Debtor maintains that Lender is liable in damages to Debtor because Lender breached its obligations to fund the Loan, misled Debtor and caused mechanic's liens to be recorded against the Project.  If Debtor owes no obligations to Lender under the Loan, Mr. Minor owes no obligation to Lender under the guaranty.  Accordingly to establish liability against Mr. Minor in the GA Twin Action, Lender will have to first prove that Debtor is liable to Lender under the Loan – a claim that is heavily disputed by Debtor and which may lead to inconsistent rulings if the GA Twin Action is remanded.

Second, Mr. Minor, as the sole member of Debtor, is essential to Debtor's reorganization. The half-built Project, the judgment entered against Developer and the claims asserted by Debtor in the adversary proceedings are Debtor's only assets, and they generate no revenues with which to pay Debtor's expenses.  The sole source of funding for Debtor's expenses is Mr. Minor.  To deplete his assets with multiple litigation in multiple forums on the same issues against the same parties wastes judicial resources and harms the estate.

## II.      BACKGROUND AND FACTS

### A.      The Three Adversary Proceedings

On or about February 11, 2009, Debtor and Mr. Minor filed a complaint in the Circuit Court of Charlottesville in the Commonwealth of Virginia, Case No. CL 09-64 ("VA Lead Action") against Developer and Danielson for:  Breach of Contract, Breach of the Implied Covenant of Good Faith and Fair Dealing, Breach of Fiduciary Duty, Fraud in the Inducement,

Fraud, and Constructive Fraud.  (Shumener Decl., ¶ 2, Ex. 1.)  On February 20, 2009, Owners filed a motion to add Lender as a defendant to the VA Lead Action.  (Shumener Decl., ¶3, Ex. 2.)

On February 24, 2009, four days after Owners moved to add Lender to the VA Lead Action, Lender filed a complaint against Owners in the State Court of Fulton County, State of Georgia, Case No. 2009EV006754F ("GA Twin Action") involving the same loan, the same parties, the same witnesses and the same issues as in the VA Lead Action.  (Shumener Decl., ¶ 5, Ex. 4.)  After a stay of the GA Twin Action was denied, on May 5, 2009, Owners filed a counterclaim against Lender in the GA Twin Action, alleging the same claims as alleged in the VA Lead Action:  Breach of Contract, Breach of the Implied Covenant of Good Faith and Fair Dealing, Breach of Fiduciary Duty, Fraud in the Inducement, Fraud and Constructive Fraud. (Shumener Decl., ¶ 6, Ex. 5.)

General Contractor filed a complaint on June 5, 2009 in the Circuit Court of Charlottesville, Virginia against Debtor and Lender, among others, for Foreclosure of Mechanic's Liens ("VA Lien Action").  (See Shumener Decl., ¶ 8, Ex. 6.)  The VA Lien Action arose out of Lender's wrongful failure to fund the Loan at issue in the VA Lead Action and GA Twin Action.  On November 25, 2009, Debtor filed a counterclaim alleging Breach of Contract against General Contractor in the VA Lien Action for, *inter alia*, concealing material facts about the budget at issue in the VA Lead Action and GA Twin Action.  (Shumener Decl., ¶ 9, Ex. 7.)

All three actions – the VA Lead Action, the GA Twin Action and the VA Lien Action – arise out of the same Loan, and involve the same fraudulent scheme in which Developer, Danielson, Lender and General Contractor colluded against Debtor and Mr. Minor (collectively, "Owners") to conceal the costs of construction.  (Shumener Decl., ¶¶ 2-9, Exs. 1-7.)

In 2007, Lender and Developer negotiated a loan for the Project. After Developer's former partners refused to sign the guarantees that Lender required, Lender instructed Developer to find a "strong guarantor." (Shumener Decl., ¶ 11, Ex. 9.) Developer found Mr. Minor.

To seal the sales pitch to Owners, Lender and Developer colluded on a sham construction budget, stating that the Project could be completed for $30 million. The sham budget was given to Lender's appraiser for an appraisal of the Project. Lender then sent its appraisal to Mr. Minor (via Developer), assuring Owners that the terms Lender would give to Owners for the Loan would be even better than the terms offered to Developer's former partners.

In reliance on Lender's appraisal, budget and assurances, Owners purchased the site for the Project in August 2007 for $4.5 million. Days later, knowing that Owners were now heavily invested in the Project and needed construction financing, Lender made material changes to the terms of the Loan, bumping Mr. Minor's exposure under the guaranty from 20% to 100% of the Loan post-construction. After being called on its tactics, Lender agreed to limit Mr. Minor's exposure to 50%, but required $6.3 million instead of $5.9 million in equity.

Lender and Developer knew from the outset that Owners had no experience in real estate development. It was precisely because Owners lacked this experience that they agreed to pay Developer $900,000 for Danielson's expertise and to obtain the $23.6 million Loan from Lender. Danielson claimed to have 30 years experience in real estate development, and Lender professed to have made $1.5 billion in hotel construction loans before making the Loan to Debtor.

One week before the Loan closed, General Contractor delivered to Lender a Contractor's Consent and Certificate ("Certificate") enclosing its construction contract ("GC Contract") containing a Preliminary Budget for the Project. Although General Contractor's Preliminary

Budget for hard construction costs was $4 million higher than Lender's budget, Lender attached its sham budget to the Loan Agreement and closed the Loan one week later, on March 12, 2008. Unbeknownst to Owners, Lender, Developer and General Contractor omitted essential items, not only from Lender's sham budget, but also from the General Contractor's Preliminary Budget.

Six weeks after the Loan closed, having induced Owners to purchase the site for $4.5 million, fund another $2 million in Project costs, pay Developer over $200,000, pay Lender over $230,000 in loan origination fees and close the Loan under Lender's more onerous terms, on April 25, 2008, Lender suddenly declared a "$4MM gap" in the budget based on nothing more than the difference between Lender's sham budget and the General Contractor's Preliminary Budget.  (Shumener Decl., ¶ 12, Ex. 10.)  Lender knew that nothing had changed with respect to the Project and that Lender's demand was based on information that Lender had accepted before the Loan closed.

Lender and Developer soon learned that if Lender persisted in its demand for an additional $4 million, Owners would simply stop the Project and make no further draws on the Loan.  At the time, only $700,000 had been drawn on the Loan, whereas Owners had put at least $6.3 million of their own money into the Project.  To ensure that Owners would not withdraw from the Loan, Lender – in concert with Developer and General Contractor – created a fraudulent change order ("Change Order No. 1"), which purported to reduce construction costs by $2.3 million.  (Shumener Decl., ¶ 13, Ex. 11.)  Later, Developer and General Contractor admitted that they and Lender knew that all the items deducted in Change Order No. 1 would have to go back into the budget to complete the Project.  (Shumener Decl., ¶ 14, Ex. 12.)  Only Owners were misled.

To "rebalance" the sham budget in April 2008, Lender (at Developer's suggestion) also required that Owners provide furniture and artwork for the Project from Mr. Minor's private collection to save over $1 million.  With these two changes – the $2.3 million "reduction" in Change Order No. 1 and the contribution of Mr. Minor's artwork and furniture – Lender made the final demand that Owners contribute another $400,000 to rebalance the budget.  Having been led to believe that the budget had been reduced by $2.3 million and that, with Owners' contribution of certain furniture and artwork, the Project would be within the $30 million sham budget, Owners reluctantly agreed to fund the additional $400,000.  Owners' additional equity was to be funded in four monthly installments of $100,000, for a total of $400,000.  Owners funded each installment as and when required, bringing their equity to nearly $7 million.

In May 2008, Alex Judson, Developer's employee, began to question the validity of the budget and what Owners had been told about it.  Mr. Judson communicated his concerns to Developer, who ignored him.  Shortly thereafter, Developer stopped paying Mr. Judson's salary, and Mr. Judson quit in July 2008.  Mr. Judson was rehired by Owners, resumed work on the Project and, in August 2008, blew the whistle on the sham budget.

As soon as Debtor fully funded the additional $400,000, Lender again stopped funding the Loan.  At the time, a September 2008 draw request was pending, and Lender's failure to fund was causing General Contractor and the subcontractors at the Project to become "skittish." (Shumener Decl., ¶ 15, Ex. 13.)

In the meantime, Owners notified Developer that they were looking into the budget to get a realistic assessment of the cost to complete the Project.  As facts about the budget were bound to come to light, Developer pressured Owners to invest another $3 to $5 million.  To that end,

without Owners' knowledge or consent, Developer "notified" Lender of a rumor that General Contractor was about to prepare a proposed change order to request an increase to the budget. Having stirred up Lender to join in Developer's scheme, Developer then went to General Contractor and instructed General Contractor to prepare that proposed change order.

On October 13, 2008, apparently realizing that the sham budget could no longer be concealed, and to pressure Owners to put up another $3 million to $5 million, Developer asked General Contractor to write a letter pretending to notify Developer that General Contractor would be issuing a proposed change order requesting a substantial increase to the budget. General Contractor even provided a draft of the letter to Developer for review before sending it to Developer.  In the October 13, 2008 letter, which Developer then forwarded to Owners, General Contractor confirmed that Developer and Lender knew that all the items that had been "removed" by Change Order No. 1 would have to be put back into the budget to complete the Project.  (Shumener Decl., ¶ 14, Ex. 12.)  No longer trusting Developer, but not yet realizing the full extent of the collusion among Developer, Lender and General Contractor, Owners instructed Developer not to go to Lender with any proposed change order because Owners had not approved it and had not yet had an opportunity to hire independent consultants to obtain a reliable budget.   Developer concealed from Owners that Developer already had spread the "rumor" to Lender.

Lender then used the rumor as a pretext to state to Owners that Lender would not resume funding the Loan.  Actually, Lender had not funded the Loan since September 2008, weeks before Developer spread the "rumor" to Lender, and had already caused General Contractor and the subcontractors to become "skittish" and the media to swirl around the Project.

When asked about the status of General Contractor's September draw request, on November 6, 2008, Lender stated that it would not fund the request until the "potential $3.5-$4MM in change orders" were resolved. (Shumener Decl., ¶ 15, Ex. 13.) When added to the $400,000 of additional equity that Owners had just completed funding, this was the same "$4 MM gap" that Lender declared months earlier, in April 2008.

Lender's November 6, 2008 announcement that it would not fund the Loan was confirmed by a formal letter to Owners dated November 13, 2008 ("November Default Letter"). (Shumener Decl., ¶ 16, Ex. 14.) Although Owners had already deposited the additional $400,000 to fill the "$4MM gap," Lender again demanded that Debtor deposit $3.5 to $4 million, admitting that its demand was "based on conversations with Borrower's Developer," with whom Lender and General Contractor had been colluding. (Shumener Decl., ¶ 16, Ex. 14.) The November Default Letter does not identify a single default on the part of Debtor because none had occurred. Owners had lived up to their end of the bargain and funded every dime they were obligated to fund. As a result of Lender not funding the Loan, however, General Contractor filed mechanic's liens against the Project.

Lender and Developer then schemed to "take over" the Project. On November 8, 2008, Developer sent an E-mail to Cliff Harrison (who was supposed to be acting as Debtor's representative) stating, "We are making some progress on a potential take over but it is difficult at best." (Shumener Decl., ¶ 17, Ex. 15.) Although Mr. Harrison was close friends with Mr. Danielson, he was drawing a salary from Debtor to represent Debtor's interests in the Project, not to plot with Developer against Debtor. Nevertheless, on November 17, 2008, Mr. Harrison sent an E-mail to Developer and General Contractor, planning a secret meeting with Lender:

> Just to let you know, we scheduled to meet with David and the
> bank today.  The bank called and said they will need to postpone
> the meeting until they understand more of the legal ramifications
> of acting in conjunction with the developer.  Both Lee and the
> bank want to make certain there is no "opportunity" for a
> misunderstanding of collusion, conspiracy, jay-walking, etc…
> (Shumener Decl., ¶ 17, Ex. 15.)

Notably, Owners were not copied on these E-mails.

In response to inquiries from the press, Owners reported that Lender had stopped funding

the Loan.  To counteract the negative publicity to Lender, Developer made statements to the

press maligning Owners and supporting Lender.  The collusion between Lender and Developer

was so strong that Lender referred to Developer as its "talking head" who will "lobby on our

behalf."  Lender's highest ranking bank official stated in a November 14, 2008 E-mail:

> The developer will stay in touch with the press on our behalf…
>
> I suggest we refer any future inquiries to the developer who will
> lobby on our behalf.  We are sending the cease and desist letter to
> Halsey Minor in the next couple of hrs.  It should get his attention.
> (Shumener Decl., ¶ 18, Ex. 16.)

Lender and Developer then schemed to replace Owners with other prospective investors.

In a November 17, 2008 E-mail, Developer wrote to Lender:

> Greg [Friedman of Lender] – please call Jeff Galanti, VP for
> Riverstone Properties from Richmond with strong ties to
> Charlottesville.  They are very interested and would like to hear
> from you.  I met them yesterday and went through the Project.
> 804-643-4200.  Good luck.  (Shumener Decl., ¶ 19, Ex. 17.)

Neither Developer nor Lender notified Owners of Riverstone Properties' interest in their Project.

On November 17, 2008, effective November 27, 2008, Owners terminated Developer

under the Development Agreement.  (Shumener Decl., ¶ 20, Ex. 18.)  To pressure Debtor to

rehire Developer, Lender threatened again to declare a default under the Loan. Lender,

Developer and General Contractor continued to collude behind the scenes to fabricate defaults

under the Loan so that Lender could foreclose on the Project and rehire Developer.  In a

November 21, 2008 E-mail, Developer wrote the following to Lender:

> Greg == this is my understanding of the documents.
> …
> * Under the terms of my Developers Consent I am required to
> notify the bank if the Borrower is in default.
> * Under paragraph 3.25 of the Loan Agreement I believe that the
> Borrower has demonstrated that they do not have the funds to
> complete the project.
> * Under paragraph 6.01 of the Loan Agreement I believe that the
> Borrower is in default.
> **If this is true then the bank should be able to continue my contract
> and I shouldn't have to leave the project**… (Shumener Decl., ¶ 21,
> Ex. 19; emphasis added.)

These were the same bogus defaults that Lender later asserted in its complaint.  However, Debtor

committed no defaults under the Loan, and Lender knew it, which is why Lender resumed

funding the Loan even though Debtor did not capitulate to any of Lender's threats.

On December 4, 2008, at Lender's request, Owners met with Lender in Georgia.  Owners

sought to stop construction while its consultants were looking into the costs, but Lender insisted

that Owners slow down construction to keep up appearances of on-going construction so that

Lender's participating banks and the media would not learn of the problems.  Owners agreed.

In a January 23, 2009 E-Mail, Developer and Lender continued their collusion:

> I also have a business plan that I believe may work **to move
> Halsey out** and protect the property so we can go forward and
> finish the project.  (Shumener Decl., ¶ 22, Ex. 20.)

At the time, Owners knew only that Developer was instigating subcontractors to record liens

against the Project because Lender wrongfully stopped funding.  Owners did not know that

Developer was colluding with Lender to **"move Halsey out."**

On February 11, 2009, Owners filed the VA Lead Action against Developer, not realizing Lender's involvement.  On February 19, 2009, Lender and Owners held a call to discuss the Project.  When Owners confronted Lender about the budget, Lender terminated the call.  During the call, it became apparent that Lender had engaged in delay tactics to distance itself from the negative publicity and harm caused by its repeated funding delays.  The next day, February 20, 2009, Owners filed a motion to add Lender as a defendant to the VA Lead Action.  Four days later, on February 24, 2009, Lender filed a complaint commencing the GA Twin Action.

In discovery, Owners acquired further evidence of Lender's and Developer's clandestine conspiracy.   On February 22, 2009, Developer sent an E-mail to Lender, stating:

> Greg----attached is the complaint from Halsey.  I think it is very clear where he is going with this.  I am looking forward to meeting with you next week to get this thing going again.  I will plan on staying in Atlanta on Saturday evening and hopefully meet with Jon [Wright] and you.  Please confirm that this is happening and I look forward to meeting Jon.  (Shumener Decl., ¶ 23, Ex. 21.)

E-mails show that Lender and Developer met at the W Hotel in Atlanta on March 1, 2009.  On February 23, 2009, Lender sent an E-mail to Developer stating, "I assume you can meet anytime on Sunday or would you prefer to meet on Saturday night?," to which Developer replied, "Sunday would be best and probably easier for you. I would like to go to Charlottesville that afternoon late if possible."  (Shumener Decl., ¶ 24, Ex. 22.)   After arranging the meeting and making Developer's hotel reservation, Lender falsely claimed it was a chance encounter.  When confronted with E-mails showing the meeting was planned a week in advance, Developer (Lee Danielson) testified, "we had a drink together." Lender (Greg Friedman) testified, "we did pass by each other at the W," and (Jon Wright) testified, "Yes, as I was leaving he was coming into

the area where I had been with Greg." (Shumener Decl., ¶ 27-29, Exs. 25-27.)

On February 23, 2009, the day Lender was planning its March 1 meeting with Developer, Lender wrongfully accelerated the Loan. The next day, Lender filed the GA Twin Action, claiming Debtor breached the Loan. While scrambling to find evidence of a breach, evidence which Lender should have had before it filed its complaint, in February-March 2009, Lender demanded that General Contractor send to Lender the draft change order that Developer had asked General Contractor to prepare so that Lender had some "evidence" of an alleged imbalance in the sham budget. General Contractor, knowing that Owners had not approved, signed, or authorized the draft change order, sent it anyway to Lender. (Shumener Decl., ¶¶ 25-26, Exs. 23-24.)

Debtor's complaint in the first-filed VA Lead Action claims that Lender (not Debtor) breached the Loan Agreement and fraudulently induced Owners to enter into the Loan. Thus, Lender should have filed a compulsory counterclaim to Owners' first-filed Virginia complaint. Instead Lender engaged in forum-shopping and caused two separate actions on the same issues.

It has been over one year and seven months since Lender filed in Georgia, and the parties are still engaged in discovery. No dispositive motions have been heard there. Due to Lender's unwarranted refusal to fund the Loan and its last minute, scorched-earth litigation tactics, Lender has required Owners to produce approximately 200,000 pages of documents trying to find evidence of a default, forced Debtor to incur over $5 million in attorneys' fees to date, and driven Debtor into bankruptcy. Unless the GA Twin Action is consolidated with the VA Lead Action and VA Lien Action in a single forum, for a single trial, as requested in Owners' pending Motion for Consolidation, valuable judicial resources will be wasted on duplicative litigation,

millions of dollars will be wasted, and the parties will risk inconsistent results.  Debtor already completed the Arbitration in Virginia on these issues.  It should not be forced into multiple trials.

While the GA Twin Action was stalled by Lender's needless discovery disputes, the VA Lead Action resulted in an Arbitration award and judgment against Developer.  Issues pertaining to the same facts presented in the GA Twin Action and VA Lead Action as between Developer and Debtor already have been decided in favor of Debtor by the Hon. Donald H. Kent (ret.) in the Arbitration between Debtor and Developer in Virginia.  Indeed, the Arbitration award finds that, among other things, Developer  (i) "misrepresented the projected construction costs of the project" to "convince Owner to invest" in the Project, (ii) made "material misrepresentations and omissions regarding the budget," (iii) "misrepresent[ed] the true costs regarding Change Order #1," and (v) "was not acting in the Owner's best interests in dealing with the media and the lender."  (Shumener Decl., ¶¶ 30-31, Exs. 28-29.)  Developer did not act alone.

Given the Arbitration, a consolidated trial will be a second run at the same issues.  If multiple forums are involved, however, Debtor will be forced to try the same issues at least two, and possibly three, more times.  Debtor cannot afford such duplication, delay and waste.

**B.**     **Procedural History**

On September 1, 2010, Debtor filed a petition (Chapter 11) in the Virginia Bankruptcy Court commencing the Chapter 11 Case.

On September 3, 2010, Debtor timely removed the VA Lead Action and the VA Lien Action to the United States Bankruptcy Court, Western District of Virginia, Lynchburg Division.

On September 4, 2010, Debtor timely removed the GA Twin Action to the Georgia Bankruptcy Court, and filed a Motion to Transfer Venue of the action to the Virginia Bankruptcy

Court for consolidation with the VA Lead Action and VA Lien Action, as all three actions involve the same Loan, Project (in Virginia), parties (Debtor, Developer and General Contractor are in Virginia), facts, third party witnesses (most are in Virginia), and evidence (virtually all of which is in Virginia). All three actions are "at the heart of the Chapter 11 case" because they are crucial to Debtor's completion of the Project. The parties already agreed that the pre-trial discovery taken in the VA Lead Action and GA Twin Action can be used in both actions to avoid duplication of the 30 depositions taken and thousands of documents produced.

On September 9, 2010, the Honorable James E. Massey, U.S. Bankruptcy Court Judge, Northern District of Georgia, entered an order granting Debtor's Motion to Transfer Venue to the Western District of Virginia, in which the Court held: "It is obvious that the resolution of the Chapter 11 case depends on the resolution of [the GA Twin Action]," and that "the resolution of the [GA Twin Action] appears to be at the heart of the Chapter 11 case." (Shumener Decl., ¶ 32, Exs. 30.) No less is true of the VA Lead Action and the VA Lien Action.

## III.     ARGUMENT

### A.     An Action Against Debtor's Guarantor Should Not Be Remanded Where Debtor's Liability Under The Loan Is Unresolved.

Where, as here, Lender sued Mr. Minor, knowing Debtor's liability under the Loan is disputed, remand of the action as to Mr. Minor (Debtor's sole member and guarantor) will interfere with the estate, create judicial inefficiency and risk inconsistent results. Westinghouse Credit Corp. v. Yeary (In re Brothers Coal Co.), 6 B.R. 567 (Bankr. W.D. Va. 1980).

In Brothers Coal, the debtor obtained a loan from plaintiff secured by debtor's mining equipment. Defendant, debtor's principal officer and shareholder, guaranteed the loan. After debtor filed bankruptcy, plaintiff sued defendant for breach of guaranty. Defendant removed

plaintiff's lawsuit to this Court, the Virginia Bankruptcy Court.  Plaintiff filed a motion for

remand.  The Virginia Bankruptcy Court <u>denied</u> plaintiff's motion for remand, reasoning that:

> **It would seem to be inappropriate and a duplication of judicial
> effort to litigate such issues in the State Court while the same
> issues may have to be litigated again in this Court involving the
> allowance of the claim of the Defendant** under 11 U.S.C. s 509
> concerning claims and rights of co-debtors, **as well** as 11 U.S.C. s
> 502 and 11 U.S.C.. s 510 providing for certain **subordination of
> claims**.    Indeed,    whether    compliance    with    the    Uniform
> Commercial Code in the disposition of collateral was done in a
> commercially reasonable manner, may well have to be determined
> in arriving at the liability remaining as between the three parties –
> Debtor, Plaintiff and Defendant.
>
> In order to determine whether or not remand should be granted this
> Court should only look to the jurisdictional language as to whether
> or not the matters affecting the action in question "arise in" or is
> "related to" the Debtor proceeding. From the foregoing facts, it
> would appear without question that the **enforceability of the
> Plaintiff's claim against the Defendant is related to the rights
> the Debtor has under the loan agreements**, the repossession and
> liquidation provisions of the Uniform Commercial Code, as well as
> the sections of Title 11 U.S.C. relating to allowance, qualification
> and subordination of claims and consequently, is clearly "related"
> within the purview of 28 U.S.C. s 1471…. Indeed, **the possible
> elimination of duplication of effort and multiplicity of litigation
> would be better served by retention of this action in this Court.**

<u>Id.</u> at 571 (emphasis added).

Similarly, in <u>Blackacre Bridge Capital LLC v. Korff (In re River Center Holdings LLC)</u>,

288 B.R. 59 (Bankr. S.D.N.Y. 2003), debtor borrowed money from plaintiff and granted a

second-lien mortgage securing the loan.  Debtor filed bankruptcy.  Plaintiff filed an adversary

proceeding against debtor and debtor filed an adversary proceeding against plaintiff, which were

consolidated.  Plaintiff subsequently filed a lawsuit in state court against defendant, the president

of debtor and guarantor of debtor's loan.  Defendant removed the lawsuit to bankruptcy court.

The bankruptcy court denied plaintiff's motion for remand, reasoning that:

> It would likely be contrary to law, and unjust, to apply doctrines of res judicata or collateral estoppel against either [debtor] or [defendant] based on determinations in proceedings in which they were not parties, yet there would be exactly this risk if the actions were proceeding in different courts. The issues are, as Judge Preska found in Nemsa, "inextricably intertwined," see 1995 WL 489711 at *8, and that strongly counsels against separating the litigation as to the intertwined issues. **There is no good reason, in this Court's view, to decide identical or nearly identical issues in two separate courts**.
>
> Additionally, as previously noted, **the outcome of this adversary proceeding could at least reasonably be expected to give [defendant] an indemnity claim against the estate**. Furthermore, a central issue in the related two adversary proceedings, and/or the claims process in the underlying chapter 11 case, will be determining the nature, extent, validity, priority, and value of the [plaintiff's] claim against [debtor]. Whether, and/or to what extent, these matters would be determinative of the amount of the [plaintiff's] claim against [defendant] is debatable, but **it plainly would be in the interests of judicial efficiency and economy to place all of such determinations under one tent.**

Id. at 69 (footnote omitted) (emphasis added).

In Mimbres Valley Bank v. Greeman (In re Greeman Motors, Inc.), 22 B.R. 1 (Bankr. N.M. 1982), the New Mexico bankruptcy court denied remand on the same ground. Relying heavily on Brothers Coal, the New Mexico bankruptcy court held that:

> In a case factually similar to the case at bar, the Bankruptcy Court in the Western District of Virginia did not order remand. In that case, the debtor corporation defaulted on a promissory note it executed in favor of Westinghouse Credit Corporation. The major shareholder personally guarantied payment on the note in the event of default by the primary obligor and was sued in state court on his guaranty. The court in Westinghouse noted two important factors present in the case:
>
> (1) **enforcement of the creditor's claim against the guarantor related to the debtor's rights under the loan agreement at issue**; and, (2) the remedies available to the creditor were the same

whether he proceeded in state or bankruptcy court.

Id. at 2 (citation omitted) (emphasis added).  The New Mexico bankruptcy court also noted that "it is possible that a **claim for indemnification by the individual [guarantor]** against the debtor's estate may arise as a result of the Luna County action, and lastly, there is a **pending motion for consolidation** of the removed cases."  Id. at 3.

Here, as in Brothers Coal, River Center and Greeman Motors, Lender's claim against guarantor is related to and dependent on Debtor's rights under the Loan.  As in Brothers Coal, River Center and Greeman Motors, Lender's claim against guarantor will lead to guarantor's claim for indemnity against Debtor.  As in Brothers Coal, River Center and Greeman Motors, other adversary proceedings regarding the same facts, Loan and Project are pending before the Court, as is a Motion for Consolidation.  Accordingly, remand should be DENIED.

**B.**     **Virtually All the Factors Weigh in Favor of Denying Lender's Motion to Remand**

When determining whether to remand a case removed under 28 U.S.C. § 1452, "similar equitable considerations are pertinent to the court's decision on abstention" under 28 U.S.C. § 1334, which include the following:

> (1) the court's duty to resolve matters properly before it; (2) the predominance of state law issues and non-debtor parties; (3) the economical use of judicial resources; (4) the effect of remand on the administration of the bankruptcy estate; (5) the relatedness or remoteness of the action to the bankruptcy case; (6) whether the case involves questions of state law better addressed by the state court; (7) comity considerations; (8) any prejudice to the involuntarily removed parties; (9) forum non conveniens; (10) the possibility of inconsistent results; (11) any expertise of the court where the action originated; and (12) the existence of a right to a jury trial.

In re Ahearn, 318 B.R. 638, 643-44 (E.D.Va. 2003).  Ten of the twelve factors weigh against remand, and the remaining two factors are neutral.  Notably, Lender cites only five factors for

the Court to consider in determining whether to remand the GA Twin Action, conveniently omitting critical factors that weigh strongly <u>against</u> remand.[4]

### 1.   The Court Should Resolve The GA Twin Action

The Virginia Bankruptcy Court has jurisdiction over the GA Twin Action because it is at least "related to" the Chapter 11 Case.  Indeed, as Judge Massey stated in the order granting the Motion to Transfer Venue of the GA Twin Action to the Virginia Bankruptcy Court, the resolution of the GA Twin Action is "at the heart of [this] Chapter 11 case."

### 2.   Virginia and Federal Law – <u>Not</u> Georgia Law – Predominate

Contrary to Lender's claims, Georgia state law does <u>not</u> predominate even the GA Twin Action.  The law of the Commonwealth of Virginia and federal law predominate.  In the Motion to Remand, Lender argues that the "loan documents provide that Georgia law governs the claims between the parties." (Motion, p. 15).  In doing so,  Lender ignores (i) Debtor's fraud and breach of fiduciary duty claims, which are governed by Virginia law, (ii) the tort and contract claims between Debtor and Developer/Danielson, which are governed by Virginia law, and (iii) the contract and statutory claims in the VA Lien Action, which are governed by Virginia Law.  Indeed, given the fraudulent inducement claims properly alleged by Debtor and Mr. Minor, it is doubtful that the Georgia law provisions, which exist in only some of the loan documents, are enforceable.  In any event, Virginia law and federal law predominate.

First, Virginia law applies to Owners' fraud claims against Lender, Developer and Danielson because the fraud injured the Project in Virginia.  "The rule of *lex loci delicti* is well-

---

[4] The authority Lender cites for only five factors is a case in Bankruptcy Court in the Northern District of Alabama that uses various factors that Lender omits – e.g., "holding that, if the civil action has been bifurcated by removal, the entire action should be tried in the same court…prejudice to the involuntarily removed parties…and [] a lessened possibility of an inconsistent result."  <u>In re Matter of Perfect Home L.L.C.</u>, 231 B.R. 358, 362-63 (N.D.Ala. 1999).

settled in Virginia; the place of the injury supplies the governing law in tort actions." <u>Diaz Vicente v. Obenauer</u>, 736 F. Supp. 679, 690 (E.D.Va. 1990) (citations omitted); <u>Insteel Indus., Inc. v. Costanza Contracting Co., Inc.</u>, 276 F. Supp. 2d 479, 486 (E.D.Va. 2003) ("The place of the wrong for purposes of lex loci delicti rule is defined as the place where the last event necessary to make the actor liable for an alleged tort takes place, even if the actor has no control over the location of the last event."). Georgia law is in accord. <u>E.g.</u>, <u>IBM Corp. v. Kemp</u>, 244 Ga. App. 638, 641 (2000) ("the 'last event' necessary to make an actor liable for fraud is the injury, and consequently, for purposes of lexi loci delicti, the place of the wrong is where the injury is sustained"); <u>Mgmt. Sci. Am., Inc. v. NCR Corp.</u>, 765 F. Supp. 738, 739 (N.D. Ga. 1991) ("For claims sounding in tort, Georgia continues to apply the traditional choice of law principles of lexi loci delicti. Under this system, the law of the place where the injury occurred, rather than the place where the act was committed, determines the substantive rights of the parties.") (citation omitted). The acts of Lender, Developer and Danielson (fraudulently inducing Owners to enter into the Loan by, *inter alia*, misrepresenting the costs of the Project) brought construction to halt and caused mechanic's liens to be filed against the Project in Virginia. The injury was sustained in Virginia, and Virginia law applies to the fraud claims. <u>Id.</u>

Second, Virginia law applies to the claims between Debtor and Developer. The Development Agreement is a contract governed by Virginia law, which was entered into and performed in Virginia by two Virginia limited liability companies. (Shumener Decl., ¶ 33, Ex. 31.) The Development Agreement states that Virginia law applies to the claims between Developer and Debtor. <u>Id</u>. Those claims have been resolved in favor of Debtor through Arbitration and have resulted in a judgment in the VA Lead Action. (Shumener Decl., ¶¶ 30-31,

Exs. 28-29.)   Imputation of Developer's wrongful acts to Danielson, Lender and General Contractor under "alter ego" and conspiracy principles, among other principles, will involve Virginia law.

Third, Virginia law applies to the agreements between Debtor and General Contractor. Pursuant to the GC Contract, General Contractor's performance was in Virginia, and General Contractor's claims are based on Virginia's mechanic's lien law.   <u>Id</u>. (state law of place of contract performance governs).  (Shumener Decl., ¶ 34, Ex. 32.)

Fourth, Georgia state law does <u>not</u> apply to the parties' contract claims because Owners' fraudulent inducement claims render the Georgia choice-of-law provisions unenforceable. <u>Khosla v. Global Mortgage, Inc.</u>, No. 2006-8458, 2006 WL 3420304, at *3 (Va. Cir. Ct. 2006) (holding choice of law provisions unenforceable when contract's "validity is challenged in that they are part of an unenforceable contract because it was fraudulently induced.").  Thus, even Lender's breach of contract claims are not governed by Georgia law

Fifth, federal law governs expert witness designations and reports, in addition to any outstanding discovery issues in the GA Twin Action.  Lender admits that "[t]he Georgia state court indicated that it would hear any <u>Daubert</u> motions."  <u>Daubert</u> refers to <u>Daubert v. Merrell Dow Pharmaceuticals, Inc.</u>, 509 U.S. 579 (1993), which provides the standard for admitting expert testimony or evidence under the Federal Rules of Evidence.  At a June 8, 2010 hearing, the Georgia state court stated, "they're going to follow Rule 26.  Okay.  We're all agreed on that. Federal Rule 26."  (Shumener Decl., ¶ 35, Ex. 33.)  Thus, the Federal Rules of Civil Procedure govern discovery even in the GA Twin Action.  <u>McKesson HBOC, Inc. v. Adler</u>, 254 Ga. App. 500, 503 (2002) ("Georgia's Civil Practice Act is modeled on the Federal Rules of Civil

Procedure…"); see also Atl. Coast Line R.R. Co. v. Gause, 116 Ga. App. 216, 221 (1967).

**3.      The GA Twin Action Does _Not_ Involve Questions of State Law Better Addressed by The Georgia State Court**

The Court should deny remand of the GA Twin Action because it does not involve questions of state law better addressed by a Georgia state court.  First, as demonstrated above, Georgia state law does not predominate; Virginia state law and federal law predominate.

Second, *even if* Georgia law applies to the contract claims in the GA Twin Action (which it does not), neither abstention nor remand is appropriate because Georgia contract law is well developed.  See e.g., In re Cardinal Indus., Inc., 126 B.R. 754, 759 (S.D. Ohio 1991) ("In this proceeding, abstention is not compelled…[T]o the extent the Court will be called upon to apply state law principles, those principles are well developed."); see also In re Bay Vista of Virginia, Inc., 394 B.R. 820, 846 (E.D.Va. 2008) (abstention not compelled because "state law issues…[are] similar to issues frequently and routinely resolved by this Court").  "Abstention from the exercise of federal jurisdiction is the exception, not the rule.  Ordinarily, bankruptcy courts abstain only where adjudication of the proceeding will involve such courts in the resolution of unsettled state law questions or state law matters of 'substantial public import.'" Cardinal Indus., 126 B.R. at 759 (citations omitted).  Thus, *even if* Georgia state law applies to the contract claims (and it does not), that state law is well-settled and there is no need to remand.

**4.      Economical Use of Judicial Resources Requires _Denial_ of Remand**

Remand of the GA Twin Action will waste judicial resources.  In seeking remand, Lender conveniently fails to mention the VA Lead Action or the VA Lien Action.  (Motion, p. 16).  As detailed in Owners' Motion to Transfer Venue and Motion for Consolidation, if these adversary proceedings are not consolidated in Virginia, scarce judicial resources will be wasted.

The Virginia Bankruptcy Court denied remand of an action on facts less compelling than the facts present here because "elimination of duplication of effort and multiplicity of litigation would be better served by retention of this action in this Court."  Brothers Coal, 6 B.R. at 571. Brothers Coal found that a lender's claims against debtor's guarantor would affect the estate.  No less is true here.  Here, there are three related actions involving the same issues that are at the heart of Debtor's estate.  As such, remand should be denied, as it was in Brothers Coal, to eliminate "duplication of effort and multiplicity of litigation."

Remand will result in an unnecessary duplication of efforts because the VA Lead Action – which involves the same parties, evidence and witnesses as the GA Twin Action – in addition to the VA Lien Action and Debtor's Chapter 11 Case, are already going to be heard in this Court. Prior to removal of the adversary proceedings, the parties were litigating the VA Lead Action and GA Twin Action in separate courts, using the same pretrial discovery, because Lender insisted on filing the GA Twin Action after Owners had already commenced the VA Lead Action and moved to add Lender as a defendant.  Continued piecemeal litigation of the VA Lead Action and GA Twin Action will necessarily result in a tremendous waste of judicial resources. Indeed, two courts will spend time preparing for and hearing trial in separate forums, using their own resources – judges, court clerks, jurors, court reporters, and bailiffs.  Two courts will have to block off time on their dockets for trial and will have to hear the same evidentiary motions.  It simply does not make sense for the proceedings to be heard in different forums.

The three adversary proceedings are inextricably intertwined.  The issues that predominate the claims in all three adversary proceedings involve the same $23.6 million Loan, and the same sham budget used to fraudulently induce Debtor to obtain that Loan.  Witnesses

with knowledge of the facts regarding the construction, budget and Loan will be called to testify in all three actions.  The overwhelming majority of witnesses are located in Virginia or in states other than Georgia.  Only some of Lender's employees and attorneys are in Georgia (although Lender is already represented by Virginia counsel in the VA Lead Action and VA Lien Action).  No other third party witness is in Georgia, and it is questionable (at best) whether these third party witnesses can be compelled to testify in Georgia.  At least 17 third party witnesses are in Virginia, not Georgia.[5]

- The General Contractor's designees will testify at trial as to their knowledge about the budget.  Their testimony is relevant to all three cases.  These designees, Bill Goggins and David Wright, reside and work in Virginia.  They have no apparent ties to Georgia.

- Third-party subcontractors who worked on the Project, but have not been paid as a result of Lender's wrongful failure to fund the Loan, are Virginia corporations or have their principal place of business in Virginia and include: Century Concrete, Capital Interior Contractors, Inc., Bat Masonry Co., Inc., Froehling & Robertson, Inc., and Southern Air, Inc.

- Lender's third-party consultant, Broadlands Financial Group ("Broadlands"), will testify as to the construction costs and budget.  Broadlands' designees are Brian Fortay and Allison Jensen, who reside and work in Pennsylvania.  (Shumener Decl., ¶¶ 50-51, Exs. 44-45.)  Broadlands hired its own on-site inspector for the Project, Douglass Alan Miller, a resident of Virginia, to inspect the Project in Virginia.

---

[5] The following third party witnesses are in Virginia:  Clifford Harrison, William Goggins, David Wright, Linda Rossman, Douglas Miller, Southern Air, Inc., Century Concrete, Capital Interiors Contractors, Inc., Bat Masonry Company, Inc., Froehling & Robertson, Inc., Suffolk Bank, Old Dominion National Bank, Pioneer Bank, Hometown Bank, River Community Bank, Virginia National Bank, and Paxfire.  (Shumener Decl., ¶¶ 17, 36-48, Exs. 15, 34-43.)

- Other witnesses who reside and work in Virginia include Linda Rossman, Mr. Minor's former bookkeeper, and Mr. Harrison who colluded with Developer against Owners.

- Employees of Suffolk Bank, Old Dominion National Bank, Pioneer Bank, and Hometown Bank may be called to testify, as each owns part of the Loan, and what they knew of the alleged defaults may be relevant. These banks are in Virginia. Not one is in Georgia.

The aforementioned witnesses have knowledge regarding the construction costs, budget and efforts made by Lender, Developer, Danielson and General Contractor to conceal material facts from Owners. If the GA Twin Action is remanded, these witnesses will either be unavailable or forced to testify multiple times on the same issues. The unavailability of some of those witnesses will materially impair Debtor's ability to impeach them.

In sum, the three adversary proceedings are inextricably intertwined, and the Court should <u>deny</u> remand and consolidate the GA Twin Action with the VA Lead Action and VA Lien Action to ensure the "elimination of duplication of effort and multiplicity of litigation would be better served by retention of this action in this Court." <u>Brothers Coal Co.</u>, 6 B.R. at 571.

### 5.    *Remand Will Adversely Affect Administration of Debtor's Bankruptcy Estate*

Remand of the GA Twin Action will adversely affect the Debtor's estate. Remand will result in a duplication that requires Debtor to incur the inordinate expense of litigating in two forums, as the resources of Mr. Minor are the only resources available to Debtor. <u>Id.</u>

### 6.    *The GA Twin Action Is Closely Related to the Chapter 11 Case*

The Court should <u>deny</u> remand because the GA Twin Action is closely related to the Chapter 11 Case. Debtor is a party to the GA Twin Action, and all the claims asserted in that action directly affect Debtor's estate. Indeed, Lender already expressly stated its intention to

enforce its claims against Debtor's estate through the GA Twin Action. (Motion, p. 21, "If [Debtor] is found liable to [Lender] in the State Court Action, the enforcement of that claim will 'remain in the hands of the home bankruptcy court . . . .'") In the Order Granting the Motion to Transfer Venue, Judge Massey recognized that resolution of the GA Twin Action is "at the heart of the Chapter 11 case." Like In re Unity Foods, 35 B.R. 876, 877, 881 (N.D.Ga. 1983), in which the removed claim for "monetary damages arising from the [debtor]s' alleged breach of a purchase agreement"…was "so closely tied to the debtors' rehabilitation that all matters should be decided by the Bankruptcy Court," the removed GA Twin Action – which includes claims and counterclaims for monetary damages arising from alleged breaches of the Loan – is so closely tied to Debtor's rehabilitation that it should be decided by this Court.

7.      *Comity*

Comity does not weigh in favor of abstention or remand unless the proceedings are ones "(1) that present 'difficult questions of state law bearing on policy problems of substantial public import whose importance transcends the result in the case then at bar' or (2) whose adjudication in a federal forum 'would be disruptive of state efforts to establish a coherent policy with respect to a matter of substantial public concern.'" See Johnson v. Collins Ent. Co., Inc., 199 F.3d 710, 719 (4th Cir. 1999). Here, neither element is present, as Lender asserted only breach of contract. As stated *infra*, the GA Twin Action does not present "difficult questions of state law" or *any* questions of Georgia law, and the adjudication of that action in Virginia (which is a dispute over a hotel in Virginia) would not be "disruptive of state efforts to establish a coherent policy with respect to a matter of substantial public concern." Id. To the contrary, Debtor's request for equitable subordination, see part D *infra*, raises questions of pure bankruptcy law.

**8.** ***Denying Remand Will <u>Not</u> Prejudice The Involuntarily Removed Parties***

The GA Twin Action deals with the same operative facts and issues as the VA Lead Action and VA Lien Action pending before this Court.  Lender is a party to all three actions, and is already defending the VA Lien Action and the VA Lead Action in Virginia.  (Shumener Decl., ¶¶ 2-9, Exs. 1-7)  As the three actions arise from the same Loan and implicate Lender, Developer, Danielson and General Contractor's misrepresentations regarding the budget, <u>denial</u> of remand will not prejudice anyone.  <u>Id</u>.

Indeed, Lender is prepared to litigate in Virginia, just as it is in Georgia, as (i) the issues, witnesses and documents are the same in both proceedings, (ii) Lender and Debtor agreed to use pretrial discovery interchangeably in both proceedings, and (iii)  Lender's Georgia counsel has been admitted *pro hac vice* and appeared in Virginia Circuit Court and the Virginia Bankruptcy.

Although Lender argues it will suffer prejudice if the GA Twin Action is not remanded because Lender will be forced to "educate" the Virginia Bankruptcy Court as to the issues in the GA Twin Action, the arguments are meritless for a number of reasons.

To date, the Georgia state court has decided only discovery motions and schedules.  It has not ruled on any motion regarding the merits of the claims and defenses.  (Shumener Decl., ¶ 49.)

The VA Lead Action and VA Lien Action are also before the Virginia Bankruptcy Court, and all parties will "educate" the Virginia Bankruptcy Court as to the same facts even if the GA Twin Action is remanded.  Thus, no purpose is served by remand.

Finally, Lender's argument that it will suffer prejudice due to delay in the adjudication of the GA Twin Action is without merit.  Owners are going forward with mediation with Lender on

September 29-30, 2010, as scheduled.  And while the Georgia state court has scheduled trial for November 2010, Owners requested an early trial date in their pending Motion to Consolidate. Faced with the prospect of trying the same issues two or three more times after incurring the cost of prevailing in the Arbitration and the flurry of last-minute discovery have driven Debtor into bankruptcy.  Debtor's resources have been depleted dramatically by the duplicative litigation.

### 9.    *Forum Non Conveniens*

In the Motion to Remand, Lender goes to great lengths to paint Debtor's bankruptcy filing as an "eleventh-hour attempt to avoid resolution by the Georgia State Court," but the facts reveal that this is simply <u>not</u> the case.  First, as stated above, Owners are prepared to go forward with the motions for summary judgment and trial as early as the Court's calendar permits.  If there is a delay of a few weeks, this is hardly prejudicial, given the years of litigation.

Second, this is the only Court that can try all three adversary proceedings, and as detailed in Owners' Motion to Consolidate, all three actions should be tried in a single forum.

Third, although Lender argues that Debtor's bankruptcy filing is unwarranted because "nothing has changed with respect to [Debtor]'s financial condition recently that would cause it to have to seek bankruptcy protection now," that is not true.  As a result of Lender's last-minute burst of discovery and the costs of a week-long Arbitration, Debtor's legal expenses have nearly doubled.  Faced with multiple trials, those costs will become astronomical.  Saving a few weeks in getting to trial does not justify the millions of dollars that will be wasted in multiple trials in multiple forums, the burden to witnesses and the abject waste of Debtor's and judicial resources.[6]

---

[6] Furthermore, while attempting to support its baseless story, Lender grossly mischaracterizes the course of discovery in this matter.  Lender states that Owners "repeatedly expanded the scope of this action by conducting sweeping and far-reaching discovery" and that it was Owners who took "efforts to expand and delay" discovery.

*10.*  ***Remand Will Increase The Possibility of Inconsistent Results***

That remand creates the risk of inconsistent results is a key factor that Lender ignores, as it weighs heavily in Debtor's favor.  As detailed above and in Owners' Motion to Consolidate, the GA Twin Action and VA Lead Action involve the same parties, facts, issues, witnesses and evidence, presenting an inherent risk of inconsistent results if decided in separate forums.

Should remand be granted, Debtor would be forced to litigate the VA Lead Action, the GA Twin Action and the VA Lien Action separately and possibly simultaneously or back to back.  Debtor has asserted claims and defenses against each of the parties in the three actions which would allow Debtor to recover substantial damages against Lender, General Contractor, Developer and Danielson.  Specifically, Debtor has claimed that Lender fraudulently induced Debtor to enter into the Loan by procuring and presenting Debtor with a budget that Lender knew was a sham.  (Shumener Decl., ¶¶ 2-4, 6, Exs. 1-3, 5.)  Lender was aided in its efforts by Developer and General Contractor.  Indeed, General Contractor and Developer created Change Order No. 1 which feigned to reduce the construction costs in the sham budget by $2.3 million.  (Shumener Decl., ¶ 13, Ex. 11.)  Had General Contractor and Developer not created Change Order No. 1, and had Lender not demanded that it be executed, Owners would have stopped the Project when only $700,000 had been drawn on the Loan.  Instead, General Contractor, Developer, and Lender colluded to induce Owners to proceed with the Project, knowing that the budget was severely understated.  Accordingly, a decision on Debtor's claims against Lender and General Contractor should resolve Lender and General Contractor's claims against Debtor.

---

(Motion, pp. 9, 17).  Quite the contrary, Lender's discovery was so "sweeping" that Owners have produced approximately 200,000 pages of documents to Lender to date.

If two or three trials were to proceed separately, the actions could result in inconsistent judgments, which can be avoided only by <u>denying</u> remand of the GA Twin Action.

### 11.     *Expertise of Georgia State Court Weighs Neither in Favor Nor Against Remand*

The Georgia state court's expertise as to state law is irrelevant because, as discussed *infra*, (i) Virginia and federal law predominate, and (ii) Georgia contract law is well-settled.

### 12.     *The Availability of a Jury Trial Weighs Neither in Favor Nor Against Remand*

Whether a jury trial is available in this Court is also irrelevant because Lender has not sought a jury trial and denies that Owners are entitled to one.

## C.     <u>The Court Cannot Remand the GA Twin Action Based On Principles of Abstention</u>

According to the United States Supreme Court, the Court may <u>not</u> remand an action for damages based on principles of abstention.  <u>Quackenbush v. Allstate Ins. Co.</u>, 517 U.S. 706, 721 (1996).  <u>Quackenbush</u> held that "federal courts have power to dismiss or remand cases based on abstention principles only where relief being sought is equitable or otherwise discretionary and **may not do so in common-law action for damages**."  <u>Id.</u> at 706 (emphasis added); <u>see</u> <u>also</u> <u>Myles Lumber Co. v. CNA Fin. Corp.</u>, 233 F.3d 821, 824 (4th Cir. 2000) ("Counts…for breach of contract and unfair trade practices–plainly seek damages and thus, under *Quackenbush*, were not subject to remand"); <u>Lewin v. Cooke</u>, 95 F. Supp. 2d 513, 520 (E.D. Va. 2000) ("[P]laintiff's reliance on the equitable doctrines of abstention is misplaced.  The Supreme Court has conclusively held that abstention doctrines are simply not applicable to suits for damages, but apply only to suits in equity."); 28 U.S.C. §§ 1334(c)(1) and 1452(b) ("The court to which such claim or cause of action is removed may remand such claim or cause of action on **any equitable ground**.") (emphasis added).

The GA Twin Action is indisputably an action for damages.  Lender's complaint brings only two counts, each for breach of contract and monetary damages; the complaint is even titled "Verified Complaint for Damages."  Similarly, Owners' counterclaim prays for compensatory and punitive damages.  Accordingly, remand based on abstention is improper.

**D.**      **The GA Twin Action Is a Core Proceeding**

The claims and counterclaims asserted in the GA Twin Action demonstrate that it is a core proceeding.  First, because Debtor is now in bankruptcy, the GA Twin Action will include a request for relief based on equitable subordination (which request will be made at the end of trial to amend the pleadings according to proof), which relief arises under section 510(c) of the Bankruptcy Code and thus is core.  Second, Lender's claims against the estate and Debtor's counterclaims against Lender form the heart of this chapter 11 case and constitute proceedings for the allowance or disallowance of Lender's claims and the liquidation of the estate's counterclaims.  These are quintessentially core proceedings.

First, Lender's inequitable conduct entitles Debtor to equitably subordinate Lender's deed of trust to general unsecured claims, mechanic's lien claims and priority and administrative claims of those legitimate and innocent contractors/claimants.  Since a claim for equitable subordination arises under section 510 of the Bankruptcy Code, and that claim is based on allegations in the GA Twin Action, the GA Twin Action is a core proceeding.

11 U.S.C. § 510 provides that:

> (c) Notwithstanding subsections (a) and (b) of this section, after notice and a hearing, the court may—

> (1) under principles of equitable subordination, subordinate for purposes of distribution all or part of an allowed claim to all or part of another allowed claim or all or part of an allowed interest to all

or part of another allowed interest; or

(2) order that any lien securing such a subordinated claim be transferred to the estate.

As Debtor alleged in its Amended Complaint in the VA Lead Action and Counterclaim in the GA Twin Action, Lender and Developer engaged in grossly inequitable conduct, including (a) fraudulently misrepresenting the budget to Debtor, (b) colluding/fraudulently conspiring to mislead and entrap Debtor into investing millions of dollars on a Project that was out of balance from inception, and (c) refusing to fund Debtor's draw requests, thereby preventing Debtor from paying contractors who performed work at the Project.  Such inequitable conduct on the part of Lender entitles Debtor to equitably subordinate Lender's deed of trust to the general unsecured claims, mechanic's lien claims and priority and administrative claims of those legitimate and innocent contractors/claimants, in order that such contractors/creditors may resume work and complete construction of the Project, as well as transfer any lien securing Lender's claim to the estate for the benefit of innocent claimants.   Accordingly, Debtor's claim for equitable subordination will be critical to Debtor's efforts to complete the Project and reorganize.[7]

Although Debtor could not have asserted a claim for equitable subordination under 11 U.S.C. § 510 until Debtor filed bankruptcy, Debtor does not wish to amend its complaint to add a claim for equitable subordination at this point because to do so may delay Debtor from proceeding to trial as soon as possible.  Rather, Debtor intends to request that the Court enter a judgment granting all relief to which Debtor and Mr. Minor are entitled, as plaintiffs in the VA Lead Action and as counterclaimants in the GA Twin Action, in accordance with Rule 54(c) of

---

[7] Debtor's claim for equitable subordination should eliminate any doubt as to whether Debtor's actions constitute core proceedings.  Hudgins v. Shah (In re Systems Eng'g & Energy Mgmt. Assocs.), 252 B.R. 635, 650 (Bankr. E.D. Va. 2000) ("Virtually all courts that have considered the nature of equitable subordination claims under § 510 of the Bankruptcy Code have concluded such actions are core proceedings.") (citations omitted).

the Federal Rules of Civil Procedure ("Civil Rules"), made applicable by Rule 7054(a) of the

Federal Rules of Bankruptcy Procedure ("Bankruptcy Rules"), and, to the extent required, amend

the pleadings to conform to proof pursuant to Civil Rule 15(b), made applicable by Bankruptcy

Rule 7015, to equitably subordinate Lender's claims and transfer its deed of trust to the estate at

the conclusion of trial.  So that there is no prejudice or unfair surprise, as stated in the Motion for

Consolidation, Debtor is again putting all parties on notice that it intends to amend the pleadings

to conform to proof at the conclusion of trial to equitably subordinate Lender's deed of trust.

Second, the claims and counterclaims in the GA Twin Action demonstrate that this is a

core proceeding.  The crux of Lender's argument to the contrary, that this adversary proceeding

is non-core, rests on the fact that all of the claims arise under state law.  This argument fails for

many reasons, the first of which is that 28 U.S.C. § 157(b)(3) provides that the "determination

that a proceeding is not a core proceeding shall not be made solely on the basis that its resolution

may be affected by state law."  See Friedman v. Morabito (In re Morabito), 64 F.3d 658, 1995

WL 502909, at *2 (4th Cir. Aug 25, 1995) (mem.) (debtor's suit under Virginia law on

prepetition equitable contribution claim against co-guarantor was core proceeding).

The reasons why these state law claims are nevertheless core arise from their context.

When claims belonging to a debtor are property of the estate, relate to the circumstances that

compelled the debtor to seek bankruptcy protection, and represent a major asset of the

bankruptcy estate, then a bankruptcy court's determination of the estate's claims is a core

proceeding.  Id. at *3.  In Morabito, a lender's suit against a guarantor forced him to file for

bankruptcy protection.  After reaching a post-petition settlement with the lender, the debtor filed

an action for equitable contribution under Virginia law against one of his co-guarantors.  The

Fourth Circuit found "a sufficient nexus between the contribution action and [debtor's]

bankruptcy estate to consider the contribution action a core proceeding because [debtor's]

inability to pay a settlement on the [lender's] $1.46 million judgment was the reason he filed for

bankruptcy, and presumably recovery of the contribution amount [from co-guarantor] represents

a major asset of [debtor's] bankruptcy estate." Id. (relying on 28 U.S.C. § 157(b)(2)(A), (O)).

Here, Debtor's counterclaims against Lender, Danielson, and Developer belong to

Debtor's bankruptcy estate.  They relate directly to the reasons why Debtor had to file for

chapter 11 protection, the creation of a sham budget, the wrongful decision to cease funding

construction, and the resulting recording of mechanics' liens against Debtor's property.  These

counterclaims constitute major assets of the estate.  Debtor's claims against Developer have been

reduced to a money judgment for $7.9 million.  Debtor's claims against Lender (who asserts up

to $14 million in claims against the estate) and Danielson are major assets that must be resolved

in order for Debtor to develop and confirm a plan of reorganization.  These claims "are at the

heart of the Chapter 11 case."  Under the rationale of Morabito, there is a sufficient nexus

between the claims in this adversary proceeding and Debtor's bankruptcy estate (and need to

reorganize) to consider the adversary proceeding a core proceeding.  See 28 U.S.C. §

157(b)(2)(A) ("administration of the estate") & (O) ("other proceedings affecting the liquidation

of the assets of the estate or the adjustment of the debtor-creditor . . . relationship").

In addition, this adversary proceeding constitutes a core proceeding under the other

authorities cited by Lender.   For example, a removed action is core when it in substance

constitutes an objection to a claim against an estate.  In St. Vincent's Hosp. v. Norrell (In re

Norrell), 198 B.R. 987 (Bankr. N.D. Ala. 1996), a hospital had sued in state court for

nonpayment for services rendered and the patient counterclaimed for breach of contract, fraud, and misrepresentation. After the patient filed a chapter 13 petition, the hospital filed a proof of claim to which the debtor objected and filed a notice of removal of the state court action to the bankruptcy court. The bankruptcy court determined that the adversary proceeding was a core proceeding because it involved the allowance or disallowance of a claim against the estate and a counterclaim by the debtor against an entity that filed a claim against the estate. Id. at 993-94.

Here, this adversary proceeding involves the allowance or disallowance of Lender's claims. By Lender's own admission, this adversary proceeding is a proceeding to enforce its claim against the bankruptcy estate. (Motion, p. 21, "If [Debtor] is found liable to [Lender] in the State Court Action, the enforcement of that claim will 'remain in the hands of the home bankruptcy court . . . .'") In addition, Lender continues to assert those same claims against bankruptcy estate property as result of its recorded deed of trust. (Shumener Decl., ¶ 52, Ex. 46.) Thus, although Lender has not yet formally filed proofs of claims (the claims bar date is November 1, 2010), Lender is asserting claims against the estate and accordingly this adversary proceeding is a core proceeding under 28 U.S.C. § 157(b)(2)(B). See Commercial Fin. Servs., Inc. v. Jones (In re Commercial Fin. Servs., Inc.), 251 B.R. 397, 404-08 (Bankr. N.D. Okla. 2000) (party asserting affirmative defense of setoff to debtor in possession's suit invokes bankruptcy court's core jurisdiction to determine claims, making adversary proceeding part of claims allowance process and "integral to the restructuring of the debtor-creditor relationship."). Similarly, Debtor has counterclaimed against an entity, Lender, who effectively has filed a proof of claim against the estate by asserting claims against the estate in this adversary proceeding. Accordingly, this adversary proceeding is core under 28 U.S.C. § 157(b)(2)(C).

E.    <u>The Claims Between Halsey Minor And SFG Should Not Be Remanded</u>[8]

The claims between Mr. Minor and Lender cannot be severed and remanded as they are inextricably intertwined with the claims between Debtor and Lender.    The Fourth Circuit recognizes that the automatic stay applies to non-debtors when there is "such identity between the debtor and the third-party defendant that the debtor may be said to be the real party defendant and that a judgment against the third-party defendant will in effect be a judgment or finding against the debtor."    <u>A.H. Robins Co., Inc. v. Piccinin</u>, 788 F.2d 994, 999, 1001 (4th Cir. 1986). <u>A.H. Robins</u> further states as follows:

> An illustration of such a situation would be a suit against a third-party who is entitled to absolute indemnity by the debtor on account of any judgment that might result against them in the case. To refuse application of the statutory stay in that case would defeat the very purpose and intent of the statute.    <u>Id.</u>

Mr. Minor is merely a guarantor under the Loan.    Debtor is the borrower.    Mr. Minor's liability (if any) is derived from Debtor's liability (if any) under the Loan.    Thus, Mr. Minor would be entitled to reimbursement from Debtor, i.e., he would be "entitled to absolute indemnity by the debtor on account of any judgment that might result against [him]."    <u>Id.</u>

As Debtor's liability would be at issue, Debtor is an indispensable party to the GA Twin Action.    <u>Dunnam, III v. Sportsstuff, Inc.</u>, No. 3:07CV322-HEH, 2008 WL 200287, at *3 (E.D. Va. Jan. 23, 2008); <u>Midkiff v. Lowe's Home Ctrs., Inc.</u>, No. 407CV00017, 2007 WL 2188131, at *2 (W.D. Va. July 30, 2007).    In <u>Dunnam</u>, the court stayed proceedings against a non-debtor third-party because (i) debtor was an "indispensable party," and proceeding against the third-party alone would prejudice the debtor; (ii) debtor would "not be able to defend itself" in the

---

[8] Although Debtor will be filing a separate motion to enjoin Lender from proceeding against Mr. Minor outside the bankruptcy proceedings in the home bankruptcy forum, since Lender has raised the issue, it will be addressed here.

action "but will eventually be held liable for any judgment awarded through...indemnity; and (iii) "judicial economy concerns indicate a stay [was] appropriate because proceeding against [the third-party] now would result in a second, nearly identical, litigation of the issues at a later date once [debtor] is able to proceed." <u>Dunnam</u>, 2008 WL 200287, at *3.  No less is true here.

As emphasized in <u>Midkiff</u>, the Court should stay the proceedings as to Mr. Minor because the purpose of a stay is to insure that Debtor's affairs are centralized in a single forum:

> The stay applies to suits both against the debtor or third parties which could affect the property in the bankruptcy estate.  The purpose of the automatic stay is to protect debtors and their estates and to "allow for a systematic, equitable liquidation proceeding by avoiding a 'chaotic and uncontrolled scramble for the debtor's assets in a variety of uncoordinated proceedings in different courts.'  Thus, "**the stay insures that the debtor's affairs will be centralized, initially, in a single forum in order to prevent conflicting judgments from different courts and in order to harmonize all of the creditors' interests with one another**."

<u>Midkiff</u>, 2007 WL 2188131, at *2. (citations omitted) (emphasis added).

For all of the foregoing reasons, the stay should be extended to claims against Mr. Minor. First, Mr. Minor is entitled to indemnity from Debtor, which establishes the requisite "identity" between Debtor and Mr. Minor such that Debtor is said to be the "real party defendant." <u>A.H. Robins</u>, 788 F.2d at 999.  Second, Mr. Minor is the sole financial source for Debtor, such that any funds he is forced to expend to defend himself in the GA Twin Action will reduce the funds he could make available for Debtor to litigate the other adversary proceedings and reorganize its estate.  Thus, litigation against Mr. Minor necessarily affects Debtor's estate in bankruptcy.[9]

---

[9] The GA Twin Action also should be stayed under the "First-Filed" rule. <u>Allied-General</u>, 675 F.3d at 611 n.1 (4th Cir. 1982) ("Ordinarily, when multiple suits are filed in different Federal courts upon the same factual issues, the first or prior action is permitted to proceed **to the exclusion** of another subsequently filed.").

Lastly, Debtor is an indispensable party in the GA Twin Action, and proceeding against Mr. Minor alone would prejudice Debtor, as it would necessitate a "second, nearly identical, litigation of the issues at a later date." Dunnam, 2008 WL 200287, at *3.

In sum, given the identity of interest between Mr. Minor and Debtor, the automatic stay should apply with equal force to Mr. Minor because the proceeding against Mr. Minor alone will prejudice Debtor, undermine judicial economy and waste Debtor's scarce resources.

## CONCLUSION

For the foregoing reasons, Minor Family Hotels, LLC and Halsey Minor respectfully request that the Court deny Specialty Finance Group LLC's Motion to Remand.

Respectfully submitted this 20th day of September, 2010.

MINOR FAMILY HOTELS, LLC
HALSEY MINOR


_____/s/ Betty M. Shumener_____
Betty M. Shumener

Betty M. Shumener, *Admitted pro hac vice*
Kurt Ramlo, *Admitted pro hac vice*
DLA PIPER LLP (US)
550 South Hope Street Suite 2300
Los Angeles, California 90071
Telephone:  (213) 330-7700
Fax :  (213) 330-7701

Ryan C. Berry (VSB #67956)
*Application for admission pending*
DLA PIPER LLP (US)
1775 Wiehle Avenue, Suite 400
Reston, VA 20190
Telephone:  (703) 773-4000
Fax:  (703) 773-5000
*Proposed Special Counsel for Defendant and*
*Counterclaimant Minor Family Hotels, LLC, and*
*Counsel for Defendant and Counterclaimant Halsey Minor*